**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOPI TRIBE<br>1 Main Street<br>Kykotsmovi, AZ 86039<br><br>NAVAJO NATION<br>Old BIA Club Building<br>Window Rock, AZ 86515<br><br>UTE INDIAN TRIBE<br>898 S. 7500 E.<br>Fort Duchesne, Utah 84026<br><br>UTE MOUNTAIN UTE TRIBE<br>124 Mike Wash Rd.<br>Towaoc, Colorado 81334<br><br>ZUNI TRIBE<br>1203B State HWY 53<br>Zuni, New Mexico 87327,<br><br>    *Plaintiffs*,<br>  v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue NW<br>Washington, D.C. 20500<br><br>RYAN ZINKE, in his official capacity as Secretary<br>of the Interior<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>BRIAN STEED, in his official capacity as Acting<br>Director of the Bureau of Land Management<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>SONNY PERDUE, in his official capacity as<br>Secretary of Agriculture<br>1400 Independence Avenue SW<br>Washington, D.C. 20250 | Case No. _____ |

TONY TOOKE, in his official capacity as Chief of
the U.S. Forest Service
1400 Independence Avenue SW
Washington, D.C. 20250,

*Defendants.*

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................. 1

**JURISDICTION AND VENUE** ..................................................................................... 4

**PLAINTIFFS** .................................................................................................................... 5

**DEFENDANTS** ................................................................................................................. 5

**BACKGROUND** ............................................................................................................... 7

    I.    THE ANTIQUITIES ACT ...................................................................................... 7

    II.   THE PUSH FOR BEARS EARS AND THE BEARS EARS INTER-TRIBAL COALITION ............... 13

    III.  OVERVIEW OF HISTORIC NATIVE AMERICAN CONNECTIONS TO BEARS EARS ................. 19

    IV.  CONTEMPORARY AND HISTORICAL IMPORTANCE OF BEARS EARS TO HOPI AND ZUNI
PEOPLES ....................................................................................................................... 22

    V.   CONTEMPORARY AND HISTORICAL IMPORTANCE OF BEARS EARS TO THE NAVAJO PEOPLE..
........................................................................................................................... 26

    VI.  CONTEMPORARY AND HISTORICAL IMPORTANCE OF BEARS EARS TO UTE PEOPLES ........ 29

    VII. GENERAL HISTORIC AND SCIENTIFIC IMPORTANCE ......................................... 34

    VIII. THE OBAMA ADMINISTRATION'S EXTENSIVE PUBLIC OUTREACH AND COORDINATION... 35

    IX.  THE PROCLAMATION DESIGNATING BEARS EARS NATIONAL MONUMENT ...................... 36

    X.   PRESIDENT TRUMP'S ATTEMPT TO REVOKE THE NATIONAL MONUMENT AND REPLACE IT
WITH DIFFERENT MONUMENTS .................................................................................... 41

**FIRST CLAIM FOR RELIEF** ..................................................................................... 52

**SECOND CLAIM FOR RELIEF** ................................................................................. 53

**THIRD CLAIM FOR RELIEF** .................................................................................... 54

**FOURTH CLAIM FOR RELIEF** ................................................................................ 55

**PRAYER FOR RELIEF** ................................................................................................ 56

**INTRODUCTION**

1.      This case arises from President Trump's unlawful attempt to revoke and replace a national monument of major historic and scientific importance in violation of the United States Constitution and the Antiquities Act of 1906.  Beginning with Theodore Roosevelt, Presidents have designated more than one hundred monuments throughout our country. However, no President has ever previously sought to abolish one by Proclamation because the Antiquities Act does not authorize the President to do so. In attempting to, in effect, abolish the Bears Ears National Monument ("Bears Ears" or the "Monument"), the President has exceeded the limited authority delegated to his office, and violated the Antiquities Act and the separation of powers established in the Constitution. Further, the President was plainly aware that he lacked the authority to revoke a monument and is thus transparently attempting to evade that strict limitation by purporting to reduce it but, as described herein, the President's action must be viewed as a revocation, particularly with respect to all objects not included in the two "new" monuments.

2.      President Barack Obama, in recognition of the historic trust obligation the United States owes to Native Nations, established Bears Ears by Proclamation on December 28, 2016 (the "Proclamation" or "Bears Ears Proclamation"). Proclamation No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016).  President Obama proclaimed the Monument pursuant to his authority under the Antiquities Act, just as many previous Presidents have established national monuments. *Id.* at 1143.

3.      President Obama's decision to issue the Proclamation came after years of extensive outreach and coordination with Plaintiff Tribes (defined below), state and local officials, and other stakeholders. To ensure that all voices were heard, the Department of Interior

1

and the Department of Agriculture also visited the Bears Ears region and heard directly from all sides regarding the resources at risk and the importance of the area.

4.      Bears Ears has been home to Native peoples since time immemorial, and is still cherished by Native peoples for its cultural, spiritual, and archaeological importance.  Bears Ears contains hundreds of thousands of objects of historic and scientific importance, many traditional cultural properties, and many sacred sites. Plaintiff Tribes in particular continue regularly to use Bears Ears to: collect plants, minerals, objects and water for religious and cultural ceremonies and medicinal purposes; hunt, fish and gather; provide offerings at archaeological sites; and conduct ceremonies on the land. In fact, Bears Ears is so culturally and spiritually significant that some ceremonies use items that can *only* be harvested from Bears Ears. Moreover, some members of Plaintiff Tribes also continue to hold grazing permits and allotments in the area. Bears Ears is in every way a home to Plaintiff Tribes.

5.      Because of its critical contemporary and historical importance, the Bears Ears Inter-Tribal Coalition (the "Coalition"), which consists of the five Plaintiff Tribes, proposed turning the Bears Ears area into a national monument. The Coalition and its allies collected information and advocated for the creation of the Monument.  Plaintiff Tribes have also already begun to assume their responsibilities under the Proclamation as each Tribe has designated a representative to sit on the Bears Ears Commission ("Commission") that is intended to provide guidance and recommendations on the management of Bears Ears. This Commission has already formed and held several meetings to establish its bylaws and begin coordinating with the local Bureau of Land Management and Forest Service offices.

6.      On April 26, 2017, President Trump called for an arbitrary and unprecedented review of national monument designations made since January 1, 1996, where the designation

covers more than 100,000 acres or "where the Secretary determines that the designation or expansion was made without adequate public outreach and coordination with relevant stakeholders[.]"  Exec. Order No. 13792, 82 Fed. Reg. 20429 (Apr. 26, 2017). The review was purportedly to determine whether the designations conform to the objectives of the Antiquities Act. *Id*.

7.     On December 4, 2017, President Trump signed a Proclamation ("Trump Proclamation") purporting to "modify" the Bears Ears National Monument and designate instead two different, smaller units called the Indian Creek unit and the Shash Jáa unit.  In reality, this drastic change is a revocation of Bears Ears and a replacement of it with two new monuments. The Trump Proclamation eliminates specific objects designated for protection in the Bears Ears Proclamation from the two new "units." These two different monuments consist of 201,397 acres combined.  Bears Ears National Monument is 1.35 million acres, and the revocation thus removes federal monument protection from all the objects in over 1.1 million acres. While the Proclamation purports to reduce or modify Bears Ears, this action constitutes a revocation.

8.     The Antiquities Act authorizes Presidents to designate federal public lands, such as Bears Ears, as national monuments to safeguard and preserve landmarks, structures, and objects of historic or scientific importance.  The Antiquities Act, however, does not authorize presidents to rescind or modify national monuments created by their predecessors, and certainly not to revoke and replace them with smaller ones as has been done here. That power is reserved to Congress alone.

9.     President Trump's unprecedented Proclamation revoking Bears Ears and replacing it with two new monuments violated the Antiquities Act, seized an authority that the Constitution

vests in Congress, exceeded the power delegated to the President by Congress, and should be declared unlawful and enjoined to prevent its implementation.

10.     If this unprecedented and unlawful action is allowed to stand, the 129 national monuments across the United States will be at risk.  The historic and cherished national monument system will be destabilized. Congress clearly did not intend for that result.  It enacted the Antiquities Act to preserve America's historic and scientific heritage for the benefit of current and future generations.  Congress reserved to itself the authority to revoke or modify those monuments, and granted the President only the power to create them.

11.     In addition, if this unprecedented and unlawful action is allowed to stand, the Bears Ears area will immediately be subject to the devastating damage of oil and gas drilling, uranium and potash mining, mineral exploration, uncontrolled off-road vehicle use, widespread vandalism and looting, and grave robbing. Furthermore, invaluable archaeological, paleontological and faunal information will be forever lost to science and history.

## JURISDICTION AND VENUE

12.     This action arises under the Antiquities Act, and Articles I, II and IV of the Constitution of the United States. This action also arises under sections 701 through 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  The APA waives Defendants' sovereign immunity in this action. 5 U.S.C. § 702. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

13.     This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

14.     This court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief.  Injunctive relief is also authorized for claims under sections 705 through 706 of the APA.

15.     Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PLAINTIFFS

16.     Plaintiff HOPI TRIBE is a sovereign Indian Tribe, recognized by the United States, with lands located in Arizona. 82 Fed. Reg. 4915, 4916 (Jan. 17, 2017).

17.     Plaintiff NAVAJO NATION is a sovereign Indian Nation, recognized by the United States, with lands located in Utah, Arizona, and New Mexico.  *Id*. at 4917.

18.     Plaintiff UTE INDIAN TRIBE is a sovereign Indian Tribe, recognized by the United States, with lands located in Utah. *Id*. at 4919.

19.     Plaintiff UTE MOUNTAIN UTE TRIBE is a sovereign Indian Tribe, recognized by the United States, with lands located in Utah, Colorado, and New Mexico.  *Id.*

20.     Plaintiff ZUNI TRIBE is a sovereign Indian Tribe, recognized by the United States, with lands located in Arizona and New Mexico. *Id*.

21.     Collectively, Hopi Tribe, Navajo Nation, Ute Indian Tribe, Ute Mountain Ute Tribe, and Zuni Tribe are "Plaintiff Tribes" or "Plaintiffs."

## DEFENDANTS

22.     Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States.  He currently resides and conducts his duties in Washington, D.C.

5

23.     Defendant RYAN ZINKE is sued in his official capacity as the Secretary of the Interior of the United States.  In that capacity, he is responsible for ensuring that the Department of the Interior and its constituent agencies, including the Bureau of Land Management, comply with the Proclamation's direction and requirements regarding the management of Bears Ears. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

24.     Defendant BRIAN STEED is sued in his official capacity as the Acting Director of the Bureau of Land Management within the U.S. Department of the Interior.  In that capacity, he is responsible for ensuring that the Bureau of Land Management complies with the Proclamation's direction and requirements regarding the management of Bears Ears.   The Director of the Bureau of Land Management (and currently, the Acting Director of the Bureau of Land Management) resides and conducts his duties in Washington, D.C.

