# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HOPI TRIBE, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02590 (TSC) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UTAH DINÉ BIKÉYAH, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02605 (TSC) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:17-cv-02606 (TSC) |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | **CONSOLIDATED CASES** |
| | ) | |
| Defendants. | ) | |

## FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER CASE TO THE DISTRICT OF UTAH

Under the flexible and individualized analysis required under 28 U.S.C. § 1404(a), this case challenging the modification of the boundaries of the Bears Ears National Monument ("Monument") should be transferred to the District of Utah.  This consolidated case centers on lands exclusively within Utah, and it cannot be denied that it is Utah's residents who will be "most vitally affected" by its outcome.  *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 317 (D.D.C. 2015).  As such, Utah's "superior interest in this controversy is undeniable."  *Id.*

None of the other interests relied on by Plaintiffs require a different result.  Taken as a whole, Plaintiffs' connections with this forum are no greater than they are with the District of Utah: as many of the Plaintiffs in this consolidated case reside in Utah as do in Washington, D.C.  And, because the decision to issue Proclamation No. 9681, which modified the Monument, was made in both forums, Plaintiffs cannot credibly maintain on this basis that their claims are more properly decided here, rather than in Utah, where the effects of the Proclamation will be most acutely felt.  Moreover, contrary to Plaintiffs' arguments, a federal district court in Utah is no less capable of addressing the pertinent questions of federal law than this Court.  This Court should accordingly transfer this case to the District of Utah.

## ARGUMENT

Section 1404(a) endows the district courts with "broad discretion" in addressing motions to transfer.  *Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 44 (D.D.C. 2017) (quoting *In re Scott*, 709 F.2d 717, 719 (D.C. Cir. 1983)).  *See also Harris v. U.S. Dep't of Veterans Affairs*, 196 F. Supp. 3d 21, 24 (D.D.C. 2016) (quoting *In re DRC, Inc.*, 358 Fed. App'x 193, 194 (D.C. Cir. 2009)) (noting discretionary nature of the decision to transfer).  "In enacting Section 1404(a), Congress prescribed a "flexible and individualized analysis."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  As one court explained:

1

> As to whether transfer would be "in the interest of justice," prior cases have traditionally established a list of private and public interest factors for courts to weigh. *See, e.g., Foote v. Chu*, 858 F. Supp. 2d 116, 121–23 (D.D.C. 2012). Not all of these factors are statutory, however; rather, they are intended to elucidate the concerns implied by the phrase "in the interest of justice." *See Stewart Organization*, 487 U.S. at 29, 108 S.Ct. 2239. In evaluating "the interest of justice," the Court is mindful of the Supreme Court's statement that analyses of venue transfer under § 1404(a) are to be done on an individualized, case-by-case basis. *See id.*

*Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 64 (D.D.C. 2013).[1]

As such, the requisite, individualized analysis does not entail a mechanical counting of the private and public factors. To the contrary, courts have decided to transfer primarily on the basis of one factor. For instance, in *Gulf Restoration Network*, 87 F. Supp. 3d at 317, the court determined that the plaintiff's choice of forum was entitled to some deference, the defendants' choice of forum was afforded "some countervailing weight," and the "remaining private- and public-interest factors, save one, are neutral." However, given the substantial local interest in deciding local controversies at home, the court transferred the case. *Id. See also Defs. of Wildlife v. Jewell*, 74 F. Supp. 3d 77, 86 (D.D.C. 2014) (transferring case based on the pendency of related actions in the transferee forum, even though the remaining factors were all neutral or mixed); *Friends of Animals v. Phifer*, 15-cv-30011-MGM, 2015 WL 1943898, at *4 (D. Mass. Apr. 29, 2015) (holding that "[w]hile the private factors are neutral or weigh slightly against transfer, the court concludes the public factors heavily favor a transfer," and expressly addressing only the local interest public factor).

Here, while many of the private and public factors in this case are mixed or neutral, the

---

[1] Consistent with this, the court in *Stand Up* ultimately denied the motion to transfer based on an unenumerated consideration that it found of "overarching importance"—namely the "unfairness that would inure to the plaintiffs" because transferring the case would "essentially deprive the plaintiffs of any opportunity to have the preliminary injunction motion decided before" the action they were challenging took effect. 919 F. Supp. 2d at 65.

requisite individualized analysis demonstrates that this consolidated case should be transferred to Utah based on the strong public interest in having a local controversy decided at home.

**A.      The Public Interest Factors Support Transfer to Utah Because of the Strong Local Interest.**

While two of the public interest factors are neutral, the third, the strong local interest in deciding this case in Utah—where the Monument is located and whose residents will most acutely feel the outcome of this litigation—demonstrates that transfer is appropriate.

1.      <u>This localized controversy should be decided in Utah.</u>

a.      *There is Enormous Local Interest in this Controversy*

The "local interest in deciding local controversies at home" is the most important of the public interest factors, *Southern Utah Wilderness Alliance ("SUWA") v. Lewis*, 845 F. Supp. 2d 231, 237 (D.D.C. 2012), and this factor weighs strongly in support of transferring this case to the District of Utah.  *See* Defs.' Mem. Supp. Mot. Transfer ("Defs.' Mem") at 5-10, 17-cv-2590, ECF No 21.  The Supreme Court has emphasized the importance of this local interest, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947), and consistent with this direction, courts in this District often rely heavily on this factor.  *See, e.g., Lewis*, 845 F. Supp. 2d at 237; *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 116 (D.D.C. 2015).

