**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HOPI TRIBE, *et al*., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02590 (TSC) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| UTAH DINÉ BIKÉYAH, *et al*., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-02605 (TSC) |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, *et al*., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. 1:17-cv-02606 (TSC) |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official | ) | |
| capacity as President of the United States, | ) | |
| *et al*., | ) | |
| | ) | **CONSOLIDATED CASES** |
|     Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
FEDERAL DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY AND FACTUAL BACKGROUND ...............................................2

    A.    The Antiquities Act..................................................................................2

    B.    Presidential Action under the Antiquities Act. ................................4

    C.    Bears Ears National Monument ..............................................................8

    D.    Plaintiffs' Complaints ...........................................................................12

STANDARD OF REVIEW ...............................................................................12

ARGUMENT ....................................................................................................13

    I.  Plaintiffs' Failure to Demonstrate Standing Deprives this Court of Jurisdiction. ..........................................................................................13

        A.  The Plaintiffs have not demonstrated cognizable injury...............14

            1.    *The Plaintiffs have not demonstrated injury in fact.*.....14

            2.    *The UDB Plaintiffs do not adequately allege organizational standing.* ...............................................20

            3.    *The Tribes' allegations of impediments to participation are implausible.*......................................21

        B.  Plaintiffs' claims against the President are not redressable. ..........21

    II.  Plaintiffs' Claims are not Ripe. ..................................................23

    III.  Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law............................26

        A.  Judicial Review of Presidential Action Under the Antiquities Act Is Extremely Limited. ...............................................27

        B.  The Text and Legislative History of the Antiquities Act Authorize the President to Modify Monument Boundaries.....28

        C.  There Is a Longstanding and Extensive History of Presidential Modification of Monument Boundaries, and Congressional Acquiescence to this Practice....................................................32

        D.  The President Acted Within the Scope of His Authority in Issuing the Proclamation.......................................................36

i

IV.  Plaintiffs' Allegations that the Proclamation Violated the Constitution Fail to State a Claim.................................................................................39

V.  Plaintiffs' APA Counts Fail to State a Claim. ...........................................41

   A.  Plaintiffs Fail to State a Claim under 5 U.S.C. § 706(2)...............42

   B.  Plaintiffs also Fail to State a Claim for an Order Compelling Agency Action under 5 U.S.C. § 706(1).................................43

CONCLUSION..............................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................ 24

*Al-Bihani v. Obama,*
    619 F.3d 1 (D.C. Cir. 2010) ...................................................................... 33, 34

*Albertson v. FCC,*
    182 F.2d 397 (D.C. Cir. 1950) .................................................................. 30, 31

*Am. Petroleum Inst. v. EPA,*
    683 F3d 382 (D.C. Cir. 2012) ........................................................................ 24

*Anglers Conservation Network v. Pritzker,*
    809 F.3d 664 (D.C. Cir. 2016) ....................................................................... 44

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ......................................................................... 15

*Atl. States Legal Found. v. EPA,*
    325 F.3d 281 (D.C. Cir. 2003) ....................................................................... 25

*Barnett v. Obama,*
    No. SACV09-0082 DOC (ANX), 2009 WL 3861788 (C.D. Cal. Oct. 29, 2009) ........... 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 13

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 42

*Cameron v. United States,*
    252 U.S. 450 (1920) .................................................................................. 28, 29

*Cappaert v. United States,*
    426 U.S. 128 (1976) .................................................................................. 27, 28

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) ........................................................................... 13

*Cases on which Federal Defendants chiefly rely are indicated by (\*)*

i

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*,
   718 F.3d 922 (D.C. Cir. 2013) ................................................................................ 24

*\*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................... 15

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ............................................................................................... 40

*Cloud Found., Inc. v. Salazar*,
   999 F. Supp. 2d 117 (D.D.C. 2013) ...................................................................... 43

*Cobell v. Norton*,
   240 F.3d 1081 (D.C. Cir. 2001) ............................................................................ 42

*Dakota Cent. Tel. Co. v. S. Dakota*,
   250 U.S. 163 (1919) ............................................................................................... 27

*\*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................................... 2, 27, 39

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ................................................................................... 28, 33, 36

*Del Monte Fresh Prod. v. United States*,
   570 F.3d 316 (D.C. Cir. 2009) .............................................................................. 15

*Drake v. Obama*,
   664 F.3d 774 (9th Cir. 2011) ................................................................................ 22

*El Paso Nat. Gas Co. v. United States*,
   750 F.3d 863 (D.C. Cir. 2014) .............................................................................. 44

*Elec. Privacy Info. Ctr. v. FAA*,
   892 F.3d 1249 (D.C. Cir. 2018) ...................................................................... 20, 21

*Equal Rights Ctr. v. Post Props., Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ............................................................................ 15

*Fludd v. Mitchell*,
   181 F. Supp. 3d 132 (D.D.C. 2016) ..................................................................... 13

*\* Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ................................................................... 19, 20, 21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................. 2, 23, 37, 38

*Friends of Animals v. Ashe,*
    174 F. Supp. 3d 20 (D.D.C. 2016) .................................................. 43

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .................................................................. 14

*Gammill v. U.S. Dep't of Educ.,*
    989 F. Supp. 2d 118 (D.D.C. 2013) ................................................ 13

*Gross v. FBL Fin. Servs., Inc.,*
    557 U.S. 167 (2009) .................................................................. 36

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017) ........................................................ 23

*King v. St. Vincent's Hosp.,*
    502 U.S. 215 (1991) .................................................................. 31

*Kingdomware Techs., Inc. v. United States,*
    136 S. Ct. 1969 (2016) ............................................................... 29

*Kowal v. MCI Commc'ns Corp.,*
    16 F.3d 1271 (D.C. Cir. 1994) ...................................................... 13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 16

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ............................................................... 16, 42

*Marbury v. Madison,*
    1 Cranch 137 (1803) .................................................................. 32

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat) 316 (1819) ....................................................... 32

*Medellin v. Texas,*
    552 U.S. 491 (2008) ............................................................... 28, 33

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ..................................................... 23, 40

iii

*Mountain States Legal Foundation v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002) ........................................................ 27, 28, 37, 38, 39, 40

*Nat'l Wildlife Fed'n. v. EPA*,
   945 F. Supp. 2d 39 (D.D.C. 2013) ................................................................... 43

*Newdow v. Bush*,
   391 F. Supp. 2d 95 (D.D.C. 2005) ................................................................... 22

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014) ................................................................... 32, 36

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................ 2, 9, 38, 43, 44

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998) ................................................................... 1, 24, 25

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ................................................................... 24

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ................................................................... 15

*Public Citizen v. Trump*,
   297 F. Supp. 3d 6 (D.D.C. 2018) ................................................................... 15, 30

*Sandifer v. U.S. Steel Corp.*,
   571 U.S. 220 (2014) ................................................................... 29

*Sierra Club v. Antwerp*,
   560 F. Supp. 2d 21 (D.D.C. 2008) ................................................................... 30, 31

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ................................................................... 14

*Stewart v. Nat'l Educ. Ass'n*,
   471 F.3d 169 (D.C. Cir. 2006) ................................................................... 13

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................... 16

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ................................................................... 22, 23

iv

*Texas v. United States*,
    523 U.S. 296 (1998) ............................................................................ 25, 29

\* *Tulare Cty. v. Bush,*
    306 F.3d 1138 (D.C. Cir. 2002) ...................................... 2, 26, 27, 36, 38, 40

*Tulare Cty. v. Bush*,
    185 F. Supp. 2d 18 (D.D.C. 2001) ...................................................... 26

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) ........................................................ 20, 21

*U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
    154 F. Supp. 2d 19 (D.D.C. 2001) ...................................................... 40

*Udall v. Tallman*,
    380 U.S. 1 (1965) ...................................................................... 34

*United States v. California*,
    436 U.S. 32 (1978) .................................................................. 27, 28

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) ................................................................. 27, 37

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) .................................................................... 33

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) .................................................................... 32

*United Transp. Union v. ICC*,
    891 F.2d 908 (D.C. Cir. 1989) .......................................................... 15

\**Utah Ass'n of Ctys. v. Bush*,
    316 F. Supp. 2d 1172 (D. Utah 2004) .................................. 3, 4, 37, 38, 40, 45

*Wash. Water Power Co. v. FERC*,
    775 F.2d 305 (D.C. Cir. 1985) .......................................................... 35

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .................................................................... 39

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) .................................................................... 15

*Defs. of Wildlife v. Chertoff,*
    527 F. Supp. 2d 119 (D.D.C. 2007) ................................................ 40

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
    165 F.3d 43 (D.C. Cir. 1999) ................................................ 24, 25

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................ 28, 33

**Statutes**

5 U.S.C. § 704 ................................................................................ 54

5 U.S.C. § 706 ................................................................ 14, 54, 57

5 U.S.C. §§ 701-706 ........................................................................ 3

16 U.S.C. § 221 ................................................................................ 45

16 U.S.C. §§ 470aa-470mm ............................................................ 11

16 U.S.C. §§ 470ee ................................................................ 11, 23

16 U.S.C. §§ 4301-4310 .................................................................. 11

30 U.S.C. §§ 21-54 .......................................................................... 22

43 U.S.C. § 1782(c) .......................................................................... 12

43 U.S.C. § 1701(a)(4) ...................................................................... 46

43 U.S.C. § 1714(j) .......................................................................... 46

43 U.S.C. §§ 1701-1787 .................................................................. 11

54 U.S.C. § 320301 ........................................ 1, 2, 5, 11, 33, 37

54 U.S.C. §§ 300101-320303 .......................................................... 11

Pub. L. No. 81-787, § 1, 64 Stat. 849 (1950) .............................. 35

**Constitutional Provisions**

U.S. Const. art. II, § 3, .................................................................. 40

**Other Authorities**

39 Op. Atty. Gen. 185 (1938) ......................................................................................... 34

40 Cong. Rec. 7888 (1906) ........................................................................................ 3, 29

60 Interior Dec. 9 (1947) ............................................................................................... 34

H.R. Rep. No. 6157 ........................................................................................................ 16

H.R. Rep. No. 59-2224 ........................................................................................ 3, 29, 30

H.R. Rep. No. 59-2224 .................................................................................................... 3

Nat'l Park Serv., Archeology Program,
    https://www.nps.gov/archeology/sites/antiquities/FAQs.doc (last visited Sept. 26, 2018) ........ 5

Nat'l Park Serv., Archeology Program, Monuments List,
    https://www.nps.gov/archeology/sites/antiquities/monumentslist.htm (last visited Sept. 26,
    2018) ........................................................................................................................... 5

## INTRODUCTION

The Antiquities Act of 1906 authorizes the President to designate national monuments and make reservations of land "confined to the smallest area compatible with the proper care and management of the objects to be protected [therein]."  54 U.S.C. § 320301(b).  On December 4, 2017, President Trump signed Proclamation 9681, modifying the Bears Ears National Monument ("Monument") to reflect what he, in his discretion, determined to be "the smallest area compatible" with protection of the Monument objects.  *See* Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 4, 2017).  Three sets of plaintiffs filed complaints immediately thereafter.[1]

But Plaintiffs' complaints suffer multiple, incurable defects.  To begin with, they have brought suit prematurely.  They cannot demonstrate that the mere issuance of the Proclamation caused them or their members an actual or imminent, concrete and particularized injury.  To the extent Plaintiffs allege that they *could* suffer injuries when actions are taken to pursuant to the Proclamation in the future, the time to invoke the Court's jurisdiction is then and not now.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998).  In any event, Plaintiffs' claims largely focus on seeking relief directly against the President, and they fail to show that such extraordinary relief would redress their injuries as a practical matter, or is even appropriate in the circumstances.  *See Franklin v. Massachusetts*, 505 U.S. 788, 796-801 (1992).

