## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HOPI TRIBE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-2590 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UTAH DINÉ BIKÉYAH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-2605 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-2606 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | **CONSOLIDATED CASES** |
| Defendants. | ) | |
| | ) | |

## UDB PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..............................................................................iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 3

STANDARD OF REVIEW .............................................................................. 7

ARGUMENT ............................................................................................... 8

I.   THE CASE IS JUSTICIABLE ............................................................... 8

    A.   The Trump Proclamation Has Inflicted Direct Harm On The
        UDB Plaintiff Organizations.................................................. 9

        1.   The UDB Plaintiffs Have Demonstrated Direct Harm
             To The Plaintiff Organizations ............................................ 9

        2.   The UDB Plaintiffs Have Also Established Standing On
             Behalf Of Their Members ................................................. 12

        3.   The Government's Arguments Against Standing Miss
             The Mark ....................................................................... 16

    B.   The UDB Plaintiffs' Injuries Are Redressable ............................. 20

    C.   The UDB Plaintiffs' Claims Are Ripe For Review ...................... 21

    D.   The Trump Proclamation Is Otherwise Reviewable ..................... 24

II.  THE PRESIDENT LACKS AUTHORITY TO REVOKE OR
    REDUCE A NATIONAL MONUMENT ................................................. 24

    A.   The Text, Purpose, And Legislative History Of The Antiquities
        Act Confirm That The President Has No Power To Revoke Or
        Reduce A Monument ....................................................... 25

    B.   The Government Has Not Offered A Sound Basis For Its Claim
        That The President Has the Power To Revoke Or Reduce
        National Monuments......................................................... 30

    C.   Past Practice Does Not Support The Government's Position......................... 36

    D.   The Trump Proclamation Exceeds The President's Authority ...................... 43

**TABLE OF CONTENTS—Continued**

Page

CONCLUSION ....................................................................................................................... 45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Abbott Labs.* v. *Gardner*,
387 U.S. 136 (1967)................................................................23

*Abigail Alliance for Better Access to Developmental Drugs* v. *Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006)................................................10

*Action Alliance of Senior Citizens* v. *Heckler*,
789 F.2d 931 (D.C. Cir. 1986)............................................9, 11

*Alaska* v. *United States*,
545 U.S. 75 (2005)...............................................................1, 3

*Alaska* v. *United States*,
546 U.S. 413 (2006)................................................................40

*Albertson* v. *FCC*,
182 F.2d 397 (D.C. Cir. 1950)................................................32

*Am. Legal Found.* v. *FCC*,
808 F.2d 84 (D.C. Cir. 1987)....................................................9

*Am. Soc'y for Prevention of Cruelty to Animals (ASPCA)* v. *Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011)....................................................9

*Ams. for Safe Access* v. *DEA*,
706 F.3d 438 (D.C. Cir. 2013)..................................................8

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015)............................................................24

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..............................................................7, 8

[*]*Attias* v. *Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017).........................................8, 17, 19

*Bowsher* v. *Synar*,
478 U.S. 714 (1986)................................................................25

[*] Those authorities upon which we chiefly rely are marked with an asterisk.

iii

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Burlington N. R.R. Co.* v. *Surface Transp. Bd.*,
  75 F.3d 685 (D.C. Cir. 1996) ............................................................23

*Butte City Water Co.* v. *Baker*,
  196 U.S. 119 (1905) ............................................................................36

*Cal. Coastal Comm'n* v. *Granite Rock Co.*,
  480 U.S. 572 (1987) ............................................................................25

*Ctr. for Biological Diversity* v. *EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ..........................................................13

*Chamber of Commerce of U.S.* v. *Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ..........................................................24

*Citizens for Responsibility & Ethics in Washington* v. *Trump*,
  302 F. Supp. 3d 127 (D.D.C. 2018), *appeal docketed*,
  No. 18-5150 (D.C. Cir. May 23, 2018) ..............................................20

*Clinton* v. *City of New York*,
  524 U.S. 417 (1998) ............................................................................20

*Cochnower* v. *United States*,
  248 U.S. 405, *modified* 249 U.S. 588 (1919) ..................................32

*Conservation Law Found.* v. *Pritzker*,
  37 F. Supp. 3d 234 (D.D.C. 2014) ...............................................22, 23

*Coosaw Mining Co.* v. *South Carolina ex rel. Tillman*,
  144 U.S. 550 (1892) .......................................................................35, 36

*Dalton* v. *Spector*,
  511 U.S. 462 (1994) ............................................................................24

*Dames & Moore* v. *Regan*,
  453 U.S. 654 (1981) ...............................................................24, 36, 37

*Equal Rights Ctr.* v. *Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ...........................................................9

*FDA* v. *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................40

*FCC* v. *AT&T Inc.*,
  562 U.S. 397 (2011) ............................................................................30

iv

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Havens Realty Corp.* v. *Coleman*,
455 U.S. 363 (1982)..................................................................11

*Humane Soc'y of the U.S.* v. *Vilsack*,
797 F.3d 4 (D.C. Cir. 2015)..........................................................8

*Jerome Stevens Pharm., Inc.* v. *FDA*,
402 F.3d 1249 (D.C. Cir. 2005)......................................................8

*Kingdomware Techs., Inc.* v. *United States*,
136 S. Ct. 1969 (2016).............................................................31

*Knight First Amendment Inst. at Columbia Univ.* v. *Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018).........................................20, 21

*League of Conservation Voters* v. *Trump*,
303 F. Supp. 3d 985 (D. Alaska 2018) .........................................20

*MCI Telecommc'ns Corp.* v. *Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994)................................................................44

*Medellin* v. *Texas*,
552 U.S. 491 (2008)............................................................24, 36

*Mountain States Legal Found.* v. *Bush*,
306 F.3d 1132 (2002)..............................................................24

*Mountain States Legal Found.* v. *Glickman*,
92 F.3d 1228 (D.C. Cir. 1996).....................................................19

*Nat'l Treasury Emps. Union* v. *Nixon*,
492 F.2d 587 (D.C. Cir. 1974).....................................................20

*Newdow* v. *Bush*,
391 F. Supp. 2d 95 (D.D.C. 2005).................................................20

*NLRB* v. *Noel Canning*,
134 S. Ct. 2550 (2014)............................................................41

*Pennsylvania* v. *West Virginia*,
262 U.S. 553 (1923)................................................................17

*Sierra Club* v. *Jewell*,
764 F.3d 1 (D.C. Cir. 2014)........................................................18

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Sierra Club* v. *Morton,*
　405 U.S. 727 (1972)........................................................................9

*Sioux Tribe* v. *United States,*
　316 U.S. 317 (1942).............................................................2, 25, 45

*Slidell* v. *Grandjean,*
　111 U.S. 412 (1884)......................................................................36

*Susan B. Anthony List* v. *Driehaus,*
　134 S. Ct. 2334 (2014)..................................................................17

*Swan* v. *Clinton,*
　100 F.3d 973 (D.C. Cir. 1996).......................................................21

*Theodore Roosevelt Conservation P'ship* v. *Salazar,*
　661 F.3d 66 (D.C. Cir. 2011).........................................................23

*United States* v. *Alaska,*
　521 U.S. 1 (1997)..........................................................................35

*United States* v. *Gaubert,*
　499 U.S. 315 (1991)........................................................................8

*United States* v. *Holt State Bank,*
　270 U.S. 49 (1926)........................................................................35

*United States* v. *Midwest Oil Co.,*
　236 U.S. 459 (1915)................................................................28, 35

*United States* v. *Union Pac. R.R. Co.,*
　353 U.S. 112 (1957)......................................................................35

*Univ. of Tex. Sw. Med. Ctr.* v. *Nassar,*
　570 U.S. 338 (2013)......................................................................26

*Utah Div. of State Lands* v. *United States,*
　482 U.S. 193 (1987)......................................................................35

*Util. Air Regulatory Grp.* v. *EPA,*
　134 S. Ct. 2427 (2014)..................................................................31

*Whitfield* v. *United States,*
　543 U.S. 209 (2005)......................................................................32

**TABLE OF AUTHORITIES—Continued**

Page(s)

[*]*Wyoming Outdoor Council* v. *U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999) ...................................................................21, 22, 23

*Youngstown Sheet & Tube Co.* v. *Sawyer,*
   343 U.S. 579 (1952) .........................................................................................37, 38

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. art. I § 7 ...............................................................................................32

U.S. Const art. II § 2 ...............................................................................................32

U.S. Const. art. IV, § 3, cl. 2 .........................................................................2, 25, 45

**STATUTES:**

16 U.S.C. § 1 ..........................................................................................................1, 3

16 U.S.C. § 7202(a) ...........................................................................................10, 16

16 U.S.C. § 7202(c)(2) .......................................................................................10, 16

43 U.S.C. § 1701 ......................................................................................................29

43 U.S.C. § 1714(j) ..................................................................................................29

54 U.S.C. § 320301 ..............................................................................................1, 44

[*]*54 U.S.C. § 320301(a) .................................................................................... passim*

[*]*54 U.S.C. § 320301(b) .................................................................................... passim*

Act of August 19, 1935, Ch. 561, § 4, 49 Stat. 660, 661
   (repealed in part in 1976) ...................................................................................34

Act of July 5, 1884, Ch. 214, § 1, 23 Stat. 103, 103 ...............................................34

Act of June 30, 1961, 75 Stat. 148 ..........................................................................41

Act of March 3, 1931, Ch. 405, 46 Stat. 1490 .......................................................41

Act of May 1, 1958, 72 Stat. 102 ............................................................................41

Act of May 14, 1898, Ch. 299, § 12, 30 Stat. 409, 414 ...........................................34

Act of May 28, 1940, Ch. 220, § 1, 54 Stat. 224, 224 .............................................34

**TABLE OF AUTHORITIES—Continued**

Page(s)

Act of October 2, 1888, Ch. 1069, 25 Stat. 505, 527....................................................................34

Antiquities Act .............................................................................................................. *passim*

Boulder Canyon Project Act, Ch. 42, § 9, 45 Stat. 1057, 1063 (1928) .........................................34

*Federal Land Policy and Management Act of 1976.......................................................... *passim*
    § 204...........................................................................................................................29
    § 704(a), 90 Stat. 2743, 2792 (1976) .......................................................................28, 29, 39

Federal Water Power Act, Ch. 285, §  24, 41 Stat. 1063, 1075 (1920) .........................................34

Forest Reserve Act of 1891, Ch. 561, § 24, 26 Stat. 1095, 1103............................................33, 34

National Environmental Policy Act .......................................................................................23

National Parks and Recreation Act of 1978, tit. III, § 301, 92 Stat. 3467, 3473-75.....................41

Paleontological Resources Preservation Act, § 6304,
    l6 U.S.C. § 470aaa-3(a)(2)............................................................................................15

Pickett Act of 1910, Ch. 421, 36 Stat. 847, 847 ................................................................32, 33

Reclamation Act of 1902, Ch. 1093, § 3, 32 Stat. 388, 388 .......................................................33

Sundry Civil Appropriations Act of 1897, Ch. 2, 30 Stat. 11, 36................................................33

**REGULATIONS AND EXECUTIVE MATERIAL:**

36 C.F.R. § 291.12(a)(1)......................................................................................................15

Executive Order No. 13,792, 82 Fed. Reg. 20,429 (May 1, 2017)...................................................5

Proclamation No. 3539, 28 Fed. Reg. 5407 (June 1, 1963)..........................................................43

Proclamation No. 2454, 55 Stat. 1608 (1941) ..........................................................................42

Proclamation No. 3089, 20 Fed. Reg. 2103 (Apr. 5, 1955)..........................................................42

Proclamation No. 3132, 21 Fed. Reg. 2369 (Apr. 12, 1956).........................................................42

Proclamation No. 9558, 82 Fed. Reg. 1139 (Jan. 5, 2017) ................................................. *passim*

Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 8, 2017).........................................6, 7, 43, 45

**TABLE OF AUTHORITIES—Continued**

Page(s)

Annual Report of the Commissioner of the General Land Office to the Secretary
of the Interior for the Fiscal Year Ended June 30, 1904 (1904) ..............................................27

Dept. of the Interior, Opinion Letter M. 12501, 12529 (June 3, 1924) .........................................37

