**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HOPI TRIBE, *et al.*, | ) | Case No. 17-cv-2590 (TSC) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UTAH DINÉ BIKÉYAH, *et al.*, | ) | Case No. 17-cv-2605 (TSC) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | Case No. 17-cv-2606 (TSC) |
| COUNCIL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CONSOLIDATED CASES** |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | Oral argument requested |
| | ) | |
| Defendants. | ) | |

**NRDC PLAINTIFFS' OPPOSITION
TO FEDERAL DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

STANDARD OF REVIEW ................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

   I.   Plaintiffs Have Standing to Challenge President Trump's Proclamation ........................... 3

      A.  Plaintiffs have plausibly alleged injury in fact ............................................................. 3

          1.  Hard-rock mining ................................................................................................. 4

          2.  Oil and gas activity .............................................................................................. 10

          3.  Motorized vehicle use. ......................................................................................... 11

      B.  Plaintiffs' injuries would be redressed by a favorable decision ................................... 13

   II.  Plaintiffs' Claims Are Ripe for Judicial Review ................................................................ 14

   III. President Trump Had No Authority to Dismantle the National Monument. .................... 14

   IV. Defendants' Motion to Dismiss Should Be Denied ......................................................... 15

      A.  Plaintiffs have stated ultra vires and constitutional claims (Counts I and II) ........... 15

      B.  Even assuming the President had some limited authority under the statute to reduce
          monuments, Plaintiffs have alleged sufficient facts to state a claim that the Trump
          Proclamation exceeded that authority (Count IV) .................................................... 16

      C.  Plaintiffs have stated a claim for relief under the APA (Count V) ........................... 19

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    318 F. Supp. 3d 370 (D.D.C. 2018) ...................................................... 14, 17, 18

*Ashwander v. TVA*,
    297 U.S. 288 (1936) ........................................................................................ 16

*\*Attias v. Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ................................................... 3, 4, 8, 10, 11

*\*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... 17

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) .......................................................................................... 3

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ........................................................................................ 15

*Ferrer v. CareFirst, Inc.*,
    278 F. Supp. 3d 330 (D.D.C. 2017) .............................................................. 8-9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000) ...................................................................................... 3, 7

*Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ........................................................................ 8

*Jerome Stevens Pharm., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) ...................................................................... 8

*League of Conservation Voters v. Trump*,
    303 F. Supp. 3d 985 (D. Alaska 2018) ...................................................... 4, 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 9

*\*Medellín v. Texas*,
    552 U.S. 491 (2008) ............................................................................ 1, 14, 15

*\*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) ........................................................ 16, 17, 18

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................... 14

\*NRDC v. EPA,
    755 F.3d 1010 (D.C. Cir. 2014) ................................................................. 4, 9

*Orion Reserves Ltd. P'ship v. Salazar*,
    553 F.3d 699 (D.C. Cir. 2009) ...................................................................... 4

*S. Utah Wilderness Alliance et al.*,
    IBLA 2017-75 (Mar. 13, 2017) .................................................................. 12

*Scott v. Dist. of Columbia*,
    101 F.3d 748 (D.C. Cir. 1996) .................................................................... 16

\*Sierra Club v. Jewell,
    764 F.3d 1 (D.C. Cir. 2014) ..................................................................... 4, 7

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) .................................................................................. 4

\*Tulare Cty. v. Bush,
    306 F.3d 1138 (D.C. Cir. 2002) ...................................................... 17, 18, 19

*Tulare Cty. v. Bush*,
    317 F.3d 227 (D.C. Cir. 2003) (mem.) (per curiam) ..................................... 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ................................................................................ 20

*Utah Ass'n of Ctys. v. Bush*,
    316 F. Supp. 2d 1172 (D. Utah 2004) ......................................................... 18

\*Youngstown Sheet & Tube Co. v. Sawyer,
    343 U.S. 579 (1952) .................................................................................... 14

## Statutes

5 U.S.C. § 706 ............................................................................................... 19

30 U.S.C. § 22 .................................................................................................. 4

43 U.S.C. § 1782 ............................................................................................. 10

\*54 U.S.C. § 320301 ........................................................................... 1, 17, 18

**Regulations**

36 C.F.R. § 228.4 .................................................................................................... 5, 6

43 C.F.R. § 3802.0-2 ................................................................................................. 10

43 C.F.R. § 3802.0-6 ................................................................................................. 10

43 C.F.R. § 3809.5 ................................................................................................... 5, 6

43 C.F.R. § 3809.10 ..................................................................................................... 5

43 C.F.R. § 3809.11 ................................................................................................ 6, 10

43 C.F.R. § 3809.21 ................................................................................................. 5, 6

43 C.F.R. § 3809.100 ................................................................................................... 6

43 C.F.R. § 3809.312 ............................................................................................... 5, 6

43 C.F.R. § 3809.313 ................................................................................................... 5

43 C.F.R. § 3832.1 ....................................................................................................... 4

43 C.F.R. § 3833.11 ..................................................................................................... 4

**Presidential Proclamations and Executive Orders**

Pres. Proc. No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016) .................................. 1, 5, 11

Exec. Order No. 13792, 82 Fed. Reg. 20,429 (Apr. 26, 2017). ................................... 8

Pres. Proc. 9681, 82 Fed. Reg. 58,081 (Dec. 4, 2017)............................... 1, 4, 6, 17, 18

**Other Authorities**

BLM, Land Use Plan Evaluation Report: Monticello Field Office Approved Resource
    Management Plan (2015), https://bit.ly/2DbNmZW ......................................... 12-13