25.     Defendant SONNY PERDUE is sued in his official capacity as the U.S. Secretary of Agriculture.  In that capacity, he is responsible for ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service, comply with the Proclamation's direction and requirements regarding the management of Bears Ears.   The Secretary of Agriculture resides and conducts his duties in Washington, D.C.

26.     Defendant TONY TOOKE is sued in his official capacity as Chief of the U.S. Forest Service within the U.S. Department of Agriculture.  In that capacity, he is responsible for ensuring that the U.S. Forest Service complies with the Proclamation's direction and requirements regarding the management of Bears Ears.  The Chief of the U.S. Forest Service resides and conducts his duties in Washington, D.C.

27.     Collectively, Donald J. Trump, Ryan Zinke, Brian Steed, Sonny Perdue, and Tony Tooke are "Defendants."

28.     Defendants have the authority, ability, and obligation to remedy the harms alleged to Plaintiff Tribes' interests.

## BACKGROUND

### I.     The Antiquities Act

29.     The U.S. Constitution gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"  U.S. Const. art. IV, § 3, cl. 2. The U.S. Constitution does not vest the President or the Executive Branch with any authority over federal land.

30.     The President and the Executive Branch may therefore only exercise authority over federal land delegated by a statute enacted by Congress.

31.     Congress delegated such authority to the President in the Antiquities Act.

32.     In the late 19th Century and early 20th Century, Congress began to reconsider its policy that had favored disposal of federal lands and began to enact laws to keep public lands in federal ownership.

33.     An early example of this shift was creation of the national forests. The President was authorized to reserve public lands to create forest reserves in the General Revision Act of 1891, which was subsequently amended by the Forest Service Organic Act in 1897.  Among other things, the Forest Service Organic Act also provided that the "President is hereby authorized at any time to modify any Executive order that has been or may hereafter be made establishing any forest reserve, and by such modification may reduce the area or change the boundary lines of such reserve, or may vacate altogether any order creating such reserve." Act of June 4, 1987, 30 Stat. 11, 36.

34.     Representative Lacey of Iowa was chairman of House Committee on Public Lands and introduced the legislation in the U.S. House of Representatives that authorized the President to modify forest reserves. 29 Cong. Rec. 2680 (1897).

35.     At the turn of the twentieth century, pot hunters began collecting artifacts from public lands and threatened noted archeological sites, like those at Chaco Canyon and Mesa Verde, as well as at dozens of other sites. Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 477 (2003). This led to a groundswell of support for legislation to protect public resources.

36.     For example, in 1899, the American Association for the Advancement of Science established the Committee on the Protection and Preservation of Objects of Archeological Interest. Ronald Lee, *The Antiquities Act of 1906* 47 (1970). The committee's purpose was to lobby Congress to draft a bill to protect objects of antiquity.  Between 1900 and 1905, Congress considered numerous bills to safeguard the culture, scientific importance, and history of the American West, ultimately enacting the Antiquities Act in 1906.

37.     One of the earliest of such bills was one proposed by the Department of Interior in 1900, which would have vested the President with broad discretionary authority to reserve public lands as national parks in order to protect "scenic beauty, natural wonders or curiosities, ancient ruins or relics, or other objects of scientific or historic interest, or springs of medicinal or other properties[.]" H.R. 11021, 56th Cong. (1900). The Department's bill would also have subjected unlawful intrusion of such parks to penalties. *Id.* § 6.  Other bills were introduced that same year that would have provided the President with varying degrees of authority to reserve public lands to protect antiquities.  *E.g.*, H.R. 10451, 56th Cong. (1900); H.R. 9245, 56th Cong. (1900).

38.     In 1904, Congress again considered legislation to protect antiquities.  H.R. 13349 provided that the Secretary of Interior would maintain custody of antiquities on public lands. H.R. 13349, 58th Cong. (1904).  The bill also charged the Secretary with recommending to Congress areas to be set aside as national reservations and, pending action by Congress to reserve identified lands, to appoint custodians to take protective measures.  *Id.*

39.     That same year, the Senate considered S. 4127, a bill drafted by the Smithsonian Institution, that would have authorized the President to issue proclamations to set apart and reserve from sale, settlement, or occupancy public lands on which were located aboriginal monuments, ruins, and other antiquities that the President believed of sufficient public interest to warrant preservation. S. 4127, 58th Cong. (1904); Robert Claus, *Reference Service Report: Information About the Background of the Antiquities Act of 1906* 6-7 (1945).

40.     The Commissioner of the General Land Office reviewed those and other related bills and expressed the view that the President should be given broad power to reserve and set apart as national parks public lands because of scenic beauty, natural wonders, ancient ruins and relics, or other objects of scientific or historic interest, or springs of medicinal or other properties. Claus*, supra,* at 7.

41.     Later that year, Edgar Lee Hewett, a leading expert on ruins in the Southwest, was commissioned to write a report on the archeological ruins in the Southwest.  H.R. Rep. No. 58-3704, at 2 (1904). Hewett's report called for permanent protection of some sites and temporary protection of others. *Id.* at 6.

42.     In 1905, the American Anthropological Association appointed Edgar Lee Hewett as secretary of a committee charged with preparing draft legislation to protect antiquities. Scott Y. Nishimoto, *President Clinton's Designation of the Grand Canyon-Parashant National*

*Monument: Using Statutory Interpretation Models to Determine the Proper Application of the Antiquities Act*, 17 J. Envtl. L. & Litig. 51, 59 (2002). Hewett drafted a bill that represented a compromise among the approaches taken by the various competing bills.

43.     On January 9, 1906, Representative Lacey of Iowa introduced Hewett's bill as H.R. 11016, which would become the Antiquities Act. 40 Cong. Rec. 843, at 883 (1906); H.R. 11016, 59th Cong. (1906).

44.     Unlike some earlier bills, H.R. 11016 authorized the president to declare monuments to protect more than just objects of historic or prehistoric value, but also to include "other objects of historic or scientific interest." Lee, *supra*, at 74. Such inclusion accounted for the Department of Interior's request for legislation to authorize preservation of "scenic beauties and natural wonders and curiosities, by Executive Proclamation." *Id.* at 52. Unlike the Forest Service Organic Act, the Antiquities Act did not provide the President with authority to modify or revoke reservations once established by proclamation.

45.     On June 8, 1906, President Theodore Roosevelt signed the Antiquities Act of 1906 into law. 40 Cong. Rec. 8042 (1906); 54 U.S.C. §§ 320301-320303; *see generally* Nishimoto, *supra*, at 60.

46.     The Antiquities Act provides that "[t]he President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a).   It further authorizes the President to "reserve parcels of land as a part of the national monuments" that comprise the smallest area "compatible with the proper care and management of the objects to be protected." *Id*. § 320301(b).

10

47.     Pursuant to Congress' express delegation of authority in the Antiquities Act, Presidents have reserved over 150 national monuments, ranging from the Grand Canyon in Arizona, to the Statue of Liberty in New York, to Glacier Bay in Alaska.  In many instances, lands that were initially protected as national monuments became, pursuant to subsequent Congressional action, some of America's most popular national parks, including Zion National Park, Acadia National Park, and Grand Teton National Park.  The Antiquities Act is a cornerstone of America's world-renowned system of federal conservation lands.

48.     Through the Antiquities Act, Congress granted the President authority to protect "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" on federal lands. *Id.* § 320301(a).  As a result, the Act vests the President with broad "discretion" to "*declare* . . . national monuments" and "*reserve* parcels of land as a part of the national monuments."  *Id.* § 320301(a)-(b) (emphases added).  However, Congress did not authorize the President to *revoke* or *abolish* national monuments, nor did it authorize the President to *modify* or *diminish* national monuments.

49.     Until now, no President in the Antiquities Act's 111-year history has ever purported to revoke or significantly modify a national monument and replace it with different, and much smaller, "units."  Indeed, the official position of the Executive Branch has been that Presidents lack such authority.  That position has been articulated in formal legal opinions, including a 1938 Attorney General's Opinion authored by Attorney General Homer Cummings. *See* Proposed Abolishment of Castle Pinckey Nat'l Monument, 39 Op. Att'y Gen. 185 (1938).

50.     Congress confirmed that the President has no authority, implied or otherwise, to revoke or modify national monuments once they have been established when it enacted the Federal Land Policy and Management Act of 1976 ("FLPMA"). 43 U.S.C. § 1714(j).

11

51.     The House Committee Report on FLPMA states that FLPMA "would also specifically reserve to the Congress the authority to modify and revoke withdrawals for national monuments created under the Antiquities Act." H.R. Rep. No. 94-1163, at 9 (1976).

52.     This understanding was reaffirmed by the United States in a brief before the United States Supreme Court as recently as 2004. Reply Brief for the United States in Response to Exceptions of the State of Alaska at 32 n.20, Alaska v. United States, 545 U.S. 75 (2005) (No. 128, Orig.) ("Congress intended that national monuments would be permanent; they can be abolished only by Act of Congress."). Indeed, at oral argument in that case, which addressed Alaska's claim for submerged lands within the boundary of Glacier Bay National Park (formerly a national monument), an assistant solicitor general explained to the Court that "under the Antiquities Act, the President is given authority to create national monuments, but they cannot be disestablished except by act of Congress. Now, Congress could have disestablished this monument . . . It could have disestablished some part of it, and it chose not to do so." Oral Argument at 46.

53.     Congress recently confirmed its understanding that the President lacks authority to modify or revoke national monuments with the National Monument Creation and Protection Act. H.R. 3990, 115th Cong. § 2(j) (2017).  The bill would authorize the President to reduce the size of national monuments.  *Id.*

54.     National monument designations confer enhanced protection for the historic landmarks, historic and prehistoric structures, and objects of scientific and historic interest within their boundaries.  54 U.S.C. § 320301(a). For example, under the Antiquities Act, only a narrow category of persons may be authorized to remove features of a monument.  54 U.S.C. § 320302(a) (authorizing "properly qualified" institutions).  The implementing regulations likewise

12

require that once any permitted excavation is complete, the affected lands must be restored to their "customary condition."  43 C.F.R. § 3.11.  The regulations also authorize the arrest of any unauthorized persons who seek to "appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity[.]"  *Id.* § 3.15.

## II.    The Push for Bears Ears and the Bears Ears Inter-Tribal Coalition

55.    The push for Bears Ears accelerated in 2010 with the creation of the grassroots non-profit organization, Utah Diné Bikéyah ("UDB"). UDB was formed with a primary objective of protecting Bears Ears. The formation of UDB was an important step on the road to the Bears Ears National Monument. People were already discussing the possibility of creating a wilderness area, national park, national monument, or other appropriate classification. UDB defined its goal as establishing the proper boundaries—defined scientifically, culturally, and historically—necessary to protect the Bears Ears homeland.