The nature of the local interest in this controversy is twofold.  First, the controversy centers on federal lands existing completely in Utah.  *See SUWA v. Norton*, 315 F. Supp. 2d 82, 88 (D.D.C. 2004) ("The controversy is localized in the sense that it involves Utah lands, hence there is a strong local interest in having this case heard in Utah"); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 26 (D.D.C. 2002) (finding "the most persuasive factor" being "the local interest in deciding a sizeable local controversy at home.  How the [relevant] property is allocated directly impacts the counties and neighborhoods surrounding [it].").  Second, the

residents of Utah "will be the people who will be 'most vitally affected' by its outcome." *Gulf Restoration Network*, 87 F. Supp. 3d at 317.  *See also W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 103 (D.D.C. 2013) ("The implications of a decision resolving this dispute will be felt most acutely in Utah where local citizens are directly affected"); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19–20 (D.D.C. 1996) (suits "should be resolved in the forum where the people 'whose rights and interests are in fact most vitally affected by the suit—the people of [Colorado]'").  *See also* Defs.' Mem. at 5-10.

The enormous local interest in this case has been corroborated by recent filings in this case.  For instance, several individuals and Utah-based organizations have moved to intervene in *Utah Diné Bikéyah ("UDB") v. Trump,* one of the consolidated cases in this matter.  Mot. to Intervene, 17-cv-2605, ECF No. 17.  They have done so asserting that the outcome of this case will substantially affect their "conservation, recreational, and business activities" on the lands at issue in this case.  Intervenors' Mem. ECF No. 17-1 at 1.  Similarly, the State of Utah, along with several of its counties in which the Monument is located, have filed an amicus brief supporting Defendants' motion to transfer.  Their brief demonstrates the keen local interest in this matter, and the importance of its outcome to them as government entities and to their residents.  17-cv-02590, ECF No. 31 at 5-10.  This local interest is also demonstrated by statements and actions by Utah's congressional delegation.  *See* Defs.' Mem. at 10.[2]  Under these circumstances, transferring venue to Utah will respect and protect the rights of the individuals

---

[2] This local interest is further corroborated by allegations from the Plaintiffs' complaints.  For instance, the five Plaintiff tribes in *Hopi Tribe v Trump* (hereinafter the "Tribes") allege that, prior to the original creation of the Monument in 2016, members of Utah's Congressional delegation, the Tribes, and a local Utah county commission embarked on an effort to reach a collaborative proposal to address the management of federal lands in this area of Utah, including those included in the Monument.  *See* Tribes' Compl. ¶¶ 60-66, 17-cv-2590, ECF No. 1.

and entities that will be impacted most directly by the outcome of this case. *See Adams v. Bell*, 711 F.2d 161, 167 n. 34 (D.C. Cir.1983) ("[venue] policies must protect not only the interests of the technical defendants . . . but, more importantly, those whose rights and interests are in fact most vitally affected by the suit . . .").

### b. *Plaintiffs cannot overcome the local interest factor*

Plaintiffs do not, and cannot, dispute the courts' widespread recognition of the compelling interest in having local controversies decided locally. Instead, they dispute that this case constitutes a local controversy, relying on a variety of considerations that they claim outweigh the location of the affected monument as well as the intense financial, recreational, and cultural interests of the local population. *See* Hopi Tribe et al.'s ("the Tribes") Opp. to Mot. to Transfer ("Tribes' Opp.") at 16, 17-cv-2590, ECF No. 26 (citing *Nat'l Ass'n of Homebuilders v. EPA*, 675 F. Supp. d 173, 178 (D.D.C. 2009). True, in exercising their wide discretion under Section 1404(a), courts in this District have evaluated whether a controversy is local by relying, to varying extents, upon diverse considerations. *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 70 (D.D.C. 2003) ("To determine whether a controversy is local in nature, courts have taken into account a wide variety of factors."). But none of the considerations identified by Plaintiffs can overcome the location of the lands combined with the intense local public and governmental interest in these proceedings.

First, Plaintiffs argue that this case is not a local controversy because the Monument is a "national resource of importance to all Americans." *See* Utah Diné Bikéyah ("UDB") Opp. Mot. Transfer ("UBD Opp.") at 16, 17-cv-2605, ECF No. 27. For instance, UDB argues that the legislative history of the Antiquities Act demonstrates that the existence of "national monuments is an inherently national issue." *Id.* at 17 (quoting Act's legislative history indicating that

purpose of monuments was to benefit generally "the American people."). *See also* Tribes' Opp. at 14-15. That federal lands or resources are identified as "national" and are managed by the federal government for the benefit of the American people cannot mean that any case addressing them must be heard in this District. Otherwise, this District would categorically refuse to transfer controversies involving "National Forests," "National Parks," or indeed, "National Monuments." But there are numerous examples of decisions from this District transferring such cases. *See Trout Unlimited*, 944 F. Supp. 2d at 15 (addressing operation of a dam on Roosevelt National Forest); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 922 F. Supp. 2d 51, 53 (D.D.C. 2013) (addressing coal leases on National Forest in Wyoming); *W. Watersheds Project v. Jewell*, 69 F. Supp. 3d 41, 43 (D.D.C. 2014) (challenging management of Capitol Reef National Park); *Pool*, 942 F. Supp. 2d at 95 (addressing management decisions for the Monument at issue in this case and nearby Glen Canyon National Recreation Area). *See also Pres. Soc. of Charleston ("PSC") v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 55 (D.D.C. 2012) (rejecting plaintiffs' argument that Charleston's national importance as a historic district heightens the case's national relevance and nexus to D.C.).[3]