Even ignoring these threshold defects, Plaintiffs' claims simply have no merit.  Although

---

[1] *Hopi Tribe v. Trump*, No. 17-cv-2590, ECF 1 (D.D.C. filed Dec. 4, 2017) ("Tribes Compl."); *Utah Diné Bikéyah v. Trump*, No. 17-cv-2605 (D.D.C. filed Dec. 6, 2017) ("UDB Compl."); *Natural Resources Defense Council v. Trump*, No. 17-cv-2606, ECF 1 (D.D.C. filed Dec. 7, 2017) ("NRDC Compl.").  This memorandum will refer to the "Tribes," "UDB Plaintiffs," or "NRDC Plaintiffs," respectively, or to "Plaintiffs" collectively.

Plaintiffs wish it were otherwise, the President lawfully exercised his authority under the Antiquities Act to modify the boundaries of the Monument to what he, in his discretion, determined to be "the smallest area compatible" with protection of the Monument objects. 54 U.S.C. § 320301(b). Nothing in the Antiquities Act precludes one President's modification of another's determination on this basis, and congressional acquiescence to the practice over many decades leaves this Court in no position to say otherwise. Further, whether the President properly exercised the authority granted him under the Antiquities Act is not reviewable. *See Dalton v. Specter*, 511 U.S. 462 (1994); *Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002). And, because the President was acting under the congressional authorization in the Antiquities Act, Plaintiffs' claims that the Proclamation violated myriad constitutional provisions fail outright. Finally, Plaintiffs' claims against the Secretary of the Interior, Deputy Director of the Bureau of Land Management ("BLM"), Secretary of Agriculture; and Chief of the U.S. Forest Service ("Forest Service") (together "Agency Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, fail to identify final agency action, and fail to identify discrete actions that these officials are legally obligated to take. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004).

## STATUTORY AND FACTUAL BACKGROUND

### A.     The Antiquities Act

In 1906, Congress passed the Antiquities Act, delegating to the President power to declare landmarks, structures, and objects of historic and scientific interest to be national monuments, and to reserve federal lands for their protection. *See* Act of June 8, 1906, Pub. L. No. 59-209, ch. 3060, 34 Stat. 225 (codified at 54 U.S.C. § 320301). The legislation stemmed from proposals, primarily from archaeological organizations, to protect objects of antiquity on federal lands. *See*

*Utah Ass'n of Ctys. v. Bush* ("*UAC*"), 316 F. Supp. 2d 1172, 1178 (D. Utah 2004).  At the turn of

the twentieth century, public lands were generally open to the public and available for

homestead, mining, oil, gas, and other claims, unless Congress or the Executive Branch had

"withdrawn" the land from the public domain and/or "reserved" the land for a particular purpose.

As a result, many historic sites on public lands had been looted and destroyed.  *See* H.R. Rep.

No. 59-2224, at 3 (1906).

For several years, Congress debated proposals to provide withdrawal authority to the

President or the Secretary of the Interior to protect historic and other resources.  *See UAC*, 316 F.

Supp. 2d at 1178.  In particular, some members of Congress were concerned that such proposed

legislation would permit large areas of land to be withdrawn from entry.  For example, Rep. John

Stephens of Texas asked, "How much land will be taken off the market in the Western States by

the passage of the bill?"  The bill's sponsor, Rep. Lacey, responded, "Not very much.  The bill

provides that it shall be the smallest area [necessary] for the care and maintenance of the objects

to be preserved."  40 Cong. Rec. 7888 (1906).  The House Report on the enacted bill also noted

that it was intended "to create small reservations reserving *only so much land* as may be

*absolutely necessary* for the preservation of those interesting relics of prehistoric times."  H.R.

Rep. No. 59-2224, at 1 (emphasis added).

Congress understood that initial reservations of land might be inaccurate or uninformed,

and therefore could be temporary or subject to modification.  For example, the report of

Professor Edgar L. Hewett, a chief architect of the Antiquities Act, was incorporated into the

House Report and indicates that many withdrawals would only be temporary in nature: he

explained that while some lands "are sufficiently rich in historic and scientific interest and scenic

beauty to warrant their organization into permanent national parks[, m]any others should be

temporarily withdrawn and allowed to revert to the public domain after the ruins thereon have been examined by competent authority . . . ." *Id.* at 3; *see also id.* at 7-8 (stating that "the permanent withdrawal of tracts of land from the public domain for the purpose of protecting ruins thereon would seem to be unnecessary except where the ruins are of such character and extent as to warrant the creation of permanent national parks.").

As enacted, the Antiquities Act authorized the President "in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments. . . ." § 2, 34 Stat. at 225. The statute also authorized the President to reserve only those lands necessary to protect the monument objects, stating that he "may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.*

In 2014, the Antiquities Act was recodified, and now reads, in relevant part:

> (a) Presidential declaration—The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest situated on land owned or controlled by the Federal Government to be national monuments.
>
> (b) Reservation of land—The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected.

54 U.S.C. § 320301.

## B. Presidential Action under the Antiquities Act

Theodore Roosevelt, President at the time of the Antiquities Act's passage, used this new

authority to proclaim eighteen monuments.[2]  His successor, President Taft, proclaimed ten

monuments, but also diminished two of the monuments established by President Roosevelt.  In

1911, President Taft determined that the Petrified Forest National Monument, "through a careful

geological survey of its deposits of mineralized forest remains," reserved "a much larger area of

land than is necessary to protect the objects for which the Monument was created, and therefore

the same should be reduced in area to conform to the requirement of the act authorizing the

creation of National Monuments."  Proc. 1167, 37 Stat. 1716 (Jul. 31, 1911).  He reduced the

area of the monument by more than 40 percent.  *Compare id.* (reducing reservation to 25,626.60

acres), *with* Proc. 697, 34 Stat. 3266 (Dec. 8, 1906) (reserving 60,776.02 acres).  President Taft

also reduced the Navajo National Monument in Arizona three years after its establishment,

finding that, "after careful examination and survey of the prehistoric cliff dwelling pueblo ruins,"

the original proclamation "reserve[d] a much larger tract of land than is necessary for the

protection of such of the ruins as should be reserved, and therefore the same should be reduced in

area to conform to the requirements of the act authorizing the creation of National Monuments."

Proc. 1186, 37 Stat. 1733 (Mar. 14, 1912).  He substantially reduced the monument to three

separate tracts—two containing 160 acres each, and one containing forty acres—to protect three

ruins.  *Id.* at 1734.

Many other Presidents have reduced monuments, finding that the removed lands "are not

necessary for the proper care and management of the objects of scientific interest situated on the

lands within the said monument."  *See, e.g.*, Proc. 2393, 54 Stat. 2692 (Apr. 4, 1940) (reduction

---

[2] *See* Nat'l Park Serv. ("NPS"), Archeology Program, Monuments List, available at
https://www.nps.gov/archeology/sites/antiquities/monumentslist.htm (last visited Sept. 27,
2018); NPS, Archeology Program, Frequently Asked Questions, available at
https://www.nps.gov/archeology/sites/antiquities/FAQs.doc (last visited Sept. 27, 2018).

of Grand Canyon National Monument by President Franklin Roosevelt); Proc. 3344, 74 Stat. c56 (Apr. 8, 1960) (reduction of Black Canyon of the Gunnison National Monument by President Eisenhower).  President Kennedy modified the boundaries of Bandelier National Monument, adding lands but removing other lands "containing limited archaeological values which have been fully researched and are not needed to complete the interpretive story of [the monument]." Proc. 3539, 77 Stat. 1006 (May 27, 1963).

Presidents have also cited other rationales as the basis for monument reduction.  For example, President Truman excluded lands from Santa Rosa National Monument because those lands were "needed by the War Department for military purposes . . . ."  Proc. 2659, 59 Stat. 877 (Aug. 13, 1945); *see also* Proc. 3089, 69 Stat. c27 (Mar. 31, 1955) (elimination by President Eisenhower of some lands from Glacier Bay National Monument that were "being used as an airfield for national-defense purposes and are no longer suitable for national-monument purposes"); Proc. 2454, 55 Stat. 1608 (Jan. 22, 1941) (reduction of Wupatki National Monument by President Franklin Roosevelt, noting that "such lands are needed in the construction and operation of a diversion dam in Little Colorado River to facilitate the irrigation of lands on the Navajo Indian Reservation"); Proc. 2295, 53 Stat. 2465 (Aug. 29, 1938) (reduction by President Franklin Roosevelt of White Sands National Monument to allow for U.S. Highway 70).  In some cases, Presidents reduced monument reservations without providing any explanation.  For example, Mount Olympus National Monument (now Olympic National Park) was diminished— on three separate occasions by three different presidents—without any reason cited in the proclamations.  *See* Proc. 1191, 37 Stat. 1737 (Apr. 17, 1912) (President Taft); Proc. 1293, 39 Stat. 1726 (May 11, 1915) (President Wilson); Proc. 1862, 45 Stat. 2984 (Jan. 7, 1929)

(President Coolidge).[3]

And Presidents have eliminated and added lands within the same proclamation.  President Eisenhower revised the boundaries of Hovenweep National Monument (established by President Truman) on the basis that certain lands "contain[ing] no objects of historic or scientific interest were erroneously included" in the Monument.  Proc. 3132, 70 Stat. c26 (Apr. 6, 1956) (also adding lands containing valuable ruins which were "erroneously omitted from the monument"); *see also* Proc. No. 3138, 70 Stat. c31 (Jun. 7, 1956) (President Eisenhower, removing and adding lands to Great Sand Dunes National Monument); Proc. 3307, 73 Stat. c69 (Aug. 7, 1959) (President Eisenhower, removing and adding lands to Colorado National Monument); Proc. No. 3360, 74 Stat. c79 (Jul. 22, 1960) (President Eisenhower, modifying Arches National Monument to exclude lands "which have no known scenic or scientific value," while adding other lands found necessary for the proper care and management of the objects on those lands and the original monument).  All told, Presidents have eliminated lands from existing monuments on at least eighteen occasions.[4]

---

[3] Presidents have also found that additional lands are required for the protection of the original objects identified in a proclamation based on new or different information.  For example, in 1909, President Taft added lands to the Natural Bridges National Monument, noting that "at the time this monument was created nothing was known of the location and character of the prehistoric ruins in the vicinity of the bridges, nor of the location of the bridges and the prehistoric cave springs…."  Proc. 881, 36 Stat. 2501, 2502 (Sept. 25, 1909).  Recently, President Obama expanded Papahānaumokuākea Marine National Monument based on his finding that additional area was required to protect the resources identified in the original monument.  Proc. 9478, 81 Fed. Reg. 60227 (Aug. 26, 2016).