Dept. of the Interior, Opinion Letter M. 27025 (May 16, 1932) ....................................................37

*Disposition of Abandoned Lighthouse Sites*, 32 Op. Att'y Gen. 488, 490 ...................................37

*Extension of Irrigation Canals Over Lands Within A National Monument*,
50 Pub. Lands Dec. 569 (1924) .....................................................................................................37

General Land Office, Dep't of the Interior, Circular Relating to Historic and
Prehistoric Ruins of the Southwest and Their Preservation, Addenda (1904) .......................28

Memorandum from Ryan K. Zinke, Sec'y of the Interior, to the President, Interim
Report Pursuant to Executive Order 13792 (June 10, 2017) ......................................................5

Memorandum from Ryan K. Zinke, Sec'y of the Interior, to the President, Final
Report Summarizing Findings of the Review of Designations Under the
Antiquities Act (Dec. 5, 2017) .....................................................................................................6

*Proposed Abolishment of Castle Pinckney National Monument*,
39 Op. Atty. Gen. 185 (1938) ...............................................................................32, 37, 38, 44

Review of Certain National Monuments Established Since 1996,
82 Fed. Reg. 22,016 (May 11, 2017) ...........................................................................................5

**LEGISLATIVE MATERIAL:**

29 Cong. Rec. 2677 (1897) ...............................................................................................................33

67 Cong. Rec. 6805 (1926) ...............................................................................................................40

*Hearing on H.R. 5224 and H.R. 5622 Before the Subcomm. on Pub. Lands of the
H. Comm. on Interior and Insular Affairs*, 94th Cong. 172 (June 6, 1975) ...........................30

H.R. 11357, 68th Cong. (2d Sess. 1925) .........................................................................................39

H.R. Rep. 94-1163 (1976)............................................................................................................29, 30

H.R. Rep. No. 59-2224 (1906).................................................................................................3, 27, 28

H.R. Rep. No. 68-1119 (1925).........................................................................................................39

H.R. Rep. No. 96-97, pt.1 (1979)......................................................................................................40

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Public Land Policy and Management Act of 1975 Print No. 2: Hearing Before the
Subcomm. on Pub. Lands of the H. Comm. on Interior and Insular Affairs,*
94th Cong. 92 (Sept. 8, 1975) ...................................................................29

S. 3840, 68th Cong. (2d Sess. 1925) ...........................................................39

S. Rep. No. 68-849 (1925) .........................................................................39

S. Rep. No. 69-423 (1926) .........................................................................40

RULES:

Fed. R. Civ. P. 12(b)(1)...............................................................................8

Fed. R. Civ. P. 12(b)(6)...........................................................................7, 8

OTHER AUTHORITIES:

William N. Eskridge, Jr., *Public Values in Statutory Interpretation*,
137 U. Pa. L. Rev. 1007 (1989) ...........................................................36

Letter from Mark Chalmers, COO, Energy Fuels Resources (USA) Inc., to U.S.
Dep't of Interior (May 25, 2017) .........................................................18

*Grand Staircase-Escalante National Monument Visitor Centers*,
BLM, https://on.doi.gov/2T2IpIm (last visited Nov. 15, 2018)....................11

Oxford English Dictionary (online ed. 2018) ......................................25, 26

Jedediah Purdy, Whose Lands? Which Public? Trump's National Monument
Proclamations and the Shape of Public-Lands Law (2018) (unpublished
manuscript) (on file with the Duke University School of Law Scholarship
Repository), *available at* https://scholarship.law.duke.edu/cgi/
viewcontent.cgi?article=6488&context=faculty_ scholarship.........................35, 43

Hal Rothman, Preserving Different Pasts: The American National Monuments (1989) .............28

Hal K. Rothman, Nat'l Park Serv. Div. of Hist., Navajo National Monument: A Place
and Its People, An Administrative History (1991) ........................................42, 43

John C. Ruple, *The Trump Administration and Lessons Not Learned From Prior
National Monument Modifications*,
43 Harv. Envtl. L. Rev. (forthcoming 2019), *available at*
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3272594....................41, 42, 43

**TABLE OF AUTHORITIES—Continued**

Page(s)

Antonin Scalia & Bryan A. Garner, Reading Law:
  The Interpretation of Legal Texts (2012).................................................................26

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*,
  37 Ga. L. Rev. 473 (2003) .......................................................................................33

Webster's International Dictionary of the English Language (reference history ed.
  1907) ........................................................................................................................26

## INTRODUCTION

The Bears Ears National Monument (the "Monument") took its name from a pair of distinctive sandstone buttes that jut upward out of the ruddy expanse of southeastern Utah. They are set against a dramatic terrain of canyons, mesas, and mountains, a landscape as rich in scientific and historic resources as it is visually arresting.

To protect this unique area, President Obama established a national monument pursuant to the Antiquities Act. *See* 54 U.S.C. § 320301. The Antiquities Act empowers the President to do two things: First, the President can "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" on federal land "to be national monuments." *Id*. § 320301(a). Second, the President can "reserve parcels of land as a part of the national monuments." *Id*. § 320301(b). As the Supreme Court has explained, "[a]n essential purpose of monuments created pursuant to the Antiquities Act, * * * is 'to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.'" *Alaska* v. *United States*, 545 U.S. 75, 103 (2005) (quoting 16 U.S.C. § 1). In keeping with that purpose, President Obama exercised both powers conferred by the Antiquities Act: By proclamation, he identified numerous objects of historic or scientific interest and "declare[d]" them to be national monuments, and he "reserve[d]" a parcel of land to be "part of" the monument. 54 U.S.C. § 320301(a)-(b). He thus created the Bears Ears National Monument.

Soon after assuming office, President Trump ordered his Secretary of the Interior, Ryan Zinke, to review the Bears Ears National Monument designation and numerous other existing monuments, citing concerns about economic growth and energy independence. Secretary Zinke

1

reported back and—while acknowledging that public comments were "overwhelmingly in favor of maintaining existing monuments"—recommended that Bears Ears be dramatically reduced. President Trump agreed.  He cut the vast majority of the Bears Ears National Monument, leaving in its place two small "units" comprising only about 15 percent of the Monument's original area.

President Trump's attempt to dismantle the Bears Ears National Monument was unlawful. The "Constitution places the authority to dispose of public lands *exclusively* in Congress."  *Sioux Tribe* v. *United States*, 316 U.S. 317, 326 (1942) (emphasis added); *see* U.S. Const. art. IV, § 3, cl. 2.  That means Presidential power over public lands "must be traced to Congressional delegation."  *Sioux Tribe*, 316 U.S. at 326.  Here, the only source of power identified by the Government for the President's action is the Antiquities Act.  But that Act does not confer the authority President Trump purported to exercise.  As described above, it grants only two powers: The power to "declare" a monument, and the power to "reserve" land.  It does not, either expressly or implicitly, give the President the *opposite* powers—to *revoke* or *remove* land from a national monument.  That conclusion is reinforced by the fact that numerous other statutes contemporaneous with the Antiquities Act *did* expressly confer the power to modify or revoke reservations of land.  The Antiquities Act tellingly did not, in keeping with its basic purpose to create a permanent form of protection that could only be modified by Congress.  And any doubt on this front is laid to rest by the Federal Land Policy and Management Act of 1976 ("FLPMA"), where Congress reserved for itself—not the Executive Branch—the power to alter national monuments.

The Government argues that past Presidents have exercised a power comparable to the one claimed by President Trump.  But the last time a President attempted a minor boundary adjustment was over fifty years ago, well before Congress reaffirmed its primacy in public lands

law in FLPMA and made clear that the President has no implied power to revisit a prior national monument designation.  Further, the historical practice does not support the power claimed here. The Executive Branch has frequently disavowed—including to Congress—the power to modify monuments, and the past instances where the President has arguably exercised some residual, pre-FLPMA modification authority are readily distinguishable from the present case.  President Trump's Proclamation is thus unprecedented: No President has ever reduced a prior President's designation so dramatically based simply on disagreement with the prior President's judgment that the area of the monument should be "conserve[d] * * * for the enjoyment of future generations."  *Alaska*, 545 U.S. at 103 (quoting 16 U.S.C. § 1).  History provides no cover for President Trump's action.

The Federal Defendants' motion to dismiss should be denied.

## BACKGROUND

1.  The Antiquities Act was passed in 1906 in response to concern about looting on federal land.  It was meant to furnish the President with a method of "permanent" protection of landscapes and objects of historic and scientific interest, akin to the protections conferred by national parks.  *See* H.R. Rep. No. 59-2224, at 7-8 (1906).  As currently codified, the Act empowers the President, in his "discretion," to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."  54 U.S.C. § 320301(a).  It also authorizes the President to "reserve parcels of land as a part of the national monuments," and provides that the "limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  *Id*. § 320301(b).  In short, the Act confers two interrelated powers: To "declare"

3

that certain "landmarks" and "objects" are "national monuments," and then to "reserve" land "as a part of" those "monuments."

2.   Pursuant to his authority under the Antiquities Act, President Obama established the Bears Ears National Monument in order to "preserve" the area's "cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources."  Proclamation No. 9558, 82 Fed. Reg. 1139, 1142 (Jan. 5, 2017) ("Obama Proclamation").  The Obama Proclamation described those "resources" in detail: iconic landscapes like Cedar Mesa and Valley of the Gods; archaeological sites like Newspaper Rock; and historic sites like the Hole-in-the-Rock Trail, used by Mormon settlers.  *Id*. at 1139-42.  The Obama Proclamation also noted that the "paleontological resources in the Bears Ears area are among the richest and most significant in the United States."  *Id*. at 1141.  Numerous sites are "teeming with fossils" dating as far back as the Permian Period, from "ray-finned fish fossils" to "dinosaurs."  *Id*.  The fossils have yielded "insights into the transition of vertebrate life from reptiles to mammals" and "how dinosaurs dominated terrestrial ecosystems."  *Id*.  The Obama Proclamation also described the diverse flora and fauna of the area, as well as its "stunning geology."  *Id*. at 1140.

Having listed these various items in detail, President Obama "proclaim[ed] the objects identified" to be national monuments.  *Id*. at 1143; *see* 54 U.S.C. § 320301(a).  He also "reserved" about 1.35 million acres "for the purpose of protecting those objects," expressly finding that the boundaries chosen were "confined to the smallest area compatible with the proper care and management of the objects to be protected."  82 Fed. Reg. at 1143; *see* 54 U.S.C. § 320301(b). Together, the objects and land were declared the "Bears Ears National Monument."  82 Fed. Reg. at 1143.  Accordingly, "subject to valid existing rights," President Obama ordered that the land within the Monument was "withdrawn" from "entry," "mining," or "mineral * * * leasing, other

than by exchange that furthers the protective purposes of the monument." *Id*. And he ordered the U.S. Forest Service and Bureau of Land Management ("BLM") "to implement the purposes of this proclamation," and to develop a management plan in consultation with the Park Service and local Native American tribes. *Id*. at 1143-44.

3.   Soon after taking office, President Trump issued Executive Order No. 13,792, "Review of Designations Under the Antiquities Act," which set forth the new President's policy that national monuments may "create barriers to achieving energy independence" and "otherwise curtail economic growth." 82 Fed. Reg. 20,429, 20,429 (May 1, 2017). He directed Secretary of the Interior Ryan Zinke to review (1) all monuments larger than 100,000 acres designated by Presidents under the Antiquities Act since January 1, 1996, and (2) all monuments "where the Secretary determines that the designation or expansion was made without adequate public outreach and coordination with relevant stakeholders." *Id*. The Order further directed the Secretary to make "recommendations for such Presidential actions, legislative proposals, or other actions consistent with law" that the Secretary considered appropriate to effectuate the Order's stated policy. *Id.* at 20,430.

Secretary Zinke then issued a notice in the Federal Register opening a brief period for public comment on twenty-seven monuments identified for review—including the Bears Ears National Monument. Review of Certain National Monuments Established Since 1996, 82 Fed. Reg. 22,016 (May 11, 2017). Shortly after the close of comments, Secretary Zinke issued a five-page interim report on the Bears Ears National Monument concluding that it did "not fully conform with the policies set forth" in President Trump's Executive Order. Memorandum from Ryan K. Zinke, Sec'y of the Interior, to the President, Interim Report Pursuant to Executive Order 13792, at 5 (June 10, 2017). He therefore recommended that the boundary be revised. *Id*.