## INTRODUCTION

Bears Ears National Monument is one of the most pristine, remote areas in the contiguous United States, featuring a rugged labyrinth of towering cliffs and rock arches, sinuous canyons, ancient juniper forests, and desert mesas. As the Tribal Plaintiffs explain, it is the ancestral homeland of several Native American tribes, whose collective proposal led to the Monument's establishment in 2016. Then-President Obama's conferral of monument status on Bears Ears provided much-needed protection to the region's magnificent geological formations, fragile desert ecosystems, and thousands of irreplaceable cultural and archaeological sites. *See* Pres. Proc. No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016) ("2016 Proclamation"). Yet, in December 2017, President Trump issued a proclamation carving 1.15 million acres out of the Monument—leaving less than 15% of the original acreage intact—and exposing the excised lands and objects to irreversible damage from mining, oil and gas drilling, and the use of motorized vehicles. *See* Pres. Proc. 9681, 82 Fed. Reg. 58,081 (Dec. 4, 2017) ("Trump Proclamation"). Plaintiffs Natural Resources Defense Council *et al.* ("NRDC Plaintiffs") challenge the President's unlawful and *ultra vires* proclamation.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Medellín v. Texas*, 552 U.S. 491, 524 (2008). Defendants concede that no constitutional provision grants the President power to dismantle a national monument. *See* Defs.' Mem. in Supp. of Mot. to Dismiss 41, ECF No. 49-1 ("Defs.' Br."). They urge the Court instead to find such a power hidden in the Antiquities Act, but the Act confers no such power. The Antiquities Act authorizes Presidents only to "declare" national monuments and "reserve" federal public lands as a part thereof. 54 U.S.C. § 320301(a)-(b). This narrow delegation of Congress's otherwise exclusive Property Clause power authorizes Presidents to provide swift

and enduring protection for national treasures on public lands. Defendants ask this Court to read into the Act the *opposite* power—the power to *abolish* protections—but neither the text of the Act nor any other interpretive aid supports their novel argument. If Defendants were correct, national monuments across the country would have only ephemeral protection, potentially see-sawing from protected to unprotected status with every change of presidential administration. That is not what the Antiquities Act authorizes, or what Congress intended. Congress retained *for itself* the power to rescind or reduce national monuments.

Defendants also seek to avoid this Court's review altogether, raising spurious arguments about standing and ripeness. But the Trump Proclamation took immediate effect by its own terms, and as Defendants acknowledge, ground-disturbing activity may proceed on mining claims in the excised Monument lands without any affirmative approval from the federal government. There is no sound reason to delay resolving the purely legal issues concerning the President's lack of statutory or constitutional authority to dismantle the Monument. Defendants' motion to dismiss should be denied.

## BACKGROUND

Plaintiffs hereby incorporate by reference the "Background" sections in the Tribal and UDB Plaintiffs' briefs. *See* Tribal Br. 2-11; UDB Br. 3-7.[1]

## STANDARD OF REVIEW

Plaintiffs hereby incorporate by reference the "Standard of Review" section in the UDB Plaintiffs' brief. *See* TWS Br. 10.

---

[1] Throughout this brief, to minimize repetition wherever possible, NRDC Plaintiffs have incorporated by reference the opposition briefs submitted by plaintiffs in *Hopi Tribe v. Trump*, No. 17-cv-02590-TSC (D.D.C. Nov. 15, 2018) ("Tribal Br."); *Utah Diné Bikéyah v. Trump*, No. 17-cv-02605-TSC (D.D.C. Nov. 15, 2018) ("UDB Br."); and *The Wilderness Society v. Trump*, No. 17-cv-02587-TSC (D.D.C. Nov. 15, 2018) ("TWS Br.").

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge President Trump's Proclamation

NRDC Plaintiffs have associational standing to bring this suit because each Plaintiff organization has "members [who] would . . . have standing to sue in [their] own right." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000).[2] The complaint plausibly alleges that (1) Plaintiffs' members face "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180-81. Defendants take issue with the first and third elements of standing: injury in fact and redressability. As explained below, Plaintiffs' allegations are sufficient to "state a plausible claim" as to both elements. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (citation and emphasis omitted); *see* NRDC Complaint ¶¶ 16-52, 134-75, ECF No. 1 ("Compl.").

### A.    Plaintiffs have plausibly alleged injury in fact.

With respect to the "injury in fact" requirement, Defendants erroneously argue that Plaintiffs' injuries are not imminent because they are not "*certainly impending*." Defs.' Br. 15 (quoting *Clapper v. Amnesty Int'l,* 568 U.S. 398, 409 (2013)). Critically, however, Defendants ignore the other half of the test: as both the Supreme Court and the D.C. Circuit have held, "a plaintiff can establish standing by satisfying *either* the 'certainly impending' test *or* the

---

[2] Plaintiffs' allegations also satisfy the other two criteria for associational standing. Specifically, safeguarding Bears Ears from destructive activities is "germane" to the organizational purposes of each of the Plaintiffs. *Friends of the Earth*, 528 U.S. at 181; *see* Compl. ¶¶ 16-17, 19-21, 23-24, 26-28, 30-33, 35-36, 38-39, 40-43, 44-46, 47-48, 50-52. Plaintiffs' members need not participate in this litigation because none of the claims asserted or the relief sought requires individualized proof. *See Friends of the Earth*, 528 U.S. at 181.

'substantial risk' test." *Attias*, 865 F.3d at 626-27 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). Applying this standard, courts routinely find a substantial risk of injury where, as here, plaintiffs challenge government action to weaken or remove barriers to third-party activity that would harm them. *See* TWS Br. 12 (citing *Sierra Club v. Jewell*, 764 F.3d 1, 7-8 (D.C. Cir. 2014); *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014); *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 998 (D. Alaska 2018)). Plaintiffs' allegations here easily meet the "substantial risk" standard. The complaint offers detailed allegations about Plaintiffs' members' aesthetic and recreational interests in visiting and enjoying the excised lands, *see* Compl. ¶¶ 18, 21, 25, 29, 34, 37, 39, 42, 45, 49, 52, 134-42, and as explained below, the Trump Proclamation puts those interests at imminent risk of harm.