56.    To achieve its goal, UDB began a process to culturally map the Bears Ears region. *See generally* Bears Ears Inter-Tribal Coal., *Protecting the Whole Bears Ears Landscape: A Call to Honor the Full Cultural and Ecological Boundaries* (2016). More than seventy cultural interviews were conducted by a Navajo traditionalist fluent in English and the Diné languages. The resulting ethnographic data was captured and organized on a fine scale. Maps were then prepared using that information to show why Bears Ears should be set aside as a cultural, historical, and scientific landscape.

57.    This ethnographic mapping process benefited from Traditional Knowledge, which is increasingly recognized by western sciences and scholarship and used by federal agencies in land management and planning. Traditional Knowledge is derived from keen observation carried out and passed down over hundreds or thousands of years. It represents another way of knowing

the social and ecological landscape. It is invaluable to scientists in places where it remains intact—places such as Bears Ears. The Presidential Proclamation rightly refers to Traditional Knowledge several times and emphasizes its critical place in future land management at the Bears Ears National Monument.

58.    This intensive work began in 2010 and continued for several years. UDB's work shows that the Bears Ears landscape is one discrete unit, bound together in numerous ways, and it blends perfectly with other protected lands around it.

59.    UDB released its Bears Ears proposal in April 2013. The Proposal called for a 1.9 million acre protected area that could be designated as a national monument, wilderness area, national recreation area, or other classification under federal law.

60.    In 2013, the Utah Congressional delegation was also developing the so-called Public Lands Initiative ("PLI"). This was an initiative, led by Congressmen Rob Bishop and Jason Chaffetz, with the professed goal of reaching a consensus agreement among all stakeholders over the public lands of Eastern and Southern Utah, an area of great cultural value, beauty, and mineral potential. The general idea was that an agreement would lead to congressional legislation putting some federal lands in wilderness and other protected status and allowing multiple-use development to proceed on most of the other lands. The Tribes wanted to develop an agreement through the PLI process, but also wanted to ensure that Bears Ears was properly protected. As a result, the Tribes analyzed the options of PLI and national monument status, among others.

61.    The Tribes were very apprehensive about the PLI process. Up to that time, the Utah leaders had never taken the Tribes or their proposal seriously. This was in spite of the fact that the Tribes worked tirelessly on the PLI process, putting in as much or more effort than any

14

party involved in the process. The Tribes made at least 25 presentations at PLI meetings, complete with maps, a two-page summary of the UDB proposal (the precursor to the later and more comprehensive Coalition Proposal), and substantial oral presentations.

62.     Congressional staff were present at approximately a dozen of these meetings. The Tribes also made four separate trips to Washington, D.C. to meet with the Utah delegation; at each of those meetings, the Tribes made extensive statements complete with maps and a summary of the Proposal. At all of these meetings, both in the field and in Washington, D.C., the Tribes asked for comments on their proposal. It was to no avail.

63.     In spite of the Tribes' extensive and unwavering efforts, in no instance did anyone from the Utah delegation or the PLI make a single substantive comment, positively or negatively, on the Tribes' proposal. Although the proponents of the PLI described the process as "open" and "ground-up," PLI leaders said that they were relying heavily on the San Juan County Commission. Indeed, the Tribes were told to present their proposal *to* the San Juan County Commission.

64.     As part of the PLI process, the San Juan County Commission conducted a public comment survey on PLI in 2014 to gauge support for various land use proposals for Bears Ears. The UDB proposal was initially identified as "Alternative D" and the County Commission staff agreed to include Alternative D in the list of alternatives on the survey. Then, the staff broke that promise and refused to include Alternative D on the list for the formal comment process.

65.     Supporters of Alternative D (Bears Ears) waged a write-in campaign. Despite being omitted from the list, the Bears Ears proposal received 300 positive comments, 64% of the 467 total comments received in the County. The Commission then completely rejected the results of its own survey and selected the heavy-development, low conservation "Alternative B" to

become the basis for the PLI. Alternative B received just two comments, or one half of 1% of the total.

66.     Despite the extraordinary unfairness of this proceeding, at no time has the San Juan County Commission, the PLI, or the Utah delegation ever seen fit to acknowledge it, much less apologize and disown it.  The Native American citizens of Utah, who comprise roughly half the population of San Juan County (the "County"), deserve better representation.

67.     As a result, in 2015 Tribal leaders from the Hopi Tribe, Navajo Nation, Ute Indian Tribe, Ute Mountain Ute Tribe, and Zuni Tribe created the Bears Ears Inter-Tribal Coalition (the "Coalition").   Bears Ears Inter-Tribal Coal., *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* 18 (Oct. 15, 2015), http://www.bearsearscoalition.org/wp-content/uploads/2015/10/Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf (the "Bears Ears Proposal"). The Coalition sought to protect and preserve the homeland area that Plaintiffs all care so deeply about by urging the President to exercise the powers delegated to him under the Antiquities Act.  *Id.*  All of the Plaintiff Tribes passed resolutions in support of the Coalition detailing the importance of Bears Ears. *Id.*

68.     The newly-formed Coalition created the Bears Ears Proposal, a comprehensive proposal for a Bears Ears National Monument that they submitted to President Obama on October 15, 2015.  *Id.* at 19.  Submission by this date would allow the President ample time to consider, and hopefully sign, a proclamation under the Antiquities Act, before the end of his term. This would also allow time for the PLI sponsors, Congressmen Rob Bishop and Jason Chaffetz, to review the Tribal proposal and include all or part of it in their proposed legislation, if so inclined.

69.     The Bears Ears Proposal called for 1.9 million acres of ancestral land within Bears Ears to be protected (but President Obama's Proclamation ultimately included 1.35 million acres).  *Id.* at 20. On October 18, 2016, the Coalition submitted a supplemental report calling on President Obama to protect the entire landscape as proposed by the Coalition. *See generally Protecting the Whole Bears Ears Landscape*, *supra*. The supplemental report detailed the importance of the various regions within Bears Ears and why the entire 1.9 million acres should be protected. *Id.*

70.     Below is a map the Coalition included in its proposal. Bears Ears Proposal, *supra*, at 6.  The map depicts a larger area than the final monument because the President ultimately chose a smaller area than Plaintiffs requested.



71.     Below is the final Bears Ears boundary map, from the Bureau of Land Management. Proclamation at 1147; *see also*, *Bears Ears Nat'l Monument Map*, Bureau of Land Mgmt. (Dec. 28, 2016), https://www.blm.gov/programs/national-conservation-lands/national-monuments/utah/bears-ears/map (Bears Ears boundary map reproduced here in color).



72.     Because the Bears Ears Monument is a product of Plaintiffs' own history, efforts, and advocacy, the current President's repudiation of it will cause direct, immediate, and irreparable harm to Plaintiffs and their tribal members.

18

**III.     Overview of Historic Native American Connections to Bears Ears**

73.       "Rising from the center of the southeastern Utah landscape and visible from every direction are twin buttes so distinctive that in each of the native languages of the region their name is the same: Hoon'Naqvut, Shash Jáa, Kwiyagatu Nukavachi, Ansh An Lashokdiwe, or 'Bears Ears.'" Proclamation at 1139. Below is a picture of the Bears Ears formation.



74.       Many Native Americans and Native Nations, including Plaintiffs and their members, have profound historic, cultural, and spiritual ties to Bears Ears and the more than 100,000 historic landmarks, structures, and historic and scientific objects located within Bears Ears.   Bears Ears Proposal, *supra*, at 9; Bureau of Land Mgmt., BLM-UT-PL07-0074-1610, *Draft Resource Management Plan and Environmental Impact Statement* 3-9-3-20 (2007) (the "BLM EIS"); *see also* Robert S. McPherson, *A History of San Juan County: In the Palm of Time* (1995).

19

75.    Plaintiffs trace their ancestry back millennia to the ancient peoples who have populated the region since time immemorial.  Their presence is manifested in the migration routes, ancient roads, great houses, villages, granaries, hogans, wikiups, sweat lodges, corrals, tipi rings, shade houses, pueblos, kivas, rock paintings, petroglyphs, pictographs, and cliff dwellings that continue to dominate the Bears Ears landscape today.   *Native American Connections*, Bears Ears Inter-Tribal Coal., http://bearsearscoalition.org/proposal-overview/ancestral-and-modern-day-land-users/   (last visited Dec. 4, 2017).  These historic markers connect Plaintiffs to their ancestors, who lived, hunted, gathered, prayed and built communities on these lands.  *Id.*  Today, Plaintiffs continue these activities and, with the protections of a national monument, hope to do so into the future.

76.    Below is a map depicting the region as it appears to the Native eye, and it shows even today how close Plaintiffs' reservations are to one another and to Bears Ears itself:



20

77.     For millennia, Plaintiffs' ancestors lived in Southeastern Utah and the Four Corners area, including within Bears Ears. Most of the Ancient Puebloans who populated the region moved to other lands to the south and east beginning approximately seven hundred years ago.  Bears Ears Proposal, *supra*, at 9. However, Native people today, including Plaintiff Tribes, continue to use the Bears Ears area and view it as part of their ancestral and modern homeland. *Id.*

78.     "Cedar Mesa is a part of our footprints, a path that tells a story. History is crucial to man because it tells us of who we are.  Those who lived before us have never left.  Their voices are part of the rhythm or heartbeat of the universe and will echo through eternity."  *Id*. at 10 (quoting Alfred Lomahquahu, Hopi).

79.     "The importance of Bears Ears for our people is through our ancestral sites that were left behind eons ago by our ancestors.  They documented the sites by using oral history, pictographs, and by leaving their belongings.  When we visit Bears Ears, we connect with our migration history immediately without doubt."  *Id*. (quoting Phillip Vicenti, Zuni).

80.     Native American connections to Bears Ears are not just about protecting the past. Plaintiffs and their members still regularly visit the area to hunt, collect herbs and medicines, perform or attend ceremonies, and connect with their ancestors.

81.     The depth of the connection that many Native people have to Bears Ears is highly sensitive and it is considered inappropriate to write down much of this important cultural information.  *E.g.*, BLM EIS, *supra*, at 13-14–3-16, 3-18–3-20 (briefly explaining the Tribes' historical, cultural and spiritual connection to the Bears Ears area).  But the Native perspective on the historic and cultural importance of this area is critical to understanding why the objects and geographical features within Bears Ears deserve the protection of a national monument.