Second, Plaintiffs assert that a case addressing issues of federal statutory and constitutional law cannot comprise a local controversy warranting transfer to another District. *See* UDB Opp. at 16 (citing *Greater Yellowstone Coal. v. Kempthorne*, No. CIV.A. 07-2111 (EGS), 2008 WL 1862298, at *6 (D.D.C. Apr. 24, 2008)); Tribes' Opp. at 17 (arguing that their

---

[3] Indeed, while the Antiquities Act indicates that national monuments are meant to protect national resources, most, if not all, federal lands are likewise to be managed for the benefit of American people under relevant statutes. *See, e.g.,* 16 U.S.C. § 531(a) (national forests are to be managed in a manner "that will best meet the needs of the American people"); 43 U.S.C. § 1702 (c) (federal lands managed by BLM should be managed as to "best meet the present and future needs of the American people"); 54 U.S.C. § 100101 (purpose of national park system is to conserve various resources "for the enjoyment of future generations").

claims allege that "President Trump acted without federal constitutional and statutory authority). But this argument—that the need to address "statutory and constitutional questions" overcomes any local interest in a controversy—not only conflates two factors (namely the local interest and relative familiarity with governing laws factors), but does so inconsistently.  Because "all federal courts" are equally competent to decide issues of federal law, that a case calls upon a federal district court to do so is inapposite to whether the case is local—and certainly should not weigh against transfer.[4]  *See PSC*, 893 F. Supp. 2d at 58 (the competence of a court to resolve issues of federal law "is a separate issue entirely from the question of whether the case at bar is a 'local controversy' for purposes of a motion for discretionary transfer.")  Indeed, if application of federal law were important in the transfer analysis, then "any challenge involving a federal law implemented by a federal agency could not be transferred elsewhere."  *Id.* at 55.

Third, and closely related to this contention, Plaintiffs also argue that this case has "national implications" due to the need to address these issues of federal law, which may also be at issue in potential, future actions by the President addressing existing monuments.  Tribes' Opp. at 16.  But again, both this Court and the District of Utah are equally placed with respect to their competency to interpret federal statutory and Constitutional law.  Further, there is "no 'blanket rule' that national policy cases should be brought in D.C."  *Starnes v. McGuire,* 512 F.

---

[4] "[I]it is of course well settled that no federal court is more competent than any other to resolve questions of federal law."  *Oceana v. BOEM*, 962 F. Supp. 2d 70, 78 (D.D.C. 2013).  *See also In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (noting that all federal courts are "presumptively competent" to decide issues of federal law); *Oceana v. Pritzker*, 58 F. Supp. 3d 2, 7 (D.D.C. 2013) (noting that "the transferee federal court is competent to decide federal issues correctly"); *M & N Plastics, Inc. v. Sebelius*, 997 F. Supp. 2d 19, 25 (D.D.C. 2013) ("all federal courts should have the requisite familiarity with federal law"); *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) ("this Court follows 'the principle that the transferee federal court is competent to decide federal issues correctly.'" (quoting *Flowers*, 276 F. Supp. 2d at 70 n. 6)).

2d 918, 928 (D.C. Cir. 1974) (citation omitted).[5]

It is true that some courts in this District, relying on their broad discretion to address transfer motions, have found the existence of "national implications" to be relevant to whether a case is "truly local." But many of these cases are easily distinguishable. For instance, Plaintiffs rely on *Oceana v. Pritzker*, where the court stated that it "must determine whether this is a "question[ ] of national policy or national significance." 58 F. Supp. 3d at 9 (quoting *BOEM*, 962 F. Supp. 2d at 77). The court held that the decision at issue—regulation of fisheries off the coast of New England—was not a purely local dispute and denied transfer to the District of Massachusetts. *Id.* But the court's rationale emphasized that the impacts of such regulation were not centered on Massachusetts. The fishery "covers the waters off five Northeastern states, of which Massachusetts is just one." *Id.* at 9. Moreover, it noted that "Northeast fish do not always remain in the Northeast Multispecies Fishery; they migrate throughout the region and into other fisheries, including the Mid–Atlantic Fishery, which sits far closer to Washington, D.C., than to Massachusetts." *Id.* at 10. And in fact, "[d]epletion of stocks in the Northeast Multispecies Fishery will thus directly affect the marine ecosystem along the entire eastern seaboard." *Id.* Given this absence of a distinct interest by the transferee district, the court denied the motion. *See also BOEM*, 962 F. Supp. 2d at 78 (rejecting transfer of case addressing lease sales in the Gulf of Mexico to District of Alabama because the "keen interest" of Alabamans was no greater than that of the "citizens of Texas, Louisiana, Mississippi, and Florida."); *Otay Mesa*