[4] *See* Proc. 1167, 37 Stat. 1716 (July 31, 1911) (Petrified Forest National Monument); Proc. 1186, 37 Stat. 1733 (Mar. 14, 1912) (Navajo National Monument); Proc. 1191, 37 Stat. 1737 (Apr. 17, 1912) (Mount Olympus National Monument), Proc. 1293, 39 Stat. 1726 (May 11, 1915) (Mount Olympus National Monument), Proc. 1862, 45 Stat. 2984 (Jan. 7, 1929) (Mount Olympus National Monument); Proc. 2295, 53 Stat. 2465 (Aug. 29, 1938) (White Sands National Monument); Proc. 2393, 54 Stat. 2692 (Apr. 4, 1940) (Grand Canyon National Monument); Proc. 2454, 55 Stat. 1608 (Jan. 22, 1941) (Wupatki National Monument); Proc. No. 2499, 55 Stat. 1660 (Jul. 18, 1941) (Craters of the Moon National Monument); Proc. 2659, 59 Stat. 877

### C.      Bears Ears National Monument

The Bears Ears National Monument (the "Monument") was established and its boundaries initially designated by President Obama in December 2016.  *See* Proc. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016) (the "2016 Proclamation").  In his discretion, President Obama reserved approximately 1.35 million acres of federal land managed by the BLM and U.S. Forest Service ("USFS" or "Forest Service") for the Monument, and withdrew those lands from entry, location, selection, sale, leasing, or other disposition under the public land laws—but subject to all valid existing rights.  82 Fed. Reg. at 1143.

The 2016 Proclamation caused an instant controversy—there was significant local and national opposition to the creation of the Monument.  *See, e.g.,* James R. Rasband, *Stroke Of The Pen, Law Of The Land?*, 63 Rocky Mtn. Min. L. Inst. 21, 21-2 - 21-3 (2017) (noting that "President Obama's proclamations drew strong protests from some in public land communities near the monuments and from many in the congressional delegations of the states containing the monuments"); Nora R. Pincus, *Chapter 14 Annual Mining And Public Land Law Update*, 63 63 Rocky Mtn. Min. L. Inst14, 14-9 (2017) (noting that "Bears Ears was one of the most controversial of President Obama's new monuments, drawing strong opposition from the State of Utah and numerous elected officials . . .").

---

(Aug. 13, 1945) (Santa Rosa National Monument); Proc. 3089, 69 Stat. c27 (Mar. 31, 1955) (Glacier Bay National Monument); Proc. 3132, 70 Stat. c26 (Apr. 6, 1956) (Hovenweep National Monument); Proc. 3138, 70 Stat. c31 (June 7, 1956) (Great Sand Dunes National Monument); Proc. 3307, 73 Stat. c69 (Aug. 7, 1959) (Colorado National Monument); Proc. 3344, 74 Stat. c56 (Apr. 8, 1960) (Black Canyon of the Gunnison National Monument); Proc. 3360, 74 Stat. c79 (July 22, 1960) (Arches National Monument); Proc. No. 3486, 76 Stat. 1495 (Aug. 14, 1962) (Natural Bridges National Monument); Proc. 3539, 77 Stat. 1006 (May 27, 1963) (Bandelier National Monument).

The 2016 Proclamation instructed the Secretaries of Agriculture and the Interior to "jointly prepare a management plan for the monument and . . . promulgate such regulations for its management as they deem appropriate." 82 Fed. Reg. at 1143-44.  It further instructed the Secretaries to prepare a transportation plan designating "where motorized and non-motorized, mechanized vehicle use will be allowed." *Id.* at 1145.  And, recognizing "the importance of tribal participation" in the management of the Monument, the 2016 Proclamation established the "Bears Ears Commission," consisting of an elected officer from each of the five plaintiff Tribes, to "provide guidance and recommendations on the development and implementation of management plans and on management of the monument." *Id.* at 1144.  However, the 2016 Proclamation made clear that the Commission's role was limited to providing advice and information: it instructed the Secretaries only to "carefully and fully consider integrating the traditional and historical knowledge and special expertise of the Commission," or, in its absence, some comparable entity. *Id.*  The 2016 Proclamation expressly authorized the Secretaries to reject any recommendation from the Commission—but required them to provide a written explanation for doing so. *Id.*

On December 4, 2017, President Trump issued Proclamation 9681 to make "certain modifications" to the boundaries of the Monument.  *See* 82 Fed. Reg. at 58,081.  Pursuant to the authority delegated to him in the Antiquities Act, the President declared "that the boundaries of the Bears Ears National Monument are hereby modified and reduced to those lands and interests in land owned or controlled by the Federal Government" within two "modified monument areas" to be known as the Indian Creek and the Shash Jáa units. *Id.* at 58,085.  The President determined that the modified boundaries, which encompass approximately 201,876 acres,

9

comprise "the smallest area compatible with the proper care and management of the objects to be protected" by the Monument designation.  *Id.*; *see also* 54 U.S.C. § 320301(b).

While the Proclamation reduces the number of acres that are within the Monument, the lands now removed from the Monument remain in federal ownership, subject to management and protection under numerous federal statutes.  *See* 82 Fed. Reg. at 58,082.  These statutes include, *inter alia*,  the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1787; the Archaeological Resources Protection Act of 1979 ("ARPA"), 16 U.S.C. §§ 470aa-470mm; the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-320303, the Federal Cave Resources Protection Act of 1988, 16 U.S.C. §§ 4301-4310; and the Paleontological Resources Preservation Act ("PRPA"), 16 U.S.C. §§ 470aaa-470aaa-11.  Certain of these statutes (such as the PRPA and ARPA) make violations punishable by criminal penalties.  16 U.S.C. §§ 470ee; 470aaa-5.  Moreover, approximately 367,937 acres of the lands that were formerly within the Monument continue to be managed as Wilderness Study Areas ("WSAs"), which under FLPMA must be managed "so as not to impair their suitability for future congressional designation as Wilderness."  43 U.S.C. 1782(c); Decl. of Edwin Roberson ("Roberson Decl.") ¶¶ 6, 12.  Another 46,326 acres now excluded from the Monument are part of the congressionally designated Dark Canyon Wilderness Area, which the USFS manages to maintain or enhance its wilderness character.  Decl. of Nora Rasure ("Rasure Decl., ¶ 8(a) & 10.  An additional 77,688 acres of the now-excluded lands are also included in seven inventoried roadless areas (or "IRAs").  *Id.* ¶ 8(b).  The USFS manages these IRAs under its 2001 Roadless Rule, which, among other things, generally prevents the creation of new roads.  *Id.* ¶ 8(b) & 9.[5]

---

[5] Proclamation 9681 maintains the Bears Ears Commission (but renames it "Shash Jáa" commission).  It continues representation from the five plaintiff Tribes, and also adds a new

When Proclamation 9681 issued on December 4, 2017, no land use plan for the Monument had yet been created or approved—nor had any specific "regulations for its management" been promulgated—pursuant to the 2016 Proclamation.  *See* Proc. 9558, 82 Fed. Reg. at 1144.  Accordingly, all of the lands designated as part of the Monument in the 2016 Proclamation continued (and continue today) to be managed under the land use plans that predate the Monument's creation, namely the BLM's Monticello Resource Management Plan ("RMP") and Moab RMP (hereinafter the "BLM RMPs"),[6] for the lands managed by the BLM, and the Manti La-Sal National Forest Land and Resource Management Plan ("MLS Forest Plan"), for those lands managed by the Forest Service.  Roberson Decl. ¶¶ 8, 16; Rasure Decl. ¶ 11.  On January 16, 2018, the BLM and the Forest Service issued a notice commencing a process to prepare new land use plans for the lands that remain in the Monument following Proclamation 9681.  *See* Notice of Intent to Prepare Monument Mgmt. Plans for the Bears Ears National Monument, 83 Fed. Reg. 2181, 2182 (Jan. 16, 2018).  This planning process has and will continue to entail seeking input from the public, Tribes, state and local governments, and other federal agencies.  *Id.*[7]  The lands excluded from the Monument by Proclamation 9681 will continue to be governed (as they have been up to this point) by the BLM RMPs and MLS Forest Plan.  *Id.*; Roberson Decl. ¶8, 15; Rasure Decl. ¶ 11.

---

member—a designee from the San Juan County Board of County Commissioners.  82 Fed. Reg at 58,086.

[6] About 1,142,049 acres of these lands are in the planning area managed by BLM's Monticello Field Office and subject to the Monticello RMP.  Roberson Decl. ¶ 8.  The other 8,871 acres are in the planning area managed by BLM's Moab Field Office and subject to the Moab RMP.  *Id.*

[7] On August 17, 2018, the BLM and the Forest Service published draft monument management plans and an accompanying draft environmental impact statement.  83 Fed. Reg. 41,111 (Aug. 17, 2018).  The agencies are inviting public comment through November 15, 2018.  *Id.*

D.     **Plaintiffs' Complaints**

Plaintiffs are Tribes and organizations representing individuals with asserted historic, spiritual, recreational, aesthetic, scientific, and cultural interests in the land currently and formerly included in the Monument.  Tribes Compl. ¶¶ 74-115; UDB Compl. ¶¶ 8-71; NRDC Compl. ¶¶ 16-52.  Plaintiffs filed complaints challenging the Proclamation shortly after it issued.  Asserting claims against the President and the Agency Defendants, Plaintiffs allege that:

(i)     the Proclamation exceeded the scope of the President's delegated authority under the Antiquities Act or was otherwise an abuse of discretion (Tribes' Count I; UDB Count II; NRDC Counts I, IV);

(ii)    the Proclamation violated certain constitutional provisions and the separation of powers (Tribes' Counts II & III; UDB Counts III & IV; NRDC Counts II & III); and

(iii)   the implementation of the Proclamation (or non-implementation of the 2016 Proclamation) is therefore unlawful and can be enjoined under the Administrative Procedure Act, 5 U.S.C. § 706 (Tribes' Count IV; NRDC Count V).

Based on these allegations, Plaintiffs seek a declaratory judgment that the Proclamation is invalid and an injunction barring its implementation.  *See* Tribes Compl. ¶¶ 222-27; UDB Compl. at 70-71; NRDC Compl. at 60-61.  The UDB Plaintiffs also seek a declaration that the 2016 Proclamation remains "controlling," and all Plaintiffs seek an injunction directing the Agency Defendants to enforce the 2016 Proclamation.  *Id.*

### STANDARD OF REVIEW

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  *Gammill v. U.S. Dep't of Educ.*, 989 F. Supp. 2d 118, 120 (D.D.C. 2013).  Although it must assume all of the factual allegations in the complaint to be true, the court "must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a

Rule 12(b)(6) motion for failure to state a claim" because "subject matter jurisdiction focuses

on the court's power to hear the claim." *Id*. at 120–21 (internal citations omitted).  A court may

consider materials outside the pleadings in order to resolve the question of its jurisdiction.

*Fludd v. Mitchell*, 181 F. Supp. 3d 132, 137 (D.D.C. 2016).

On a Rule 12(b)(6) motion for failure to state a claim, a court must assess whether the

complaint alleges sufficient facts that, if accepted as true, state an entitlement to relief that is

"plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the

Court must accept the facts pleaded as true, legal assertions devoid of factual support are not

entitled to this assumption.  *See Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1276 (D.C. Cir.

1994).  A complaint that presents merely "labels and conclusions" or "a formulaic recitation of

the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  "In determining

whether a complaint states a claim, the court may consider the facts alleged in the complaint,

documents attached thereto or incorporated therein, and matters of which it may take judicial

notice."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ARGUMENT

## I.     **Plaintiffs' Failure to Demonstrate Standing Deprives this Court of Jurisdiction**

Consistent with Article III's case-or-controversy requirement, a plaintiff "must

demonstrate standing to sue."  *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir.