Secretary Zinke's final report was released a few months later.  Memorandum from Ryan K. Zinke, Sec'y of the Interior, to the President, Final Report Summarizing Findings of the Review of Designations Under the Antiquities Act (Dec. 5, 2017).  The report stated—without analysis or reference to a formal Executive Branch legal opinion—that there was "no doubt" the President has authority to modify a national monument, and then acknowledged that public comments received "were overwhelmingly in favor of maintaining existing monuments."  *Id*. at 2-3.  Secretary Zinke nonetheless recommended that the Bears Ears National Monument be dramatically reduced.  He opined—again without support—that "many objects" President Obama had protected with the monument designation were in fact "common or otherwise not of particular scientific of [sic] historic interest."  *Id*. at 10.  And he suggested that "traditional uses" of the land, like "mining," had been "unnecessarily restricted."  *Id*. at 7.

In accord with Secretary Zinke's recommendation, President Trump issued a proclamation invoking the Antiquities Act and purporting to shrink the Bears Ears National Monument by 85 percent.  Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 8, 2017) ("Trump Proclamation").  The Trump Proclamation replaced President Obama's original Monument with two new smaller "units": the Shash Jáa unit and the Indian Creek unit (the "Trump Units").  *Id*. at 58,082.  These units comprise 228,784 acres in total.  They exclude 1,150,860 acres originally included in the Bears Ears National Monument (the "Revoked Area").  *Id*. at 58,085.  The Trump Proclamation directs that the Revoked Area be open to "entry, location, selection, sale, or other disposition under the public land laws," "disposition under all laws relating to mineral and geothermal leasing," and "location, entry, and patent under the mining laws" within 60 days.  *Id*. And, by eliminating over a million acres of land from the monument, the Trump Proclamation also removes the monument status of numerous landmarks and objects within the Revoked Area

that had been specifically designated as monuments by the Obama Proclamation—like the Valley of the Gods, Cedar Mesa, Fry Canyon, Hideout Canyon, Elk Ridge, the Hole-in-the-Rock-Trail, and multiple other ruins and paleontological sites. *See* UDB Compl. ¶¶ 174-175.

By way of explanation, the Trump Proclamation acknowledged that the Obama Proclamation had "identifie[d] a long list of objects of historic or scientific interest," but countered that "[s]ome" of those objects "are not unique to the monument" and, in President Trump's view, "are not of significant scientific or historic interest." 82 Fed. Reg. at 58,081. As a result, the Trump Proclamation deprived those objects and the land surrounding them of the protections of the Antiquities Act.

4. Two days after the Trump Proclamation was issued, Utah Diné Bikéyah ("UDB"), Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc. ("CLF"), Patagonia Works, The Access Fund, National Trust for Historic Preservation, and Society of Vertebrate Paleontology ("SVP") (collectively, "the UDB Plaintiffs") sued President Trump, Secretary Zinke, and several other federal officials. The Complaint explained how the UDB Plaintiffs and their members had been and would be harmed by the unlawful Trump Proclamation. UDB Compl. ¶¶ 8-71. And it contained four counts: Two counts alleging violations of the two subsections of the Antiquities Act, one count alleging a violation of the constitutional separation of powers, and one count alleging a violation of the Constitution's Take Care Clause. *Id*. ¶¶ 189-220. This Court consolidated the case with two other similar challenges to the Trump Proclamation. ECF No. 32. The Federal Defendants moved to dismiss all counts.

### STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S.

662, 678 (2009) (internal quotation marks omitted).  To establish standing in response to a Rule 12(b)(1) motion to dismiss, a plaintiff need only set out "a plausible claim that [it has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  *Humane Soc'y of the U.S.* v. *Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  In determining whether a plaintiff has met that "light burden," *Attias* v. *Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017), the court must accept all "facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor." *Humane Soc'y*, 797 F.3d at 8.  The "court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction," but "the court must still 'accept all of the factual allegations in [the] complaint as true.'"  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)).

## ARGUMENT

## I.      THE CASE IS JUSTICIABLE.

The UDB Plaintiffs' complaint and supporting declarations are more than sufficient to establish Article III standing at the motion to dismiss stage.  In order to find that Article III is satisfied, this Court need only determine that a single plaintiff has suffered an injury attributable to the defendants and redressable by this Court.  *Ams. for Safe Access* v. *DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013) ("to proceed to the merits of their claims, we need only find one party with standing").  Thus, while the eight UDB Plaintiffs have set out multiple reasons why both the Plaintiff organizations and their members will suffer concrete harm from the Trump Proclamation, Plaintiffs need only show that *one* of these reasons establishes standing for *one* of these Plaintiffs in order for the standing requirement to be met.  *Id.*  Because the UDB Plaintiffs have made that showing many times over, and because Plaintiffs' injuries may be redressed by

this Court and are ripe for review, Federal Defendants' motion to dismiss for lack of standing or ripeness should be denied.

> **A.     The Trump Proclamation Has Inflicted Direct Harm On The UDB Plaintiff Organizations.**

"An organization may assert standing on its own behalf or on behalf of its members." *Am. Soc'y for Prevention of Cruelty to Animals (ASPCA)* v. *Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).  In this case, the UDB Plaintiffs have established standing on their own behalf and on behalf of their members as well.

> **1.     The UDB Plaintiffs Have Demonstrated Direct Harm To The Plaintiff Organizations.**

An organization has standing to bring suit in its own right if it is "among [those] injured" by a defendant's wrongful conduct.  *Sierra Club* v. *Morton*, 405 U.S. 727, 735 (1972).  To prove standing under this theory, an organization need only "make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision."  *ASPCA*, 659 F.3d at 24.   An organization may make this showing by "alleg[ing] that discrete programmatic concerns are being directly and adversely affected by the defendant's actions," *Am. Legal Found.* v. *FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987), and by demonstrating that the organization has "used its resources to counteract that harm."  *Equal Rights Ctr.* v. *Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011).  For example, the D.C. Circuit has found standing where a plaintiff identified "concrete organizational interests detrimentally affected by the particular HHS regulatory dispositions they challenge."  *Action Alliance of Senior Citizens* v. *Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986).  Similarly, the D.C. Circuit found standing where an organization alleged that its activities were impeded by the FDA policies it was attacking.

*Abigail Alliance for Better Access to Developmental Drugs* v. *Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

The UDB Plaintiffs have made the requisite showings in this case.  As the Complaint details, the UDB Plaintiffs are all organizations that have a specific, concrete interest in protecting, preserving, and cultivating the land contained in the original Bears Ears National Monument, the contents of that land, or both.  UDB Compl. ¶¶ 8-71, 174-188.  And the UDB Plaintiffs have been forced to divert resources towards efforts associated with the original Monument as a direct result of the Trump Proclamation and the increased threat it poses to that land and the cultural, paleontological, and biological resources in it.  *Id.*  To take one example: Friends of Cedar Mesa was formed to foster "stewardship and advocacy for the Cedar Mesa area, with a focus on protecting cultural resources."  Hadenfeldt Decl. ¶ 9.  As a result of the Trump Proclamation, Friends of Cedar Mesa has had to divert time and resources away from specific stewardship and educational projects in order to direct them towards the original Bears Ears National Monument.  *See id.* ¶¶ 30-32.

Notably, Friends of Cedar Mesa was forced to undertake an unplanned fundraising campaign to construct a new Bears Ears Education Center in Bluff, Utah, the gateway to the Monument.  *Id.* ¶¶ 31-32.  Under the Obama Proclamation, there were two BLM ranger stations (Kane Gulch Ranger Station and Sand Island Station) inside the Monument boundaries.  *Id.* ¶ 31.  While Friends of Cedar Mesa believed these stations were not offering adequate visitor information at the time of the Obama Proclamation, *id.*, the Monument designation meant that there would be improvements to the management and resources of the stations, and it meant that more stations might soon be built within the area.  *See* 16 U.S.C. § 7202(a), (c)(2) (requiring BLM to manage national monument lands "to conserve, protect, and restore" the objects and

values for which they are designated); *see also Grand Staircase-Escalante National Monument Visitor Centers*, BLM, https://on.doi.gov/2T2IpIm (last visited Nov. 15, 2018) (encouraging visitors to stop at one of the four visitor centers established following the designation of Grand Staircase-Escalante National Monument "to learn about paleontology, archaeology, geology, human history, and ecology through ranger-led presentations, interpretive exhibits, and materials at the book store"). The Trump Proclamation, however, excluded the Kane Gulch and Sand Island Stations from the Monument boundaries and decreased the resources that would flow to the Cedar Mesa area as a whole. Friends of Cedar Mesa was therefore forced to construct and run its own Education Center to ensure that visitors to the Monument would be properly informed about its cultural resources and how they must be protected. This unanticipated drain on Friends of Cedar Mesa's finances is precisely the sort of direct injury that is cognizable under Article III. *See Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982) (recognizing standing where an organization was forced to expend funds combatting the results of defendant's challenged conduct).[1]

UDB's experience provides another strong example of the way in which the Trump Proclamation has inflicted direct injury on the Plaintiff organizations. UDB is a Native-American led organization dedicated to "ensuring that sacred ancestral lands remain intact for future generations." Maryboy Decl. ¶ 3. It played a significant role in the creation of the

---

[1] Friends of Cedar Mesa has also suffered additional concrete harms from the Trump Proclamation. The organization had planned several stewardship projects for areas within the original Monument boundaries, and the organization had already raised the necessary funds for these projects that were to be matched by BLM funding. Hadenfeldt Decl. ¶¶ 33-34. BLM, however, has now requested that Friends of Cedar Mesa prioritize its work within the new Trump Units. *See id.* As a result, Friends of Cedar Mesa has had to delay or cancel the projects that were to be conducted in the Revoked Area. *Id.* Again, this sort of impediment to "concrete organizational interests" is exactly the sort of injury that creates Article III standing. *Heckler*, 789 F.2d at 937.

Monument in the first place.  UDB Compl. ¶ 20; Noyes Decl. ¶¶ 5-9.  As a result of the Trump Proclamation, UDB has had to divert resources from ethnographic and educational activities to protecting the objects and landscapes within the original Bears Ears National Monument from development, looting, vandalism, and other adverse impacts to the spiritual and aesthetic value of the land.  UDB Compl. ¶ 23; *see also* Noyes Decl. ¶¶ 9-10 (detailing on-the-ground stewardship activities undertaken by UDB).  Absent the Trump Proclamation, protection of these resources would have been the responsibility of BLM and the Forest Service.  *See* 82 Fed. Reg. at 1143-44. Moreover, since the Trump Proclamation, UDB has faced increased difficulty in collecting traditional tribal knowledge about the area that has been essential to UDB's mission.  *See* Noyes Decl. ¶¶ 32-33.

Each of the other UDB Plaintiffs has alleged similar, concrete injuries that flow directly from the Trump Proclamation's purported changes to the Monument.  *See, e.g.*, UDB Compl. ¶¶ 13 (alleging that CLF must "divert its limited resources * * * towards restoring protection of, and mitigating adverse impacts to, this historically and culturally significant area"); 42 (Archeology Southwest has refocused "its financial resources to raising awareness" of the Monument land); 50 ("Patagonia will be forced to divert more resources * * * towards protection and restorations of the objects comprising the Bears Ears National Monument"); 56 (Access Fund has invested considerable resources towards "stewardship projects within * * * Bears Ears"); 63 (similar for National Trust); 70 (SVP has "devoted substantial time and resources to the protection of paleontological resources within" the Monument).  They have therefore established standing sufficient to withstand the Government's motion to dismiss.

> ### 2.  The UDB Plaintiffs Have Also Established Standing On Behalf Of Their Members.

Because the Plaintiff organizations have standing in their own right, there is no need to

go any further.  *See Ctr. for Biological Diversity* v. *EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017).

But even if there were any doubts, the UDB Plaintiffs have also established standing on behalf of

their members.