*(1) Hard-rock mining.* First, the Trump Proclamation "open[ed]" the excised lands to "location" and "entry . . . under the mining laws." 82 Fed. Reg. at 58,085; *see* Compl. ¶¶ 143-44. This termination of the 2016 Proclamation's mineral withdrawal was self-executing: it became effective "60 days after" President Trump's signature, with no need for a new management plan or any other agency action. 82 Fed. Reg. at 58,085. As a result of the Trump Proclamation, the excised lands are now subject to the General Mining Law of 1872, 30 U.S.C. § 22 *et seq.*, which aims "[t]o encourage mining" on federal public lands. *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 699 (D.C. Cir. 2009).

The General Mining Law is extraordinarily permissive: it allows private citizens to enter onto federal land and "stake, or 'locate,' claims to extract minerals *without prior government permission*." *Id*. (emphasis added); *see also* 43 C.F.R. §§ 3832.1, 3833.11 (describing process of locating and recording claims on BLM-managed land). Once a claimant has located her claim, she may undertake "casual use" activities at any time, and she "need not notify BLM" before

doing so. 43 C.F.R. § 3809.10(a).[3] A claimant may also undertake more extensive "notice"-level

activities—that is, activities "causing surface disturbance" of up to five acres—simply by

sending the BLM a "notice" of planned operations and waiting fifteen calendar days after the

BLM receives it. *Id.* §§ 3809.10(b), 3809.21(a). Unless the BLM requests additional information

or takes other specific actions within that fifteen-day window, the claimant may proceed with

ground-disturbing work. *Id.* §§ 3809.312(a), 3809.313; *see also* 36 C.F.R. § 228.4 (a)(1)-(2)

(similar Forest Service regulations).[4] Though they bury it in a footnote, Defendants concede that

"'notice-level' operations do not require affirmative agency approval." Defs.' Br. 18 n.10.

In addition to lifting the prohibition on *new* mining claims in the excised lands, the

Trump Proclamation also allows the operators of *existing* mineral claims in those lands (i.e.,

claims that pre-dated the Monument's creation) to undertake mining activities that would have

been prohibited under the 2016 Proclamation. Compl. ¶ 152. President Obama's designation of

Bears Ears National Monument in 2016 left "valid existing rights" in place, 82 Fed. Reg. at

1143, but the conferral of monument status imposed certain restrictions on the use and

development of those existing claims. For example, federal regulations require that, for all

mining claims located in "[n]ational [m]onuments," claimants must go through a more involved

---

[3] *See* 43 C.F.R. § 3809.5 (defining "casual use" activities as those that "result[] in no or negligible disturbance," e.g., collecting samples without mechanized earth-moving equipment).

[4] Plaintiffs have alleged that "[n]ew hard-rock mining claims and exploration are also likely to occur on Forest Service-managed land," where a similar regulatory scheme governs. Compl. ¶ 150 (citing 36 C.F.R. § 228.4(a)). The Forest Service manages "approximately 256,469" of the 1.15 million acres of land excluded from the Monument. Rasure Decl. ¶ 5, ECF No. 49-3. Defendants' declarant does not dispute Plaintiffs' allegations about hard-rock mining activity on these lands under the Forest Service regulations, and Defendants focus their arguments about the likelihood of hard-rock mining activity largely on BLM-managed lands, *see* Defs.' Br. 18 n.10. This discussion follows suit, focusing on the BLM's regulations and noting the Forest Service's parallel regulations where appropriate.

process before undertaking what would otherwise be classified as notice-level activities. 43

C.F.R. § 3809.11(c)(7). Before beginning such work, a claimant must submit a full "plan of

operations" to the BLM, and the BLM in turn must "prepare[] a mineral examination report" to

determine the claim's validity before operations begin. *Id.* §§ 3809.11(c), 3809.100(a). The

Trump Proclamation purports to have abolished those restrictions on the lands stripped of

monument status. 82 Fed. Reg. at 58,085. Because of the Trump Proclamation, the BLM will no

longer require claimants to comply with those heightened standards in the lands excised from the

Monument. *See* Compl. ¶¶ 152, 176-77.

Thus, there is no "attenuated chain" of events that must happen before surface-disturbing

mining activities may begin in the excised lands. *Contra* Defs.' Br. 15. The Trump Proclamation

is self-effectuating; it allows prospectors to locate new claims, and to undertake notice-level

activity on new or existing claims, without *any* affirmative approval from the federal

government.[5] The harm associated with such notice-level activities can be substantial. Road

construction, the use of mechanized earth-moving equipment, and the use of truck-mounted

drilling equipment all can proceed without the BLM's affirmative approval. *See* 43 C.F.R.

§§ 3809.5, 3809.21(a), 3809.312(a); *see also* 36 C.F.R. § 228.4(a)(1)-(2) (similar Forest Service

---

[5] Defendants assert that the "development of . . . [hard-rock] minerals" is "not imminent because
[it] requires multiple steps before commencement," including "actions by third parties, as well as
the need for the BLM's and/or the USFS's approval in compliance with the National
Environmental Policy Act ('NEPA') and other applicable statutes . . . ." Defs.' Br. 18-19.
Defendants are presumably distinguishing between "development" (i.e., activities that require a
full plan of operations) and "exploration" (i.e., notice-level activities, which do not require a plan
of operations). *See* 43 C.F.R. § 3809.5 (defining "exploration"). As Defendants concede, no
NEPA analysis or affirmative BLM/USFS approval is required for notice-level activities. And by
definition, notice-level activities involve surface disturbance that can be quite extensive. *See id.*
§ 3809.21(a) (defining notice-level activities in BLM lands as operations "causing surface
disturbance of 5 acres or less"); 36 C.F.R. § 228.4(a) (defining notice-level activities in Forest
Service lands as "operations which might cause significant disturbance of surface resources");
*see also infra* at 7 (describing impacts of notice-level activities).

regulations). And contrary to Defendants' assertion that the complaint contains "no factual allegations" that notice-level activities "would cause any actual injury in fact to Plaintiffs," Defs.' Br. 16-17, Plaintiffs have alleged those injuries in detail. Notice-level mining activities can produce unsightly waste and debris, scrape scars into the soil, remove native vegetation, disturb wildlife habitat, increase erosion, and harm water quality. Compl. ¶ 149. The "auditory and visual" intrusions from these activities can extend well beyond the boundaries of the mining claims themselves, broadly impacting large "areas that would otherwise be quiet and pristine." *Id.*; *see also id.* ¶ 151. Even if a site is never commercially developed, these exploratory activities alone can have long-lasting impacts on the land. *Id.* ¶ 151.