21

**IV.      Contemporary and Historical Importance of Bears Ears to Hopi and Zuni Peoples**

82.      The Zuni Tribe is historically, culturally, and spiritually tied to the Bears Ears region because the region "holds immense importance for all Pueblo people'[s] identity and history." Zuni Tribal Council, Permanent Protection of Bears Ears Region through National Monument Designation, Res. No. M70-2016-P014, at 1 (Mar. 7, 2016), http://www.bearsearscoalition.org/wp-content/uploads/2016/03/M70-2016-P014-Bears-Ears-Designation-7MAR2016.pdf. Just as with the Hopi, described below, the "villages, shrines, burials, rock inscriptions, dwellings, and ancient transportation routes" are immensely important to the Zuni Tribe's identity and history, and the natural resources located within Bears Ears are still "necessary for traditional and spiritual practice." *Id.*

83.      The well maintained kivas from the *Hisatsinom* - the People of Long Ago - exemplify the important cultural and spiritual connection that specific objects within Bears Ears provide to the Hopi and Zuni, among others. *See* BLM EIS, *supra*, at 3-15, 3-84.  Ancestral kivas, like those of today, were entered by a ladder stretching from the roof down to the center of the floor.  *See The Museum Collections of Chaco Culture: Kivas*, National Park Service, https://www.nps.gov/museum/exhibits/chcu/slideshow/kivas/kivasintro.html (last visited Dec. 4, 2017).  Below is a picture of a kiva in the Cedar Mesa region of Bears Ears. *Bears Ears Monument Timeline*, Durango Herald (Dec. 28, 2016), https://durangoherald.com/articles/124458-bears-ears-monument-timeline?wallit_nosession=1.



84.     Kivas are still used in Pueblo ceremonies today. *See The Museum Collections of Chaco Culture*, *supra*. During ceremonies, "the ritual emergence of participants from the kiva into the plaza above represents the original emergence by Puebloan groups from the underworld into the current world." *Id.* Thus, maintaining and preserving the ancestral kivas in Bears Ears is of utmost importance to the Hopi and Zuni, as well as other descendants of the Ancestral Puebloans.

85.     As one Zuni elder explains, "[t]he cultural resources here, the petroglyphs, the structures, all of this, is evidence of the Native people who lived in and passed through the Bears Ears.  It provides a link to our ancestors, from long ago.  This cultural information is important for all Native people." *Bears Ears: A Native Perspective on America's Most Significant Unprotected Cultural Landscape*, Bears Ears Inter-Tribal Coalition 7 (2016), http://www.bearsearscoalition.org/wp-content/uploads/2016/03/Bears-Ears-bro.sm_.pdf (quoting Octavius Seowtewa, Zuni Elder).

86.     The Zuni still regularly go to Bears Ears to gather items for use in ceremonies. They collect plants and minerals from Cedar Mesa, Indian Creek, and other areas. They also collect spring water there, for they view water as similar to the blood of their mother, and they believe that being able to harvest that water and bring it to the Zuni people ensures that there will be water in the future. When collecting items and water, the Zuni always offer prayers and do not take more than they need.

87.     The Hopi and Zuni, who are among the descendants of the Ancestral Puebloans described above, maintain traditional knowledge about these places that is critical to understanding them. *Protecting the Whole Bears Ears Landscape*, *supra*, at 23. By approximately 2100 years ago, these Ancestral Puebloans had established settlements that would be their homes for many generations. Numerous cliff dwellings and other ancient sites are still found within the Bears Ears region.

88.     Within Bears Ears, Comb Ridge and Cedar Mesa typify the Ancestral Puebloan connection to the area and contain "some of the most precious stores of prehistoric structures in the world." *Protecting the Whole Bears Ears Landscape*, *supra*, at 22. Comb Ridge hosts "side-canyons rich with the ancient structures and art of the Ancestral Puebloans" as well as a dense collection of intact Ancestral Puebloan dwellings. *Id.* Cedar Mesa possesses an archaeological site dating from the last ice age nearly 12,000 years ago and is "the best example of a site dating to this period in the state and region." *Id.* at 22-23.

89.     A prolonged drought sometime during the 1200's, however, forced the Ancient Puebloans to spread out in all directions from the Bears Ears Region. BLM EIS, *supra*, at 3-15. Some descendants of the Ancestral Puebloans eventually settled in northeastern Arizona, where Hopi clans live to this day. *Id*. Oral traditions of the Hopi recount that ancestral Hopi clans

24

migrated through and settled on lands in southern Utah and the Southwest during their long migration to their current location. Hopi Tribal Council, Approval to Support Proposal for a Presidential Proclamation Designating Bears Ears National Monument, Res. No. H-035-2016, at 3 (Mar. 25, 2016), http://www.bearsearscoalition.org/wp-content/uploads/2016/03/042-2016-Memo-Approval-to-support-proposal-for-a-presidential-proclamation-designating-Bears-Ears-National-Monument.pdf (the "Hopi Resolution"); BLM EIS, *supra*, at 3-15. To the Hopi, these ancestors were the *Hisatsinom* - the People of Long Ago. Hopi Resolution, *supra*, at 3; BLM EIS, supra, at 3-15; Bears Ears Proposal, *supra*, at 35-36.

90.     The Pueblo of Zuni settled in the western part of central New Mexico around 700 to 800 A.D. *See* BLM EIS, *supra*, at 3-15.  The Zuni still reside in western New Mexico to this day. *Id.* The Pueblo of Zuni claims stewardship over all lands upon which their ancestors "hunted, collected materials such as plants and minerals, or traveled regularly to trade." *Id.* Like the Hopi, the Zuni consider all Ancestral Puebloan sites within Bears Ears places of traditional importance. *Id.*

91.     Because the Hopi and Zuni trace their origins to the Bears Ears region, their cultural affiliation with the objects found there and the people that created them is longstanding and still very much alive.  *Id.* (describing "habitation sites, pictograph sites, and petroglyph sites").

92.     The Ancestral Puebloans' migration is intimately associated with the Hopi and Zuni covenant to protect the Earth that is still honored today. *See* Hopi Resolution, *supra.* The Hopi view the objects that their ancestors left behind in and around Bears Ears – "ancient villages, sacred springs, migration routes, pilgrimage trails, artifacts, petroglyphs, and the physical remains of buried *Hisatsinom*" – as footprints testifying of continual Hopi land

25

stewardship. *Id*. at 3. To the Hopi, the ancestors intentionally left these objects behind "to mark the land as proof that the Hopi have fulfilled their Covenant [to protect the land]" and as proof that "the Hopi ancestors buried in the area continue to inhabit the land." *Id.*

93.     These objects, the terrain, and the clouds together create a physical landscape that nourishes and sustains modern Hopi and Pueblo identity, "maintained through oral traditions, songs, ceremonial dances, pilgrimages, and stewardship." *Id.* The Bears Ears landscape "situates the Hopi people in time and space, providing a geographical conception of history and religion that connects the past, present and future."  *Id.*

94.     It has been said that you cannot go an eighth of a mile without encountering another important scientific or historic object within Bears Ears.

## V.     Contemporary and Historical Importance of Bears Ears to the Navajo People

95.     Plaintiff Navajo Nation is the largest Indian Nation in the United States with a population of over 300,000 citizens. Its jurisdiction spans a land base of over 27,000 square miles in the states of Arizona, New Mexico, and Utah. All 1.3 million acres of Navajo Nation lands located in Utah fall entirely within the County; these lands constitute 20 percent of the County's land base and the almost 7,000 Navajo citizens living there make up roughly half of the County's population. Bears Ears lies immediately north of the Nation.

96.     The lands protected by the Monument hold special cultural and historical significance for the Navajo people, who believe that the towering spires in the Valley of the Gods are ancient Navajo warriors frozen in stone, and that the Bears Ears peaks are the top of the dismembered head of a bear that stands guard to culturally important Changing Bear Woman. Many traditional Navajo ceremonies, practiced since time immemorial, continue to take place in the Monument, and draw on plants, soils, and other items that can only be harvested from the

26

Monument.  For example, certain soils from the Bears Ears region possess special protection and empowering qualities when harvested and administered in the proper way.  The Bears Ears landscape also has seminal importance in Navajo songs, prayers, and healing ceremonies that have unique and close ties to the Bears Ears region, its flora and fauna, and its historical and spiritual qualities, including the *Anaaji* (Enemy Way), the *Dine'ee* (Wild Game Way), the *Dzilk'iji* (Mountain Top Way), and the *Hozhooji* (Blessingway), which seeks to restore and revitalize *hózhǫ́* (harmony, beauty, and balance) for the individual for whom the ceremony is performed.

97.     In addition to its current spiritual significance, Bears Ears has great historical significance to the Navajo people. The White Canyon region, known as "*Nahoniti'ino*" (hiding place) to the Navajo people, is revered because it was a place of refuge in the summer of 1864, when Colonel Kit Carson marched over 9,000 Navajos at gunpoint 350 miles to Fort Sumner in east central New Mexico as part of his scorched earth campaign against the Navajo. Hundreds of Navajos died of hunger, exhaustion, or abuse along the journey.  Those who survived were held as prisoners of war at Bosque Redondo until 1868 when Navajo leaders negotiated the release and return of their people to their homelands pursuant to a treaty. Many Navajos escaped this removal by hiding in what is now the Monument. Bears Ears is also home to important figures in Navajo history, including Headman *K'aayélii* (who was born near the twin Bears Ears buttes), whose band eluded capture from the U.S. army by hiding in the canyons of the Monument, and Navajo Chief Manuelito (born in the Headwaters Region of Bears Ears, north of Cedar Mesa), a key figure in the resistance against the Long Walk and signatory to the Treaty of 1868.

98.     Navajo ties to the region extend from "pre-historic" times to the present. Ethnographic studies and oral traditions describe the Navajo ethno-genesis as an assimilation of

various ethnic groups, including the Anasazi and Puebloan peoples from Canyon de Chelly, who the Navajo acknowledge as their relatives by referring to them as *Nihinaazází'* (the ancestors who lived around us). Today the Navajo people continue to make offerings and prayers to these relatives in the Bears Ears region.  Until recently, the Navajo people resided in areas now within the Monument's boundaries. They lived there in hogans (traditional homes made out of wooden logs, tree bark and mud, the doorway of which always faces east to allow for greeting of the rising sun, or Father Sun, a revered deity who provides good blessings) and wikiups, herded sheep, and hunted on the land. They also foraged, created rock art, and buried ancestors there. Many hogans remain in the region today, standing as a tribute to the deep cultural and historical ties the Navajo people retain to the Monument lands.