---

[5] UDB notes that "other cases suggest that questions of national policy or national significance are quite appropriately resolved here (or, at least, no more appropriately resolved elsewhere)." UDB Opp. at 15 (quoting *BOEM*, 962 F. Supp. 2d at 77). But this quotation from *BOEM* says less than UDB thinks it does—it merely recognizes that it is equally appropriate to resolve questions of national policy or significance in this District or in any other appropriate District. And as noted below, the *BOEM* court did not rely upon the existence of significant national questions, but rather on the absence of a particularized local interest in the transferee forum. *Id.*

*Prop. L.P. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 122, 127 (D.D.C. 2008) (rejecting transfer

to because "this case will have no direct or unique impact upon the residents of San Diego

County"). Here, in contrast, this case—and the interests it will impact—are focused on Utah.

Similarly, UDB relies on *Kempthorne*, 2008 WL 1862298, at \*6, where the court found

the case had national implications because it addressed Yellowstone National Park. But even

assuming the court's conclusion in that case was appropriate, it is distinguishable because of

Yellowstone's stature as perhaps the most famous National Park in the country, if not the world.

*See id.* (noting that "Yellowstone National Park is truly a national icon."). *See also Int'l*

*Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1253 (D. Wyo. 2004) (explaining that

Yellowstone, created in 1822, was the first national park); Robert B. Keiter, *The National Park*

*System: Visions for Tomorrow*, 50 Nat. Resources J. 71, 71–72 (2010) ("Ever since Yellowstone

was established in 1872 as the world's first national park, the American national park idea has

served as a worldwide model for nature conservation"). The Monument (created only in 2016) is

indisputably not akin to Yellowstone National Park in the national consciousness.[6]

Moreover, in contrast to cases cited by Plaintiffs, numerous other decisions from this

District have rejected the importance of asserted "national significance" especially where, as

---

[6] Also of note, *Kempthorne* was not the first suit before Judge Sullivan addressing snowmobile use at Yellowstone, the central issue in that case. Judge Sullivan emphasized his "long history with the facts and law surrounding th[e] case" from having presided over three earlier lawsuits, including *Fund for Animals v. Norton*, 352 F. Supp. 2d 1 (D.D.C. 2005). 2008 WL 1862298, at \*6. Critically, Judge Sullivan later highlighted that "long history" as one of the factors distinguishing *Kempthorne* in *Niagara Preservation Coalition v. FERC*, 956 F. Supp. 2d 99 (D.D.C. 2013), where he transferred a case involving a project on historically significant land on the Niagara River in New York. *Id.* at 105, 107. And, this same consideration applies to *Fund for Animals*, which the Tribes cite as "denying transfer despite strong local interest in Wyoming." Tribes' Opp. at 17. Contrary to the Tribes, Judge Sullivan stated there too that "most importantly, this Court has a long history with the facts and law surrounding this case and [related] prior litigation." *Fund for Animals*, 352 F. Supp. 2d at 2.

here, there are compelling local interests.[7]  For instance, in *Gulf Restoration Network*, the

plaintiffs challenged a federal approval of a restoration project responding to the 2010

Deepwater Horizon oil spill in the Gulf of Mexico.  87 F. Supp. 3d at 305.  Plaintiffs opposed a

motion to transfer the case to the District of Alabama, urging that "the Spill and the related

restoration efforts are of 'national significance,' . . . that there is a 'profound national interest' in

how the Defendants fulfill [various federal statutory obligations,] . . . and that the judgment in

this case could affect 'the conduct of the broader Deepwater Horizon Natural Resource Damage

Assessment and future natural resource damage assessments in any part of the nation.'"  *Id.* at

316.  The court rejected plaintiff's argument:

> The court agrees with Defendants that this case should be litigated within the
> "view and reach" of the people who will be "most vitally affected" by its
> outcome. Although the Spill and subsequent restoration efforts are significant to
> individuals and communities nationwide, particularly those who reside in the
> other Affected States, Alabama's superior interest in this controversy is
> undeniable.

*Id.*[8]  *See also Pool*, 942 F. Supp. 2d at 103 ("The implications of a decision resolving this dispute

will be felt most acutely in Utah where local citizens are directly affected and therefore the local

interest in this case outweighs the national interest"); *Norton*, 315 F. Supp. 2d at 88

("Notwithstanding this national attention, the dispute remains focused on 21 parcels of land in

---

[7] Some of Plaintiffs' cases that identify "national significance" as a consideration do not
ultimately rely upon it.  For instance, in *Stand Up,* 919 F. Supp. 2d at 64, "the local population
directly affected by the disputed decision was expressly *not* interested in having the case decided
in its home forum."  *Gulf Restoration Network*, 87 F. Supp. 3d at 317 (citing and distinguishing
*Stand Up*, 919 F. Supp. 2d at 65).  Moreover, as noted above, the *Stand Up* court's decision was
driven by a distinct concern of "overarching importance"—transferring venue would have been
unduly prejudicial by preventing plaintiffs from being able to seek preliminary injunctive relief.
919 F. Supp. 2d at 65.
[8] While *Gulf Restoration Network* also distinguished other cases by noting that the other
decisions "affected the use of *national* resources managed by *federal* officials," it also noted that
many of those other cases addressed resources that were not associated with one single state.  *Id.*
at 317.