2017).  To do so, a plaintiff must show: (1) "an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc.

v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000).  Where, as here, standing is

addressed at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each

13

element.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration in original).

Plaintiffs have failed to do so here.  In their rush to bring this suit, Plaintiffs neglected their burden to show the Proclamation caused them an injury in fact that is concrete and imminent, or that entry of remedies against the first-captioned defendant—the President—would provide them with redress, or even be appropriate in the circumstances, given the possibility of remedies against subordinate officials.  This Court does not have jurisdiction to award Plaintiffs symbolic remedies for hypothetical injuries.  The complaints should be dismissed.

### A.    The Plaintiffs have not demonstrated cognizable injury.

None of the Plaintiffs can demonstrate a concrete and imminent injury resulting from the Proclamation because their allegations of injury depend upon future events that may or may not occur, or may occur under conditions that would not cause actual injury to themselves or their members.  Nor do the Utah Diné Bikéyah ("UDB") Plaintiffs, or the Tribes in the lead case, adequately allege injury to themselves as organizations or tribes, respectively.  Plaintiffs also fail to demonstrate that their alleged injuries would be redressed by a favorable decision.

### 1.    *The Plaintiffs have not demonstrated injury in fact.*

All of the Plaintiffs' claims fail on the first prong of the standing analysis; they do not allege imminent, concrete, and particularized harm to themselves or their members.[8]  Rather, their allegations sketch out broad categories of *potential future* injuries that they believe *could* result if the Agency Defendants were to approve proposals for mineral development or other uses of the lands, or to administer existing legal protections (against looting, for example), in a way

---

[8] An organization can assert standing on its own behalf, on behalf of its members or both. However, under either an organizational or associational standing theory, the organization must "show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'"  *People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

Plaintiffs might deem to be inadequate.  *See* Tribes Compl., ¶¶ 156-57; UDB Compl. ¶176;

NRDC Compl. ¶ 141-42.  But plaintiffs who rest their "claims for declaratory and injunctive

relief on predicted future injury" bear "a 'more rigorous burden' to establish standing."  *Arpaio*

*v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d

908, 913 (D.C. Cir. 1989)).   Plaintiffs' "'threatened injury must be *certainly impending* to

constitute injury in fact'" and "[a]llegations of *possible* future injury are not sufficient."  *Clapper*

*v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

158 (1990)).  *See also Public Citizen v. Trump*, 297 F. Supp. 3d 6, 21 (D.D.C. 2018)

("'Allegations of *possible* future injury' premised on 'attenuated chain[s] of inferences' will not

suffice." (quoting *Clapper*, 568 U.S. at 409, 414 n.5)).  And, of course, "standing is assessed as

of the time a suit commences."  *Del Monte Fresh Prod. v. United States*, 570 F.3d 316, 324

(D.C. Cir. 2009).

　　The Plaintiffs cannot meet this rigorous burden described in *Arpaio* and *Clapper*.  They

do not attempt to show that any concrete and particularized injury is "certainly impending," but

rather identify activities that they assert could—in the future—impair their enjoyment of the

excluded lands.  *See, e.g.*, NRDC Compl. ¶¶ 141-42 (alleging that the Proclamation renders

excluded lands "vulnerable" to mining, oil and gas leasing, road construction, and off-highway

vehicle ("OHV") use); UDB Compl. ¶ 176 (Proclamation "opens" certain areas to "incompatible

uses").  But identifying categories of activities that might occur across hundreds of thousands of

acres does not establish concrete and particularized injury.  *See Summers v. Earth Island Inst.*,

555 U.S. 488, 495 (2009); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

　　In addition to being insufficiently specific, Plaintiffs gloss over circumstances that make

their conclusory assertions of imminent harm implausible.  First, the Monument had been in

existence for barely over a year—since December 28, 2016—when Plaintiffs brought suit.  82 Fed. Reg. 1139.  Plaintiffs provide no explanation as to why, if numerous alleged harms resulting from unchecked mineral development and other uses are now imminent, they did not occur before the Monument was created at the end of 2016, given the years of considerable and widely publicized preparatory work that put the public on notice that activities and uses of the land could be restricted by a future Monument designation.  *See* Tribes Compl. ¶ 119; UDB Compl. ¶¶ 110, 114; NRDC Compl. ¶¶ 95-98.  During that time, anyone considering mineral development in the now-excluded areas would have had an incentive to locate mining claims, obtain leases, or otherwise establish protectable mineral interests when the lands were still being considered for monument designation.  But Plaintiffs do not allege that any such activities occurred in the run-up to the 2016 Proclamation.  Nor do they allege that other "incompatible" or harmful uses of lands now excised from the Monument would have been proposed, and approved, but for the 2016 Proclamation creating the Monument.

Plaintiffs may reply with citations to the handful of locatable mineral mining claims and proposals that have been submitted since Proclamation 9681 issued.  Those examples are of no moment because "standing is to be determined as of the commencement of the suit."  *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 570 n.5 (1992).  But even if that were not the rule, the recent filings by third parties do not establish an "imminent" injury.  Only three new mining claims were recorded with the BLM following Proclamation 9681, and all of them have since been forfeited.  Roberson Decl. ¶ 41.  With respect to pre-existing mining claims, there has been only one site—the Easy Peasy mine—where any sort of mining activity, in this case limited to exploration, can proceed.  *Id.* ¶ 38.  But the mining claim underlying that mine predates the original creation of the Monument, *id.*, and furthermore, Plaintiffs' complaints contain no factual

allegations demonstrating that the activity proposed to occur there—removing ore from an existing underground mine site for testing purposes—would cause any actual injury in fact to Plaintiffs. *See id.*[9]

Moreover, Plaintiffs, in alleging that harm will result from changed management of the lands, ignore a critical fact: the land use plans governing the lands excluded from the Monument were never modified after the 2016 Proclamation. As noted above, the 2016 Proclamation required the Agency Defendants to prepare a land use plan for the Monument—but they did not do so before Proclamation 9681 issued. *See* 83 Fed. Reg. at 2182. Thus, notwithstanding Proclamation 9681, the very same land use plans (*i.e.*, the BLM RMPs and MLS Forest Plan) remain in effect for both the lands remaining within, and those that are now outside, the Monument. *See id.*; Roberson Decl. ¶¶ 8, 16; Rasure Decl. ¶ 11. This circumstance refutes allegations, such as that by the NRDC Plaintiffs, that harm will occur if management "revert[s] to those pre-Monument travel plans." NRDC Compl. ¶ 164. Like the broader land use plans, the travel plans from the BLM RMPs and MLS Forest Plan have remained in effect from before the 2016 Proclamation to the present. Roberson Decl. ¶ 10; Rasure Decl. ¶ 13. Moreover, the 2016 Proclamation did not mandate the closure of any designated routes—it directed the Secretaries to prepare a transportation plan that designates roads and trails within the Monument and merely cabined the Secretary's discretion to open new routes in the future to those already designated.

---

[9] The NRDC Plaintiffs unsuccessfully attempt to show an immediate impact from the 2017 Proclamation by alleging that construction of a new OHV route and parking lots was stayed by the Interior Board of Land Appeals ("IBLA"), as a result of the 2016 Proclamation. NRDC Compl. ¶ 169. But the BLM approved this construction *prior* to the Monument's designation in December 2016, and despite the President's modification of the 2016 Proclamation, IBLA's stay remains in place. Roberson Decl., ¶ 18.

Plaintiffs have not alleged that BLM has or will designate a route for motorized vehicle use that would have been prohibited under the 2016 Proclamation.

Finally, Plaintiffs' assertions of changed management also ignore the fact that nearly half-a-million acres of the excluded lands are within other special designations, such as the Dark Canyon Wilderness, WSAs,  inventoried roadless areas, Areas of Critical Environmental Concern, and Special Recreation Management Areas, which designations impose additional protections for the natural and cultural resources on such lands.  Roberson Decl., ¶¶ 12-14 and Exs. A & B thereto; Rasure Decl. ¶¶ 8-10.  Under these circumstances, Plaintiffs' allegations that the mere issuance of Proclamation 9681 resulted in imminent harm are unsupportable.

Furthermore, many of the potential future activities and uses that are alleged to cause Plaintiffs injury can occur only through an application and environmental review process that could result in denial, modification, or implementation of particular projects in ways that *avoid* those alleged injuries.  For example, development of leasable minerals (such as coal, oil and gas, or potash) or minerals locatable under the Mining Law of 1872, 30 U.S.C. §§ 21-54 (such as gold, silver, and uranium),[10] road construction, or increased OHV use, are not imminent because

---

[10] For locatable minerals, one activity that may occur now on lands excluded from the Monument is the "location" of new mining claims.  Roberson Decl. ¶ 33.  But as noted above, contrary to Plaintiffs' unsupported predictions, there are presently *no* new, active mining claims recorded after Proclamation 9681.  *Id.* ¶ 41.  Moreover, claim location typically does not result in more than negligible surface disturbance or cause resource impacts.  *Id.* ¶ 33.  And the Proclamation does not authorize mining *operations*, which are governed by the agencies' surface-management regulations.  Indeed, before any extractive mining operations (and some exploration operations) may occur, the operator must obtain the BLM's approval of a plan of operations, following environmental review under NEPA, and would have to comply with all other applicable federal, state, and local laws.  *Id.* ¶ 35.  And while "notice level" operations do not require affirmative agency approval, such operations may not proceed if the BLM determines that the notice does not contain measures to prevent unnecessary or undue degradation.  *Id.* ¶ 36.  Additionally, both plan and notice-level operations must be accompanied by a financial guarantee to cover reclamation costs in an amount acceptable to BLM.  *Id.* ¶ 37.  And, the BLM would retain the discretion to restrict both plan and notice-level operations that unlawfully impact resources.  *Id.* ¶

each requires multiple steps before commencement.  These steps include actions by third parties, as well as the need for the BLM's and/or the USFS's approval—in compliance with the National Environmental Policy Act ("NEPA") and other applicable statutes—on a site-specific or project-specific basis.  Roberson Decl.  ¶¶ 26-35.  *See Food & Water Watch, Inc. v. Vilsack ("F&WW")*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("'[W]hen considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).'") (internal citation omitted).