An organization may assert standing on behalf of its members who have been injured if it

can show that "(1) at least one of its members would have standing to sue in his own right; (2)

the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the

relief requested requires the member to participate in the lawsuit."  *Id.* (internal quotation marks

omitted).  The latter two requirements are easily met in this case because each of the Plaintiff

organizations is devoted to the protection of the lands and resources within the original

Monument.  UDB Compl. ¶¶ 8-71.  Moreover, the claims the UDB Plaintiffs assert (challenges

to the legality of the Trump Proclamation) and the relief they seek (a declaration that the changes

to the Monument are unlawful and an injunction restoring the prior Monument boundaries) in no

way require the participation of members as named plaintiffs.

The only question, then, is whether at least one of the UDB Plaintiffs' members would

have standing to sue in his own right.  The answer is an obvious yes.  The UDB Plaintiffs'

members have already suffered harm to their financial, cultural, aesthetic, recreational, and

scientific interests as a result of the Trump Proclamation and they will experience even more

harm in the future if the unlawful action is not reversed.  *Id*. ¶¶ 176-188.

SVP's members, in particular, have already been directly impacted by the Trump

Proclamation.  SVP is the world's largest organization dedicated to promoting and encouraging

paleontology and paleontological research and preservation.  *Id*. ¶ 65.  It has over 2,200 members

who are scientists, students, artists, and individuals devoted to paleontology, including many

who are devoted to researching and protecting paleontological resources within the former

confines of the Bears Ears National Monument.  *Id.* ¶¶ 67, 70.

The Trump Proclamation has had a direct effect on the availability of funding for SVP members to conduct paleontological research within the formerly protected areas of the Monument.  *See id.* ¶ 185.  The National Landscape Conservation System ("NLCS") provides a significant source of grant funding for research projects conducted on national monument land, but those funds may not be used for land outside the monuments.  *Id.*  Thus, when the Trump Proclamation diminished the size of the Bears Ears National Monument, it also diminished the availability of funds for SVP members to use for projects on the excluded lands.  *Id.*

For example, NLCS grants represent the single most significant source of research funding for SVP member Robert Gay.  *See* Gay Decl. ¶ 17.  Mr. Gay has been working under an NLCS grant to conduct research in the Bears Ears region since the summer of 2017.  *Id.*  Prior to the Trump Proclamation, Mr. Gay and another member of SVP used funds from the grant to conduct research that resulted in the discovery of a large fossil site on the far western edge of the original Monument boundary.  *Id.* ¶ 13.  Mr. Gay had intended to continue researching and excavating the recently discovered fossil site during the summer of 2018, but that area was excluded from the new Trump Units.  *Id.* ¶¶ 13, 17.  As a result, Mr. Gay could no longer use NLCS funds at that site and instead had to redirect his research elsewhere.  *Id.*  Similarly, one of the most important Triassic fossil sites in Utah, known as P2N, is located near Fry Canyon— another area excluded from the Monument by the Trump Proclamation.  *Id.* ¶¶ 13, 16.  Mr. Gay had intended to work on the excavation of that site, but will not be able to do so now that he cannot use NLCS funding for the work.  *Id.* ¶ 17.  These financial harms satisfy Article III.[2]

---

[2]  Nor is it only NCLS funding that has been affected.  Mr. Gay was recently denied a grant from the Canyonlands Natural History Association for a proposed visitors guide to paleontological

Less access to research funding is not the only injury to SVP's members that has been inflicted by the Trump Proclamation.  As the Government acknowledges in its motion, the Forest Service regulations expressly prohibit the casual collection of common invertebrate and plant paleontological resources within national monument boundaries.  Mot. 19 n.11; 36 C.F.R. § 291.12(a)(1).  But casual collection *is* allowed on non-monument land.  *See* Paleontological Resources Preservation Act (PRPA), § 6304, l6 U.S.C. § 470aaa-3(a)(2).  Thus, when the Trump Proclamation excluded certain Forest Service lands from the Bears Ears National Monument, it opened them up to casual collection.

The impacts for SVP members and other paleontologists are profound.  SVP members currently conduct research—and intend to continue to conduct research—on Forest Service lands that have been excluded from the Monument boundaries and are thus open for casual collection. *See* Uglesich Decl. ¶ 12.  Casual collection necessarily hinders the research.  Invertebrate and plant fossils provide important contextual information.  *Id.* ¶¶ 9, 12.  Even for large vertebrate sites like P2N, plant and invertebrate fossils can be used to determine the time period, climate, environment, and biological context of these sites.  *See id.* ¶ 9; Gay Decl. ¶ 14.  Casual collection lessens the availability of these fossils and thereby decreases the information that can be gleaned from a site, inflicting concrete injury for Article III purposes.

Members of other Plaintiff organizations have also experienced harms sufficient to establish Article III standing.  Notably, the land in former Bears Ears National Monument was protected from future mineral development in a comprehensive fashion.  82 Fed. Reg. at 1143. But most of the land that was excluded from the Monument by the Trump Proclamation is now devoid of those protections, leaving it open for activities such as oil and gas leasing and mining.

---

resources within the Monument, and the denial specifically cited the controversy surrounding the Monument as a reason for that denial.  Gay Decl. ¶ 19.

*See, e.g.*, Roberson Decl. ¶¶ 11, 23.  Many of the organizations' members regularly visit specific areas within these newly-excluded lands, and mineral development would inhibit their ability to continue to do so.  Tallman Decl. ¶ 12; Barlage Decl. ¶ 6; Maryboy Decl. ¶¶ 16, 19; Hadenfeldt Decl. ¶¶ 37, 39-40, 42; UDB Compl. ¶ 64.  Mineral development in these areas will thus inflict cognizable and concrete injuries to these members' recreational, aesthetic, professional, and spiritual interests.

Further, many of the areas that members regularly visit are home to significant cultural and archeological resources, such as: Cedar Mesa, Comb Ridge, Valley of the Gods, Grand Gulch, Fry Canyon, Elk Ridge, Bears Ears Meadow, the Abajo Mountains, Slickhorn Canyon, John's Canyon, the Highway 261 corridor on top of Cedar Mesa, Road Canyon, Cottonwood Canyon, and Tank Mesa. *See, e.g.*, Tallman Decl. ¶ 9; Hadenfeldt Decl. ¶ 40; Doelle Decl. ¶¶ 15-16, 18; Pahl Decl. ¶¶ 13-15; Maryboy Decl. ¶ 16.  All of these areas were excluded from the Trump Units.  The UDB Plaintiffs have enumerated in detail the damage and destruction they have witnessed to important cultural and archeological resources in these areas as a result of insufficient funding, inadequate resources, and improper management policies.  *E.g.*, Maryboy Decl. ¶¶ 17-18; Hadenfeldt Decl. ¶¶ 23-24, 35, 41; Doelle Decl. ¶ 19; Noyes Decl. ¶ 5; White Decl. ¶¶ 6-8; Pahl Decl. ¶ 13.  The Obama Proclamation was designed to prevent these harms. *See* 82 Fed. Reg. at 1139-41, 1143-44; *see also* 16 U.S.C. § 7202(a), (c)(2).  By removing monument protections from a broad swath of land, the Trump Proclamation has virtually guaranteed that the harms will occur, inflicting Article III injuries to the cultural, recreational, and spiritual interests of the UDB Plaintiffs' members.

### 3. The Government's Arguments Against Standing Miss The Mark.

Despite the abundant evidence that the Plaintiff organizations have standing in their own

right and on behalf of their members, the Government asks this Court to dismiss the Complaint on standing grounds.  None of its arguments is persuasive.

The Government primarily asserts that Plaintiffs rely solely on "broad categories of *potential future* injuries."  Mot. 14.  That is patently incorrect.  The UDB Plaintiffs have pointed to numerous concrete injuries that are occurring *right now*.  Friends of Cedar Mesa has already had to build a new Education Center, UDB has already been forced to divert funds to protecting cultural resources, and SVP members have already lost funding.  That is more than enough to show a concrete Article III injury sufficient for standing.

In any event, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief."  *Pennsylvania* v. *West Virginia,* 262 U.S. 553, 593 (1923); *see also Attias,* 865 F.3d at 626-629.  "[A]n allegation of future injury may suffice" if "there is a *substantial risk* that the harm will occur." *Susan B. Anthony List* v. *Driehaus*, 134 S. Ct. 2334, 2341 (2014) (emphasis added) (internal quotation marks omitted).  Here, there is no question that—on top of the injuries that have already occurred—the Trump Proclamation has also created a "substantial risk" of harm to the recreational and aesthetic values of the land, and a "substantial risk" that the cultural and paleontological resources on that land will be lost or destroyed.

The Government tries to evade this conclusion by arguing that the Obama Proclamation newly designated the Bears Ears National Monument, and the Trump Proclamation simply returned the land to the recent status quo.  Mot. 16.  But, as the UDB Plaintiffs have documented, many of the harms they cite *were* occurring before the Bears Ears National Monument was created.  *E.g.*, Maryboy Decl. ¶¶ 17-18; Hadenfeldt Decl. ¶¶ 23-24, 35, 41; Doelle Decl. ¶ 19; Noyes Decl. ¶ 5; White Decl. ¶¶ 6-8; Pahl Decl. ¶ 13.  The Obama Proclamation was designed to

halt these injuries to the land, the resources, and the organizations and people who enjoy them. *See* 82 Fed. Reg. at 1143-44. The Trump Proclamation has ensured that these harms will recommence by removing the broad, interconnected, protective measures and management benefits that come with a national monument designation.

The Government also suggests that the mining harms—at least—will not materialize because any mining that was going to occur would have happened before 2016. Mot. at 16. That suggestion is disingenuous at best, as President Trump was urged to reduce the Bears Ears National Monument specifically for the purpose of facilitating mineral development: In a comment letter submitted on May 25, 2017 as part of Secretary Zinke's national monument review, Energy Fuels Resources expressed concern that the original Bears Ears National Monument "could affect existing and future mill operations," and that there are "many other known uranium and vanadium deposits located within the newly created [Monument] that could provide valuable energy and mineral resources in the future." *See* Ex. A at 1 (Letter from Mark Chalmers, COO, Energy Fuels Resources (USA) Inc., to U.S. Dep't of Interior (May 25, 2017)). Accordingly, Energy Fuels encouraged Secretary Zinke to reduce the Bears Ears National Monument boundaries to "provide an adequate buffer between the White Mesa mill, the Daneros mine and all valid existing mineral rights such that there will be no impact to our lawful existing *or future operations*." *Id.* at 2 (emphasis added). The D.C. Circuit has expressly found that these types of expressions of interest in conducting future mining operations "demonstrate the requisite 'substantial probability' of injury." *Sierra Club* v. *Jewell*, 764 F.3d 1, 4-8 (D.C. Cir. 2014) (rejecting assertion that mining-related injury was speculative where mining companies made public comments indicating that they "own[ed] or lease[d] minerals, particularly coal, *with the expectation of developing them in the nomination area*").

The Government further asserts that the Trump Proclamation will not result in increased "looting, grave-robbing, and theft and destruction" because "[e]xisting statutes" will continue to protect the lands.  Mot. 19.  But these existing statutes have already proven insufficient at deterring this wrongful conduct.  *E.g.*, Maryboy Decl. ¶¶ 17-18; Hadenfeldt Decl. ¶¶ 23-24, 35, 41; Doelle Decl. ¶ 19; Noyes Decl. ¶ 5; White Decl. ¶¶ 6-8; Pahl Decl. ¶ 13.  That is a major reason why the Plaintiff organizations advocated for the Bears Ears National Monument, and it is a major reason why the land was granted monument status.  *See* 82 Fed. Reg. at 1139-41, 1143-44.  Further, decreasing the legal restrictions on particular conduct necessarily will increase the risk that the conduct will occur.  And the D.C. Circuit has held that conduct that creates a "heightened risk" of profound harm to plaintiffs can be sufficient for standing.  *Attias*, 865 F.3d at 626-629; *Mountain States Legal Found.* v. *Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) (upholding standing where Forest Service management plan posed an increased risk of forest fire that would harm plaintiffs' aesthetic and environmental interests).