These impacts pose substantial harm to Plaintiffs' members, who enjoy quiet recreation, solitude, education, and aesthetic delight from visiting the areas the Trump Proclamation has now stripped of monument protection. *Id.* ¶ 153; *see also id.* ¶¶ 133-42, 143-52. Defendants attempt to minimize these allegations of harm, Defs.' Br. 18, but it is well settled that injuries to aesthetic interests—such as the ability to "view and enjoy" an unspoiled landscape or to "observe it for purposes of studying and appreciating its history"—are cognizable injuries for standing purposes. *Jewell*, 764 F.3d at 5; *see also Friends of the Earth*, 528 U.S. at 183.

Nor is it speculative to believe such surface-disturbing activities will happen. There are "deposits of hard-rock minerals—primarily uranium—throughout the Monument," Compl. ¶ 145, which have long attracted extractive industry interest, *see id.* ¶ 93. Indeed, hard-rock mining claims were located inside the Monument boundaries in September 2016, just before the Monument's designation. Compl. ¶ 145.[6] And in 2017, representatives from Energy Fuels

---

[6] Defendants are therefore incorrect when they contend that "Plaintiffs do not allege that any . . . [hard-rock mineral claiming] activities occurred in the run-up to the 2016 Proclamation." Defs.' Br. 16. *See* Compl. ¶ 145; *see also id.* ¶ 136 (alleging that Lockhart Basin has been

Corporation—which owns the Daneros uranium mine just outside the original Monument's western boundary—lobbied the Trump Administration to shrink Bears Ears and presented administration officials a map depicting lands they proposed to be removed from the Monument; these lands were ultimately stripped of monument protection by the Trump Proclamation. *Id.* ¶ 146; *see also* UDB Br. 18. President Trump himself justified his monument review by opining that national monuments may "create barriers to achieving energy independence" and "curtail economic growth." Exec. Order No. 13792, 82 Fed. Reg. 20,429, 20,429 (Apr. 26, 2017). Secretary Zinke similarly explained that his recommendations to the President were based, among other things, on national monuments' impacts on extractive uses such as mining. *Id.* ¶ 124. It requires no speculation—only "common sense," *Attias*, 865 F.3d at 628 (citation omitted)—to conclude there is a substantial risk that mining activity will now occur in the excised lands, harming Plaintiffs' members' interests in enjoying the lands in their natural state.

Defendants attempt to rebut Plaintiffs' well-pleaded allegations with factual averments of their own, relying principally on a declaration by the BLM's state director, Edwin Roberson. *See* Roberson Decl., ECF No. 49-2. While the Court "may consider materials outside the pleadings when deciding a motion to dismiss for lack of jurisdiction," it "must still accept all of the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations, alterations, and quotation marks omitted), and courts are generally wary of resolving factual disputes before there has been a "a full airing of the facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992). The Court need not accept Defendants' proffered facts at this stage of the proceedings. *Cf. Ferrer v. CareFirst, Inc.*, 278 F. Supp. 3d

---

"targeted for hardrock mining"); *id.* ¶ 137 (alleging that mining claims were located in White Canyon "[p]rior to the Monument's designation").

330, 332-33 (D.D.C. 2017) (court did not clearly err by declining to consider defendant's

declaration to resolve 12(b)(1) motion).

Regardless, to the extent the Court considers it, Mr. Roberson's declaration *supports*

Plaintiffs' allegations with respect to hard-rock mining. He concedes, as he must, that "'notice-

level' exploration operations do not require formal BLM approval or NEPA analysis." Roberson

Decl. ¶ 36. He also acknowledges that "[t]here are currently 157 mining claims on BLM-

administered lands now excluded from [the Monument]," including one called "Easy Peasy"

where he admits the operator has already submitted a notice of planned operations to the BLM.

*Id.* ¶ 38. Mr. Roberson's assertion that the operator has "not [yet] commenced its noticed

exploration," *id.*, is irrelevant, given that the operator need not await further action from the

BLM to begin work.[7] And of course, nothing stops other claimants from undertaking notice-level

activity on other existing mines, or locating new claims, consistent with the permissive

regulatory scheme described above.

Defendants also attempt to downplay Plaintiffs' injuries by asserting that "half-a-million

acres of the excluded lands are within other special designations, such as the Dark Canyon

Wilderness, WSAs [Wilderness Study Areas], inventoried roadless areas, Areas of Critical

Environmental Concern [ACECs], and Special Recreation Management Areas, which

designations impose additional protections for the natural and cultural resources on such lands."

---

[7] Defendants protest that any activities occurring since December 2017 "are of no moment because 'standing is to be determined as of the commencement of the suit.'" Defs.' Br. 16 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). It is, of course, true that standing is evaluated as of the time of the complaint's filing. But the post-filing events that Defendants themselves recite corroborate what the complaint plausibly alleges: that Plaintiffs indeed face a substantial and non-speculative risk of harm. *See NRDC*, 755 F.3d at 1017 (holding that plaintiffs adequately alleged a "substantial probability" of injury, and noting that, "as it turned out," post-filing events confirmed the allegations).