LaVerne Tate #40
Hogan in Upper Cottonwood, July 2002
Bernal Bradford   photo

99.      Indeed, Navajo people continue to make extensive use of the Monument lands. For example, they camp there and continue to hunt for wild game—including elk, mule deer,

wild turkeys, and rabbits—as they have done since time immemorial. Other Navajo people access the Monument lands to forage for native plants such as piñon nuts, wild potatoes, wild onions, spinach, turnips, and sumac berries. Navajo people also continue to gather firewood, grasses for traditional basket-weaving, and logs for traditional structures. Navajo medicine people also continue to harvest soils and medicinal plants such as sage, juniper and mountain tobacco, all of which are all important in numerous Navajo ceremonial practices.

100.    As a people whose culture is derived from a deep connection to the Monument lands, and to the animals that share that land, the Navajo people have remained dedicated participants in the creation of the Monument. The Navajo citizens group Utah Diné Bikéyah spent six and a half years researching and analyzing the specific lands in the region to identify the lands with the strongest cultural ties to the Navajo and other Coalition tribes. *Protecting the Whole Bears Ears Landscape*, *supra*, at 2, 10. Their ethnographic research and data analysis was used by the Coalition in making its recommendation for a monument designation to the President. This research demonstrates that all lands within the Monument boundary are necessary for the proper care and management of important cultural and historic resources. The Navajo people have a demonstrated, enduring, and strong interest in the preservation of the Monument as designated by President Obama because this specific designation provides significant protection for the preservation of Navajo culture and traditions into the future.

## VI.    Contemporary and Historical Importance of Bears Ears to Ute Peoples

101.    The Ute also have deep ties to Bears Ears.  The aboriginal territory of the Ute covered an extensive area of land in what are now the states of Colorado, Utah, New Mexico, and Arizona.  BLM EIS, *supra*, at 3-14. This included much of Bears Ears. *Id.*; *see also*

McPherson, *supra*, at 50-53. The map below represents the original Ute domain. *See* Fred A.

Conetah, *A History of the Northern Ute People* (1982).



LANDS OF THE UTE PEOPLE

102.    Many of the current Ute Tribes have a connection to Bears Ears. The Weeminuche

band in particular occupied the San Juan River Valley, parts of northwestern New Mexico, and

southeastern Utah. Charles S. Marsh, *People of the Shining Mountains: The Utes of Colorado*

19-20 (1982).   The Weeminuche comprise most of the present members of Plaintiff Ute

Mountain Ute Tribe.  *Id*. at 20.

103.    Utes place religious and traditional importance on many areas in Bears Ears,

including: "Water Canyon or River-Flowing-From the Sunrise (San Juan River), Sagebrush

Canyon or Crows Canyon (Montezuma Canyon), Slick Rock Mound (Comb Ridge), [and] Two Rocks Canyon (Cow Canyon)," among others.  BLM EIS, *supra*, at 3-14.

104.    Historically and to this day, the Ute Bear Dance, which is a spring ceremony symbolic of nature's awakening, is performed in many areas in and around Bears Ears.  BLM EIS, *supra*, at 3-17. Utes derive traditional knowledge from certain petroglyph panels within Bears Ears for their Bear Dances, thus necessitating the protection of those petroglyphs.  *Id*. at 3-19.

105.    "Native People relate to rock art with our hearts. I regularly visit one rock art site that is a holy site. It provides us knowledge of our past and future.  We do not view these panels as just art, but almost like a coded message that exists to help us understand. This knowledge informs our life and reality as humans."  *A Native Perspective*, *supra*, at 9 (quoting Malcolm Lehi, former Ute Mountain Ute Council Member).  Below are pictures of rock art within Bears Ears.





106.   The Ute still use the Bears Ears area for hunting and fishing and to gather materials for medicinal, spiritual, and other uses. They also value the region's preservation of sacred places and the economic development it provides. Tri-Ute Council, Support for Presidential Designation of the Bears Ears National Monument to Protect Cultural, Historical, and Natural Resources on Federal Lands in San Juan County, UT, Joint Inter-Tribal Resolution No. 16-001, at 1 (June 14, 2016),     http://www.bearsearscoalition.org/wp-content/uploads/2016/06/TriUteReso6132016-1.pdf.

107.   The Ute people still call the Headwaters region of the Bears Ears National Monument home. *Protecting the Whole Bears Ears Landscape*, *supra*, at 21.  They hold public lands grazing permits and allotment lands there, and use the lands to commune with their ancestors. *Id.*

108.   Ute locations within the Headwaters region such as "Arch Canyon, Hammond Canyon, Allen Canyon, Dark Canyon, and Elk Ridge are revered for the important role they have played in shaping Ute culture in the past and for their importance to future generations." *Id*. The Headwaters region is "central to provisioning, sustaining, and perpetuating human lives and

32

culture." *Id.* "For these reasons, the Headwaters house the shreds and patches of past lives that preserve the knowledge of those who lived before." *Id.* "Archaeological sites are abundant and significant numbers [are located] in all environmental zones of the Headwaters region." *Id.*

109.    Ute people also still frequent the area to collect herbs and medicine, forage for food, gather firewood for heating and ceremonial use, and to hunt game. *Native American Connections*, *supra*.

110.    The Utes also have several treaties with the United States, the first of which was entered into in 1849.  It was a peace treaty signed between the United States and the Utes at Abiquiu, New Mexico. *History of the Southern Ute*, Southern Ute Tribe, https://www.southernute-nsn.gov/history/ (last visited Dec. 4, 2017); Marsh, *supra*, at 43.  The treaty acknowledged that the Utes were under the "protection and guardianship" of the United States, recognizing the important government-to-government relationship and the solemn trust obligation of the United States.

111.    In 1868, the Utes entered into another treaty. Marsh, *supra*, at 67-68.  While the Utes ceded other lands in this treaty, including portions of Utah and Bears Ears, they reserved most of western Colorado and parts of northeastern Utah (Uintah and Ouray reservation).   *Id.* The Weeminuche (Ute Mountain Ute), who had resided in southeastern Utah, vehemently objected to being pushed into Colorado.  *Id.* at 68.  Many eventually moved to Colorado, but some remained in southern Utah, *id.*, and the Ute Mountain Ute now have reservation land in Utah near Bears Ears.  *See* Bureau of Indian Affairs, *Ute Mountain Indian Ute Reservation* 1, https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ieed/ieed/pdf/idc1-022550.pdf   (last   visited Dec. 4, 2017) (describing Ute Mountain Ute Reservation).

112.    The Weeminuche eventually relocated on a dry piece of arid land now known as Towaoc in southwestern Colorado where the Ute Mountain Ute tribal headquarters is located today.    *Id.*; *see also Ute Mountain Ute Tribe*, Colo. Comm'n of Indian Affairs, https://www.colorado.gov/pacific/ccia/ute-mountain-ute-tribe (last visited Dec. 4, 2017).

### VII. General Historic and Scientific Importance

113.    In addition to its incomparable value to Plaintiff Tribes, Bears Ears is also incredibly valuable for historic and scientific study. As a coalition of paleontologists explained in a letter to the President in October 2016, the landscape's fossil-bearing rocks offer "an unparalleled record of ancient seas that covered the continent, the rise of vertebrate life on land, the ascendency of the dinosaurs, and even the remains of Ice Age animals who once roamed the high plateaus and deep canyons that make the landscape of the Bears Ears area so visually stunning today."  Letter from 40+ Paleontologists on Bears Ears Support to President Obama, 1 (Oct. 31, 2016), http://utahdinebikeyah.org/wp-content/uploads/2016/11/UDB_PaleontologistLetter_11-7-16.pdf.    The landscape's many canyons and exposed layers of sedimentary rock offer geologists a view of our continent that stretches back millions of years. *Id.* at 1-2.

114.    Bears Ears is also extremely valuable to the field of archaeology as there are more than 100,000 archeological sites within Bears Ears.  *Archaeologists Push for Bears Ears National Monument*, Crow Canyon Archaeological Ctr. , http://www.crowcanyon.org/e-newsletter/2016/June/2016_June_Bears_Ears.html (last visited Dec. 4, 2017).

115.    The Bears Ears National Monument is also home to unique flora and fauna found nowhere else in the world.  Proclamation, *supra*, at 1141-43.  It is also rich in a diverse range of

34

other wildlife, including bighorn sheep, mule deer, elk, mountain lion, bear, bobcats, foxes, eagles, birds, bats, and lizards. *Id* at 1139.

### VIII. The Obama Administration's Extensive Public Outreach and Coordination

116.    The Obama Administration put in an inordinate amount of time and expertise in conducting research, reaching out to the public, and developing its position on Bears Ears. From top to bottom, the administration developed and analyzed a tremendous amount of scientific, historical, economic, cultural, and legal material.

117.    The Obama Administration welcomed and received the views of the public. The Antiquities Act does not require any specific procedures, other than the issuance of a proclamation by the President. But President Obama directed that this be an open process. The administration received all manner of written opinions by letters and email. Meetings were arranged with countless organizations and individuals. Utah public officials, for example, had ongoing meetings and communications with the President, high White House officials, the two secretaries, heads of agencies, and career staff. As late as December 21, 2016, just one week before the Proclamation was signed, the Governor of Utah's office complimented the staff to the Department of the Interior on the time and attention that they devoted to this issue. Memorandum from Democratic Staff on refuting Republican Claims that Obama Administration failed to consult on Bears Ears to Democratic Members of Comm. on Oversight and Gov't Reform 3 (Apr.                 13,                 2017),                 https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2017-04-13.Bears%20Ears%20Monument%20Democratic%20Memo.pdf ("House Staff Memorandum").

118.    Secretary Sally Jewell, accompanied by top Interior and Agriculture officials, traveled to Bluff, Utah and held a day-long open public hearing in which more than one hundred

citizens, drawn by lot, made two-minute statements. *See* Amanda Nichols, *Secretary Jewell to Discuss Protection of Bears Ears at Public Meeting*, Bluff Utah Blog (July 11, 2016), http://bluffutah.org/secretary-jewell-to-discuss-protection-of-bears-ears-at-public-meeting/. Every perspective was represented. The overflow crowd was estimated at approximately 2,000; the largest gathering ever held in Bluff. Comment Letter from the Hopi Tribe, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe and Zuni Pueblo to National Monument Review of the Dep't of Interior 13 (May 25, 2017) http://bearsearscoalition.org/wp-content/uploads/2017/05/Bears-Ears-Comments-5.25.pdf.