Utah.  Land is a localized interest because its management directly touches local citizens."); *Lewis*, 845 F. Supp. 2d at 238 ("While there can be no debate about the objective natural beauty of these locations, this fact alone does not suffice to create a national interest that outweighs Utah's strong local interest in having local controversies decided within its borders"); *Harvey*, 437 F. Supp. 2d at 49 ("While the fact that Plaintiffs' claims invoke federal law, relate to the Everglades ecosystem, and are brought by a national environmental organization suggests that the case has a national aspect, . . . the extent and degree of Florida's interest is indisputable"); *Akiachak Native Comty. v. Dep't of the Interior*, 502 F. Supp. 2d 64, 68 (D.D.C. 2007) (finding that although the case concerned "a statute that has national application to all federally recognized tribes," the local interest factor supported transfer, because "this case will have an immediate effect only felt in Alaska."); *Alaska Wilderness League*, 99 F. Supp. 3d at 117 ("[E]ven accepting that this case touches upon some national concerns, it is beyond cavil that the regulation most *directly* affects Alaskan lands, livelihoods, waters, and wildlife.").  Here, consistent with these numerous cases, even though "plaintiffs characterize this case as one with 'national significance,' it will have inherently local effects."  *M&N Plastics*, 997 F. Supp. 2d at 25 (citation omitted).

Fourth, the Tribes argue that this is not a local controversy because there has been "personal involvement" by Washington, D.C.-based official, including President Trump and Secretary Zinke.  Tribes' Opp. at 18.  While, as shown by Plaintiffs, some decisions from this District find such circumstances relevant, other decisions do not.  For instance, in *WildEarth Guardians*, 922 F. Supp. 2d at 55, the Secretary of the Interior was intimately involved, in fact travelling to Wyoming to personally announce the challenged actions.  The court still found that the local interest weighed in favor of transfer, noting that the Secretary's travel "might indicate a

substantial interest in the underlying issue in Washington, but could just as easily signify that the issue was important mainly within the state of Wyoming." *See also Gulf Restoration Network*, 87 F. Supp. 3d at 312, 317 (transferring based on local interest, despite Secretary of the Interior being "directly and personally involved" in announcing decision and "five District of Columbia-based officials provid[ing] the necessary final approval").

Fifth, Plaintiffs seek to minimize the importance of the Monument being located in Utah. *See, e.g., Nat'l Ass'n*, 675 F. Supp. 2d at 178 (noting that "the mere presence of a local interest, in the form of property located within the proposed transferee district, is not dispositive in the transfer analysis"). But the *National Association* court's rationale ultimately rested on the fact that the decision being challenged did not have significant local implications. It noted that there was no indication that the decision "will have a major impact on local economic, political, and environmental interests" nor had the court received "communication from the public indicating that there is a high degree of local public interest in the regulation at issue." *Id.* The same cannot be said here. As substantiated by the motion to intervene in *UDB* and Utah's amicus brief, there is exceedingly keen interest in this case, and these parties emphasize numerous significant and local implications for Utah. Moreover, virtually all of the injuries alleged by Plaintiffs here relate to their use and enjoyment of land in Utah. Indeed, the Tribes concede that "their "paramount and undisputable interests . . . may largely exist within the southwestern United States. . . ." Tribes' Opp. at 14. *See also* Tribes' Compl., ¶¶ 74-80, 151-61, 172-73, 179-80 (alleging harm in Utah); *PSC*, 893 F. Supp. 2d at 56 (noting that "the potential effects Plaintiffs have alleged will all be felt in Charleston, not in Washington").[9]

---

[9] The Tribes also cite to *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 13 (D.D.C. 2007). However, the court's reasoning in that case is unconvincing. The court held that there was not a sufficiently localized impact on the suit in light of "both Congress' express declarations of the

As a result, Plaintiffs cannot reasonably argue that the outcome of this case will not have a "major impact on local economic, political, and environmental interests."  *See Nat'l Ass'n*, 675 F. Supp. 2d at 178.  In summary, the strong localized interest in having this case decided in Utah is indisputable, and it is ultimately determinative of the public interest analysis here, as detailed below.

 2. The other public interest factors do not counterbalance the strong local interest in transferring this case to the Utah forum.

The other two public interest factors—familiarity with the governing law and the courts' relative congestion—play a limited role in the analysis under the circumstances of this case.

With respect to the familiarity with the governing law, courts in both Districts are equally capable of determining the federal statutory and constitutional issues raised by this case.  *See Alaska Wilderness League*, 99 F. Supp. 3d at 116; *Norton*, 315 F. Supp. 2d at 89.  This factor, then, is neutral.