Plaintiffs also allege that removal of certain lands from the Monument will result in looting, grave-robbing, and theft and destruction of archaeological and paleontological artifacts. Tribes Compl. ¶¶ 181-187; UDB Compl. 177; NRDC Compl. ¶ 139.  But these conclusory allegations are speculative as well.  Existing statutes, including (but not limited to) the ARPA, PRPA, the National Forest Management Act, and FLPMA, bar unauthorized removal or destruction of such resources on federal lands—regardless of whether the resources are on lands within a national monument.  Roberson. Decl. ¶ 15; Rasure Decl. ¶ 12.[11]  Indeed, both ARPA and PRPA impose criminal penalties for destruction or removal of protected resources.  *See* 16 U.S.C. §§ 470ee, 470aaa-5.  Furthermore, monument status does not itself prevent (nor its removal cause) third party malfeasance.  Plaintiffs have not alleged that the 2016 Proclamation resulted in a *reduction* in looting, grave robbing, or other theft or destruction of resources.  At

---

36.  USFS regulations require a similar procedure.  Rasure Decl. ¶ 14(a).

[11] The Tribes assert that the Proclamation removes "protections for archaeological and paleontological resources," Tribes Compl. ¶ 184, but the above-listed statutes remain in place.  It is true that casual collection of common invertebrate and plant fossils for non-commercial purposes will now be allowed on USFS lands, when it would not have been if such lands remained in the Monument.  *Id.* ¶ 185.  But Plaintiffs do not allege facts showing that casual collection of such fossils (such as common fossils of prehistoric shells and leaf impressions) causes a concrete injury to their interests.  *See* Rasure Decl. ¶ 15 (describing "common" fossils).

most, the UDB Plaintiffs allege that the 2016 Proclamation  would have "increase[d] funding available for the management of the . . . Monument," which would have "allow[ed] for the hiring of more personnel for monitoring and law enforcement."  UDB Compl. ¶ 178.  This alleged chain of events is entirely speculative, and thus, insufficient to demonstrate imminent injury.  *See F&WW*, 808 F.3d at 913.  Moreover, Plaintiffs have no factual basis to allege that Proclamation 9681 (which is silent on the subject) will result in reduced funding for monitoring and law enforcement.  *See* 82 Fed. Reg. 1139.  Under these circumstances, the Plaintiffs have not plausibly alleged a concrete and imminent injury in fact, and their claims should be dismissed.

> 2. *The UDB Plaintiffs do not adequately allege organizational standing.*

Certain of the UDB Plaintiffs also assert organizational standing, *see UDB* Compl. ¶¶ 13, 23-24, 33, 41-42, 50, but fail to adequately support their assertion.  "To establish organizational standing, a party must show that it suffers a 'concrete and demonstrable injury to [its] activities, distinct from a mere setback to [the organization's] abstract social interests."  *Elec. Privacy Info. Ctr. v. FAA* ("*EPIC*"), 892 F.3d 1249, 1255 (D.C. Cir. 2018) (quotation marks and citation omitted).  The organization must show "a direct conflict between the defendant's conduct and the organization's mission," *id.* (citation omitted), and an expenditure of resources that makes the injury concrete.  *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  The D.C. Circuit has characterized this as a two-part inquiry: the court must "ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm."  *F&WW*, 808 F.3d at 919.

Both inquiries defeat the relevant UDB Plaintiffs' asserted organizational standing.  As to the first part, the UDB Plaintiffs allege nothing more than a "setback to their abstract social interests," *EPIC*, 892 F.3d at 1255 (citation omitted).  They have not shown a "direct conflict"

with each organization's mission," *id.* (citation omitted), or alleged facts showing that the Proclamation "perceptibly impaired [their] ability to provide services," *F&WW*, 808 F.3d at 919. As to the second part, all the UDB Plaintiffs allege only that they will need to divert funds from one set of advocacy campaigns to another. *See* UDB Compl. ¶¶ 13, 23, 35, 41, 50. Because "the expenditure of resources on advocacy is not a cognizable Article III injury," the UDB Plaintiffs' allegations "will not suffice" to demonstrate organizational standing. *Turlock*, 786 F.3d at 24

        3.     *The Tribes' allegations of impediments to participation are implausible.*

While the Tribes do not expressly assert "organizational standing," they do allege that Proclamation 9681's modifications to the planning Commission created by the 2016 Proclamation injures their interests in participation in the management of the Monument. *See* Tribes Compl. ¶¶ 190-94. These allegations fail to meet the plausibility requirement. First, while the Tribes assert that the Proclamation "deprived [the Tribes] of their government–to–government relationship," *id.* ¶ 192, this allegation is contradicted by the Proclamation, which expressly maintains the Commission, and its focus on the Tribes' participation. 82 Fed. Reg. at 58,085. Next, the Tribes assert they will "have a reduced opportunity to participate on the Commission . . . as the Trump Proclamation purports to include a local county representative in the Bears Ears commission." Tribes Compl. ¶ 190.[12] But the addition of a single county representative cannot credibly result in "a reduced opportunity [for the Tribes] to participate." *Id.* These theories of injury are too attenuated to supply an independent basis for standing.

**B.  Plaintiffs' claims against the President are not redressable.**

Plaintiffs have brought, collectively, eleven claims against the President, for which they

---

[12] The Proclamation adds a member of the San Juan County Board of Commissioners to the Commission. 82 Fed. Reg. at 58,086. The entire Monument occurs within San Juan County, Utah. *See* Roberson Decl. ¶ 9.

seek declaratory and injunctive relief.  Plaintiffs have not shown that entry of their requested declaratory and injunctive relief against the President would redress their injuries, or that the Court should award such relief against the countervailing separation of powers concerns.  *See, e.g.*, *Swan*, 100 F.3d at 976 n.1 (noting that injunction against the President would present separation of powers concerns and "similar considerations regarding a court's power to issue relief against the President himself appl[ied] to [the plaintiff's] request for a declaratory judgment"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005) (dismissing suit to enjoin President from presenting prayers at inauguration in part because court was "without the authority" to enter declaratory or injunctive relief against the President); *Barnett v. Obama*, No. SACV09-0082 DOC (ANX), 2009 WL 3861788, at *11 (C.D. Cal. Oct. 29, 2009) (dismissing suit to declare President ineligible for office because court could not enter declaratory or injunctive relief against the President), *aff'd sub nom. Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011).  Thus, even if Plaintiffs had articulated an injury in fact, their injuries would not be redressable by remedies against the President.  Plaintiffs therefore lack standing to pursue the claims against him.

Further, Plaintiffs' alleged injuries generally stem from future *implementation* of the Proclamation by subordinate officials—not from the mere issuance of the Proclamation by the President.  For instance, the Tribes specifically seek an order "prohibiting [the President] from enforcing or implementing [the Proclamation] in any way," Tribes Compl. ¶ 225, but they have not alleged that the President has any ongoing role in "enforcing or implementing" the Proclamation.[13]  Thus, Plaintiffs fail to demonstrate that an injunction against the President

---

[13] Similarly, the NRDC Plaintiffs seek declaratory and injunctive relief invalidating the Proclamation—but all of their claims addressing the Proclamation are asserted solely against the President.  *See* NRDC Compl. ¶¶ 181-200.  In contrast, the UDB Plaintiffs have appropriately

would have any practical consequence for redressing any concrete and particularized injury they claim to be suffering.

Even if Plaintiffs had alleged specific implementation steps to be taken by the President (and the Proclamation does not indicate there are any such steps), Plaintiffs would face an exceedingly high bar to show that there are circumstances making the "extraordinary measure" of an injunction against the President appropriate, particularly when injunctive relief against subordinate officials is available. *See Swan*, 100 F.3d at 978. *See also Franklin*, 505 U.S. at 802 (entry of injunction against the President "should have raised judicial eyebrows"); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) ("[T[his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties . . . .").[14] Plaintiffs have not requested a specific injunction prohibiting any specific act by the President, and Plaintiffs have not made any factual allegations that could justify consideration of such an injunction, even in the abstract.[15]

## II.     Plaintiffs' Claims are not Ripe.

Plaintiffs' claims are also not ripe for adjudication. "The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for

---

excluded the President from their requested injunctive remedies. *See* UDB Compl. at 71-72.

[14] Even in the *Hawaii v. Trump* litigation, where the district court entered a sequence of injunctions precluding enforcement of executive orders on immigration, the Ninth Circuit held that entry of an injunction against the President personally was "not appropriate." *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (per curiam) (vacating preliminary injunction directed to the President), *vacated as moot*, 138 S. Ct. 377 (2017).

[15] The Tribes also fail to show standing to seek mandatory relief "requiring President Trump to rescind his Proclamation." Tribes Compl. ¶ 225. *See Swan*, 100 F.3d at 977 (courts "do not have authority under the mandamus statute to order any government official to perform a discretionary duty"). No provision of law would require the President to formally rescind the Proclamation if Plaintiffs were to prevail, and the Tribes do not allege how their injuries would be redressed if he did.

judicial resolution." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  In the absence of any

site-specific decision implementing the Proclamation, Plaintiffs present an "abstract

disagreement[] over administrative policies" that seeks "judicial interference [before] an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." *Id.* at 148-49.  The ripeness doctrine has both constitutional and prudential

facets.  *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017).  A court can find

a case unripe under either facet.  *See id.*  Plaintiffs' claims are unripe under both.

The first facet (the "jurisdictional" or "constitutional" facet) "is subsumed into the Article

III requirement of standing, which requires a petitioner to allege inter alia an injury-in-fact that is

'imminent' or 'certainly impending.'" *Chlorine Inst., Inc. v. Fed. R.R. Admin*., 718 F.3d 922,

927 (D.C. Cir. 2013) (citation omitted).  Ultimately, this facet of "the ripeness requirement

excludes cases not involving present injury." *Wyo. Outdoor Council v. U.S. Forest Serv*., 165

F.3d 43, 48 (D.C. Cir. 1999).  As described above, given the speculative and contingent nature of

the harm they allege, Plaintiffs have not demonstrated injury that is imminent or certainly

impending.  Rather, their alleged injuries stem largely from future, discrete agency decisions,

which can be challenged, if and when they occur.

Plaintiffs likewise fail to articulate claims that are prudentially ripe.  *See Ohio Forestry*,

523 U.S. at 732.  The D.C. Circuit assesses prudential ripeness based on "'the fitness of the

issues for judicial decision' and the extent to which withholding a decision will cause 'hardship

to the parties.'" *Am. Petroleum Inst. v. EPA*, 683 F3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott

Labs.*, 387 U.S. at 149).  Among other factors, a claim's fitness for review "depends on whether

[the issue] is purely legal, whether consideration of the issue would benefit from a more concrete

setting, and whether the agency's action is sufficiently final." *Id.* (citations omitted).  Here,

Plaintiffs' allege injuries that generally cannot occur until the Agency Defendants take specific steps to authorize actions Plaintiffs have identified as the source of harm.  While the Proclamation modifies the management overlay for lands excluded from the Monument, it does not *itself* authorize the mineral development or vehicle use that Plaintiffs allege will cause them harm.

Further, delayed review will result in no hardship to Plaintiffs.  If the Agency Defendants later issue a site-specific decision, authorizing a particular development or other use that will cause Plaintiffs' members a concrete and particularized injury, then Plaintiffs may challenge such decision at that time.  *See Wyo. Outdoor Council*, 165 F.3d at 50–51 ("There is no 'hardship' here since [plaintiff] may pursue its NEPA claim based on the Forest Service's compliance as of the date of lease issuance").  *See also Ohio Forestry*, 523 U.S. at 734 (fact that it might be easier "to mount one legal challenge against the [Forest] Plan now, than to pursue many challenges to each site-specific logging decision to which the Plan might eventually lead," did not constitute cognizable hardship).

Finally, even if the Court were to find all of the other claims justiciable, the Tribes' Fourth Count and the NRDC Plaintiffs' Fifth Count, alleging that the Agency Defendants will fail to carry out the duties supposedly mandated by the 2016 Proclamation, are indisputably unripe.[16]  Both counts rely completely upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284

---

[16] The UDB Plaintiffs do not assert a count expressly and solely challenging future agency action or inaction.  However, they do make factual allegations about future agency action or inaction in support of their Second and Fourth Counts, UDB Compl. ¶¶ 193 & 217, and seek related injunctive relief against the Agency Defendants, such as their request for an order enjoining those parties "from further actions or inaction inconsistent with Proclamation 9558."  UDB Compl. at 72.  These allegations and requests corroborate the lack of ripeness of their claims.