Finally, the Government asserts that the UDB Plaintiffs cannot assert organizational standing because they merely allege an injury to "abstract social interests" and the diversion of funds for "advocacy."  Mot. 20-21 (internal quotation marks omitted).  Again, the Government is wrong.  The UDB Plaintiffs have pointed to very specific interests of their organizations—such as Friends of Cedar Mesa's interest in protecting the Cedar Mesa lands or SVP's goal to encourage paleontological research within the original Monument boundaries—that are directly injured by the Trump Proclamation.  And they have provided detailed allegations about the ways in which they have been forced to divert funds to create new resources, such as the Education Center, to combat the effects of the Trump Proclamation.  *See* pp. 9-12, *supra*.

**B.      The UDB Plaintiffs' Injuries Are Redressable.**

The UDB Plaintiffs' harms can be remedied in this case through a declaratory judgment that the Trump Proclamation is *ultra vires* and injunctions against the relevant subordinate officials.  *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ.* v. *Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018); *League of Conservation Voters* v. *Trump*, 303 F. Supp. 3d 985 (D. Alaska 2018).  Those forms of relief will redress the Plaintiffs' injuries by reversing the effects of the Trump Proclamation and ensuring that Bears Ears National Monument is fully restored.

The Government contends that the Plaintiffs are not entitled to declaratory or injunctive relief against the President himself.  That is both wrong and irrelevant.  It is wrong because prior courts have approved the use of declaratory judgments against the President.  Notably, in *Clinton* v. *City of New York*, the Supreme Court held that a challenge to the President's use of the line-item veto "would be redressed by a declaratory judgment that the cancellations [by the President] are invalid."  524 U.S. 417, 433 n.22 (1998); *see also Nat'l Treasury Emps. Union* v. *Nixon*, 492 F.2d 587 (D.C. Cir. 1974) (issuing a declaratory judgment against President Nixon); *Citizens for Responsibility & Ethics in Washington* v. *Trump*, 302 F. Supp. 3d 127, 138-40 (D.D.C. 2018), *appeal docketed*, No. 18-5150 (D.C. Cir. May 23, 2018) (recognizing that declaratory relief is available against the President in certain instances).[3]

It is irrelevant because—even if relief is unavailable against the President—the UDB Plaintiffs' injuries may be fully addressed through injunctive and declaratory relief against subordinate officials.  Though the Antiquities Act empowers the President alone to act, the

---

[3]  The Government cites *Newdow* v. *Bush*, 391 F. Supp. 2d 95 (D.D.C. 2005), for the proposition that declaratory relief is unavailable against the President.  But that was just one of a number of alternative grounds for dismissal in *Newdow*, and the court there was under the mistaken impression that courts universally refuse to issue such relief.  *Id*. at 101, 104, 106-107.  In fact, as noted above, the D.C. Circuit *itself* has issued such relief. *See Nat'l Treasury Emps. Union*, 492 F.3d 587.

protections, approvals, management plans, and other responsibilities that flow from a President's proclamation are under the control of the BLM and the Forest Service.  For example, rather than directing President Trump to rescind his Proclamation or direct the agencies not to give effect to its provisions, this Court could direct the agency officials themselves.  *See Swan* v. *Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *Knight First Amendment Inst. at Columbia Univ.*, 302 F. Supp. 3d at 561 (concluding that the plaintiffs' First Amendment injuries in being blocked from the @realDonaldTrump account could be redressed through declaratory or injunctive relief directed at Director Scavino).

### C.  The UDB Plaintiffs' Claims Are Ripe For Review.

The Trump Proclamation has injured the UDB Plaintiffs, and there is a substantial risk that these injuries will increase in the future.  Their challenge is therefore ripe for this Court's review, both under Article III and as a matter of prudential ripeness.  *See Wyoming Outdoor Council* v. *U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (ripeness is "[c]losely akin to the standing requirement, and indeed not always clearly separable from it").

The Government argues that the claims are unripe, relying primarily on the theory that the Government must take other "specific steps to authorize" some of the actions that will harm the UDB Plaintiffs, such as opening the Revoked Area for mining.  Mot. 25.  Even if the Government were right with respect to the mining-related harms (which it is not), that would not help its cause because many of the UDB Plaintiffs' other injuries require no such intervening steps.  For example, the UDB Plaintiffs have already been forced to redirect resources, protect

the recently exposed lands, and seek alternative grant funding as a result of the Trump Proclamation, *see* pp. 9-16, *supra*. That alone makes their claims ripe.

Moreover, the Government is *not* correct that the mining-related harms are unripe. When an agency makes a programmatic land-use decision that fundamentally alters the status of the land—such as removing a barrier to development—"the impending threat of injury is sufficiently real to constitute injury-in-fact" and the plaintiff's claim is ripe for review. *Wyoming Outdoor Council*, 165 F.3d at 51; *see also Conservation Law Found.* v. *Pritzker*, 37 F. Supp. 3d 234, 244 (D.D.C. 2014) ("Although Framework 48 did not itself open any closed areas to fishing, the Court finds that Defendants' decision to allow exemptions to the closed-area rules posed a sufficiently imminent threat to satisfy Article III.").

In *Wyoming Outdoor Council*, the D.C. Circuit held that the plaintiffs' claim that the Forest Service violated its regulations in opening certain lands to oil and gas leasing was sufficiently ripe for review, despite the fact that "there [was] no certainty that drilling [would] commence on the disputed lands." 165 F.3d at 51. The Forest Service's alleged illegal action imposed an "impending threat of injury * * * sufficiently real to constitute injury-in-fact," and "there no longer exist[ed] the possibility that further agency action [would] alter the claim in any fashion." *Id.* The same holds true here: Future actions may affect the extent to which mining occurs and its particular locations, but they will not alter the UDB Plaintiffs' claim that—under the Antiquities Act—mining should not be permitted *at all*. The Trump Proclamation instituted a fundamental change in the status of certain excluded lands in terms of their availability for mineral development: It restored the pre-Monument regime, which allows for land-disturbing activities and energy development that would not be permissible under the Obama Proclamation. *See* 82 Fed. Reg. at 1143. While the Government (at 18) suggests that the environmental review

process afforded by the National Environmental Policy Act ("NEPA") could potentially foreclose or modify proposed projects in ways that avoid potential injury, that is irrelevant to Plaintiffs' claims under the Antiquities Act, which will not be altered by later actions or factual development and, simply, "can never get riper." *Conservation Law Found.*, 37 F. Supp. 3d at 246 (quoting *Wyoming Outdoor Council*, 165 F.3d at 51). And NEPA is "essentially procedural"; it "does not mandate particular substantive environmental results." *Theodore Roosevelt Conservation P'ship* v. *Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) (internal quotation marks omitted).

Further, any delay would impose significant hardships on the UDB Plaintiffs. The harms already inflicted by the Trump Proclamation will continue to impact the UDB Plaintiffs if this suit is delayed. And postponing suit until some theoretical future action occurs would force Plaintiffs to engage in constant burdensome monitoring in order to assess when, exactly, they could renew their suit. Nor are Plaintiffs the only ones that would benefit from prompt resolution of this challenge. BLM has already initiated the planning process for a new resource management plan under the Trump Proclamation. A decision on whether the Trump Proclamation is lawful would prevent further public resources from being wasted on a plan that must later be redone. And all other parties that seek to use or enjoy the affected land would be served by a prompt decision as to its status.

Finally, no further factual development is required to decide the issues of this case. It centers on "a purely legal question"—whether the President has the authority to revoke or reduce national monuments under the Antiquities Act—"and such questions are typically found fit for judicial review." *Burlington N. R.R. Co.* v. *Surface Transp. Bd.*, 75 F.3d 685, 691 (D.C. Cir. 1996) (citing *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 149 (1967)). There is no reason to hold

otherwise in this case.  Accordingly, the Government's motion to dismiss on ripeness grounds should be denied.

### D.       The Trump Proclamation Is Otherwise Reviewable.

Unable to point to a specific bar to this Court's jurisdiction, the Government makes the general claim that judicial review of the Trump Proclamation is "extremely limited."  Mot. 27. But it does not explain how that purported limitation has any relevance to the issues in this case. It is well-settled that this Court has equitable authority to enjoin "violations of federal law by federal officials," including the President.  *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Chamber of Commerce of U.S.* v. *Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).  And in the specific context of the Antiquities Act, the D.C. Circuit has confirmed that judicial review is "available to ensure that * * * the President has not exceeded his statutory authority."  *Mountain States Legal Found.* v. *Bush*, 306 F.3d 1132 (2002).  That is the precise question here: Whether President Trump has "exceeded his statutory authority" by dramatically reducing the Bears Ears National Monument, and by revoking national monument status for numerous protected objects and landmarks in the Revoked Area.[4]

## II.     THE PRESIDENT LACKS AUTHORITY TO REVOKE OR REDUCE A NATIONAL MONUMENT.

"The President's authority" to issue the Trump Proclamation "must stem either from an act of Congress or from the Constitution itself."  *Medellin* v. *Texas*, 552 U.S. 491, 524 (2008)

---

[4]  The Government's citation to *Dalton* v. *Spector*, 511 U.S. 462 (1994), also misses the mark. *Dalton* held that judicial review is unavailable when a statute "commits [a] decision to the discretion of the President," but it assumed that review *is* possible when the question is whether the President enjoys a particular authority *at all*.  *Id.* at 473-474 (citing *Dames & Moore* v. *Regan*, 453 U.S. 654, 667 (1981) (reviewing claim that actions of the President and Secretary of the Treasury "were beyond their statutory and constitutional powers")).  That question, after all, raises grave "separation-of-powers" concerns that are not implicated merely because a President has allegedly abused his discretion.  *Dames & Moore*, 453 U.S. at 668.

(internal quotation marks omitted).  The Government has disclaimed any constitutional authority

for its actions, and for good reason.  The "Constitution places the authority to dispose of public

lands *exclusively* in Congress."  *Sioux Tribe*, 316 U.S. at 326 (emphasis added).  The Property

Clause in Article IV, Section 3 of the Constitution provides that "Congress shall have Power to

dispose of and make all needful Rules and Regulations respecting the Territory or other Property

belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  This Clause "gives Congress

plenary power to legislate the use of the federal land."  *Cal. Coastal Comm'n* v. *Granite Rock

Co.*, 480 U.S. 572, 581 (1987).  The Constitution thereby ensures that any grant of authority to

withdraw federal protections for public lands will be subject to "full, vigorous, and open debate"

in a deliberative, multimember legislature.  *Bowsher* v. *Synar*, 478 U.S. 714, 722 (1986).

Accordingly, if the President wishes to withdraw protections from federal lands, his

authority to do so "must be traced to Congressional delegation."  *Sioux Tribe*, 316 U.S. at 326.

The Government points to only one statutory source of authority for the Trump Proclamation: the

Antiquities Act.  Mot. 41.  The validity of the Trump Proclamation thus turns on whether it is

authorized by the Antiquities Act.  It is not.

### A.     The Text, Purpose, And Legislative History Of The Antiquities Act Confirm That The President Has No Power To Revoke Or Reduce A Monument.

1.  The Antiquities Act confers two related powers.  First, it authorizes the President to

"declare * * * national monuments."  54 U.S.C. § 320301(a).  Second, it authorizes the President

to "reserve parcels of land as a part of the national monuments."  *Id*. § 320301(b).  Neither of

those delegated powers encompasses the power to revoke or reduce an existing monument.

Not even close.  The power to "declare" a national monument is the power to bring it into

existence by formal pronouncement.  *See* Oxford English Dictionary (online ed. 2018) ("declare"

means "to assert, proclaim, announce or pronounce by formal statement").  And that is the *only*

power subsection (a) confers.  The text simply does not provide that a President may revoke or reduce a monument.  And the phrase "declare national monuments" cannot be understood to convey that power either.  In ordinary parlance, the phrases to "declare national monuments" and to "revoke" or "shrink" national monuments are polar opposites: The power to declare a national monument does not, as a matter of common sense or ordinary usage, subsume within it the power to do the opposite—declare that a landmark, structure, or object is *no longer* a national monument.  To conclude otherwise would import into the statute a broad power that the text simply does not confer.  *See Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 353 (2013) ("[I]t would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it.").