Defs.' Br. 18 (relying on Roberson Decl. ¶¶ 12-14 & Ex. A & B; Rasure Decl. ¶¶ 8-10).

Assuming that is true, it does not defeat Plaintiffs' standing. Notably, Defendants do *not* assert

that those designations provide the same level of protection as monument status does. For

example, there is no categorical prohibition on hard-rock mining in Wilderness Study Areas or in

Areas of Critical Environmental Concern. *See* Federal Land Policy and Management Act, 43

U.S.C. § 1782(c) ("Unless previously withdrawn from appropriation under the mining laws,

[WSAs] shall continue to be subject to such appropriation . . . ."); 43 C.F.R. § 3809.11(c)(3)

(regulating mining activity in ACECs).[8] Nor do Defendants dispute that the *other* half-a-million

acres excised from the Monument are left without any special protected status whatsoever. It is

undisputed, for example, that many of the specific areas Plaintiffs name in the complaint, which

their members use—such as White Canyon, Lockhart Basin, and the Valley of the Gods, Compl.

¶¶ 136-38—are now open to the location and development of hard-rock mining claims.

Given these facts, Plaintiffs have plausibly alleged "a 'substantial risk' of future injury"

from hard-rock mining activity in the lands now excised from the Monument, *Attias*, 865 F.3d at

627, as is sufficient to invoke the Court's jurisdiction.

*(2) Oil and gas activity.* Plaintiffs' allegations of harm from hard-rock mining alone are

sufficient to demonstrate standing, but they are not the only source of Plaintiffs' injuries. The

complaint also alleges a substantial risk of harm relating to oil and gas leasing and extraction.

*See* Compl. ¶¶ 154-59. Unlike with hard-rock mining, the BLM must take certain affirmative

---

[8] In fact, the regulations governing WSAs provide that "[t]he objectives of this subpart are
to . . . *[a]llow* mining claim location, prospecting, and mining operations in lands under
wilderness review pursuant to the U.S. Mining Laws, but only in a manner that will not impair
the suitability of an area for inclusion in the wilderness system unless otherwise permitted by
law." 43 C.F.R. § 3802.0-2(a) (emphasis added); *see also id.* § 3802.0-6.

steps (such as holding lease sales) before oil and gas development may begin, but it is not
speculative to expect that the BLM will take those steps now that the President has opened the
excised lands to mineral leasing. As the complaint alleges, there are "oil and gas deposits
throughout the Monument, including in the areas now stripped of monument protection," Compl.
¶ 155, and spurring mineral extraction was one of the express purposes of the President's
monument review, *see supra* at 8. The complaint further alleges that White Canyon—a
spectacular area that the Trump Proclamation carved out of the Monument—"was often the
target of leasing proposals" prior to the Monument's designation in 2016. Compl. ¶ 137; *see also
id*. ¶ 136 (alleging industry interest in leasing in Lockhart Basin, which the Trump Proclamation
excised from the Monument). Given these allegations, Plaintiffs have alleged a "plausible claim"
that there is a "substantial risk" of oil and gas activity in the excised lands. *Attias*, 865 F.3d at
625, 627 (citations and emphasis omitted); *cf. League of Conservation Voters*, 303 F. Supp. 3d at
997-98 (finding imminent risk of oil and gas exploration activity even though agency needed to
approve permits first).

    *(3) Motorized vehicle use.* Finally, Plaintiffs have alleged a substantial risk of harm from
motorized vehicle use in the lands excised from the Monument. The 2016 Proclamation
essentially froze motorized vehicle access at 2016 levels, with limited exceptions, effective
immediately. *See* 82 Fed. Reg. at 1145 (prohibiting the construction or designation of "additional
roads or trails" within the Monument except as needed "for the purposes of public safety or
protection of . . . [the Monument's] objects"). President Trump's unlawful action purports to
abolish this protection in the excised lands. *See* Compl. ¶¶ 161-62, 164. It is therefore irrelevant
that, as Defendants note (Defs.' Br. 17-18), the Agencies had not yet promulgated a new
transportation management plan (as required by the 2016 Proclamation) by the time President

Trump dismantled the Monument. The 2016 Proclamation *itself* imposed restrictions on the establishment of new motorized vehicle trails, and the Trump Proclamation purports to abolish those restrictions in the lands carved out of the Monument.

As one concrete example, Plaintiffs alleged that shortly before the Monument was designated in 2016, "the BLM approved construction of a new off-highway vehicle trail and three parking lots in the Indian Creek area." Compl. ¶ 169. When President Obama established the Monument, this area fell inside the new Monument's boundaries—and as a result, the Interior Board of Land Appeals (IBLA) stayed the construction, concluding that "[b]ecause the [OH]V trails here are for recreational purposes, and not for public safety or protection of objects protected under the [2016] Proclamation, we conclude . . . that the trails are inconsistent with the [2016] Proclamation." Order, *S. Utah Wilderness Alliance et al.*, IBLA 2017-75, *7 (Mar. 13, 2017); *see also id.* at *4 (finding that the construction could cause "long-lasting environmental harm"). Now, however, the Trump Proclamation has left at least part of this area *outside* the newly diminished Monument boundaries—and therefore, the basis for the IBLA's stay order no longer applies. Compl. ¶ 170. Defendants protest that "IBLA's stay remains in place," Defs. Br. 17 n.9 (citing Roberson Decl. ¶ 18), but they do not dispute that the BLM could, at any point, seek to dissolve the stay based on the new boundaries and resume construction.