119.    The House Committee on Oversight and Government Reform documented the timeline of events that led up to the Bears Ears Proclamation.  The timeline and the documentation reveal repeated contacts, meetings, coordination, and outreach by the Obama Administration with the Utah delegation, governor, and local communities prior to the Monument Proclamation.  *See* House Staff Memorandum, *supra.*

### IX. The Proclamation Designating Bears Ears National Monument

120.    President Obama exercised the authority vested in him under the Antiquities Act to protect Bears Ears as a national monument pursuant to a Proclamation issued on December 28, 2016.  President Obama made this decision because of the historic and scientific objects the Monument contains, their importance to Plaintiffs, and because of near constant threats of exploitation and damage to those objects.  *See generally* Bears Ears Proclamation, *supra.*

121.    The Bears Ears Proclamation describes in detail the geological, paleontological, archaeological, historical, cultural, and ecological significance of Bears Ears and the landmarks and objects to be protected therein. *Id.* at 1139-43.  The Bears Ears Proclamation, rather than including the 1.9 million acres requested from the Coalition, reserves 1.35 million acres of land

36

that the President determined was necessary for the proper care and management of the objects of historic and scientific interest to be protected. *Id.* at 1143.

122. The Bears Ears Proclamation recognizes the "[a]bundant rock art, ancient cliff dwellings, ceremonial sites, and countless other artifacts [that] provide an extraordinary archaeological and cultural record." *Id.* at 1139. While the area is important to all Americans, the proclamation recognizes that "the land is profoundly sacred to many Native American tribes, including the Ute Mountain Ute Tribe, Navajo Nation, Ute Indian Tribe of the Uintah Ouray, Hopi Nation, and Zuni Tribe." *Id.*

123. The Bears Ears Proclamation notes that the earliest Native people – from the Clovis to the Ancestral Puebloans – utilized the Bears Ears region for millennia. *Id.* "The remains of single family dwellings, granaries, kivas, towers, and large villages and roads linking them together reveal a complex cultural history. 'Moki steps,' hand and toe holds carved into steep canyon walls by the Ancestral Puebloans, illustrate the early people's ingenuity and perseverance and are still used today to access dwellings along cliff walls." *Id.*

124. The "petroglyphs and pictographs capture the imagination with images dating back at least 5,000 years and spanning a range of styles and traditions. From life-size ghostlike figures that defy categorization, to the more literal depictions of bighorn sheep, birds, and lizards, these drawings enable us to feel the humanity of these ancient artists." *Id.*

125. The Bears Ears Proclamation also describes rock art left by the Ute, Navajo, and Paiute peoples. "It is the less visible sites, however—those that supported the food gathering, subsistence and ceremony of daily life—that tell the story of the people who lived [within Bears Ears]. Historic remnants of Plaintiff Tribes' sheep-herding and farming activities are scattered

throughout the area, and pottery and Navajo hogans record the lifeways of Native peoples in the 19th and 20th centuries." *Id.* at 1140.

126.     The Bears Ears Proclamation recognizes that the area's cultural importance to Native Nations continues to this day, acknowledging that Plaintiff Tribes and their members still go to Bears Ears for ceremonies, and to hunt, fish, and gather "medicinal and ceremonial plants, edible herbs, and materials for crafting items like baskets and footwear." *Id.*

127.     The Bears Ears Proclamation acknowledges that "traditional ecological knowledge" amassed by Plaintiffs and other Native Nations is, "itself, a resource to be protected and used in understanding and managing this landscape sustainably for generations to come." *Id.*

128.     The Bears Ears Proclamation includes specific provisions that are essential to the protection of Bears Ears and Plaintiffs' cultural and spiritual connection to the many historic and scientific objects within Bears Ears. *Id.* at 1143-44.

129.     For example, the Bears Ears Proclamation withdraws the lands "from all forms of entry, location, selection, sale, or other disposition . . . [;] from location, entry, and patent under the mining laws[;] and from disposition under all laws relating to mineral and geothermal leasing." *Id.* at 1143.  Thus, while valid existing rights were unaffected by the designation of the Monument, the Bears Ears Proclamation immediately prohibited all new mining claims and all new leases for oil and gas development, which is critical to protecting the scientific and historic objects within Bears Ears. *Id.* at 1145.

130.     Prohibiting these mining and other claims is also critical for reducing the burdens the United States imposed on Plaintiffs' religious and spiritual beliefs through past management decisions and historical dealings.

131.    The Bears Ears Proclamation also protects against looting, giving warning "to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument and not to locate or settle upon any of the lands thereof."  *Id.*  As noted above, looting and vandalism of many of the sites and objects within Bears Ears was one of the main reasons Plaintiffs advocated for its protection.

132.    The Bears Ears Proclamation requires the Forest Service and the Bureau of Land Management to "manage the monument" consistent with "the purposes of this proclamation," and designated the Bureau of Land Management's lands within the Monument as part of the National Landscape Conservation System. *Id.* at 1143.

133.    Congress established the National Landscape Conservation System "to conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values."  16 U.S.C. § 7202(a).

134.    Pursuant to an order by the Secretary of the Interior, the Bureau of Land Management must not only manage a national monument in a manner that protects the values for which it was designated, but must also, where appropriate, prohibit "uses that are in conflict with those values."  Sec'y of Interior Order No. 3308 (Nov. 15, 2010) (regarding management of the National Landscape Conservation System).

135.    The Bears Ears Proclamation also requires the Secretaries of the Interior and Agriculture to prepare a transportation plan. Motorized and non-motorized mechanized travel is only authorized on designated roads and trails, and such designations must be consistent with the care, management, and protection of the objects identified in the Bears Ears Proclamation, including irreplaceable cultural sites. Proclamation, *supra*, at 1143, 1145.  Where motorized or

non-motorized mechanized travel threatens historic or scientific objects, the Bureau of Land Management and the U.S. Forest Service may close roads or trails to such uses. *Id.* at 1145.

136.    The Bears Ears Proclamation preserves public access to the lands contained in the Monument, including access for hunting and fishing, which are activities that shall continue to be managed by the State of Utah and that are still practiced by Plaintiffs' members.  *Id.*; *see also*, *Bears Ears National Monument: Questions & Answers*, U.S. Forest Service 3-4, https://www.fs.fed.us/sites/default/files/bear-ears-fact-sheet.pdf (last visited Dec. 4, 2017) The Bears Ears Proclamation also preserves Plaintiffs and their members' right to collect plants, firewood, and other traditional materials within the Monument.  Bears Ears Proclamation at 1145.

137.    In recognition "of the importance of tribal participation to the care and management of the objects [in Bears Ears], and to ensure that management decisions affecting the monument reflect tribal expertise and traditional and historical knowledge," the Bears Ears Proclamation establishes the "Bears Ears Commission" to "provide guidance and recommendations on the development and implementation of management plans and on management of the monument."  *Id.* at 1144. The Commission consists of "one elected officer each from the Hopi Nation, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe of the Uintah Ouray, and Zuni Tribe."  *Id.*

138.    The Bears Ears Proclamation directs the Secretaries to "meaningfully engage" the Commission in the development of the management plan and subsequent management of the monument, and to "carefully and fully consider integrating the traditional and historical knowledge and special expertise of the Commission."  *Id.*  If the Secretaries "decide not to

40

incorporate specific recommendations" of the Commission, they must "provide the Commission . . . with a written explanation of their reasoning."  *Id.*

139.    The Commission gives Plaintiffs a government-to-government seat at the table to provide substantial, meaningful and continuous input on management of the Monument and to more effectively protect the immensely important historic, scientific, and cultural objects within Bears Ears. Overall, the Bears Ears Proclamation directs the Secretaries to work with the tribally based Commission "to *ensure* that management decisions affecting the monument reflect tribal expertise and traditional and historical knowledge." *Id.* at 1144 (emphasis added.)

140.    The Bears Ears Proclamation also establishes a mechanism for the participation of other stakeholders in the management of the Monument through the establishment of an advisory committee.  *Id.*  The advisory committee consists of "interested stakeholders, including State and local governments, [T]ribes, recreational users, local business owners, and private landowners." *Id.*  The purpose of the advisory committee is to contribute "information and advice regarding the development of the management plan and, as appropriate, management of the monument." *Id.*

### X. President Trump's attempt to revoke the National Monument and replace it with different monuments.

141.    While campaigning, President Trump stated he would consider abolishing national monuments, including the Katahdin Woods and Waters National Monument in Maine. *Could Donald Trump Undo the Katahdin Woods and Waters National Monument?*, New Hampshire Public Radio (Nov. 18, 2016), http://nhpr.org/post/could-donald-trump-undo-katahdin-woods-and-waters-national-monument#stream/0.

142.    On January 20, 2017, President Trump was sworn in as President of the United

States.  Peter Baker & Michael D. Shear, *Donald Trump Is Sworn In as President, Capping His*

*Swift          Ascent*,          N.Y.          Times          (Jan.          20,          2017),

https://www.nytimes.com/2017/01/20/us/politics/trump-inauguration-day.html?_r=0.

143.    After Secretary Zinke was nominated to be the Secretary of Interior, but before he

was confirmed by the United States Senate, the Commission members sent him letters requesting

a meeting to discuss the role of the Commission. Letter from Co-Chairs of Bears Ears Inter-

Tribal   Coalition   to   Ryan   Zinke   (Jan.   26,   2017),http://bearsearscoalition.org/wp-

content/uploads/2017/01/BEITC_Letter_to_Zinke.pdf. The Navajo, Hopi and Zuni tribes also

sent Secretary Zinke letters requesting to meet about Bears Ears.

144.    On March 17, 2017, in accordance with the Bears Ears Proclamation, Plaintiffs

formally named their representatives for the Commission.  The same day, the Commission sent

another letter to Secretary of the Interior Zinke requesting to meet to discuss management

priorities and reminding him of his obligation to work with the Commission. *Bears Ears*

*Commissions Selected Focus on the Future of the National Monument*, Bears Ears Inter-Tribal

Coal. (Mar. 17, 2017),  http://bearsearscoalition.org/bears-ears-commissioners-selected-focus-on-

the-future-of-the-national-monument/.

145.    On April 26, 2017, President Trump called for an unprecedented "review" of

national monument designations made since January 1, 1996, where the designation covers more

than 100,000 acres or "where the Secretary of Interior determines that the designation or

expansion was made without adequate public outreach or coordination with relevant

stakeholders."  Exec. Order No. 13792, 82 Fed. Reg. 20429. The review was purportedly to

determine whether the designations conform to the objectives of the Antiquities Act.  *Id.*

42

146.    Nearly three million comments were submitted in response to the review. Review of Certain National Monuments Established Since 1996; Notice of Opportunity for Public Comment, 82 Fed. Reg. 22016 (May 11, 2017) https://www.regulations.gov/document?D=DOI-2017-0002-0001.

147.    The overwhelming majority of comments nationwide, including a majority of those in San Juan County itself, supported maintaining the Bears Ears National Monument.