With respect to the relevant congestion of the two Districts, as Defendants previously noted, the most recent data (from September 2017) shows that the District of Utah is relatively more congested than this District due to the relative number of judgeships.  *See* Defs.' Mem. at 11.  However, courts generally place little weight on this factor.  *See, e.g., Harvey*, 437 F. Supp. 2d at 49; *Pool*, 942 F. Supp. 2d at 101 (finding relative congestion weighed against transfer—but still doing so in light of compelling local interests).  Doing likewise here is particularly appropriate because, although the District of Utah is relatively more congested, that congestion

---

national character of the statutes at issue in this case and the fact that the issue here is whether federal agencies complied with federal law."  But it is difficult to see how any case against the federal government could be transferred under such analysis.  *See PSC*, 893 F. Supp. 2d at 55 (reasoning that if application of federal law were important in the transfer analysis, then "any challenge involving a federal law implemented by a federal agency could not be transferred elsewhere."  *Id.* at 55.

has not meaningfully increased the timeliness of its resolution of cases.  Specifically, the average

time from filing to disposition is just over a month less in this District.  *See*

http://www.uscourts.gov/file/23316/download, (Sept. 30, 2017) (indicating an average of 7.1

months in this District, and an average of 8.4 months in the District of Utah, between filing and

disposition).  So the relative congestion will not lead to any meaningful delay, and accordingly,

this factor is neutral.[10]  *See Norton*, 2002 WL 32617198, at *4 (noting that "it is not apparent that

transfer to the District of Utah will lead to any unnecessary delay due to docket congestion").

### B.   The Private Interest Factors Carry Little Weight.

While primarily mixed or neutral, taken as a whole, the relevant private interest factors,

in concert with the strong interest in deciding local controversies locally, tip the scales in favor a

forum in Utah.

#### 1.   Plaintiffs' choice of forum should receive little weight.

As Defendants demonstrated in their opening brief, Plaintiffs' choice of forum is entitled

to relatively little weight in the circumstances here.  While courts generally afford deference to

the plaintiff's choice, less deference is given when the plaintiff has substantial ties to the

proposed transferee district.  *See PSC*, 893 F. Supp. 2d at 54 (citing *Airport Working Grp. of

Orange Cty., Inc. v. Dep't of Def.*, 226 F. Supp. 2d 227, 230 (D.D.C. 2002) (noting less deference

is accorded when "Defendants seek transfer to the plaintiffs' resident forum" (internal quotation

marks omitted)).  As a whole, as many of the Plaintiffs in this case reside in Utah for venue

---

[10] The Tribes argue that the "federal Judicial Conference has declared a 'judicial emergency'" in
the District of Utah.  Tribes' Opp. at 12.  A "judicial emergency," however, refers not to the
overall condition of a District's docket—but rather the existence of a vacancy in a District that
has a certain amount of "weighted filings" per judgeship.  *See* http://www.uscourts.gov/judges-
judgeships/judicial-vacancies/judicial-emergencies/judicial-emergency-definition (last visited
Feb. 8, 2018).  The District of Utah has a single vacancy—and given the number of weighted
filings and the longevity of that vacancy, the vacancy is deemed a judicial emergency.

purposes as reside in Washington, D.C.[11]  And the majority of the Plaintiffs reside elsewhere, with nine of the remaining Plaintiffs residing in states bordering Utah.[12]  Further, most allege having members in Utah and/or organizational or member activities occurring in Utah.  *See, e.g.,* Defs.' Mem. at 10; UDB Compl., ¶¶ 27, 35, 51 58, 64, 71, 17-cv-1605, ECF No. 1.

While, as Plaintiffs note, some decisions from this District have afforded substantial deference to Plaintiffs' preference when only some of the plaintiffs reside in the District, Tribes' Opp. at 16 4 n.1, others have not.  *See Jewell,* 74 F. Supp. 3d at 84 ("any deference owed by the Court in this action is lessened because only one of the three plaintiffs resides in the current forum"); *Norton*, 315 F. Supp. 2d at 87 (not deferring to plaintiffs' choice even though the plaintiffs—including plaintiffs in this case, TWS and SUWA—had offices in Washington, D.C.); *Flowers*, 276 F. Supp. 2d at 67 (holding that "the fact that the parties each have offices in the District of Columbia is not dispositive of the question of deference").  *Cf. Van Antwerp*, 523 F. Supp. 2d at 12 n.4 (finding presence of one plaintiff sufficient in that case, but noting it "could easily conceive of a set of circumstances where relevant factors would weigh against deferring to plaintiffs' selected venue despite one plaintiff's residency in that district").

With respect to the decision-making process, Defendants do not dispute that Washington, D.C.-based officials were involved in the decision.  However, this does not itself ensure

---

[11] Plaintiffs Ute Indian Tribe, Utah Diné Bikéyah, Friends of Cedar Mesa and SUWA reside in Utah, while Plaintiffs National Trust for Historic Preservation, TWS, Defenders of Wildlife, and National Parks Conservation Association reside in Washington, D.C.  *See* Tribes' Compl. at 1; UDB Compl. at 1; NRDC Compl. at 1, 17-cv-2606, ECF No. 1.  Moreover, portions of the Ute Indian Tribe, Navajo Nation and Ute Mountain Ute Tribe's lands are in Utah.  Tribes' Compl. ¶¶ 17-19.