(D.C. Cir. 2003) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Even assuming the

2016 Proclamation creates enforceable obligations (which, as discussed below, it does not), none

of the Plaintiffs has alleged that the Agency Defendants have taken any particular action

inconsistent with that Proclamation.  Instead, the Tribes and NRDC Plaintiffs allege that

Defendants may violate some unidentified obligations that they allege exist under the 2016

Proclamation.  *See* NRDC Compl. ¶ 205 (alleging "[o]n information and belief, Defendants have

no intention of carrying out their duties under the 2016 Proclamation"); Tribes Compl. ¶ 154

(alleging that Agency Defendants "will not take any further steps to carry out their mandatory

duties under" the 2016 Proclamation).

Such a challenge to Defendants' future management regime is necessarily premature:

there has been no final agency action or decision regarding what that management regime with

respect to the Monument will entail.  *Cf. Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 30 (D.D.C.

2001) ("The plaintiffs cannot demonstrate ripeness with respect to their claim that the current

management of the Monument violates their rights because the Secretary of Agriculture has not

yet implemented the final management plan called for in the Proclamation."), *aff'd*, 306 F.3d

1138 (D.C. Cir. 2002).  And with respect to the lands that now fall outside the Monument, the

Tribes and NRDC Plaintiffs have made no factual allegations describing any specific action that

they believe is inconsistent with the Proclamation.  Accordingly, these claims are unripe.

## III.   Plaintiffs' *Ultra Vires* Claims Fail as a Matter of Law.

To the extent the Court determines it has Article III jurisdiction over Plaintiffs' *ultra*

*vires* claims as to any defendant, it should dismiss those claims pursuant to Rule 12(b)(6).

Plaintiffs assert that the President lacked the authority to issue the Proclamation.  To the

contrary, the President possesses broad power under the Antiquities Act to modify reservations

of land for national monuments, and in particular, to ensure compliance with the statutory

directive to confine the reservation to the "smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). The President expressly relied upon and exercised this authority, and further judicial review of the President's exercise of discretion in complying with the statutory requirements is foreclosed by Circuit precedent. *See Tulare*, 306 F.3d at 1141-42. The Tribes' Counts I, II, and III, the UDB Plaintiffs' Counts I, II, III, and IV, and the NRDC Plaintiffs' Counts I, II, III, and IV therefore should be dismissed.

## A. Judicial Review of Presidential Action Under the Antiquities Act Is Extremely Limited.

Where the President acts pursuant to a delegation of authority from Congress, judicial review of presidential decisionmaking is extremely limited in scope. This longstanding rule originates in concerns about separation of powers and the potential involvement of the judiciary in "considerations which are beyond the reach of judicial power." *Dakota Cent. Tel. Co. v. S. Dakota*, 250 U.S. 163, 184 (1919); *see also Dalton*, 511 U.S. at 476 ("How the President chooses to exercise the discretion Congress has granted him is not a matter for our review."); *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."). Thus, judicial review of presidential action is "not available when the statute in question commits the decision to the discretion of the President." *Dalton*, 511 U.S. at 474.

Judicial review of presidential action under the Antiquities Act follows these principles. It is available, at most, "to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States*, 306 F.3d at 1136 (citing *United States v. California*, 436 U.S. 32, 35-36 (1978), and *Cappaert v. United States*, 426 U.S. 128, 141-42 (1976)). *See also Tulare*, 306 F.3d at 1138 (rejecting claims

27

that monument proclamation was *ultra vires* based on alleged failure "to include a certain level of detail," designation of nonqualifying objects, and failure to comply with the "smallest area compatible" requirement).

Here, these precedents limit judicial review to addressing only whether the President's decision to modify the Monument is authorized by the Antiquities Act. It is. The Antiquities Act authorizes the President to modify monument reservations to ensure that the area reserved is "confined to the smallest area" necessary to protect the identified resources, and that is exactly what Proclamation 9681 does. *See* 82 Fed. Reg. at 58,085 ("it is in the public interest to modify the boundaries of the monument to exclude from its designation and reservation approximately 1,150,860 acres of land that I find are unnecessary for the proper care and management of the objects to be protected within the monument"). As demonstrated below, the President's authority to take this action is confirmed by the text and legislative history of the Antiquities Act, a longstanding and extensive practice of modifying monument boundaries, and congressional acquiescence in the exercise of this authority over many decades.

### B. The Text and Legislative History of the Antiquities Act Authorize the President to Modify Monument Boundaries.

Presidential authority to act "must stem either from an act of Congress or from the Constitution itself." *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *Dames & Moore v. Regan*, 453 U.S. 654, 668 (1981)). On multiple occasions, the Supreme Court has confirmed that the Antiquities Act delegates "broad power" to the President to designate national monuments and reserve lands for those monuments. *See Mountain States*, 306 F.3d at 1135 (citing *California*, 436 U.S. 32; *Cappaert*, 426 U.S. at 141-42; *Cameron v. United States*, 252 U.S. 450, 40 (1920)). By its terms, the statute grants the President substantial flexibility, expressly leaving the declaration of

a monument to the President's "discretion."  54 U.S.C. § 320301(a).  Similarly, the decision to reserve lands for a monument is entirely discretionary.  *See id.* § 320301(b) ("The President *may* reserve parcels of land . . . ." (emphasis added)).

The Antiquities Act also provides an instruction to the President.  If lands are reserved for a monument, "[t]he limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  *Id.*  In contrast to the discretionary language used in the rest of the statute, Congress used strong and mandatory terms—"shall be confined"—to limit the area of lands reserved for a monument.  *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.").  Dictionaries contemporaneous with the passage of the Antiquities Act confirm that "shall" indicated a firm obligation, defining the term as "[t]o be obliged; must."  *See* Webster's Int'l Dictionary of the English Language 1322 (1907, W.T. Harris ed.), available at https://catalog.hathitrust.org/Record/100598138.  Congress also chose the word "confine," which indicates an ongoing action or constraint.  *See id.* at 300 (defining "confine" as to "restrain within limits" and "to keep close").  Congress could not have been more plain that Presidents are to ensure that monument reservations are and remain "confined" to the smallest area the President deems to be consistent with protection of the monument objects.  *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

The importance of confinement is also confirmed by the Act's legislative history, where the limits on reservations were consistently emphasized.  *See* H. R. Rep. No. 59-2224, at 1

(Antiquities Act intended "to create small reservations reserving *only so much land* as may be *absolutely necessary* for the preservation of those interesting relics of prehistoric times" (emphases added)); 40 Cong. Rec. 7888 (1906) (colloquy between Rep. John Stephens and Rep. John Lacey noting that "not very much" land will be withdrawn under the Antiquities Act because of the "smallest area necess[a]ry" provision).  Indeed, Congress could have simply directed the President to "reserve" land in "*an* area compatible" with protection of monument objects; its express instruction to "confine" the reservation to "*the*" area that is the "*smallest*" compatible with protection must be given significant weight.

It would be nonsensical to interpret this compulsory instruction from Congress to "confine" monument reservations as not encompassing the authority to modify monument reservation boundaries when the President finds that "the smallest area" compatible with protection is smaller than the area presently reserved.  The President cannot fully comply with Congress' instruction to ensure that monument reservations remain "confined" to the smallest area without the power to revisit prior reservations.  It is a well-settled principle that government entities have broad authority to reconsider decisions and correct errors.  *See, e.g., Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide."); *Sierra Club v. Antwerp*, 560 F. Supp. 2d 21, 23 (D.D.C. 2008) (same).  And Congress clearly understood that initial reservations of land might require revision, based on new understandings as to what the "smallest areas compatible" should comprise.  *See* H.R. Rep. No. 59-2224, at 3 (noting some monument lands "should be temporarily withdrawn and allowed to revert to the public domain after the ruins thereon have been examined by competent authority"); *see also id*. at 7-8 (stating that "the permanent withdrawal of lands" would be "unnecessary except where the ruins are of such character and extent as to warrant the creation of permanent

30

national parks.").

Plaintiffs completely ignore the importance of the Act's confinement requirement; their complaints are premised on the notion that the President's authority to reserve land is, in effect, a one-way ratchet—that is, a President can reserve lands, but cannot later determine that some of those lands are not necessary for protection of the monument objects.  Plaintiffs purport to find that restriction in the grant of authority to "declare" and "reserve."  *See, e.g.*, Tribes Compl. ¶¶ 8, 198, 206: UDB Compl. ¶ 2, 199, 211; NRDC Compl. ¶¶ 4, 74, 127, 184.  But courts must "follow the cardinal rule that a statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context."  *King v. St. Vincent's Hosp*., 502 U.S. 215, 221 (1991).  Here, the "smallest area" requirement shows that, where it wanted to impose significant limitations on the President's authority, Congress did so expressly—in clear, precise, and mandatory terms.  Given this context, it would be inconsistent to find that Congress meant to imply a one-way-ratchet restriction of equal or greater significance through its use of the terms "declare" and "reserve."  The term "declare" simply authorizes the President "to make known by language" his designation of a monument; it does not constrain his authority to modify the reservation to comply with the statutory command.  *See* Webster's Int'l Dictionary (1907), at 377.  And as discussed above, the President's authority to "reserve" lands is expressly constrained by the "shall be confined to the smallest area compatible" requirement.

It is not possible to reconcile Plaintiffs' cramped view of the President's authority under the statute with the general principle that reconsideration "is inherent in the power to decide." *See, e.g., Albertson*, 182 F.2d at 399; *Antwerp*, 560 F. Supp. 2d at 23.  A President is free to revoke prior Presidents' executive orders, and take other actions—including reversals of prior decisions—necessary to fulfill his constitutional duty to "take Care that the Laws be faithfully

executed." *See* U.S. Const., art II, § 3; *see also* Vivian S Chu & Todd Garvey, Cong. Research Serv., RS20846, Executive Orders: Issuance, Modification, and Revocation 7 (2014) ("The President is free to revoke, modify, or supersede his own orders or those issued by a predecessor."). So too here: a President is free to revise the boundaries of a predecessor's national monument designation to ensure compliance with the Antiquities Act's confinement requirement. Indeed, recognition of presidential modification authority here appropriately puts the Executive on equal footing with the Legislature, as the Supreme Court has recognized that "one legislature may not bind the legislative authority of its successors." *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996).

Put simply, a President cannot comply with the statutory instruction to ensure that the reserved lands are "confined to the smallest area" necessary to protect the objects if he can never remove lands from a monument reservation. The Antiquities Act grants the President this authority.

### C.    There Is a Longstanding and Extensive History of Presidential Modification of Monument Boundaries, and Congressional Acquiescence to this Practice.

While the text, purpose, and history of the reservation provision amply demonstrate that modification of monuments is within the scope of the President's delegated authority, that conclusion is cemented by decades of presidential practice in modifying monument designations and congressional acquiescence to that practice despite numerous opportunities to curtail it.

When the elected branches of government are in accord on the meaning of a statute, courts are properly reluctant to intervene. "[T]he longstanding 'practice of the government' can inform [a court's] determination of 'what the law is.'" *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 401 (1819), and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Thus, courts afford a presumption of congressional

consent to presidential action that is "known to and acquiesced in by Congress" over an extended period of time. *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915); *Dames & Moore*, 453 U.S. at 686 (same). *See also Medellin*, 552 U.S. at 524 ("Presidential authority can derive support from 'congressional inertia, indifference or quiescence.'" (quoting *Youngstown*, 343 U.S. at 637)); *Al-Bihani v. Obama*, 619 F.3d 1, 26 (D.C. Cir. 2010) (en banc) ("courts presume that Congress authorized the President, except to the extent otherwise prohibited by the Constitution or statutes, to take at least those actions that U.S. Presidents historically have taken . . . .").