The same goes for subsection (b).  The first sentence of that subsection gives the President authority to "reserve parcels of land as a part of the national monuments."  54 U.S.C. § 320301(b).  The power to "reserve" land is merely the authority to "set [it] apart" or "maintain" that land as part of the monument.  Oxford English Dictionary; *see also* Webster's International Dictionary of the English Language (reference history ed. 1907) (defining "reserve" as to "keep back" or "retain").  It would be nonsensical to say that *removing* land *from* a national monument is no different from "*reserv*[*ing*]" land "as a *part* of" a monument; words simply cannot be interpreted to mean their opposites.  As for the second section of subsection (b), that simply sets a parameter the President must apply when designating land as part of a monument: "The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).  Placing a limit on the

President's power to create a monument in no way gives him a *new* power to modify or revoke existing monuments.

2.   The legislative history and purpose of the Antiquities Act reinforce the conclusion that the statute gives the President the power to create—but not reduce or revoke—national monuments.   The Antiquities Act was passed in response to growing national concern that valuable artifacts and objects of historic and scientific interest were being destroyed and looted. *See* H.R. Rep. No. 59-2224, at 3.   This damage was being done before Congress—which generally moves less quickly than the Executive Branch—was able to protect these objects.   In the run-up to passage, the Commissioner of the General Land Office (the precursor to the BLM) had described the "futility" and "manifold delays" in accomplishing monument protections "by means of a special act of Congress in each instance," and advocated for a "general enactment" to allow "action to be taken promptly" by "empowering the President to set apart, as national parks, all tracts of public land * * * it is desirable to protect."   Annual Report of the Commissioner of the General Land Office to the Secretary of the Interior for the Fiscal Year Ended June 30, 1904, at 59-60 (1904).   The need to empower the President to move "promptly" to "protect" land spurred the Antiquities Act.

Nothing in the history, however, suggests that Congress recognized a similar need for the Executive to be able to *de*-designate national monuments.   The Government cites a memorandum by Edgar Hewett—the chief architect of the Antiquities Act—for the proposition that "many withdrawals would only be temporary in nature."   Mot. 3.   But Hewett was describing the *pre*-Antiquities Act authority the Executive claimed to make temporary withdrawals of land. The Antiquities Act was passed to give the Executive a means of permanently protecting land because this existing temporary withdrawal power was considered insufficient.   *See* H.R. Rep.

No. 59-2224 at 2-3 ("incorporat[ing]" the Hewett Memorandum, which explains that legislation was needed to ensure that "regions may be made a *perpetual* source of education and enjoyment for the American people" (emphasis added)); General Land Office, Dep't of the Interior, Circular Relating to Historic and Prehistoric Ruins of the Southwest and Their Preservation, Addenda, at 13 (1904) (letter from GLO Commissioner William Richards to Edgar Hewett describing attempts to secure monument legislation, and explaining that "[i]n the meantime" certain "tracts have been protected from appropriation by being temporarily withdrawn"). Indeed, many of the first national monuments started out as temporary withdrawals that were made permanent once the Act was passed. *See* Hal Rothman, Preserving Different Pasts: The American National Monuments 56-58 (1989).

3. Any doubt as to whether the President has the power to unilaterally reduce or revoke national monuments is laid to rest by the Federal Land Policy and Management Act ("FLPMA"). Enacted in 1976, FLPMA was a major overhaul of federal public lands law that consolidated control of public lands in the hands of Congress. Before FLPMA, the Executive had claimed extensive authority in this area, citing two primary sources of power. First, the Executive relied on a 1915 Supreme Court case, *United States* v. *Midwest Oil Co.*, 236 U.S. 459 (1915), which had held that Congress had acquiesced in the Executive practice of withdrawing public land for certain purposes. Second, the Executive pointed to a series of statutes that explicitly gave the President certain powers over public lands.

Through FLPMA, Congress removed or amended these two purported sources of Executive power and replaced them with a regime in which Congress took a more central role. FLPMA abrogated *Midwest Oil*, expressly "repeal[ing]" "the implied authority of the President to make withdrawals and reservations resulting from acquiescence of the Congress." FLPMA

§ 704(a), 90 Stat. 2743, 2792 (1976); *see also* H.R. Rep. No. 94-1163, at 1 (1976) ("The Executive Branch of the Government has tended to fill in missing gaps in the law, not always in a manner consistent with a system balanced in the best interests of all the people.").  And it repealed twenty-nine specific statutory provisions granting the President the power to withdraw land for public use.  FLPMA § 704(a); *see* 43 U.S.C. § 1701 ("it is the policy of the United States" that "Congress delineate the extent to which the Executive may withdraw lands without legislative action").  With the exception of the Antiquities Act, the Executive Branch's prior express and implied withdrawal power was consolidated in FLPMA § 204, which gave the Secretary of the Interior limited power to withdraw land for public purposes, subject to the close oversight by Congress.

An early draft of FLPMA would have placed the power to designate national monuments within this scheme.  *See Public Land Policy and Management Act of 1975 Print No. 2: Hearing Before the Subcomm. on Pub. Lands of the H. Comm. on Interior and Insular Affairs*, 94th Cong. 247, Bill p. 92 (Sept. 8, 1975) (proposing to amend the Antiquities Act "by deleting 'President of the United States' and substituting therefor 'Secretary of the Interior'").  Congress ultimately rejected that proposal, but it left no doubt that the Executive Branch has no right to modify or revoke national monuments.  It included a provision in FLPMA explicitly mandating that "[t]he Secretary shall not * * * modify, or revoke any withdrawal creating national monuments."  43 U.S.C. § 1714(j).  And it did not amend the Antiquities Act, leaving the President with the right to create, but not revoke or modify, national monuments.

FLPMA's legislative history makes it even more clear that Congress' intent was to bar the Executive from unilateral reductions or revocations of national monument land.  A House Report on FLPMA explains that Congress' intent was to "specifically reserve *to the Congress* the

authority to modify and revoke withdrawals for national monuments created under the Antiquities Act" and "insure that the integrity of the great national resource management systems will remain under the control of the Congress."  H.R. Rep. 94-1163, at 9 (emphasis added); *see also Hearing on H.R. 5224 and H.R. 5622 Before the Subcomm. on Pub. Lands of the H. Comm. on Interior and Insular Affairs*, 94th Cong. 172, 176 (June 6, 1975) (statement of committee staff member Irving Senzel: "[T]here is a section added in there that provides that no modification or revocation of national monuments can be made except by an act of Congress.").  That is an explicit repudiation of the power claimed here.

**B.**     **The Government Has Not Offered A Sound Basis For Its Claim That The President Has the Power To Revoke Or Reduce National Monuments.**

Despite the clear import of the text, legislative history, and purpose of the Antiquities Act and FLPMA, the Government argues that the President has the right to modify and revoke national monuments.  None of the Government's arguments holds water.

1.  The Government first claims that the text of the Antiquities Act gives the President the power to modify and revoke national monuments because it instructs that parcels of land reserved for a national monument must "be confined to the smallest area compatible" with protection of the objects designated as national monuments.  That does not follow.  Interpreting the relevant language to give the President the power to modify existing monuments would wrench text from context, in violation of the cardinal principle of statutory interpretation that a phrase must be construed "in light of the terms surrounding it."  *FCC* v. *AT&T Inc.*, 562 U.S. 397, 405 (2011) (internal quotation marks omitted).  The phrase the government relies on comes immediately after a sentence that grants the President authority to "reserve parcels of land."  54 U.S.C. § 320301(b).  Read as a whole, then, subsection (b) authorizes the President to reserve a parcel of land, and requires that—*at the time* of the President's reservation—the parcel be

30

"confined to the smallest area compatible" with the statutory criteria.  *Id.*  It does not license future Presidents to revisit that determination at a later time *ad infinitum*.

The Government's contrary reading fails for a second reason: It would impose a mandatory, continuing, and indefinite duty on the President to revisit the boundaries of *every national monument ever designated*, and to determine whether *each parcel* is confined to the "smallest area compatible" with the statutory criteria at all times.  In using the word "shall" in subsection (b), Congress did not merely *authorize* the President to confine the limits of a reserved parcel; it *required* the President to do so.  *See Kingdomware Techs., Inc.* v. *United States*, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.").  If—as the Government claims—the statute permits the President to reduce the size of previously-designated national monuments, it also must require him to continually revisit the boundaries of every existing monument and parcel.  That would force the President to evaluate, on an ongoing basis, whether the reserved parcels of land in each of the 157 monuments complies with the statutory criteria.  It would be remarkable if Congress so subtly imposed such a massive obligation on the President.  "We expect Congress to speak clearly" when it gives the Executive such broad responsibility.  *See Util. Air Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2444 (2014).  Congress did not do so here.

Moreover, even if the relevant text could somehow be interpreted to give the President a power to reduce existing monuments, it cannot possibly permit him to revoke monument status altogether.  As noted, Congress gave the President two powers within the Antiquities Act: The President may designate "objects" as national monuments, 54 U.S.C. § 320301(a), and he may designate surrounding land as part of that monument, *id*. § 320301(b).  Even if the language the Government points to implicates the latter power, it does not affect the former.  Thus, the

President has no statutory hook for his claimed authority to alter the status of designated objects.

2. The Government next adverts to "the general principle that reconsideration 'is inherent in the power to decide.'" Mot. 31 (quoting *Albertson* v. *FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)). There is no such principle. The President has the "power to decide" whether to pardon someone; he does not have the power to "unpardon" someone if he subsequently changes his mind (or disagrees with his predecessor). *See* U.S. Const art. II, § 2. The President has the "power to decide" whether to sign legislation passed by Congress; he does not have the power to reconsider that choice or to veto a law that has already been signed. U.S. Const. art. I, § 7. Likewise, the President has the power to "declare" national monuments and "reserve" appurtenant land; he does not have the power to *revoke* or *shrink* a monument. Indeed, it remains the official position of the Executive Branch that the President has no power to revoke a national monument he has created. *See Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Att'y Gen. 185 (1938). In short, if Congress had "intended" to give the "opposite power" to designation and reservation, "it would have been at equal pains to have explicitly declared it." *See Cochnower* v. *United States*, 248 U.S. 405, 407-408, *modified* 249 U.S. 588 (1919).

This point is reinforced by a bevy of other statutes, passed around the same time as the Antiquities Act, that *do* grant the Executive power to modify a previous reservation or withdrawal of land in explicit terms. These other statutes "clearly demonstrat[e] that [Congress] kn[ew] how to" grant the power at issue here "when it wishe[d] to do so." *Whitfield* v. *United States*, 543 U.S. 209, 216-217 (2005). For instance, the Pickett Act of 1910 gave the President express authority "at any time in his discretion, *temporarily* [to] withdraw from settlement, location, sale, or entry any of the public lands of the United States * * * and reserve the same for

water-power sites, irrigation, classification of lands, or other public purposes"; it then provided that "such withdrawals or reservations shall remain in force *until revoked by him*."  Pickett Act of 1910, Ch. 421, 36 Stat. 847, 847 (emphases added).  Similarly, the Reclamation Act of 1902 provided that "the Secretary of the Interior shall * * * withdraw from public entry the lands required for any irrigation works contemplated * * * and *shall restore to public entry* any of the lands so withdrawn when, in his judgment, such lands are not required for the purposes of this Act."  Reclamation Act of 1902, Ch. 1093, § 3, 32 Stat. 388, 388 (emphasis added).  That is *exactly* how the Government reads the Antiquities Act.  If Congress meant to confer the same power, it clearly knew how to do so explicitly.