More broadly, the stay of construction in Indian Creek demonstrates that the 2016 Proclamation had immediate protective effects—protections that the Trump Proclamation purports to eliminate. Now, because of the Trump Proclamation, the BLM has reverted to its pre-Monument approach to motorized vehicle management, which "the BLM itself recognized . . . failed to ensure adequate protection of cultural and paleontological resources." Compl. ¶ 129 (quoting BLM, Land Use Plan Evaluation Report: Monticello Field Office

Approved Resource Management Plan 5 (2015), https://bit.ly/2DbNmZW); *see also id.* ¶ 176. Without the Monument protections in place, there is a substantial likelihood that the BLM will designate additional roads and trails in the excised lands without adequate regard for the fragile ecological, paleontological, and cultural resources located there, leading to increased traffic, noise, and damage from motorized vehicles. Plaintiffs' members who use these areas will suffer injuries to their aesthetic, recreational, and educational interests as a result. *Id.* ¶¶ 132, 134-42, 160-71.

Any one of these categories of injury described above—injuries from hard-rock mining, oil and gas activity, or off-highway vehicle use—would be enough by itself to establish Plaintiffs' standing. Plaintiffs need not wait until these injuries actually befall them to invoke the Court's jurisdiction. The Trump Proclamation presents a substantial risk of harm to Plaintiffs' members' aesthetic, recreational, and educational interests in using and enjoying the excised lands, and that is sufficient to establish an injury in fact.

## B.    Plaintiffs' injuries would be redressed by a favorable decision.

Plaintiffs' complaint also satisfies Article III's redressability requirement. Plaintiffs ask this Court to declare the Trump Proclamation unlawful and to enjoin its implementation by the Agency Defendants. *See* Compl. at 60-61 (prayer for relief). The relief Plaintiffs seek—a declaration that the Trump Proclamation is unlawful, and an injunction prohibiting the Agency Defendants from implementing it—would effectively eliminate the risk of harm to Plaintiffs' members' interests by reinstating monument status and the 2016 Proclamation's protections for the entire 1.35 million-acre Monument. As explained in the TWS Plaintiffs' Brief, these remedies are well within the Court's equitable power, and they would redress Plaintiffs' injuries. *See* TWS Br. 16-17.

## II.    Plaintiffs' Claims Are Ripe for Judicial Review.

Plaintiffs' claims are ripe for judicial review for the reasons explained in the TWS

Plaintiffs' brief. *See* TWS Br. 17-19. In particular, these cases raise questions of law that are

"fit[] . . . for judicial decision" now. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d

1423, 1431 (D.C. Cir. 1996) (citation omitted). Plaintiffs' "legal argument[s] that the President

d[id] not have the statutory or constitutional authority" to issue a proclamation dismantling the

Monument are already "fully formed." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F.

Supp. 3d 370, 410 (D.D.C. 2018) (citation omitted) (appeal docketed, No. 18-5289). There is no

uncertainty about whether agency officials will treat the Trump Proclamation as controlling:

Defendants acknowledge that they will. *See* Defs.' Br. 44 ("[The Trump] Proclamation . . . now

controls."). The Court therefore need not await further action or clarification of the agencies'

position before resolving these legal questions about the President's authority. Resolving these

questions now, as opposed to at some later date, imposes no hardship on Defendants. In contrast,

the longer Plaintiffs must wait for a judicial ruling on the Trump Proclamation's illegality, the

more likely it is that irreversible damage will befall the excised lands. There is no prudential

reason to delay resolving Plaintiffs' claims.

## III.    President Trump Had No Authority to Dismantle the National Monument.

"The President's power, if any," to issue a proclamation dismantling a national monument

"must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet &*

*Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *accord Medellín*, 552 U.S. at 524. Here,

Defendants admit that President Trump lacked any independent constitutional authority to

support his proclamation. *See* Defs.' Br. 41 ("No authority has been asserted by the President to

support the Proclamation in the event the Antiquities Act is held not to authorize it."). Thus, the

14

Trump Proclamation can survive if—and only if—the Antiquities Act delegated such authority to the President.

As explained in detail in the other opposition briefs filed today, the Antiquities Act does not grant the President authority to rescind or reduce national monuments. Its protective purpose, legislative history, and numerous other congressional enactments all reaffirm the statutory text: Congress delegated to the President the authority to create national monuments, but not to dismantle them. And contrary to Defendants' arguments, the scattered instances of presidential monument reductions from over half a century ago do not come close to a "systematic, unbroken[] executive practice, . . . never before questioned," that might support a claim that Congress has silently acquiesced in an unwritten presidential power to dismantle monuments. *Medellín*, 552 U.S. at 531 (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)). To avoid unnecessary repetition of these legal arguments, Plaintiffs hereby incorporate by reference the arguments presented in their fellow plaintiffs' briefs. *See* TWS Br. 19-37.

**IV.    Defendants' Motion to Dismiss Should Be Denied.**

**A.    Plaintiffs have stated *ultra vires* and constitutional claims (Counts I and II).**

For the reasons set forth fully in the above-referenced briefs, President Trump's proclamation removing monument protections from roughly 1.15 million acres of Bears Ears is unlawful. The Antiquities Act gives him no such authority. Plaintiffs' first count therefore states a claim and should not be dismissed. *See* Compl. ¶ 185 (Count I) ("President Trump's Proclamation . . . is *ultra vires*").

In addition, President Trump's arrogation of Congress's exclusive Property Clause power violates the Constitution's separation of powers. His proclamation revoking monument status from roughly 85% of Bears Ears purports to do by executive fiat what only Congress can do. The

complaint therefore states a separation-of-powers claim. *See* Compl. ¶¶ 186-90 (Count II). To be

sure, the Court need not decide the constitutional question if it ultimately determines that

Plaintiffs are entitled to relief on their *ultra vires* claim. *See Ashwander v. TVA*, 297 U.S. 288,

347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one

involving a constitutional question, the other a question of statutory construction or general law,

the Court will decide only the latter."). At this early stage in the proceedings, however,

Plaintiffs' separation-of-powers claim should not be dismissed. *See, e.g.*, *Scott v. Dist. of

Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) (plaintiffs may plead alternative theories of

liability).[9]

### B.    Even assuming the President had some limited authority under the statute to reduce monuments, Plaintiffs have alleged sufficient facts to state a claim that the Trump Proclamation exceeded that authority (Count IV).