148.    Nonetheless, in an unprecedented move President Trump purported to modify the Bears Ears National Monument and replace it with two new, much smaller "units" called the Indian Creek National unit and the Shash Jáa unit. Given the magnitude of the change, this is effectively a revocation of Bears Ears and a replacement of it with two new monuments. In this revocation and replacement, President Trump purported to create new boundaries for these separate new monuments and issued new maps delineating them.

149.    In so doing, President Trump has attempted to remove protection from the tens of thousands of cultural and archaeological sites and objects of historic and scientific interest in 1.1 million acres.  As to these objects, the Bears Ears National Monument has been fully revoked.

150.    In deciding to revoke the Bears Ears National Monument, the President stated that revocation of the Bears Ears Monument will not "leave tribal artifacts or fossils unprotected." *1600 Daily: Everything White House 12/4/2017*, The White House (Dec. 4, 2017), https://www.whitehouse.gov/1600daily.

151.    The President's statement is factually erroneous.  The President's revocation of the National Monument removes substantial protection from numerous known tribal artifacts.

152.     The President's statement provides substantial proof that he made his decision based upon a substantial misunderstanding of the facts that had led to the area being designated as the Bears Ears National Monument.

153.     Below is a map that shows, approximately, the purported new "units."



154.     Since President Trump has taken this action, Defendants Secretary of the Interior, Acting Director of the Bureau of Land Management, Secretary of Agriculture, and Chief for the U.S. Forest Service will not take any further steps to carry out their mandatory duties under the

Bears Ears Proclamation, unless and until the court declares the President's action unlawful and sets it aside.

155.     Mandatory duties under the Bears Ears Proclamation include, but are not limited to, further consulting with Plaintiffs on the establishment of the Commission and convening meetings with the Commission to assist in beginning the work of the Commission.

156.     The Bears Ears Proclamation protected the Bears Ears landscape from the disruptive and damaging effects of oil and gas exploration and development, hard rock mineral location, uncontrolled off-road vehicle use, and the widespread vandalism and looting of archaeological and paleontological sites.  *See generally*, Bears Ears Proclamation, *supra*.

157.     President Trump's action purports to sweep those protections away, and it opens Bears Ears up to new oil and gas leasing and to new claims for hard rock minerals like uranium, thereby inviting significant and irreversible damage to this culturally important landscape.

158.     Plaintiffs and their members use and enjoy the lands and the historic and scientific resources contained within Bears Ears.

159.     The revocation and replacement of Bears Ears will adversely affect Plaintiffs and their members' interests by removing protections against looting, grave robbing, vandalism, mining, oil exploration, construction, and other activities that will disturb the spirituality, tranquility, and scenic beauty of the area.

160.     The revocation and replacement will also destroy artifacts that should continue to capture and preserve the histories and knowledge of Plaintiffs and their ancestors, thereby further adversely affecting Plaintiffs' interests.

161.    Without the protections afforded by the Bears Ears Proclamation, these activities are certain to occur, and Plaintiffs will lose their use and enjoyment of the resources negatively affected or destroyed.

162.    President Trump's attempt to revoke the Bears Ears designation and replace it with two smaller, new monuments renders one of the country's most pristine, unique landscapes vulnerable to immediate harm, and thus deprives Plaintiffs and their members of the cultural, spiritual, historic, recreational, scientific, and educational benefits they derive from Bears Ears.

163.    For example, lands that were protected under the Bears Ears Proclamation are now open for location, entry, and patent under the Act of May 10, 1872, 30 U.S.C. § 22 (Mining Law of 1872). Revocation of the monument status for Bears Ears allows such activities to resume immediately because, under the General Mining Law, prospectors do not need permits or other prior authorization from the Bureau of Land Management or any other government agency to commence with location and entry.

164.    Prospectors may also engage in "casual use" and "notice use" activities on these lands without prior approval or any other affirmative action from the Bureau of Land Management or any other government agency. 43 C.F.R. §§ 3809.10(a), 3809.605(b) (casual use), §§ 3809.21, 3809.312(a) (notice use). The resumption of these activities will disturb surface soils in Bears Ears; will cause imminent harm to its natural, archaeological, and paleontological resources; and will encourage criminal looting and defacement.

165.    Mineral development, including uranium mining, has destructive impacts not only on the claimed land itself, but also on the surrounding area.  Mineral development poses an imminent threat to Bears Ears' unique character, as the Proclamation described it, as "one of the

46

most intact and least roaded areas in the contiguous United States." Bears Ears Proclamation, *supra*, at 1141.

166.     Mineral development under the General Mining Law of 1872 is particularly concerning to Plaintiffs. Uranium mining has had a particularly negative impact for the Ute Mountain Ute and Navajo. *See, e.g.*, *Navajo Nation: Cleaning Up Abandoned Uranium Mines*, EPA, https://www.epa.gov/navajo-nation-uranium-cleanup (last visited Dec. 4, 2017); Jon Kovash, *The Ute Mountain Utes Cite Continuing Violations at the White Mesa Uranium Mill*, Utah Public Radio (May 24, 2016), http://upr.org/post/ute-mountain-utes-cite-continuing-violations-white-mesa-uranium-mill.

167.     There are over 500 abandoned uranium mines on the Navajo reservation that need remediation and cleanup and that have rendered local flora and fauna unsafe to access or use. *See* Cleaning Up Abandoned Uranium Mines, EPA, https://www.epa.gov/navajo-nation-uranium-cleanup/cleaning-abandoned-uranium-mines (last updated Nov. 30, 2017).

168.     Plaintiffs wish to protect Bears Ears and its flora and fauna from similar uranium contaminations and mining disasters in the future.

169.     Without the Bears Ears Proclamation's protections, uranium mining activities will occur and impede Plaintiffs' use and enjoyment of the lands and resources in Bears Ears.

170.     Before the Bears Ears Proclamation, oil and gas companies were consistently and intensely pushing for new drilling sites in many regions of Bears Ears, including Cedar Mesa, Tank Mesa, Lockhart Basin, Hatch Point, and Harts Point.  Bears Ears Proposal, *supra*, at 34.

171.     Before the Bears Ears Proclamation, some areas within Bears Ears were designated for oil and gas development under the Moab Master Leasing Plan. Large potash mines were also proposed.

47

172.    Without the Bears Ears Proclamation's protections, oil and gas development and potash mining activities will occur and injure Plaintiffs' use and enjoyment of the lands and resources within the monument.

173.    Mining and oil and gas production can have many adverse impacts to Native people.  Adverse impacts include the following:

• direct damage, disturbance, or destruction of places, resulting from exploration, construction, operation, transportation, and reclamation activities;

• disturbance of graves, human remains, or other materials protected under the Native American Graves Protection and Repatriation Act;

• visual, audible, or atmospheric elements that adversely affect the integrity and values of resources;

• impediments to traditional practices or land uses;

• restricted access to traditional use areas or sacred sites;

• disruption of a place's setting or its association with other important places, resulting from visual or auditory impacts;

• loss of springs or declines in quantity or quality of important water sources; and

• social impacts such as distress or anxiety caused by effects on cultural values and sense of place, or fears of loss, illness, or resource contamination.

174.    Mitigation under these circumstances is often impossible, as alterations or damage to the values of significant, connected places is irreversible and irreparable, regardless of reclamation.

48

175.    Any disturbance or damage to Bears Ears from mining, regardless of size, is significant to Plaintiffs because it will disrupt the function of these particular places and affect Plaintiffs' and their members' use and enjoyment of these resources.

176.    In addition, by designating Bears Ears as a national monument and including it in the National Landscape Conservation System, the Proclamation gave the Bureau of Land Management the authority and the duty to immediately regulate off-road vehicle usage to protect natural, archaeological, and paleontological resources within the Monument's boundaries.

177.    President Trump's action removes these protections.

178.    Off-road vehicle use has wrought decades-long havoc on the Bears Ears landscape and treasured archaeological sites.  Bears Ears Proposal, *supra*, at 35.

179.    Monument-status protection for Bears Ears improves management of off-road vehicle use and the recreational experience for all visitors, including off-roaders.  *Id.*

180.    The operation of off-road vehicles that can continue to occur in the absence of a monument designation harms Plaintiffs' cultural, spiritual, recreational, scientific, and educational interests through noise, air pollution, increased looting and grave robbing, and other physical impacts on the land and environment that Plaintiffs and their members enjoy and regularly use.

181.    Of all the degradations to Bears Ears, none are worse than looting and grave robbing.

182.    There were more than a dozen reports of serious looting cases between May 2014 and April 2015, ranging from "small-scale theft to ancestral remains being tossed around when graves are plundered."  *Id.*

49

183.   "[T]hese deplorable acts defile the past and wound the present," which for Plaintiff Tribes "is so directly connected to the past." *Id.*

184.   President Trump's action removes urgently needed protections for archaeological and paleontological resources in Bears Ears.

185.   While federal regulations generally allow the "casual collecting" of common invertebrate and plant fossils for non-commercial personal use on land managed by the Forest Service, 36 C.F.R. §§ 291.5, 291.10, that same casual collecting is absolutely prohibited in national monuments, *id.* § 291.12. Violations may be punished by a fine or imprisonment, thereby providing greater protections against looting and grave robbing. *Id.* § 1.3(b).

186.   Due to President Trump's action, casual collection of archaeological and paleontological resources will resume and likely destroy the valuable information those resources contain.

187.   Plaintiffs themselves will lose the ability to enjoy the scientific, cultural, and educational value of those resources.

188.   Further, countless places important to Native Americans are often not identified because many feel that they should not share sacred and traditional knowledge with outsiders.

189.   Thus, the resources important to Plaintiffs within Bears Ears that are identified likely represent a fraction of the total number of Native American resources within Bears Ears, and any mining or other activity has the potential to affect resources that have not been publicly identified.

190.   Due to President Trump's action, Plaintiffs will have a reduced opportunity to participate on the Commission or to provide input on the creation and implementation of the

50

Monument management plan as the Trump Proclamation purports to include a local county representative in the Bears Ears Commission with the other sovereign Native delegates.

191.    Although the BLM and USFS began discussions about meeting with the Commission, that work will no longer move forward.

192.    By revoking the Bears Ears Proclamation and replacing the Monument with two different, smaller monuments, President Trump has deprived Plaintiffs of their government-to-government relationship, through the Commission, and the opportunity to provide meaningful guidance and recommendations on the process for protecting the landscape they have utilized and maintained since time immemorial.

193.    By failing to carry out their duties under the Bears Ears Proclamation, Defendants Secretary of the Interior, Acting Director of the Bureau of Land Management, Secretary of Agriculture, and Chief for the U.S. Forest Service ("Agency Defendants") have deprived Plaintiffs of their government-to-government relationship, through the Commission, and the opportunity to provide meaningful guidance and recommendations on the process for protecting the landscape they have utilized and maintained since time immemorial.