[12] Specifically, Hopi Tribe and WildEarth Guardians are located in New Mexico; Zuni Tribe, Archaeology Southwest, Center for Biological Diversity, and Grand Canyon Trust are located in Arizona; and The Access Fund, and Conservation Lands Foundation, and Great Old Broads for Wilderness are headquartered in Colorado.  Tribes' Compl. at 1; UDB Compl. at 1; NRDC Compl. at 1.  Further, Sierra Club has a chapter in Utah.  NRDC Compl., ¶ 40.

substantial deference to Plaintiffs' choice of this forum.  Corroborating the firm connection with

the District of Utah, both the President and the Secretary travelled to Utah in connection with the

challenged decision.  Addressing similar circumstances, the court in *WildEarth Guardians* noted:

"that Secretary of the Interior Ken Salazar traveled from D.C. to Wyoming to announce the

contested actions, . . . might indicate a substantial interest in the underlying issue in Washington,

but could just as easily signify that the issue was important mainly within the state of Wyoming."

922 F. Supp. 2d at 55.  And as noted in Defendants' opening brief, the deference that would

otherwise be afforded to Plaintiffs' choice of forum is diminished by the fact that any effects of

that decision—including Plaintiffs' alleged injuries—primarily will be felt in Utah, not in the

District of Columbia.  Defs.' Mem. at 12.  Accordingly, any weight owed to Plaintiffs' choice of

forum is minimal, and yields to the heavy weight given to the local interest in Utah.

> 2.  Defendants' choice of forum is consistent with the strong local connection
>      to Utah.

Defendants demonstrated in their opening brief that their choice of forum should be

afforded weight because they present "legitimate reasons for preferring to litigate the case in the

transferee district, . . . the harm from a federal agency's decision is felt most directly in the

transferee district," and "the economic and environmental impacts of the Project will be felt most

acutely" in the Defendant's choice of forum.  *See Gulf Restoration Network*, 87 F. Supp. 3d at

313.  In response, Plaintiffs first ignore *Gulf Restoration Network*, and argue that Defendants are

entitled to *no* deference for their choice because they show no inconvenience in having to litigate

this case here.  Tribes' Opp. at 5; UDB Opp. at 11.  But none of the case law—including the

cases they cite—address inconvenience in the context of Defendants' preference.  *See*

*Kempthorne*, 2008 WL 1862296 at *4; *In re Vitamins Antitrust Litig.*, 263 F. Supp. 2d 67, 70

(D.D.C. 2003).  Rather, this question goes to the convenience of the parties—which as addressed

below—is neutral.

The Tribes next seek to distinguish *Gulf Restoration Network* by arguing that the plaintiffs in that case lacked any tie to the District of Columbia.  Tribes' Opp. at 6.  But while the *Gulf Restoration Network* court did, as the Tribes argue, find diminished deference to plaintiff's choice on that basis, its determination that the defendants' choice of forum was accorded some weight had nothing to do with the plaintiff's circumstances.  *See* 87 F. Supp. 3d at 313.[13]  Accordingly, the argument is inapposite to Defendants' choice, and certainly does not rebut the showing that Defendants' choice of forum weighs in favor of transfer.

### 3.  Plaintiffs' claims arise in Utah and the District of Columbia.

As Defendants demonstrated in their opening brief, this factor weighs in favor of transfer, or is at very least neutral.  The decision challenged in this case was made in both Utah and Washington, D.C.  *See Nat'l Ass'n*, 675 F. Supp. 2d at 179.  And its effects—and any injuries alleged by Plaintiffs—will be felt primarily in Utah.

The Tribes disagree, and argue that their claims arose only in this District.  First they argue this necessarily follows from the fact that the decision-makers reside in Washington, D.C. *Id.* at 7.  But the cases they cite do not support their argument.  For instance, in *The Wilderness Society v. Babbitt*, the court found the factor "inconclusive" where some agency action occurred in Alaska, but "the Secretary signed the [decision] here in Washington" and nationwide

---

[13] UDB argues that Defendants "tellingly" conflate the local interest factor with their preference. UDB Opp. at 11 n. 5.  But *Gulf Restoration Network* makes it clear this consideration is appropriate in considering whether a defendant's choice is entitled to deference.  Similarly, while the Tribes continue to dispute the argument that the outcome of this case will be felt most acutely in Utah, their own allegations undercut their contention.  Tribes' Opp. at 7.  As they assert, "the impact of the litigation will be felt by the Tribes who enjoy an ancient and sacred connection to Bears Ears . . . ."  *Id.*  The Monument exists exclusively in Utah, thus corroborating the centrality of Utah to this controversy.

comments were received.  104 F. Supp. 2d 10, 15 (D.D.C. 2000).  Second, the Tribes seek to minimize the fact that the Proclamation was signed in Utah.  But the Proclamation could not have been effective until that event occurred.  *See Chamber of Commerce of U.S. v. Reich*, 886 F. Supp. 66, 76 (D.D.C. 1995), *rev'd on other grounds*, 57 F.3d 1099 (D.C. Cir. 1995) (implying effectiveness of executive order occurred "upon the President's signing").  Accordingly, the Tribes cannot dispute that, both empirically and legally, the decision was made final in Utah.  Finally, the Tribes argue that virtually every critical stage of the decision-making process took place in this District."  Tribes' Opp. at 8 (quoting *Akiachak Native Comty.*, 502 F. Supp. 2d at 68.  But this is inaccurate: the decision-making process occurred in both forums, and culminated in Utah.[14]  As Defendants previously demonstrated (and the Tribes do not dispute), that process involved the Secretary travelling to Utah for the express purpose of making a more informed recommendation to the President about the Monument.  And as noted immediately above, the decision was finalized in Utah.  Thus, at very least, the location of the decision is neutral.  *Gulf Restoration Network*, 87 F. Supp. 3d at 313 (noting that "where the decision-making process was diffuse courts have found this factor to be neutral"); *The Wilderness Soc.*, 104 F. Supp. 2d at 15.