Here, the longstanding and extensive history of presidential modifications of monument boundaries, acquiesced in by Congress, corroborates the authority to make such modifications. First, as described above, Presidents have modified prior President's monument reservations— including by reducing them—since the statute's earliest days. Only five years after passage of the Antiquities Act, President Taft diminished the Petrified Forest National Monument based on his determination that it reserved "a much larger area of land than is necessary to protect the objects for which the Monument was created, and therefore the same should be reduced in area to conform to the requirements of the act authorizing the creation of National Monuments." Proc. 1167, 37 Stat. 1716 (Jul. 31, 1911); *see also* Proc. 1186, 37 Stat. 1733 (Mar. 14, 1912) (diminishing Navajo National Monument in Arizona because it reserved a larger tract of land than was necessary). And in numerous other instances, Presidents reduced monuments to comply with the statutory requirement that reservations be confined to the smallest area necessary.[17] *See, e.g.*, Proc. No. 2393, 54 Stat. 2692 (Apr. 4, 1940); Proc. No. 3344, 74 Stat. 56

---

[17] As noted above, Presidents exercised their authority to reduce monuments based on other reasons not specifically cited in the statute. *See supra* at p. 5-7. Furthermore, the modification authority works both ways—Presidents have also determined that *additional* lands are required for the protection of the original objects identified in a proclamation, based on new information or circumstances. *See supra* at p.7 n.3.

(Apr. 8, 1960); Proc. No. 3539, 77 Stat. 1006 (May 27, 1963).  This practice is entirely

consistent with Congress' expectation, as evidenced by the statute's legislative history, that

subsequent study of monument objects might necessitate a change to monument boundaries.  *See*

*supra* pp. 3-4 (quoting Hewett report).  Since enactment of the Antiquities Act, Presidents have

eliminated lands from Monuments on at least *eighteen occasions*.  *See supra* 7 n.3.

The Executive Branch's interpretation of the Antiquities Act as authorizing the President

to exclude lands from a monument that were part of a predecessor's initial reservation is also

reflected in long-standing legal opinions.  For example, a 1947 Interior Solicitor's Opinion

concluded, relying on a 1935 Solicitor's Opinion, that the President is "authorized to reduce the

area of a national monument" and that "[t]his authority has its source in the provision of the

statute authorizing the establishment of national monuments, which states that their limits 'in all

cases shall be confined to the smallest area compatible with the proper care and management of

the objects to be protected.'"  National Monuments, 60 Interior Dec. 9, 10 (1947); *see also*

Proposed Abolishment of Castle Pinckney National Monument, 39 Op. Att'y Gen. 185, 188

(1938) (noting that "the President from time to time has diminished the area of national

monuments established under the Antiquities Act by removing or excluding lands therefrom,

under that part of the act which provides that the limits of the monuments 'in all cases shall be

confined to the smallest area compatible with the proper care and management of the objects to

be protected'").  This enduring understanding of Presidential authority under the statute is

entitled to substantial weight—particularly where, as President Taft's 1911 proclamation shows,

it was the contemporaneous understanding near the time of the statute's passage.  *See Udall v.

Tallman*, 380 U.S. 1, 16 (1965) (particular respect is due when practice "involves a

contemporaneous construction of a statute by the men charged with the responsibility of setting

its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new") (citation omitted); *Wash. Water Power Co. v. FERC*, 775 F.2d 305, 322–23 (D.C. Cir. 1985) ("The contemporaneous interpretation of the Department of the Interior is all the more to be deferred to in a case like this, where the statute and its interpretation by the Agency is almost eighty years old.").

In the face of this well-established presidential practice of modifying monument boundaries (including to remove lands from them), Congress has never revoked this authority, despite opportunities to do so.  First, Congress's knowledge of presidential modification of monuments cannot reasonably be disputed.  Congress has remained involved in the establishment and disestablishment of monuments, including several monuments that were modified by Presidents.  For example, Congress created Olympic National Park, abolishing Mount Olympus National Monument, in 1938, but only after several Presidents had altered the Monument's boundaries.  *See* Act of June 29, 1938, ch. 812 § 1, 52 Stat. 1241 (codified at 16 U.S.C. § 251); *see also* Act of Nov. 12, 1971, Pub. L. No. 92-155, 85 Stat. 422 (codified at 16 U.S.C. § 272) (abolishing Arches National Monument and creating Arches National Park); Act of Feb. 26, 1919, ch. 44, Pub. L. No. 65-277, §§ 1 & 9, 40 Stat. 1175, 1178 (codified at 16 U.S.C. § 221) (redesignating Grand Canyon National Monument as a national park).

Next, Congress has amended the Antiquities Act and separately, has expressly addressed Executive Branch withdrawal authority, but it never revoked the President's asserted authority to modify monument boundaries.  Specifically, Congress amended the Antiquities Act in 1950 to bar any "further extension or establishment of national parks or monuments in Wyoming" without express authorization of Congress.  Act of Sept. 14, 1950, Pub. L. No. 81-787, § 1, 64 Stat. 849.  And Congress declined another opportunity to modify presidential authority in the

35

1970s, when it conducted a comprehensive review and revision of federal public lands policy. That review focused particularly on land-withdrawal authority, and culminated in the 1976 enactment of FLPMA.

FLPMA declared it to be national policy that "Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action."  43 U.S.C. § 1701(a)(4).  But, despite this stated focus, FLPMA did not alter presidential authority under the Antiquities Act.  In contrast, Congress *did* limit the Secretary of the Interior's authority, stating that the "Secretary of the Interior shall not . . . modify or revoke any withdrawal creating national monuments" under the Antiquities Act.  *See* 43 U.S.C. § 1714(j). Under these circumstances, Congress' decision not to address Presidential modification authority is compelling evidence of congressional acquiescence to the exercise of this authority.  *See Dames & Moore*, 453 U.S. at 686.  *Cf. Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally.")  This "longstanding 'practice of the government'" therefore decidedly corroborates the President's authority under the Act to modify monument boundaries, including by excluding lands from existing monument reservations.  *See Noel Canning*, 134 S. Ct. at 2560.

### D.   The President Acted Within the Scope of His Authority in Issuing the Proclamation.

In various Counts, Plaintiffs allege that, even assuming presidential authority to modify monument boundaries, the President's modification in the Proclamation is without factual or legal basis.  Tribes Count I; NRDC Count IV; UDB Count II.  These claims fail.

As discussed above, judicial review of presidential action under the Antiquities Act is extremely limited, and allows at most a determination of whether the President, on the face of the

Proclamation, exercised his authority in accordance with that Act's standard.  *See Tulare*, 306

F.3d at 1141 (addressing whether challenged proclamation "adverts to the statutory standard");

*Mountain States*, 306 F.3d at 1137 (noting that proclamation "recites grounds for the designation

that comport with the Act's policies and requirements"); *UAC*, 316 F. Supp. 2d at 1183 (judicial

review "is at best limited to ascertaining that the President in fact invoked his powers under the

Antiquities Act").  Indeed, the separation of powers concerns inherent in review of discretionary

presidential action may "bar review for abuse of discretion altogether." *Mountain States*, 306

F.3d at 1135; *see also UAC*, 316 F. Supp. 2d at 1183 ("When the President is given such a broad

grant of discretion as in the Antiquities Act, the courts have no authority to determine whether

the President abused his discretion." (citing *United States v. George S. Bush & Co., Inc.*, 310

U.S. 371 (1940))).  Plaintiffs' Counts contravene this precedent, and effectively ask this Court to

determine whether the President's Proclamation is "arbitrary and capricious."  *See, e.g.*, Tribes

Compl. ¶ 151 (alleging factual error in Proclamation); NRDC Compl. ¶ 200 (alleging

Proclamation "is based on considerations wholly outside the Antiquities Act and lacks legal or

factual justification."); UBD Compl. ¶¶ 203-05 (reservations under Proclamation are not

"sufficient for, and thus not compatible with, the proper care and management" of objects).  But

review under this standard is unavailable for Presidential actions, which are "not reviewable for

abuse of discretion under the APA." *Franklin*, 505 U.S. at 801.

Reviewing the face of the Proclamation, it plainly comports with the Antiquities Act and

is a proper exercise of the President's authority to modify a monument reservation to the smallest

area compatible with the protection of the objects.  First, the Proclamation states that "[t]he

Antiquities Act requires that any reservation of land as part of a monument be confined to the

smallest area compatible with the proper care and management of the objects of historic or

scientific interest to be protected."  82 Fed. Reg. at 58,081.  The Proclamation then continues:

"Determining the appropriate protective area involves examination of a number of factors,

including the uniqueness and nature of the objects, the nature of the needed protection, and the

protection provided by other laws."  *Id.*

The Proclamation then proceeds to evaluate these factors, and finds that "[s]ome of the

objects Proclamation 9558 identifies are not unique to the monument, and some of the particular

examples of these objects within the monument are not of significant scientific or historic

interest."  *Id.*  Moreover, the President determined that "many of the objects Proclamation 9558

identifies were not under threat of damage or destruction before designation such that they

required a reservation of land to protect them."  *Id.*  And, other federal laws and agency

management designations will continue to provide protection to the objects.  *Id.*

The Proclamation concludes that certain archaeological and historic objects identified

within the original monument are not of unique or distinctive significance and that, in light of

this, the original boundaries of the monument do not reflect "the smallest area compatible with

the proper care . . . of these objects."  *Id.* at 58,082.  The President concludes:

> [T]he important objects of scientific or historic interest can instead be protected
> by a smaller and more appropriate reservation of 2 areas: Shash Jaá and Indian
> Creek.  Revising the boundaries of the monument to cover these 2 areas will
> ensure that, in accordance with the Antiquities Act, it is no larger than necessary
> for the proper care and management of the objects to be protected within the
> monument.

*Id.*

The Proclamation fully satisfies the applicable standard.  It repeatedly "adverts to the

statutory standard" for designating monument objects and reserving monument lands, *Tulare* 306

F.3d at 1141, and it "recites grounds for" the modification of the boundary that "comport with

the Act's policies and requirements," *Mountain States*, 306 F.3d at 1137.  This "compel[s] a

finding in favor of the President's action [which is] essentially the end of the legal analysis." *UAC*, 316 F. Supp. 2d at 1183.  Because no further inquiry is appropriate, NRDC Plaintiffs' Count IV, UDB Plaintiffs' Count II, and the Tribes' Count I should be dismissed for lack of jurisdiction and failure to state a claim.

**IV.    Plaintiffs' Allegations that the Proclamation Violated the Constitution Fail to State a Claim.**

Plaintiffs repackage their *ultra vires* claims as a variety of constitutional claims, invoking separation of powers principles.  *See* Tribes' Counts II (separation of powers) and III (Property Clause); UDB Counts III (separation of powers) and IV (Take Care Clause); NRDC Counts II (separation of powers) and III (Take Care Clause).

These claims fail outright.  As established above, Congress has delegated authority to modify monument boundaries to the President in the Antiquities Act, and the President's exercise of this authority therefore cannot violate any constitutional principle.  Furthermore, Plaintiffs' attempts to restate their *ultra vires* arguments as constitutional claims violate the Supreme Court's admonition that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ."  *Dalton*, 511 U.S. at 473-74.