Further, the Forest Reserve Act of 1891 had similar language to the Antiquities Act, providing "[t]hat the President of the United States may, from time to time, set apart and *reserve*, * * * public land bearing forests, * * * as public reservations, and the President shall, by public proclamation, *declare* the establishment of such reservations and the limits thereof."  *See* Forest Reserve Act of 1891, Ch. 561, § 24, 26 Stat. 1095, 1103 (emphases added).  The Act did not expressly grant the power to the President to revoke or modify a reservation of public land.  Tellingly, Congress deemed it necessary to *amend* the Act in order to provide for such modification authority.  Sundry Civil Appropriations Act of 1897, Ch. 2, 30 Stat. 11, 36.  Representative John Lacey explained why that amendment was necessary: The original Act "gave [the President] the power to create a reserve, but *no power to restrict or annul it*."  29 Cong. Rec. 2677 (1897) (emphasis added).  A few years later, Representative Lacey was one of the chief sponsors of the Antiquities Act, introducing the version in the House that ultimately became law.  *See* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 483-484 (2003).  Despite having just amended the Forest Reserve Act on the

33

understanding that the power to modify must be explicitly conferred, Congress chose not to confer that power in the Antiquities Act. Instead, it used one-way reservation language similar to the original Forest Reserve Act. That is powerful evidence that Congress did not intend to confer the power to modify or revoke.[5]

    3.  The Government's claim that the power to create a monument implicitly includes the power to modify or revoke it also runs headlong into a long line of Supreme Court cases holding that Congress can authorize the removal of federal protections from public lands only if it does so expressly. Thus, the Court has repeatedly held that the disposal of land by Congress is "not lightly to be inferred" from legislation, "and should not be regarded as intended unless the

---

[5] There are numerous other near-contemporaneous statutes that expressly include language regarding modification or revocation of withdrawn land, and that further cement the point that Congress would have been express if it intended to confer those powers. *See* Act of July 5, 1884, Ch. 214, § 1, 23 Stat. 103, 103 ("[W]henever, in the opinion of the President * * * the lands, or any portion of them, included within the limits of any military reservation * * * have become or shall become useless for military purposes, he shall cause the same * * * to be placed under the control of the Secretary of the Interior for disposition"); Act of October 2, 1888, Ch. 1069, 25 Stat. 505, 527 (providing for reservation of lands designated in United States surveys for irrigation purposes, but providing "[t]hat the President may at any time in his discretion by proclamation open any portion or all of the lands reserved by this provision to settlement"); Act of May 14, 1898, Ch. 299, § 12, 30 Stat. 409, 414 ("[T]he President is authorized and empowered, in his discretion, by Executive order from time to time to establish or discontinue land districts in the District of Alaska, and to define, modify, or change the boundaries thereof[.]"); Federal Water Power Act, Ch. 285, § 24, 41 Stat. 1063, 1075 (1920) (providing that lands included in proposed projects will be "reserved from entry, location, or other disposal * * * until otherwise directed by the commission or by Congress" and providing a means for Interior to "declare such lands open to location, entry, or selection" subject to certain conditions); Boulder Canyon Project Act, Ch. 42, § 9, 45 Stat. 1057, 1063 (1928) (providing that lands "found by the Secretary of the Interior to be practicable of irrigation and reclamation by the irrigation works * * * shall be withdrawn from public entry. Thereafter, at the discretion of the Secretary of the Interior, such lands shall be opened for entry, in tracts * * * in accordance with * * * the reclamation law"); Act of August 19, 1935, Ch. 561, § 4, 49 Stat. 660, 661 (repealed in part in 1976) (providing President authority to "withdraw from sale, public entry or disposal * * * such public lands * * * as he may find to be necessary" to carry out a certain statute, "*[p]rovided*, [t]hat any such withdrawal may subsequently be revoked by the President"); Act of May 28, 1940, Ch. 220, § 1, 54 Stat. 224, 224 (providing that the President is authorized to "reserve and set aside from all forms of location, entry, or appropriation any national-forest lands * * * and such reservation shall remain in force until revoked by the President").

intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank*, 270 U.S. 49, 55 (1926); *see United States* v. *Alaska*, 521 U.S. 1, 34 (1997); *Utah Div. of State Lands* v. *United States*, 482 U.S. 193, 201-202 (1987).  Similarly, the Court has explained that "[s]tatutory grants" of property to private parties "are to be construed strictly in favor of the public, and whatever is not unequivocally granted is withheld." *Coosaw Mining Co.* v. *South Carolina ex rel. Tillman*, 144 U.S. 550, 562 (1892).  In other words, "[n]othing passes" out of federal protection "by mere implication." *Id.*; *see United States* v. *Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957) ("[N]othing passes except what is conveyed in clear language.").

In light of its precedents requiring express statutory authorization for the removal of protections from federal lands, the Supreme Court has never concluded that Congress has granted the President authority to revoke federal protections for public lands in the absence of explicit statutory language to that effect.[6]  That is no accident.  As the Court has explained, requiring express statutory language permitting the removal of federal protections from public land is "wise" because it ensures that the authority to withdraw those protections springs from

---

[6]  Indeed, in *Midwest Oil* itself the Court noted the asymmetry between expanding and reducing federal protection for public lands.  There, the Court held that the President had implied authority, due to long-standing practice and congressional acquiescence, to withdraw land from private oil claims.  But the Court took pains to note that the President did not have implied power to create "*private* rights" by, for instance, "withdrawing for a railroad more than had been authorized by Congress."  236 U.S. at 472-473 (emphasis added).  In other words, there is a sharp distinction between Presidential action to protect land on behalf of the public, and Presidential action to remove protections from public land for private benefit.  Even before Congress repudiated the concept of delegation by acquiescence in FLPMA, then, the Court had never held that the President can rely on an implicit grant of authority to *remove* protections that benefit the public from our Nation's lands.  *See generally* Jedediah Purdy, Whose Lands? Which Public? Trump's National Monument Proclamations and the Shape of Public-Lands Law 28 (2018) (unpublished manuscript) (on file with the Duke University School of Law Scholarship Repository), *available at*          https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=6488&context=faculty_ scholarship ("Although the President over the twentieth century enjoyed a variety of pre-FLPMA powers to move multiple-use lands in and out of availability for one purpose [or] another, * * * Congress has never authorized the President to remove land unilaterally from a categorical regime and open it to extractive use").

the only constitutionally proper source—"open dealing with legislative bodies." *Coosaw*, 144 U.S. at 562 (quoting *Slidell* v. *Grandjean*, 111 U.S. 412, 438 (1884)).  And because federal property belongs to the "nation" as a whole, *Butte City Water Co.* v. *Baker*, 196 U.S. 119, 126 (1905), the Court has long worried that the "skillful use of terms" in a statute by individuals with private interests could be manipulated to "accomplish something not apparent on the face of the act." *Coosaw*, 144 U.S. at 562 (quoting *Slidell*, 111 U.S. at 438).  Requiring express authorization thus ensures that "collective rights and property" are not "lost through official inadvertence" by Congress.  William N. Eskridge, Jr., *Public Values in Statutory Interpretation*, 137 U. Pa. L. Rev. 1007, 1057 (1989).

### C.   Past Practice Does Not Support The Government's Position.

The Government also seeks support in "decades of presidential practice in modifying monument designations and congressional acquiescence to that practice."  Mot. 32.  But past practice cannot supply a power that is absent from the statute itself.  Further, the historical practice is not comparable to the President's action here, and Congress not only never acquiesced in the practice but superseded it by statute.

*First*, it is axiomatic that "[p]ast practice does not, by itself, create power." *Medellín*, 552 U.S. at 532 (quoting *Dames & Moore*, 453 U.S. at 686).  A President cannot render an action legal merely by taking it.  Even accepting the Government's characterization of the relevant history, then, it does not resolve the case.  No court has ever considered whether the President has the power to modify a national monument.  The fact that the President may have asserted this power in the past only means that the question has been posed, not answered. *Id*.

*Second*, when assessing a historical "gloss" on Executive power, the Supreme Court has explained that the relevant question is whether there is "a systematic, *unbroken*, executive

practice, long pursued to the knowledge of the Congress and *never before questioned*."  *Dames & Moore*, 453 U.S. at 686 (emphases added) (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 610-611 (1952)).  Here, numerous internal Executive Branch opinions disclaim the power the President now asserts.

For instance, an Interior Solicitor opinion from 1924 "failed to find statutory authority for the President" to reduce the size of two national monuments.  Dept. of the Interior, Opinion Letter M. 12501, 12529 (June 3, 1924).  That opinion relied on an Attorney General opinion of 1921, which had explained that "[t]he power to thus reserve public lands * * * does not necessarily include the power to * * * restore them" to the public domain, and that it had been "repeatedly held by this Department that lands reserved * * * can thereafter be disposed of only as directed by Congress." *Disposition of Abandoned Lighthouse Sites*, 32 Op. Att'y Gen. 488, 490.  Another Interior Solicitor opinion from 1924 opined that the Department could not authorize the construction of a canal through a national monument "without specific authority of Congress." *Extension of Irrigation Canals Over Lands Within A National Monument*, 50 Pub. Lands Dec. 569, 570 (1924).  And an Interior opinion from 1932 regarding national monuments noted that "it has frequently been ruled by the Attorney General that in the absence of authority from Congress the President may not restore to the public domain lands which have been reserved for a particular purpose." Dept. of the Interior, Opinion Letter M. 27025, at 4 (May 16, 1932).

The Attorney General has issued decisions of its own to the same effect.  In 1938, the Attorney General issued an opinion as to whether the President could abolish Castle Pinckney National Monument, and concluded that he could not.  *See Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Att'y Gen. 185 (1938).  The opinion noted that the

Antiquities Act "does not in terms authorize the President to abolish national monuments."  *Id*. at 186.  "If the President has such authority, therefore, it exists by implication."  *Id*.  And the opinion concluded that implying such a power would be inappropriate.  A "reservation made by the President under the discretion vested in him by the statute was in effect a reservation by the Congress itself, and * * * the President thereafter was without power to revoke or rescind the reservation, and so return the land to the public domain and subject it to entry or preemption by settlers."  *Id*. at 187.  In other words, once a President has declared a national monument and reserved land, "the power conferred by the act [i]s exhausted," and the President has no "authority" to "recall that reservation" and "restore the land."  *Id*. at 187-188.  To be sure, the opinion noted that past Presidents had "diminished the area of national monuments."  *Id*. at 188.  But it did not analyze or take a firm position on the legality of that practice, and the animating logic of the opinion was that once a President declares a national monument "the power conferred by the act [i]s exhausted."  *Id.* at 187.  That same logic would compel the same conclusion in the case of a President's power to reduce a national monument.

It is uncommon for the Executive Branch to narrowly construe the scope of its own power.  During the oral argument in *Youngstown*, it was pointed out that Justice Jackson, when he was Attorney General, had written an opinion authorizing the seizure of a manufacturing plant in circumstances similar to the case then at hand.  He responded: "I claimed everything, of course, like every other Attorney General does.  It was a custom that did not leave the Department of Justice when I did."  Transcript of Oral Argument, *Youngstown*, 343 U.S. 579 (Nos. 744, 745).  In light of that "custom," it is remarkable for an Attorney General or other Executive Branch lawyer to *disclaim* an Executive Power.  Such disclaimers should be given extra judicial weight.

*Third*, the Government cannot rely on past practice to demonstrate congressional acquiescence in the President's authority to reduce or revoke national monuments.  For one thing, almost all of the relevant past practice occurred before FLPMA.  As noted, that statute made it abundantly clear that—regardless of past practice—Congress wanted to assume tighter control over public lands going forward.  Indeed, FLPMA specifically abrogated the Supreme Court's decision in *Midwest Oil*, which had found that the President possessed a limited implied power to withdraw lands for public purposes.  FLPMA, § 704(a), 90 Stat. 2743, 2792.  Thus, Congress itself has rejected an attempt to rely on acquiescence to create Executive rights in this area.

For another, the Executive can scarcely assert that Congress has acquiesced in the President's authority to modify or de-designate monuments when the Executive Branch has repeatedly told Congress that it lacks that power.  For example, in 1925, the Secretary of the Interior wrote to Congress specifically to request that it pass legislation authorizing the President to modify national monuments.  He wrote that "[t]he Attorney General * * * held that the power to thus reserve the public lands does not necessarily include the power to restore them to the general public domain; in fact, that after such establishment by proclamation it becomes a fixed reservation subject to restoration only by legislative act."  S. Rep. No. 68-849, at 2 (1925); *see also* H.R. Rep. No. 68-1119 (1925).  In response to the Secretary's letter, bills were introduced in both the House and Senate that would have provided the President the authority to "restore" national monument lands to the public domain, and that would have validated any prior modifications of monuments.  S. 3840, 68th Cong. (2d Sess. 1925); H.R. 11357, 68th Cong. (2d Sess. 1925).  While these bills did not become law, the attempts indicate that Congress was aware of the Executive Branch's position that it lacked authority and still chose not to grant the

requested power.  *Cf. FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (FDA's statements that it "lacked authority" to regulate tobacco, combined with "rejected bills that would have granted the FDA such jurisdiction," showed that Congress had ratified the FDA's position that it lacked jurisdiction over tobacco).