Even if the Antiquities Act afforded the President some limited authority to diminish

monuments—which it does not—judicial review is available to ensure the President acted within

those limits and "has not exceeded his statutory authority." *Mountain States Legal Found. v.

Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002). Plaintiffs have adequately alleged that the President

exceeded any such authority by "eliminating national monument status and protection from 1.15

million acres of the Monument," thereby "exclud[ing] objects of scientific and historic

importance from . . . protection." Compl. ¶ 199 (Count IV).

Defendants mistakenly suggest that this Court cannot review whether President Trump

abused his discretion, Defs.' Br. 36-39, because judicial review of presidential decision-making

is "extremely limited," *id.* at 36. But the cases they cite "merely stand[] for the proposition that

when a statute . . . contains *no limitations* on the President's exercise of . . . authority, judicial

---

[9] Because Defendants have disavowed any constitutional authority to diminish monuments, *see* Defs.' Br. 41, Plaintiffs will not pursue their claim under the Take Care clause (Count III).

review of an abuse of discretion claim is not available." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1331 & n.5 (D.C. Cir. 1996) (emphasis added). The D.C. Circuit has already held that the Antiquities Act is not such a statute: rather, it "places discernible limits on the President's discretion," so "[c]ourts remain obligated to determine" whether the President has violated the Act. *Mountain States*, 306 F.3d at 1136.[10] Thus, the "[C]ourt must analyze the organic statute that supposedly confers statutory authority upon the President, assess the scope of [the challenged proclamation], and check for inconsistencies between the statute and [proclamation]." *Am. Fed'n of Gov't Emps.*, 318 F. Supp. 3d at 393; *see also* TWS Br. 41-43.

Here, even assuming the President had some limited authority to redraw monument boundaries that are "confined to the smallest area compatible with the proper care and management of the objects to be protected," 54 U.S.C. § 320301(b), such authority would in no way authorize the wholesale dismantling of a national monument, as President Trump has attempted to do here. The Trump Proclamation eliminates the vast majority of Bears Ears National Monument's total acreage and leaves numerous "objects to be protected," *id.*, stranded outside the monument boundaries. *See* Compl. ¶ 199; *see also* Tribal Br. 10-11; UDB Br. 6-7, 44-45. Indeed, the Trump Proclamation *admits* that it strips monument protection from objects of scientific and historic interest. 82 Fed. Reg. at 58,084 ("Some of the existing monument's objects, or certain examples of those objects, are not within the monument's revised boundaries . . . ."). And it attempts to justify their exclusion on the (unfounded) basis that some

---

[10] Defendants also contend, erroneously, that this Court must limit its review to whether the President recites the relevant statutory language on the "face of the Proclamation." Defs.' Br. 36-37. But the D.C. Circuit has deemed it "'untenable . . . to conclude that there are no judicially enforceable limitations on presidential actions . . . so long as the President *claims* that he is acting pursuant to' a statutory directive." *Mountain States*, 306 F.3d at 1137 (quoting *Reich*, 74 F.3d at 1332). In both *Mountain States* and *Tulare County* (discussed below), the D.C. Circuit looked beyond the challenged proclamations to the factual allegations in plaintiffs' complaints.

are not "unique" or of "significant" historic or scientific interest, *id*. at 58,081—an ad hoc standard found nowhere in the Antiquities Act. *See* Compl. ¶ 200.[11]

For example, the Trump Proclamation excised from the Monument areas like White Canyon, Lockhart Basin, and the Valley of the Gods, *id*. ¶¶ 136-38, which contain numerous cultural and archaeological sites, stunning vistas, and rich biological and geological resources. The Trump Proclamation also stripped monument status from Farm House Ruin, Tower Ruin, and Fry Canyon Ruin. *Id*. ¶ 129. Rather than ensuring the "proper care and management of the objects to be protected," 54 U.S.C. § 320301(b), the Trump Proclamation strips these "objects of scientific and historic importance from the protection they enjoyed under the 2016 Proclamation, leaving them vulnerable to the very damage that the 2016 Proclamation sought to avoid." Compl. ¶ 199.

The complaint therefore "allege[s] facts to support the claim that the President acted beyond his authority under the Antiquities Act." *Mountain States*, 306 F.3d at 1137. The D.C. Circuit's opinion in *Tulare County* is instructive. There, a plaintiff challenging Giant Sequoia National Monument claimed that President Clinton "abused his discretion by designating more land than is necessary to protect the specific objects of interest." *Tulare Cty. v. Bush*, 306 F.3d 1138, 1142 (D.C. Cir. 2002). The D.C. Circuit affirmed dismissal of this claim not because the Proclamation "adverts to the statutory standard," as Defendants appear to suggest (Defs.' Br. 37,

---

[11] The Trump Proclamation notes that some of these objects of interest are "subject to [overlapping] Federal protections" under other laws or agency designations, 82 Fed. Reg. at 58,081, but that fact does not render national monument protections superfluous or inappropriate; nor does it give the President a power to revoke monument protections that he otherwise lacks. *Cf. Utah Ass'n of Ctys. v. Bush*, 316 F. Supp. 2d 1172, 1184 (D. Utah 2004) ("While the Antiquities Act and the Wilderness Act in certain respects may provide overlapping sources of protection, such overlap is neither novel nor illegal, and in no way renders the President's [Monument designation] invalid.").