194.    As the Bears Ears Coalition recognized, "[r]uining the integrity of these lands forever compromises our ability to heal . . . . The continuity of indigenous traditional medicine is in peril, as long as lands like the Bears Ears are not protected." *Proposal Overview*, Bears Ears Inter-Tribal Coal., http://bearsearscoalition.org/proposal-overview/ (last visited Dec. 4, 2017).

195.    Plaintiffs and their members' interests are being, and will continue to be, adversely affected and irreparably injured by the defendants' actions unless the relief sought herein is granted. Their injuries would be redressed by the relief sought herein.

196.    Plaintiffs have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

### Antiquities Act, 54 U.S.C. § 320301
### (All Defendants)

197.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint as if set forth in full.

198.    The Antiquities Act only empowers the President to declare national monuments. It does not delegate or authorize the power to revoke, replace, or diminish them once designated. More specifically, the President lacks authority to undesignate "historic landmarks, historic and prehistoric structures, and other objects of scientific or historic interest" once they have been lawfully proclaimed a national monument, and lacks the further authority to remove lands from a national monument once they have been reserved for the "proper care and management of the objects to be protected" at the discretion of the establishing President. 54 U.S.C. § 320301.

199.    In issuing his Proclamation, President Trump acted in contravention of the authority delegated to the President under the Antiquities Act. 54 U.S.C. § 320301.  That action in effect revokes the Bears Ears National Monument and replaces it with two different, smaller ones, and thereby reduces the public lands reserved as part of the Monument. It also purports to lift monument protections for tens of thousands of objects identified in 1.1 million acres of the Bears Ears National Monument. Moreover, that action revokes the national monument protection of numerous objects declared a national monument in the Bears Ears Proclamation.

200.    As a result, the Trump Proclamation is *ultra vires,* unlawful, and subject to non-statutory review.

201.    In implementing the Trump Proclamation, the actions of the Agency Defendants are *ultra vires*, unlawful and subject to non-statutory review.

52

## SECOND CLAIM FOR RELIEF

### U.S. Constitution, Article I, Sections 1 and 7 — Separation of Powers
### (All Defendants)

202.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint as if set forth in full.

203.    Article I, Section 1 of the U.S. Constitution provides that "all legislative powers are vested in the Congress," and therefore only Congress may create law.

204.    Article I, Section 7 of the U.S. Constitution, also called the Presentment Clause, provides that after a bill has passed both houses of Congress but before it becomes law it "shall be presented to the President" at which time he may sign or veto the bill.

205.    Based on these provisions, and those enumerated in Article 2 of the Constitution, the President has specific executive powers to initiate and influence legislative proposals, or to veto in total any legislative procedures, but "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. N.Y.C.*, 524 U.S. 417, 438 (1998).

206.    The Antiquities Act only provides that the President may declare national monuments and reserve public lands; it does not delegate or authorize the power to revoke, abolish, diminish, or replace them as has been done here.  54 U.S.C. § 320301. Only Congress can revoke or diminish a national monument after it has been created.

207.    In issuing the Proclamation, President Trump has purported to amend the Antiquities Act by engrafting to it a new provision of the law that would authorize him to revoke, diminish, and replace monuments. This action is without statutory authority and violates the limits of the President's Constitutional authority under Article 1, Sections 1 and 7.

208.    Because the President's order is unlawful and he therefore cannot properly direct the agencies to act, in implementing the Trump Proclamation, the Agency Defendants purport to create law, or purport to amend an existing statute in violation of the limits of Constitutional authority of the Executive Branch under Article 1, Sections 1 and 7.

### THIRD CLAIM FOR RELIEF

### U.S. Constitution, Article IV, Section 3 — the Property Clause
### (All Defendants)

209.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

210.    The Property Clause of the U.S. Constitution, Article IV, section 3, clause 2, provides that "Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  The President has the authority to dispose of such property, or to make rules and regulations concerning such property, only to the extent that Congress has delegated that authority to the President.

211.    The Antiquities Act only provides that the President may declare national monuments; it does not delegate or authorize the power to revoke, abolish, diminish, or replace them as has been done here.  54 U.S.C. § 320301.

212.    In issuing his Proclamation, President Trump acted without authority and encroached upon Congress's power under the Property Clause in Article IV of the Constitution.

213.    In implementing the Trump Proclamation, the Agency Defendants have acted without authority by implementing a presidential decision that encroached upon Congress's power under the Property Clause in Article IV of the Constitution.

54

**FOURTH CLAIM FOR RELIEF**

**Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*
(All Agency Defendants)**

214.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

215.   The Administrative Procedure Act (the "APA") confers a right of action on any person adversely affected by final agency action or failure to act.  5 U.S.C. §§ 701-706.

216.   The APA directs the court to "compel agency action [that has been] unlawfully withheld."  5 U.S.C. § 706(1).

217.   The Bears Ears Proclamation directs the Secretaries, through the Forest Service and the Bureau of Land Management, to undertake specific, mandatory duties to protect the special values of the Bears Ears National Monument, including:

a)   managing the Monument lands to implement the protective purposes of the Proclamation;

b)   administering the lands under the Bureau of Land Management's jurisdiction as part of the National Landscape Conservation System;

c)   jointly preparing a management plan for the Monument that will protect and restore the objects identified in the Proclamation and provide for maximum public involvement in that process;

d)   establishing an advisory committee to inform the development of the management plan;

e)   meaningfully engaging the Commission, comprised of elected officers from five Tribal nations, and "carefully and fully consider[ing] integrating the traditional and historical

55

knowledge and special expertise of the Commission" into the Monument management or providing a written explanation for their decision not to do so.

218.    Because President Trump had no lawful authority to revoke Bears Ears National Monument and replace it with two different, smaller monuments, the Secretaries of the Interior and Agriculture remain subject to the Proclamation's direction to undertake specific, mandatory duties to protect the special values of the full, 1.35 million acre Bears Ears National Monument.

219.    Agency Defendants have failed to carry out their mandatory duties under the Proclamation.

220.    On information and belief, Agency Defendants have no intention of carrying out those duties as long as the Trump Proclamation remains in place.

221.    Agency Defendants' failure to act constitutes an agency action "unlawfully withheld" under section 706 of the APA.

## PRAYER FOR RELIEF

WHEREFORE plaintiffs request that the Court:

222.    Declare that the Trump Proclamation, and the Agency Defendants' implementation thereof, is *ultra vires* and exceeds the authority delegated to the President under the Antiquities Act;

223.    Declare that the Trump Proclamation, and the Agency Defendants' implementation thereof, violates the U.S. Constitution, Article I, Sections 1 and 7, the Separation of Powers doctrine;

224.    Declare that the Trump Proclamation, and the Agency Defendants' implementation thereof, violates the U.S. Constitution, Article IV, Section 3, the Property Clause;

225.    Issue injunctive relief requiring President Trump to rescind his Proclamation, or prohibiting him from enforcing or implementing it in any way;

226.    Issue injunctive relief against the Agency Defendants, prohibiting them from implementing the unlawful Proclamation and directing them to carry out the mandatory duties imposed in the Proclamation;

227.    Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412 ; and

228.    Grant such other relief as the Court deems just and proper.

Dated:  December 4, 2017                  Respectfully submitted,

By:

*/s/ Matthew Campbell*
Matthew Campbell (DC Bar # CO0060)
Native American Rights Fund
1506 Broadway
Boulder, Colorado 80302
Phone:   (303) 447-8760
mcampbell@narf.org

*/s/ Natalie Landreth*
Natalie Landreth (DC Bar # AK) (admitted April 3, 2017)
Native American Rights Fund
745 W. 4th Ave, Suite 502
Anchorage, AK 99501
Phone: (907) 276-0680
landreth@narf.org

*/s/ Justin R. Pidot*
Justin R. Pidot (*Pro Hac Pending*)
University of Denver Sturm College of Law
(for identification purposes only)
2255 East Evans Ave.

Denver, CO 80208
(303) 871-6168
jpidot@law.du.edu

*Attorneys for Plaintiffs Hopi Tribe, Ute Mountain Ute Tribe, and Zuni Tribe*

 */s/ Ethel B. Branch*
Ethel B. Branch, Attorney General (*Pro Hac Pending*)
Office of the Attorney General
THE NAVAJO NATION DEPARTMENT OF JUSTICE
Post Office Box 2010
Window Rock, Arizona (Navajo Nation) 86515
Email: ebranch@nndoj.org
Phone: 928-871-6345
Fax: 928-871-6177

*/s/ Paul Spruhan*
Paul Spruhan, Asst. Attorney General (DC Bar #AZ0017)
Litigation and Employment Unit
NAVAJO NATION DEPARTMENT OF JUSTICE
Post Office Box 2010
Window Rock, Arizona (Navajo Nation) 86515
Email: pspruhan@nndoj.org
Phone: 928-871-6210
Fax: 928-871-6177

*/s/ Katherine Belzowski*
Katherine Belzowski, Senior Attorney (DC Bar # AZ0018)
Litigation and Employment Unit
NAVAJO NATION DEPARTMENT OF JUSTICE
Post Office Box 2010
Window Rock, Arizona (Navajo Nation) 86515
Email: kbelzowski@nndoj.org
Phone: 928-871-6210
Fax: 928-871-6177

*/s/ Julia Guarino*
Julia Guarino, Attorney (*Pro Hac Pending*)
NAVAJO NATION DEPARTMENT OF JUSTICE
Post Office Box 2010
Window Rock, Navajo Nation (Arizona) 86515
Email: jguarino@nndoj.org
(928) 871-6186 phone
(928) 871-6177  fax

58

*/s/ Leland Begay*
Leland Begay, Associate General Counsel (*Admission Pending*)
Ute Mountain Ute Tribe
Department of Justice
P.O. Box 128
Towaoc, Colorado 81334
Phone:  (970) 564-5627
Fax: (970) 565-0750
lelandbegay@utemountain.org

*Attorney for Plaintiff Ute Mountain Ute Tribe*

*/s/ Rollie Wilson*
Rollie Wilson (DC Bar #1008022)
Fredericks Peebles & Morgan LLP
401 9th Street, N
Washington, DC 20004
Phone: (202) 450-4887
Facsimile: (202) 450-5106
Email: rwilson@ndnlaw.com

*/s/ Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen (*Pro Hac Pending*)
Jeremy J. Patterson (*Pro Hac Pending*)
Chloe E. Bourne (*Pro Hac Pending*)
Katie Frayler (*Pro Hac Pending*)
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Fax: (303) 673-9155
jrasmussen@ndnlaw.com
jpatterson@ndnlaw.com
cbourn@ndnlaw.com
kfrayler@ndnlaw.com

*Attorneys for Plaintiff Ute Indian Tribe*