Moreover, in addressing where the claim arose, it is appropriate to address where the effects will be felt.  And that is true even if the "decision-makers may be located in Washington."  *See Ctr. for Envtl. Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 357 (D.D.C. 2014) (finding that this factor "weigh[ed] strongly in favor of transfer" when the "alleged affects . . . occurred or allegedly occurred in the Eastern District of California").

---

[14] Like TWS in the *TWS v. Trump* case, the Tribes argue that activities related to an earlier executive order, requiring monument review, was issued in Washington, D.C.  Tribes' Opp. at 8-9.  But the Tribes are not challenging the issuance of the executive order.  Further, the Tribes (as well as the other plaintiffs) provide no support for their surmise that "the vast majority of comments" addressed the specific Monument at issue in this case.  *See id.* at 9.

The Tribes simply ignore this contention.  Thus, because the decision-making process occurred in both forums, and the alleged impacts of the decision will be felt in Utah, this factor ultimately favors transfer, or at very least, is neutral.

### 4.    Convenience of the Parties is Neutral

While Defendants did not address this factor in their opening brief, Plaintiffs argue convenience of the parties requires that this case remain in this Court.  But their arguments fail.

UDB argues this District would be more convenient because one of their eight plaintiffs is headquartered here, one has a "regional" office there, and one is in Maryland—and then tautologically argues that the other five plaintiffs don't consider this District inconvenient because they filed suit here.  UDB Opp. at 12.  But two of the UDB plaintiffs reside in Utah, and three others reside in states bordering Utah.  Seeking to overcome the decidedly western tilt of their locations, UDB notes that their counsel (and one of Defendants' counsel) are located in this District.  *Id.* at 12, 13.  But as the Tribes point out, consideration of "the convenience of counsel is 'irrelevant and improper.'"  Tribes' Opp. at 11 (quoting *In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003)).  *See also Stand Up*, 919 F. Supp. 2d at 64 n.14 ("[w]here counsel resides is of little relevance for purpose of evaluating venue transfer motions").[15]

Moreover, many of the Plaintiffs in this consolidated case regularly litigate matters in the District of Utah when it suits them.  *See Ute Indian Tribe v. Utah*, No. 2:13-cv-00276, 2014 WL 1648728, (D. Utah Apr. 24, 2014); *Navajo Nation v. San Juan County*, No. 2:12-cv-00039, 2015 WL 1137587, at *1 (D. Utah Mar. 12, 2015); *Impact Energy Res. v. Salazar*, 09-cv-00435 (D. Utah) (motion to intervene as defendants by parties SUWA, NRDC, TWS, Sierra Club, Grand

---

[15] For their part, as noted above, the Tribes are all located in the American Southwest (and three of the five have lands in Utah).  Tribes' Compl. ¶¶ 16-20.

Canyon Trust, National Parks Conservation Association, National Trust For Historic

Preservation, and Great Old Broads For Wilderness), available at 2009 WL 5129262.[16]

Finally, UDB notes that "all of the Federal Defendants reside in the District of

Columbia."  UDB Opp. at 13.  But the location of the named Defendants is irrelevant: as UDB

concedes, this case will be decided on legal issues, and obviously the named Defendants will not

be participating directly.  Particularly under these circumstances, "the convenience of the

parties[] does not present a valid reason for denying transfer."  *Harvey*, 437 F. Supp. 2d at 48.

4. Evidentiary issues are neutral, or if anything, weigh in favor of transfer.

The Parties agree that the convenience of witnesses and access to proof factors play little

role here in light of the nature of Plaintiffs' claims and the absence of a need for discovery.

Tribes Opp. at 11; UDB Opp. at 13.[17]

**CONCLUSION**

As demonstrated above, the flexible, individualized analysis required under Section

1404(a) demonstrates that this consolidated case should be transferred to the District of Utah

based on the strong public interest in having a local controversy decided at home.


Respectfully submitted this 15th day of February, 2018,


JEFFREY H. WOOD
Acting Assistant Attorney General


   */s/ Romney S. Philpott*
Romney S. Philpott
U.S. Department of Justice
Environment and Natural Resources Division

---

[16] *See also TWS v. Trump*, 17-cv-2587, Defs.' Reply at 20 (noting numerous cases litigated by Plaintiffs from *NRDC v. Trump* in the District of Utah).

[17] As noted in Defendants' opening brief, these factors would become relevant, however, and would favor transfer to Utah, if evidentiary showings are required with respect to requests for preliminary injunctive relief or with respect to Plaintiffs' standing.

Natural Resources Section
999 18th St., #370
Denver, CO 80202
Phone:  303-844-1810
Fax:  303-844-1350
E-mail:  Romney.Philpott@usdoj.gov

Judith E. Coleman
U.S. Department of Justice,
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  202-514-3553
Fax:  202-305-0506
Email:  Judith.Coleman@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2018, I electronically filed the foregoing document and its attachments with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all parties.

*/s/ Romney S. Philpott*