Although these claims can be readily disposed of on these grounds, they fail for additional reasons.  Plaintiffs' separation of powers claims assert that the President improperly exercised legislative authority by reducing the boundaries of the Monument.  But, where a statute authorizes Executive branch action and "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform," there is no constitutional concern.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  The "intelligible principle" standard is clearly met here, where Congress has instructed the President to confine

monument reservations to the "smallest area compatible" with protection of the objects. *See Mountain States*, 306 F.3d at 1136-37 (Antiquities Act "includes intelligible principles to guide the President's actions"); *Tulare*, 306 F.3d at 1143 (same). And because Congress has properly delegated its authority under the Property Clause to the President in the Antiquities Act, and the President has exercised this authority in issuing the Proclamation, there is no separation of powers concern or violation of the Property Clause here. *See Mountain States*, 306 F.3d at 1136-37 (rejecting Property Clause claim); *UAC*, 316 F. Supp. 2d at 1184 (same).

Nor is the Tribes' contention plausible that Defendants violated the Presentment Clause. Tribes' Compl. ¶¶ 204-07. They cannot credibly allege that the Proclamation somehow acted to "alter the text of any statute, repeal any law, or cancel any statutory provision, in whole or in part." *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 124 (D.D.C. 2007). *Cf. Clinton v. City of New York*, 524 U.S. 417, 447 (1998) (finding Presentment Clause violation where statute "gives the President the unilateral power to change the text of duly enacted statutes"). Their real challenge (addressed above) is that the Proclamation was inconsistent with the Antiquities Act—not that it amended the Act. *See* Tribes Compl. ¶¶ 206-07.

There is likewise no violation of the "Take Care" clause. The Take Care Clause, U.S. Const. art. II, § 3, states that the President "shall take Care that the Laws be faithfully executed." "This Clause entrusts the power to enforce the laws of the United States in the hands of the Executive Branch." *U.S. ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 154 F. Supp. 2d 19, 25 (D.D.C. 2001). As an initial matter, Plaintiffs have not established a right of action to enforce the Take Care Clause against the President. The Supreme Court has recognized that this Clause is not an appropriate subject for judicial intervention, because of significant separation of powers concerns. *See Mississippi*, 71 U.S. (4 Wall.) at 499 (an attempt by the judiciary to

enforce President's duty to see that the laws be faithfully executed would be "an absurd and excessive extravagance"). Moreover, the President is acting in accord with the Antiquities Act's instruction to confine monument reservations to the smallest area compatible with the protection of the objects. Simply put, there is no plausible violation of the Take Care clause.

Finally, Plaintiffs' allegations of constitutional violations would also fail *even if* the Court were to hold that the Proclamation somehow exceeded the delegation of authority in the Antiquities Act. The Proclamation makes clear that it was issued pursuant to the authority in the Antiquities Act and that authority only. *See* 82 Fed. Reg. at 58,081. Thus, if Plaintiffs were to demonstrate that the Proclamation was not authorized by the Antiquities Act, it would be unnecessary for the Court to review Plaintiffs' constitutional claims. No authority has been asserted by the President to support the Proclamation in the event the Antiquities Act is held not to authorize it.

But, of course, as demonstrated above, the Antiquities Act *does* authorize the Proclamation. In short, Plaintiffs' *ultra vires* claims fail, and Plaintiffs' constitutional claims fail with them. The Court should accordingly dismiss those counts of Plaintiffs' complaints alleging that the Proclamation violated the Property Clause, Take Care Clause, or constitutional separation of powers (Tribes' Counts II, III; UDB Counts III, IV; NRDC Counts II, III).

## V.     Plaintiffs' APA Counts Fail to State a Claim.

Under the APA, a court may set aside final agency action found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2), and a court may compel a final agency action that has been unlawfully withheld or unreasonably delayed, *id*. § 706(1). The Tribes and NRDC Plaintiffs assert claims under the APA, alleging that the Agency Defendants will act unlawfully by implementing the Proclamation or by failing to implement the 2016 Proclamation. *See* Tribes Compl. ¶¶ 214-221 (Count IV); NRDC Compl.

¶¶ 201-205 (Count V).  As demonstrated above, Plaintiffs do not have standing to bring these

unripe claims.  Furthermore, Plaintiffs fail to state a claim on these APA counts because they are

premised on Plaintiffs' allegations that the Proclamation is *ultra vires* or otherwise unlawful,

and, as shown above, those allegations fail as a matter of law.  But even absent these unavoidable

defects, Plaintiffs' APA counts fail to state a claim and should be dismissed.

### A.    Plaintiffs Fail to State a Claim under 5 U.S.C. § 706(2).

Plaintiffs' claims seeking to set aside agency action under § 706(2) fail because Plaintiffs

have not alleged any final agency action by the Agency Defendants that is reviewable under the

APA, 5 U.S.C. § 704.  Under the two-part test in *Bennett v. Spear*, 520 U.S. 154 (1997), an

agency action is final if it "mark[s] the consummation of the agency's decisionmaking process"

and is an action "by which rights or obligations have been determined, or from which legal

consequences will flow."  *Id.* at 177-78.  A cause of action exists under the APA only "when and

to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."

*Nat'l Wildlife Fed'n*, 497 U.S. at 894.

Plaintiffs have not alleged a "specific" final agency action by the Agency Defendants.

*See id.*  Plaintiffs' general allegations about changes in agency policy do not describe any

discrete agency action that "marked the consummation" of an agency decision-making process or

"determine[d]" rights or obligations, *Bennett*, 520 U.S. at 177-78.  For example, the NRDC

Plaintiffs generally allege that Agency Defendants "have decided not to carry out their duties

under the 2016 Proclamation," NRDC Compl. ¶ 176, and "will promptly revert to their pre-

designation land management approach" under a multiple-use regime.  *Id.* ¶ 133.  But it is well

established that "an on-going program or policy is not, in itself, a final agency action," *Cobell v.

Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (quotation marks omitted), and alleged "[g]eneral

deficiencies in compliance" with resource-protection obligations "lack the specificity" to support

review under the APA.  *SUWA,* 542 U.S. at 66.  The APA does not provide a vehicle for "a broad programmatic attack" on agency management decisions.  *Id.* at 64.

Nor can NRDC Plaintiffs cure this defect with "information and belief" allegations about broad categories of agency actions that may occur in the future.  *See, e.g.,* NRDC Compl. ¶¶ 153 (hardrock mining); 159 (oil and gas leases); 168 (road construction and designations).  Allegations about agency actions that could occur in the future do not demonstrate that final agency action has occurred under the APA.  *See, e.g., Friends of Animals v. Ashe,* 174 F. Supp. 3d 20, 37 (D.D.C. 2016) (dismissing challenge to Fish and Wildlife Service's policy for granting import permits as allegations about future permits did not identify final agency action); *Nat'l Wildlife Fed'n. v. EPA,* 945 F. Supp. 2d 39, 45 (D.D.C. 2013) ("The fact that an agency *will* apply a regulation if certain events take place in the future does not satisfy the final agency action requirement[.]"); *Cloud Found., Inc. v. Salazar,* 999 F. Supp. 2d 117, 127 (D.D.C. 2013) (future determination does not constitute final agency action).

Similarly, the Tribes fail to identify any final agency action that they are challenging.  *See* Tribes Compl. ¶ 226.  While the Tribes allege that the Agency Defendants "have deprived Plaintiffs of their government-to-government relationship" by "failing to carry out their duties under the [2016] Proclamation," *id.* ¶ 193, a failure to carry out broadly stated general legal mandates is not final agency action under the APA, *SUWA,* 542 U.S. at 66, and the Tribes' Complaint does not contain a count to set aside agency action under 5 U.S.C. § 706(2).  The only APA claim they present is one to compel agency action pursuant to § 706(1).  *See* Tribes Compl. ¶¶ 214-221.

**B.**      **Plaintiffs also Fail to State a Claim for an Order Compelling Agency Action under 5 U.S.C. § 706(1).**

Alternatively, Plaintiffs' APA counts seek an order compelling the Agency Defendants to

"carry out the mandatory duties imposed in the [2016] Proclamation."  Tribes Compl. ¶ 226.  *See also* NRDC Compl. at 61 (prayer for relief 4).  Under *SUWA,* the type of "failure to act" that is remediable under § 706(1) is "limited . . . to a discrete action," such as "the failure to promulgate a rule or take some decision by a statutory deadline."  542 U.S. at 63.  The action must also be "legally required," just as the historical remedy of mandamus "was normally limited to the enforcement of a specific, unequivocal command."  *Id.* (internal quotation marks and citation omitted).  *See also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).  Plaintiffs fail to show either of these elements.

Plaintiffs' request for an order compelling the Agency Defendants to comply with the general protective mandates embodied in the 2016 Proclamation identifies no discrete action.  *See* Tribes Compl. ¶¶ 214-221, 226; NRDC Compl. ¶¶ 204-05; *id.* at 61 (prayer for relief 4).[18]  In *SUWA*, the Court held that general "compliance" with protective mandates (in that case, from a statute) is not a discrete agency action the court could compel.  542 U.S. at 66.  *See also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014) (provision containing "only a general follow-the-law directive . . . flunks *SUWA*'s discreteness test"); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 21, 27 (D.D.C. 2017) (finding regulation "far too general and amorphous to be the kind of agency action that can be enforced by a claim under § 706(1)").

Plaintiffs' claims also fail the "legally required" element of *SUWA*.  To the extent there are any inconsistencies with the 2016 Proclamation, Proclamation 9681 now controls.  Plaintiffs cite no source of law that specifically and unequivocally commands BLM to act contrary to the

---

[18] Plaintiffs do not support this claim with factual allegations.  As detailed in Part V.A, the Complaints contain only general information-and-belief allegations about possible future actions by the Agency Defendants.  *See, e.g.*, Tribes Compl. ¶ 220; NRDC Compl. ¶¶ 159, 168; *see also, e.g.*, UDB Compl. ¶ 193.

provisions of Proclamation 9681.  Further, it is well settled that no general private cause of action exists to enforce obligations imposed on executive branch officials by executive orders. Such a cause of action exists only when the order's terms and purpose evidence the intent to create a private right of action.  *See UAC*, 316 F. Supp. 2d at 1200.  The 2016 Proclamation evidences no such intent.  *See* 82 Fed. Reg. at 1139-47.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaints should be dismissed in full for lack of Article III jurisdiction.  To the extent the Court concludes it has Article III jurisdiction, all counts should be dismissed for failure to state a claim.  To the extent the Court concludes the complaints state a claim, the President should be dismissed as a defendant to the claim(s) based on lack of jurisdiction.

Respectfully submitted this 1st day of October, 2018,


JEFFREY H. WOOD
Acting Assistant Attorney General

   */s/ Romney S. Philpott*
Romney S. Philpott
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th St., #370
Denver, CO 80202
Phone:  303-844-1810
Fax:  303-844-1350
E-mail:  Romney.Philpott@usdoj.gov

Judith E. Coleman
U.S. Department of Justice,
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  202-514-3553

45

Fax:  202-305-0506
Email:  Judith.Coleman@usdoj.gov

Attorneys for Federal Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2018, I electronically filed the foregoing document and its attachments with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all parties.

*/s/ Romney S. Philpott*