In 1926, the Secretary sent Congress another letter, explaining that a canal needed to pass through the Casa Grande Ruins National Monument.  The letter elaborated that "no damage will ensue to the monument by the elimination of the areas in question," and contained a "draft of proposed legislation which, if enacted, will eliminate the barrier that now prevents the construction of the canal * * * and *will permit the taking of similar action in the future where conditions require*."  S. Rep. No. 69-423, at 2 (1926) (emphasis added).  The draft bill would have eliminated the specific lands from Casa Grande Ruins *and* provided, more generally, that "hereafter the President of the United States is authorized, in his discretion, to eliminate lands from national monuments by proclamation."  67 Cong. Rec. 6805 (1926).  However, the more general authorization was struck in committee, and Congress enacted only the narrow language removing a small piece of land from Casa Grande Ruins.  *Id.*

More recently, in connection with the Alaska National Interest Lands Conservation Act of 1980, the Executive Branch represented to Congress that a "National Monument designation" is "*permanent*."  H.R. Rep. No. 96-97, pt.1, at 341 (1979) (emphasis added) (letter from the Secretary of the Interior).[7]  And the legislative history of that Act repeatedly reflects Congress' understanding that national monument "withdrawals are permanent unless overturned by judicial ruling or Congress acts to supersede or revoke them."  *Id.* at 142; *see also id.* at 385, 393

---

[7]  Indeed, in 2006, the Executive Branch made that same representation to the Supreme Court. *See* Memorandum in Support of Motion of the U.S. for Partial Summary Judgment on Count IV of the Amended Complaint 44, *Alaska* v. *United States*, 546 U.S. 413 (2006) (No. 128, Original).

(statement that lands had "been given permanent national monument protection" and that "national monuments are permanent unless changed by the Congress").

In short, the Executive Branch has repeatedly represented to Congress that it lacks authority to revoke or modify a national monument and—in the face of those representations—Congress has repeatedly refused to grant such a power.[8]  In these circumstances, it cannot be said that Congress has in any way "acquiesced" in that Executive power.

*Finally*, even if the Court did think it was somehow appropriate to look at the past practice of the Executive, the examples the Government cites do not support the power asserted here.  The eighteen prior modifications are clearly distinguishable, either because they purported to rely on a separate source of Executive power, or because they were meant to improve protection of monument resources by correcting survey errors or descriptions of monument resources.  In any event, even if some past examples were relevant (despite FLPMA) and not strictly distinguishable, they would at most be "scattered * * * anomalies" when set against the background of more than a century of history under the Antiquities Act, and should not govern this Court's analysis of the question presented.  *NLRB* v. *Noel Canning*, 134 S. Ct. 2550, 2567 (2014).

Some of the examples reflect pre-FLPMA wartime actions that the President may have believed were within his constitutional authority as Commander-in-Chief.  For instance,

---

[8]  On four occasions, Congress has granted the Executive Branch *specific* power to modify *particular* monuments.  Act of March 3, 1931, Ch. 405, 46 Stat. 1490; Act of May 1, 1958, 72 Stat. 102; Act of June 30, 1961, 75 Stat. 148; National Parks and Recreation Act of 1978, tit. III, § 301, 92 Stat. 3467, 3473-75; *see* John C. Ruple, *The Trump Administration and Lessons Not Learned From Prior National Monument Modifications*, 43 Harv. Envtl. L. Rev. (forthcoming 2019) (manuscript at 30-32), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3272594.  These acts all presume the absence of a more general power to modify monuments, and reflect that Congress did not understand the President to possess that power.  That further undercuts the case for acquiescence.

President Wilson reduced the Mt. Olympus Monument in 1915, which made available a particular type of spruce that was needed to build military aircraft.  Ruple, *supra*, at 79.[9]  Other examples may have been premised on separate statutory powers.   President Roosevelt's proclamation reducing Wupatki National Monument, for instance, relied at least in part on the Pickett Act, which *did* grant express modification authority.  Proclamation No. 2454, 55 Stat. 1608, 1608 (1941).  And numerous other monuments were reduced because they erroneously included either land not owned by the Federal Government or pre-existing highways.  Ruple, *supra*, at 55-66.  The Antiquities Act applies only to *federal* land, so revisions that remove non-federal lands are not reductions at all, but rather, clarifications of a monument's proper legal extent.  54 U.S.C. § 320301(a).

Still other monuments were reduced to correct typographical errors or to address improvements in survey information regarding the designated land.  For example, Hovenweep National Monument was reduced because of a scrivener's error in the original proclamation.  Proclamation No. 3132, 21 Fed. Reg. 2369 (Apr. 12, 1956).  And many monument designations from the beginning of the twentieth century had to be altered because early surveys of the West were inaccurate or incomplete: Navajo National Monument in Arizona was initially set aside on the basis of a hand-drawn map prepared by a Paiute Indian guide.  Hal K. Rothman, Nat'l Park Serv. Div. of Hist., Navajo National Monument: A Place and Its People, An Administrative History 19-21 (1991).  President Taft made the designation because of an urgent need to protect the objects and the surrounding landscape, but he knew that—because a formal map did not

---

[9]  Santa Rosa Island National Monument, which is now part of Gulf Islands National Seashore, was reduced in 1945 to expand Eglin Field, a key testing and training range for pilots during World War II.  Ruple, *supra*,  at 74-75.  Glacier Bay National Monument was home to a secret World War II military airfield that was removed from the monument by President Eisenhower in 1955.  Proclamation No. 3089, 20 Fed. Reg. 2103, 2103 (Apr. 5, 1955).

exist—the boundaries of the monument would have to be revised as more information came in. *Id*. at 28; Ruple, *supra*, at 46-47. The eventual modification of the boundaries, then, was part of the plan from the start, and the reductions *vindicated* the intent of the original national monument declaration, rather than contravening it. The same is true of many other monuments. *See* Ruple, *supra*, at 47-55.[10]

Again, all of these distinctions are beside the point: Even if the Government *could* cite analogous past examples, they could not override the plain statutory language, nor could they erase the Executive's own prior decisions opining that the President lacks the power to reduce or modify monuments. And they certainly could not establish congressional acquiescence in light of FLPMA and the Executive's repeated communications to Congress expressing its belief that the President has no power to reduce or revoke monuments.

### D.  The Trump Proclamation Exceeds The President's Authority.

Because no President has the power to reduce or revoke a national monument, the Trump Proclamation is plainly unlawful. First, by its own terms, the Trump Proclamation "reduced" the "boundaries of the Bears Ears National Monument." 82 Fed. Reg. at 58,085. For the reasons given above, the President has no power to reduce a national monument. The Trump

---

[10]  The Grand Canyon National Monument reduction was *sui generis*; it was the product of several years of back-and-forth between President Roosevelt and the Congress. Ruple, *supra*, at 70. The most that can be said from the Grand Canyon story is that Congress knew of the specific boundary reduction of the Grand Canyon monument and did not object at that time, though it did ultimately make the lands removed by Roosevelt part of Grand Canyon National Park. *Id*. Congress did not acquiesce in any broader proposition of Executive power. The revision of Bandelier National Monument—which, in 1963, was the last Presidential monument revision before President Trump's—was essentially a land swap. Proclamation No. 3539, 28 Fed. Reg. 5407 (June 1, 1963). A few thousand acres of the monument were transferred to Los Alamos Laboratory, in exchange for a few thousand acres added to the monument. That modest swap actually *enhanced* protection of the monument's resources, and, as a general matter, "[f]ederal land agencies are typically authorized to seek acreage-swaps with private or state-government landholders," Purdy, *supra*, at 39-40, particularly during the high watermark of implied Presidential power.

Proclamation is thus unlawful.

Second, even if the Government were right that the President possesses some power to "*modify* the boundaries" of a monument, Mot. 2 (emphasis added), the Trump Proclamation goes far beyond modification. It eliminated 85% of the Bears Ears National Monument, expressly excising numerous objects that President Obama had singled out for protection. As the Supreme Court, per Justice Scalia, once observed: "'Modify,' in our view, connotes moderate change." *MCI Telecommc'ns Corp.* v. *Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994). "It might be good English to say that the French Revolution 'modified' the status of the French nobility—but only because there is a figure of speech called understatement and a literary device known as sarcasm." *Id*. The same could be said of President Trump's "modifi[cation]" of Bears Ears National Monument. The Trump Proclamation therefore cannot be defended as an instance of a limited power to "modify" monuments.

Third, even the Government does not argue that the President has the power to *revoke* a national monument. Indeed, it remains the formal position of the Executive Branch that the President lacks any such power, *see Proposed Abolishment of Castle Pinckney National Monument*, 39 Op. Atty. Gen. 185 (1938), and the Government does not repudiate that position in its brief. As is clear from the Antiquities Act, the word "monument" has two meanings: It refers both to the land "reserve[d] as a part of" a national monument, and to the specific "landmarks," "structures," and "objects" declared to be national monuments. 54 U.S.C. § 320301. Here, the Trump Proclamation excludes numerous landmarks, objects, and structures that President Obama specifically declared to be national monuments, like the Valley of the Gods, Fry Canyon, Hole-in-the-Rock-Trail, and numerous other ruins and paleontological sites. *See supra* p. 6-7; UDB Compl. ¶¶ 174-175. President Trump has therefore revoked the

monument status of those objects and landmarks.  Indeed, the Trump Proclamation was quite explicit on this point: It acknowledged that the Obama Proclamation had "identifie[d] a long list of objects of historic or scientific interest," but found that "[s]ome" of those objects are "not unique to the monument" and, in President Trump's view, are "not of significant scientific or historic interest."  82 Fed. Reg. at 58,081.  In short, President Trump revoked the national monument designation of numerous objects with the original Monument, and that is unlawful even under the Executive Branch's own construction of the Antiquities Act.[11]

Finally, the Trump Proclamation violates the separation of powers.  The Constitution, in the Property Clause, "places the authority to dispose of public lands exclusively in Congress." *Sioux Tribe*, 316 U.S. at 326; *see* U.S. Const. art. IV, § 3, cl. 2.  By unilaterally revoking protections for public lands without authorization, President Trump has encroached on Congress' domain.  He cannot, by Executive fiat, achieve what the Constitution entrusts to Congress.  *See supra* p. 24 n.4.[12]

## CONCLUSION

For all of the foregoing reasons, Federal Defendants' motion to dismiss should be denied.

Respectfully submitted,

*/s/ Adam M. Kushner*
Adam M. Kushner (DC Bar # 426344)

---

[11]  Even if the Antiquities Act gave the President some power to modify the boundaries of prior monuments to ensure that they are "confined to the smallest area compatible with the proper care and management of the objects to be protected," 54 U.S.C. § 320301(b), the Trump Proclamation is not consistent with that statutory directive.  The President lacks the authority to dismantle a national monument wholesale, and to remove from the new monument boundaries numerous objects identified for protection by the designating President.  The UDB Plaintiffs hereby incorporate by reference the NRDC Plaintiffs' brief on this point.  *See* NRDC Opp. 16-19.

[12]  Because the Government has expressly disavowed any source of Executive power besides the Antiquities Act for the Trump Proclamation, the UDB Plaintiffs will no longer pursue their Take Care Clause claim.  UDB Compl. ¶¶ 214-220.

Douglas P. Wheeler III (DC Bar # 463959)
Hunter J. Kendrick (DC Bar # 144629)
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: 202-637-5600
Fax: 202-637-5910
Email: adam.kushner@hoganlovells.com
Email: douglas.wheeler@hoganlovells.com
Email: hunter.kendrick@hoganlovells.com

Thomas P. Schmidt (*pro hac vice*)
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
Telephone: 212-918-3000
Fax: 212-918-3100
Email: thomas.schmidt@hoganlovells.com

*Attorneys for Plaintiffs Utah Diné Bikéyah,
Friends of Cedar Mesa, Archaeology
Southwest, Conservation Lands Foundation,
Inc., Patagonia Works, The Access Fund,
the National Trust for Historic Preservation,
and the Society of Vertebrate Paleontology*

Dated:  November 15, 2018

**CERTIFICATE OF SERVICE**

I certify that on November 15, 2018, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered users.

/s/ Adam M. Kushner