38), but rather because the plaintiff did "not make the factual allegations sufficient to support its claim[]"—namely, it failed to allege that any part of the Monument lacked scientific or historical value. *Tulare Cty.*, 306 F.3d at 1142. The court later reiterated that it was this pleading failure, "and nothing more," that required dismissal of the claim. *Tulare Cty. v. Bush*, 317 F.3d 227, 227 (D.C. Cir. 2003) (mem.) (per curiam) (denying petition for rehearing en banc).

Here, unlike in *Tulare County*, Plaintiffs have "identif[ied] the improperly [excluded] lands with sufficient particularity to state a claim." 306 F.3d at 1142; *see, e.g.*, Compl. ¶¶ 128-30, 136-38 (discussing specific places and objects stripped of monument protection). If the Court ultimately determines that the President lacked any statutory authority to diminish the Monument (Count I), it would be unnecessary to reach this alternative claim. But Defendants' attempt to dismiss the claim at this early juncture must be denied.

**C.    Plaintiffs have stated a claim for relief under the APA (Count V).**

Finally, the complaint states a claim for relief under the Administrative Procedure Act (APA). NRDC Plaintiffs challenge a specific "final agency action" that occurred by the time of filing: namely, the Agency Defendants' decision to cease complying with the 2016 Proclamation in the excised Monument lands insofar as it conflicts with the Trump Proclamation. *See* Compl. ¶ 176 (alleging that the Agency Defendants "have decided not to carry out their duties under the 2016 Proclamation"). As explained in detail in the TWS Plaintiffs' Brief, this decision is "not in accordance" with the Antiquities Act, 5 U.S.C. § 706(2)(A), which authorizes the President to create national monuments, but not to dismantle them.

The Agency Defendants' decision is "final," even though not memorialized in a formal decisional document, because it "'mark[s] the consummation of the agency's decisionmaking process'" and is an action from which "'legal consequences will flow.'" TWS Br. 44 (quoting

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). The Agency
Defendants will not, for example, prohibit private parties from locating and recording hard-rock
mining claims and engaging in ground-disturbing operations in the excised lands—actions that
would have been prohibited under the 2016 Proclamation. *See* Compl. ¶¶ 143, 152. They have
abandoned their obligation under the 2016 Proclamation to prepare a monument management
plan to protect the Monument's full 1.35 million acres, *see id.* ¶ 176, and they will no longer
manage the excised lands with the primary purpose of protecting the objects of scientific and
historic interest as the 2016 Proclamation requires, *see id.* ¶ 132. Where the two proclamations
conflict, the Agency Defendants here have already decided which presidential proclamation they
will follow. Defendants admit as much: "To the extent there are any inconsistencies with the
2016 Proclamation, [the Trump] Proclamation . . . now controls." Defs.' Br. 44. And nowhere do
they deny that Agency Defendants had made that decision by the time Plaintiffs filed their
complaint. That decision is contrary to law, in violation of the APA, for the reasons set forth in
the TWS Plaintiffs' Brief. *See* TWS Br. 43-45.[12]

---

[12] If the Court concludes that Plaintiffs' APA claim should be dismissed, Plaintiffs respectfully
request that the Agency Defendants remain parties if the Court deems them necessary to
facilitate effective relief for Plaintiffs' other claims. *See* TWS Br. 45.

# CONCLUSION

In passing the Antiquities Act, Congress authorized the President to create national monuments, not to dismantle them. The President's proclamation subverts the statute's text and intrudes on Congress's sole authority by eliminating monument protections from 1.15 million acres of the Bears Ears National Monument, unilaterally reopening those lands to extractive and other destructive uses. Because the President's unlawful action subjects the excised lands to immediate and irreversible harm, there is no reason, constitutional or prudential, to delay the resolution of Plaintiffs' claims. Defendants' motion to dismiss should be denied.

Dated: November 15, 2018                    Respectfully submitted,

*/s/ Heidi McIntosh*                         */s/ Sharon Buccino*
Heidi McIntosh (*pro hac vice*)             Sharon Buccino (Bar No. 432073)
Yuting Yvonne Chi (*pro hac vice*)          Jacqueline M. Iwata (Bar No. 1047984)
Earthjustice                                Natural Resources Defense Council
633 17th Street, Suite 1600                 1152 15th Street NW, Suite 300
Denver, CO 80202                            Washington, DC 20005
Tel.: (303) 623-9466                        Tel.: (202) 289-6868
Fax: (303) 623-8083                         Fax: (415) 795-4799
E-mail: hmcintosh@earthjustice.org          E-mail: sbuccino@nrdc.org
E-mail: ychi@earthjustice.org               E-mail: jiwata@nrdc.org

James Pew (Bar No. 448830)                  Katherine Desormeau (D.D.C. Bar ID
Earthjustice                                CA00024)
1625 Massachusetts Avenue, NW               Ian Fein (D.D.C. Bar ID CA00014)
Suite 702                                   Michael E. Wall
Washington, DC 20036                        Natural Resources Defense Council
Tel.: (202) 667-4500                        111 Sutter Street, 21st Floor
Fax: (202) 667-2356                         San Francisco, CA 94104
E-mail: jpew@earthjustice.org               Tel.: (415) 875-6158
                                            Fax: (415) 795-4799
*Attorneys for National Parks Conservation* E-mail: kdesormeau@nrdc.org
*Association, The Wilderness Society,*       E-mail: ifein@nrdc.org
*Defenders of Wildlife, Grand Canyon Trust,* E-mail: mwall@nrdc.org
*Great Old Broads for Wilderness, Western*
*Watersheds Project, WildEarth Guardians,*  *Attorneys for Natural Resources Defense*
*Sierra Club, and Center for Biological*    *Council*
*Diversity*

21

_/s/ Stephen H.M. Bloch_____
Stephen H.M. Bloch (*pro hac vice*)
Landon C. Newell
Laura E. Peterson
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
E-mail: steve@suwa.org
E-mail: landon@suwa.org
E-mail: laura@suwa.org

*Attorneys for Southern Utah Wilderness Alliance*