**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HOPI TRIBE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  17-cv-2590 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UTAH DINÉ BIKÉYAH, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  17-cv-2605 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE | ) | |
| COUNCIL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-2606 (TSC) |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | **CONSOLIDATED CASES** |
| | ) | ORAL ARGUMENT |
| | ) | REQUESTED |
| Defendants. | ) | |
| | ) | |

**TRIBAL PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS'
MOTION TO DISMISS**

**Table of Contents**

TABLE OF AUTHORITIES ............................................................................................... i

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.  Bears Ears: Home Since Time Immemorial ................................................................ 2

    II.  The Movement to Create the Bears Ears National Monument ............................... 7

    III. Establishment of the Bears Ears National Monument .......................................... 9

    IV. Revocation of the Bears Ears National Monument ............................................. 10

STANDARD OF REVIEW ............................................................................................... 11

ARGUMENT ..................................................................................................................... 13

    I.       The Tribes have Article III Standing ........................................................... 13

          A.  President Trump Injured the Tribes by Abrogating Their Right to Participate on a Government-to-Government Basis in the Management of All Lands Within the Original Monument Boundaries through the Bears Ears Commission ................. 14

          B.  President Trump's Action Endangers Sacred Lands and Objects of Cultural and Historic Importance to the Tribes ..................................................................... 17

          C.  The Tribe's Injuries are Traceable to the Defendants' Conduct, and Redressable by this Court ....................................................................................................... 21

    II.     Plaintiffs' Claims Are Ripe ........................................................................... 22

    III.    The Tribes Have Stated a Claim that the President Violated the Antiquities Act ........ 23

          A.  The Defendants Fail to Argue that the President has Authority to Revoke the Monument Status of Objects Designated as Part of the Bears Ears National Monument ............................................................................................................ 23

          B.  The Antiquities Act Does Not Delegate Authority to President Trump to Revoke the Monument Status of Objects Designated as Part of the Bears Ears National Monument or to Remove Virtually All of the Lands Reserved as Part of It ......... 24

1.  The text of the Antiquities Act does not authorize the President's action ....................................................................................................24

2.  The President's claimed powers contravene the protective purposes of the Antiquities Act ...............................................................................25

3.  In contrast to the Antiquities Act, other contemporaneous public lands statutes expressly authorized the President to revoke and modify reservations and withdrawals ...............................................................29

4.  Subsequent legislation demonstrates that Congress retained for itself authority over National Monuments after they are established .............34

5.  The President has not acquired Antiquities Act authority to revoke and modify the Bears Ears National Monument through Congressional acquiescence ...........................................................................................37

IV.    To Avoid a Constitutional Question, the Antiquities Act Should Not Be Construed to Delegate the Unfettered Power over National Monuments that President Trump Has Claimed. ...................................................................................................................38

V.    The Tribes Have Stated a Claim that the President Violated the Separation of Powers Doctrine ....................................................................................................................42

VI.    The Tribes Have Stated a Claim that the Trump Proclamation Violates the APA .......43

CONCLUSION ...........................................................................................................................43

## Table of Authorities

**Cases**

*Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 877 (1999) ................................................30

*Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81 (D.D.C. 2014) ...........................................................42

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................................12

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ..........................................................12, 18

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ...........................................12

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ..........................................................................12

*Bell Atl. Tel. Cos. v. FCC,* 131 F.3d 1044 (D.C. Cir. 1997) ..........................................................24

*Cappaert v. United States*, 426 U.S. 128 (1976) ...........................................................................22

*Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922 (D.C. Cir. 2013) ......................................22

*City & Cty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................................42

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ....................................................................18

*Clinton v. N.Y.C.*, 524 U.S. 417 (1998) ......................................................................................42

*Dalton v. Specter*, 511 U.S. 462 (1994) .......................................................................................24

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ..........................................................................24

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) ................................................................25

*District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077 (D.C. Cir. 1984) .........................................24

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
    485 U.S. 568 (1988) ..............................................................................................................40

*Great N. Ry. Co. v. United States*, 315 U.S. 262 (1942) ..............................................................30

*Greater Yellowstone Coalition v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) ........................25

*Havasupai Tribe v. Provencio,* No. 15-15754, 2018 WL 5289028 (9th Cir. Oct. 25, 2018) .........20

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ........................................................................................42

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) .................................................34

*Johnson v. City of Shelby*, 135 S. Ct. 346 (2014) ..........................................................24

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)................................39

*Kazarian v. Citizenship & Immigration Servs.*, 596 F.3d 1115 (9th Cir. 2010) ...........42

*Kokoska v. Belford*, 417 U.S. 642 (1974)......................................................................30

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...............................................12, 13, 21

*Massachusetts v. EPA,* 549 U.S. 497 (2007) .................................................................17

*Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457 (2d Cir. 2013)............17

*Mass. Lobstermen's Ass'n v. Ross*, No. 17-406, 2018 WL 4853901 (D.D.C. Oct. 5, 2018)..........22

*Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226
    (11th Cir. 2000) ......................................................................................................17

*Misretta v. United States*, 488 U.S. 361 (1989) ............................................................40

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir 2002) .................22, 41

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) .............................................22

*PDK Labs. Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786 (D.C. Cir. 2004)...................25

*Petit v. U.S. Dep't of Educ.*, 675 F.3d 769 (D.C. Cir. 2012)..........................................24

*Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768 (9th Cir. 2006)...........................15, 19

*Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.* 332 F.3d 654 (D.C. Cir. 2003 .......32

*Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) .................................19

*S. Utah Wilderness All. v. BLM*, 425 F.3d 735 (10th Cir. 2005) ...................................30

*Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42 (D.C. Cir. 2016) ......................12

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ......................................................13

*Smith v. United States*, 237 F. Supp. 3d 8 (D.D.C. 2017) .............................................12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50 (D.D.C. 2018) ..... 20

*Stone v. I.N.S.*, 514 U.S. 386 (1995) ............................................................................................. 32

*Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334 (2014) ......................................................... 18

*Tulare Cty. v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001) ........................................................... 22, 39

*United States v. California*, 436 U.S. 32 (1978) ........................................................................... 22

*United States v. Dupris*, 612 F.2d 319 (8th Cir. 1979) ................................................................. 31

*United States v. N. Pac. Ry. Co.*, 311 U.S. 317 (1940) ................................................................. 30

*United States v. Otherson*, 637 F.2d 1276 (9th Cir. 1981) ........................................................... 30

*United States v. Vermont*, 317 F.2d 446 (2d Cir. 1963) ................................................................. 30

*Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094 (10th Cir. 2006) ................................................... 22, 39

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332 (D.C. Cir. 2018) ....... 12

*W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991) ............................................................... 30

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) ................................................................. 38

*Yakus v. United States*, 321 U.S. 414 (1944) ................................................................................. 40

**Constitutions**

U.S. Const. art. I, § 2 ..................................................................................................................... 15

U.S. Const. art. I, § 8 ..................................................................................................................... 15

U.S. Const. amend, XIV, § 2 .......................................................................................................... 15

Ute Const., art. IV, §1(q) ................................................................................................................ 19

**Statutes and Regulations**

26 Stat. 1103 (1891) ................................................................................................................. 30, 31

30 Stat. 11-61 (1897) ...................................................................................................................... 30

30 Stat. 34 (1897) ........................................................................................................................... 32

32 Stat. 388 (1902)..........................................................................................................33

36 Stat. 847 (1910)..........................................................................................................34

40 Stat. 1175 (1919)........................................................................................................34

41 Stat. 356 (1919)..........................................................................................................34

43 Stat. 593 (1924)..........................................................................................................34

50 Stat. 746 (1937)..........................................................................................................35

52 Stat. 1241 (1938)........................................................................................................34

64 Stat. 404 (1950)..........................................................................................................35

68 Stat. 98 (1954)............................................................................................................35

69 Stat. 380 (1956)..........................................................................................................35

92 Stat. 3467 (1978)........................................................................................................35

110 Stat. 4093 (1996)......................................................................................................35

118 Stat. 3907 (2004)......................................................................................................35

16 U.S.C. § 470cc............................................................................................................18

16 U.S.C. §470kk............................................................................................................20

16 U.S.C. § 473..........................................................................................................32, 33

16 U.S.C. § 668a.............................................................................................................19

18 U.S.C. § 1866.............................................................................................................26

25 U.S.C. § 2901.............................................................................................................19

25 U.S.C. § 3001.............................................................................................................18

25 U.S.C. § 3002.............................................................................................................18

43 U.S.C. §§ 1701-1782 ................................................................................................37

54 U.S.C § 302706..........................................................................................................19

54 U.S.C. § 320301 ...........................................................................................26, 39

54 U.S.C. § 320302 ...............................................................................................26

54 U.S.C. § 320303 ...............................................................................................27

36 C.F.R. §800.2-6 ...............................................................................................15

**Court Rules**

Fed. R. Civ. P. 8(a)(2) ..........................................................................................11

Fed. R. Civ. P. 9(b) ..............................................................................................11

Fed. R. Civ. P  12(b)(1) .........................................................................................12

**Other Authorities**
***Please note: Congressional materials not available on Westlaw are being submitted in a Joint Appendix***

29 Cong. Rec. 2677 (1897) ....................................................................................31

30 Cong. Rec. 911 (1897) ......................................................................................32

30 Cong. Rec. 914 (1897) ......................................................................................31

30 Cong. Rec. 916 (1897) ......................................................................................32

30 Cong. Rec. 982 (1897) ......................................................................................31

30 Cong. Rec. 1284 (1897) ....................................................................................31

67 Cong. Rec. 6805 (1926) ....................................................................................36

83 Fed. Reg. 41, 111 (Aug. 17, 2018) ......................................................................21

Bears Ears Inter-Tribal Coalition, *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* (October 15, 2015), http://www.bearsearscoalition.org/wp-content/uploads/2015/10/Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf......6, 8

Cohen's Handbook of Federal Indian Law (2012 ed.)..........................................................13, 19

Department of the Interior, *History of Legislation Relating to The National Park System Through the 82d Congress* (Edmund B. Rodgers ed., 1964)...........................................................28

Email from Kenneth Mahoney to Sheldom Wimmer et al., (Jun. 1, 2017), *available at* https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p110/a407706 ............................................................41

Email from Brandon Boshell to Rody Cox et al., (May 22, 2017) *available at* https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p82/a407703 ............................................................41

Exec. Order No. 13,175, 65 Fed. Reg. 67, 249 (Nov. 9, 2000)..............................................14, 15

Exec. Order No. 13,792, 82 Fed. Reg. 20,429 (May 1, 2017)..........................................10, 40, 41

Kelly Y. Fanizzo, *Separation of Powers and Federal Land Management: Enforcing the Direction of the President Under the Antiquities Act*, 40 Envtl. L. 765 (2010)................................26

Larry Garahana, Memorandum, Cursory Review of the Mineral Potential/Occurrence within the Bears Ears NM (Jan. 31, 2017), *available at* https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p61/a07706 ................................................................41

General Land Office (GLO), Report of the Commissioner of the General Land Office to the Secretary of the Interior For the Year Ended June 30, 1906...............................................28

General Land Office, Report of the Commissioner of the General Land Office to the Secretary of the Interior For the Fiscal Year Ended June 30, 1908.......................................................28

Aaron Huey, *What the Bears Ears monument means to a Native American* (Oct. 18, 2018), https://www.nationalgeographic.com/environment/2018/10/bears-ears-monument-native-americans-photography/H.R. 8066, 56th Cong. (1900)......................................................5

H.R. 8066, 56th Cong. (1900) ........................................................................33

H.R. 8195, 56th Cong. (1900) ........................................................................33

H.R. 9245, 56th Cong. (1900) ........................................................................33

H.R. 10451, 56th Cong. (1900)........................................................................33,

H.R. 11021, 56th Cong. (1900)....................................................................28, 33

H.R. 14227, 56th Cong. (1901)........................................................................33

H.R. 12141, 58th Cong. (1904)........................................................................33

H.R. 12447, 58th Cong. (1904)........................................................................33

H.R. 13349, 56th Cong. (1904)..................................................................33

H.R. 13478, 58th Cong. (1904)..................................................................33

H.R. 11016, 59th Cong. (1906)..................................................................28

H.R. 11357, 68th Cong. (1925)..................................................................35

H.R. 11363, 68th Cong. (1925)..................................................................36

H.R. 3990, 115th Cong. (2017)..................................................................37

H. Rep. No. 68-1119, 68th Cong. (1925) ...................................................35

H. Rep. No. 69-1268, 90th Cong. (1968)....................................................36

Ronald F. Lee, *The Story of the Antiquities Act,* National Park Service – Archeology Program
        (2001 electronic ed.), https://www.nps.gov/archeology/pubs/lee/Lee_CH1.htm ...7, 27, 28,

Memorandum for the President from Sally Jewell and Thomas J. Vilsack on Recommendation
        for the Proposed Bears Ears National Monument (Dec. 14, 2016) .......................... passim

Memorandum for the President from Ryan Zinke, Sec'y of Interior, on Final Report
        Summarizing Findings of the Review of Designations Under the Antiquities Act (Dec. 5,
        2017), https://www.doi.gov/sites/doi.gov/files/uploads/revised_final_report.pdf.............10

Robert J. Miller, *Consultation or Consent: The United States' Duty to Confer with American
        Indian Governments*, 91 N.D.L. Rev. 37 (2015)................................................15

Amy Joi O'Donoghue, *Monumental decision: All eyes look to Jewell on divisive Bears Ears
        issue*, Deseret News (July 16, 2016),
        https://www.deseretnews.com/article/865658216/Monumental-decision-All-eyes-look-to-
        Jewell-on-divisive-Bears-Ears-issue.html .....................................................8, 9

Presidential Memorandum on Tribal Consultation (Nov. 5, 2009)................................15

Proclamation No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016)................................. passim

Proclamation No. 9681, 82 Fed. Reg. 58081 (Dec. 4, 2017)................................. passim

Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*,
        46 U. Mich. J.L. Reform 417 (2013) ...........................................................15

John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior National Monument Modifications*, 43 Harv. Envtl. L. Rev. _, at 36 (forthcoming 2019), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3272594 ....................................38

S. 4127, 58th Cong. (1904)............................................................................................33

S. 5603, 58th Cong. (1904)......................................................................................28, 33

S. 3826, 68th Cong. (1925)............................................................................................36

S. 3840, 68th Cong. (1925)............................................................................................35

S. 2703, 60th Cong. (1926)............................................................................................36

S. Rep. No. 68-849, 68th Cong. (1925) ........................................................................35

S. Rep. No. 68-1127, 68th Cong. (1925) ......................................................................36

S. Rep. No. 423, 69th Cong. (1926)..............................................................................36

Sec'y of the Interior Order No. 3342 § 2(b) (Oct. 21, 2016) .......................................14

Kathleen Sharp, *An Exclusive Look at the Greatest Haul of Native American Artifacts, Ever*, Smithsonian.com (Nov. 2015), https://www.smithsonianmag.com/history/exclusive-greatest-haul-native-american-artifacts-looted-180956959/................................................7

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. (2003).26

Kyle Swenson, *Pilfered artifacts, three suicides, and the struggle over federal land in Utah*, Washington Post (Dec. 5, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2017/12/05/pilfered-artifacts-three-suicides-and-the-struggle-over-federal-land-in-utah/?utm_term=.4802df77c4f6 ....................................................................................7

Hiroko Tabuchi, *Uranium Miners Pushed Hard for a Comeback. They Got Their Wish*, New York Times (Jan. 13, 2018), https://www.nytimes.com/2018/01/13/climate/trump-uranium-bears-ears.html .............................................................................................................11

U.S. Department of Interior, *Tribal Consultation Policy*, https://www.doi.gov/sites/doi.gov/files/migrated/cobell/upload/FINAL-Departmental-tribal-consultation-policy.pdf (last visited Nov. 15, 2018) ................................................15

Carol Hardy Vincent, Congressional Research Service, *National Monuments and the Antiquities Act* (2016), https://fas.org/sgp/crs/misc/R41330.pdf .......................................................25

Gerald W. William, *The USDA Forest Service – The First Century* (2005),
     https://www.fs.fed.us/sites/default/files/media/2015/06/The_USDA_Forest_Service_The
     FirstCentury.pdf ............................................................................................................31

Plaintiffs Hopi Tribe, Navajo Nation, Ute Indian Tribe, Ute Mountain Ute Tribe, and Zuni Pueblo (the "Tribes"), through their undersigned counsel, submit this response in opposition to Defendants' Motion to Dismiss, ECF No. 49.

## INTRODUCTION

For the first time in history, five federally recognized Tribes banded together to advocate for a national monument to protect, for all Americans and for all time, a place so wondrous it had drawn people to it for more than 13,000 years. Rich in ancient and modern Native culture, and literally part of the homeland and history of the five Tribes in this case, it is known as Bears Ears National Monument. To the Tribes, it is a living and vital place where ancestors passed from one world to the next, often leaving their mark in petroglyphs or painted handprints, and where modern day tribal members can still visit them. The Tribes worked for years to gather evidence and make a case for the protection of this landscape teeming with historical objects and sites. Recognizing that Bears Ears was exactly the kind of place for which the Antiquities Act was created, President Obama designated the Monument on December 28, 2016.

Less than a year later, in an effort to free up lands for uranium mining and other extractive industries, President Trump purported to revoke the Monument. A stunning abuse of the Antiquities Act by any measure, the Trump Proclamation removed 85 percent of the original monument lands from protection, and removed 100 percent of protection from tens of thousands (and likely more) of objects in the excised lands.  The Antiquities Act – a law created specifically to protect historical objects and places – was used instead to *remove* protection from irreplaceable historical objects and places.

Now, after the Tribes sued to undo the President's plainly illegal action, the Defendants move to dismiss the case on nearly every ground available. But their motion cannot withstand

scrutiny. The Tribes, who have suffered enormous injury in the loss of protection of their cultural heritage and the abrogation of their vested right to collaboratively manage the Monument lands, clearly have standing to right those wrongs. The Defendants' assertions that these claims are not ripe or redressable are equally as incredible, especially considering the formerly protected lands are now open to mining activity and the objects on those unprotected lands are now vulnerable to everyday collection.

The real issue here is of course not whether there are procedural hurdles, but whether the President had to the authority to do what he did. He clearly did not. The text of the Antiquities Act does not allow for what the President has done here. The legislative history of the Antiquities Act does not allow for what the President has done here. On the contrary, in revoking the Bears Ears Monument and replacing it with two remnants, President Trump usurped power reserved only to Congress – a power that Congress has repeatedly reaffirmed and claimed for itself. The Defendants' motion should be denied.

## BACKGROUND

### I.    Bears Ears: Home Since Time Immemorial

The importance of the Bears Ears landscape to the Tribes and their members cannot be overstated. The opening sentences of President Barack Obama's Presidential Proclamation (the "Obama Proclamation") establishing the Bears Ears National Monument ("BENM," "Bears Ears," or the "Monument") describe a landscape that is so ancient and unique it has no parallel:

> Rising from the center of the southeastern Utah landscape and visible from every direction are twin buttes so distinctive that in each of the native languages of the region their name is the same: Hoon'Naqvut, Shash Jáa, Kwiyagatu Nukavachi, Ansh An Lashokdiwe or "Bears Ears." For hundreds of generations, native peoples lived in the surrounding deep sandstone canyons, desert mesas, and meadow mountaintops, which constitute one of the densest and most significant cultural landscapes in the United States. Proclamation No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016).

The Tribes view Bears Ears as home since time immemorial, and it remains cherished by Native peoples for its cultural, spiritual, and archaeological importance. Compl. at 19-34. As detailed extensively in the Complaint, the Bears Ears National Monument as established by President Obama contains a documented history of the Tribes. *Id*. "The importance of Bears Ears for our people is through our ancestral sites that were left behind eons ago by our ancestors. They documented the sites by using oral history, pictographs, and by leaving their belongings. When we visit Bears Ears, we connect with our migration history immediately without doubt." *Id*. ¶ 79 (quoting Phillip Vicenti, Zuni). Indeed, Bears Ears contains over a hundred thousand objects of historic and scientific importance, many traditional cultural properties, and many sacred sites. *Id*.

For the Navajo, Bears Ears contains many important historical sites, such as the towering spires in the Valley of the Gods that are seen as ancient Navajo warriors frozen in stone, or the "Nahoniti'ino" (hiding places) that provided refuge for the Navajo from the U.S. Military. Compl. at 26-27. Many important Navajo leaders have also descended from the Bears Ears region. *Id*. For the Utes, there are many important historical places within Bears Ears – the San Juan River, Montezuma Canyon, Comb Ridge, and Cow Canyon to name a few. *Id.* ¶ 103. The Ute Bear Dance, which is a spring ceremony symbolic of nature's awakening, was performed in many areas in and around Bears Ears historically and to this day. *Id*. ¶ 104. For the Zuni and Hopi, the places within Bears Ears literally document their migration through the region. *Id*. at 22-26. The Hopi and Zuni view the historical objects left behind by their ancestors – villages, springs, migration routes, artifacts, and physical remains – as footprints testifying to their continual land stewardship. *Id*. ¶ 92. These places and objects are immensely important to all of the Tribes, and are tied to their beliefs and history as peoples. *Id*.

All of the Tribes and their members continue to regularly use Bears Ears to collect plants, minerals, objects and water for religious and cultural ceremonies and medicinal purposes; hunt, fish and gather; provide offerings at historical sacred sites; and conduct ceremonies on the land. In fact, Bears Ears is so culturally and spiritually significant that some ceremonies use items that can *only* be harvested from Bears Ears. *Id.* ¶¶ 4, 74-81.

Archaeological information supports the oral and written history of the Tribes that they have been hunting and gathering in the Monument for at least 13,000 years. Memorandum for the President from Sally Jewell and Thomas J. Vilsack on Recommendation for the Proposed Bears Ears National Monument (Dec. 14, 2016), attached as Exhibit 1 ("Presidential Memorandum"). The Lime Ridge Clovis Site in the southeast corner of BENM is one of the oldest archaeological sites in Utah. Obama Proclamation, at 1. These sites are so ancient that the Hisatsinom (Hopi word for the people of long ago) who resided in them would have experienced a different climate, cooler and wetter, and survived on animals such as mammoths and ground sloths that are now extinct. Presidential Memorandum at 5. Comparatively, more recent sites dating back at least 8,500 years are Old Man Cave on Cedar Mesa and the Green Mask site in Grand Gulch. These sites are more ancient than the Egyptian pyramids and Stonehenge.

Native people continued to live in the Bears Ears landscape through the Basketmaker II period, which was from 500 BCE to 500 CE. Presidential Memorandum at 5. It is during this time that they built houses, storage pits, campsites, rock shelters and created many pictographs that can still be seen today. *Id.* They remained through the Basketmaker III period, approximately 500-750 CE, a time noted for increased technological innovation such as cooking pottery and the bow and arrow. Basketmaker III sites in BENM show an increased use of maize and bean-based agriculture, as well as pottery and the recently-created bow and arrow, which replaced the less efficient atlatl

or throwing board. Presidential Memorandum at 6. This was a key period in the history of human technological advances and its evidence can be found everywhere in BENM. During this period, the Native inhabitants also constructed kivas and more dispersed villages, which can also be seen today, particularly in Cedar Mesa. *Id.*; *see* Compl. ¶¶ 83-84. With the advent of more and more dispersed villages, the people developed a road system, the most well-known being the Et Al network that connected those living on Cedar Mesa with all the surrounding villages. Presidential Memorandum at 6. Over time, the habitation pattern shifted to become much more defense-oriented and around 1150 CE, people began to move into the cliff dwellings that are so well known today. *Id.*

Because of this incredibly long period of habitation, there are hundreds of documented cultural sites in BENM, and tens of thousands of historic and scientific objects. Presidential Memorandum at 7; Compl. ¶ 74. Many of these ancient and important sites would be left unprotected under the Trump Proclamation (defined below), including an extraordinary structure known as The Perfect Kiva. *See* Compl. ¶ 83 (picture of the Perfect Kiva);  Aaron Huey, *What the Bears Ears monument means to a Native American* (Oct. 18, 2018), https://www.nationalgeographic.com/environment/2018/10/bears-ears-monument-native-americans-photography/ (noting that Perfect Kiva is no longer protected); for a description of the impending harms see section I B. *infra*.

While some of the sites date back 13,000 years and some of the petroglyphs date back at least 5,000 years, there are also many more recent sites in BENM, such as hogans and wikiups. Compl. at ¶ 98. There are also a number of recent sites important to contemporary history. For instance, the Utes still conduct their Bear Dance in the Bears Ears region to this day. *Id.* ¶ 104. And the birthsite of famous Navajo leader K'aayélii, who was born in 1800, is near the Bears Ears

5

buttes themselves. K'aayélii later used the canyons in BENM to elude the U.S. Army, which was trying to force Navajo people into imprisonment at Bosque Redondo. Compl. ¶ 97. Another famous Navajo leader named Hastiin Ch'ihaajin, or Manuelito, was also born in the region; he would later be one of the leaders to sign the Treaty of Bosque Redondo that established the Navajo reservation and partially restored the Navajo homeland. *Id.*

Bears Ears is quite simply an indelible part of the Tribes' cultures and histories, part of who they are as peoples. Because of this deep connection to the lands of Bears Ears, the Tribes' members continue to use the Monument for hunting, fishing, gathering, and ceremonial purposes. Obama Proclamation at 3 ("Traditions of hunting, fishing, gathering and wood cutting are still practiced by tribal members, as is collection of medicinal and ceremonial plants, edible herbs, and materials for crafting items like baskets and footwear"). While the entire Bears Ears landscape, even larger than the 1.35 million acres that became the BENM, *see* Compl. ¶ 69,[1] is critically important to the Tribes, many parts of it are also listed on the National Register of Historic Places. For example, Newspaper Rock was listed in 1976 and the Hole-in-the-Rock Trail was listed in 1980. Presidential Memorandum at 9. There are even two archaeological districts in BENM: the 2,205-acre Butler Wash Archaeological District was listed in 1981, followed shortly by the 4,240-acre Grand Gulch Archaeological District in 1982. *Id.*

When non-Native settlers moved into the Bears Ears landscape in the nineteenth century – in and around what is now Bluff, Utah – they developed a strong looting culture. Presidential

---

[1] *See also* Bears Ears Inter-Tribal Coalition, *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* (October 15, 2015), http://www.bearsearscoalition.org/wp-content/uploads/2015/10/Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf ("Bears Ears Proposal").

Memorandum at 8. During this period, practices such as pot hunting and grave robbing took hold, and great quantities of pottery and other relics prized in markets on the East Coast and in Europe were removed from Bears Ears. *See, e.g.* Ronald F. Lee, *The Story of the Antiquities Act,* National Park Service – Archeology Program (2001 electronic ed.), https://www.nps.gov/archeology/pubs/lee/Lee_CH1.htm. ("In general the vandalism committed in this venerable relic of antiquity defies all description . . . treasure hunters . . . have recklessly and ruthlessly disturbed the abodes of the dead."). While these practices are now largely unlawful and are considered unethical, they continue to occur with alarming frequency. *See, e.g*., Kathleen Sharp, *An Exclusive Look at the Greatest Haul of Native American Artifacts, Ever*, Smithsonian.com (Nov. 2015), https://www.smithsonianmag.com/history/exclusive-greatest-haul-native-american-artifacts-looted-180956959/; Compl. ¶¶ 181-82. The widespread looting in BENM has resulted in several highly publicized trials and numerous convictions. *See e.g.*, Kyle Swenson, *Pilfered artifacts, three suicides, and the struggle over federal land in Utah*, Washington Post (Dec. 5, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2017/12/05/pilfered-artifacts-three-suicides-and-the-struggle-over-federal-land-in-utah/?utm_term=.4802df77c4f6. Most recently this included a two-and-a-half-years long Federal Bureau of Investigation sting operation that resulted in federal charges being brought against almost two dozen individuals, many of whom were Blanding, Utah residents, in 2009. *Id.* The ongoing, rampant theft of the Tribes' cultural and historic patrimony from Bears Ears helped prompt the most recent movement to protect the region, which began in 2010.

## II.    The Movement to Create the Bears Ears National Monument

Tribal leaders, members of Congress, Secretaries of the Interior and state leaders have attempted to protect Bears Ears for the last 80 years. Presidential Memorandum at 2; Obama

Proclamation at 7. In 2015, the Tribes came together and formed the Bears Ears Inter-Tribal Coalition. The Coalition was a partnership among the Tribes and was charged with presenting a proposal for protecting the Bears Ears landscape to President Obama as an exercise of the special government-to-government relationship between federally recognized tribes and the United States. Compl. ¶ 67-72. Based on an extensive record of pre-historic, historic, and modern uses, the Tribes identified boundaries for a proposed 1.9 million-acre national monument to protect the Bears Ears cultural landscape for all people, for all time. The proposal explained in detail how the new national monument could be managed through a collaborative management regime wherein tribal representatives could work closely with representatives of the Forest Service and Bureau of Land Management to develop a management plan that would preserve the unique cultural, historical, and spiritual value of the Monument to the Tribes for the benefit of the public. Bears Ears Proposal at 21-33; Compl. ¶ 70. Even though the Antiquities Act was inspired over a century ago by a strong intent to preserve tribal archaeological treasures, this marked the first moment in history when tribes themselves proposed to a president the creation of a national monument to protect their antiquities.

Although the Antiquities Act does not require any level of public outreach, President Obama, like his recent predecessors, insisted on an open process that stretched beyond two years. Compl. ¶ 116-19. The President and administration officials met often with the Tribes, Utah Congressional Delegation members, the Governor and other Utah state representatives, conservation groups, and members of the public. *Id*. In July of 2016, Interior Secretary Sally Jewell travelled to Utah to meet with stakeholders and conducted a four-hour public hearing in Bluff, which was attended by almost 2,000 people. Amy Joi O'Donoghue, *Monumental decision: All eyes look to Jewell on divisive Bears Ears issue*, Deseret News (July 16, 2016),

https://www.deseretnews.com/article/865658216/Monumental-decision-All-eyes-look-to-Jewell-on-divisive-Bears-Ears-issue.html.

### III.    Establishment of the Bears Ears National Monument

On December 28, 2016, President Obama signed a Proclamation establishing the Bears Ears National Monument encompassing 1.35 million acres of public lands in the Bears Ears region. *See* section I., *supra*; Compl. ¶¶ 120-40. The Obama Proclamation catalogued the extensive unique and invaluable historic and scientific objects to be protected. In taking this action, the Administration relied upon an enormous array of evidence ranging from 300 million year-old paleontological remnants to modern day uses by the Tribes. These sources, numbering almost 250, are provided in the detailed bibliography attached to the Presidential Memorandum. Presidential Memorandum at 20. In a profound passage, the Obama Proclamation recognized that "traditional ecological knowledge amassed by the Native Americans whose ancestors inhabited this region, passed down from generation to generation, offers critical insight into the historic and scientific significance of the area. Such knowledge is, itself, a resource to be protected and used in understanding and managing this landscape sustainably for generations to come." Obama Proclamation at 1140.

Notably, the Obama Proclamation did not entirely adopt the Tribes' proposal, as it only encompassed 1.35 million acres, rather than the 1.9 million acres the Tribes sought based on the record they had compiled. Compl. ¶¶ 69-71. However, the Obama Proclamation did establish a robust federal-tribal system of collaborative management for the new Monument, which would ensure the proper care and management of the "objects" to be protected through use of indigenous knowledge. This management model was to be facilitated by a five-member Bears Ears Commission ("Commission") created by President Obama in the Proclamation. The Commission

9

was to have representatives appointed by each of the five Tribes, and was to work closely with the Bureau of Land Management and Forest Service in managing the monument. Among other provisions on collaborative management, the federal agencies were directed "to *ensure* that management decisions affecting the monument reflect tribal expertise and traditional and historical knowledge." Obama Proclamation at 1144 (emphasis supplied). The Tribes were to have a meaningful government-to-government role in how the monument would be managed.

## IV.    Revocation of the Bears Ears National Monument

On April 26, 2017, President Trump issued an executive order, "Review of Designations under the Antiquities Act." Exec. Order No. 13,792, 82 Fed. Reg. 20,429 (May 1, 2017). The order directed new Interior Secretary Ryan Zinke to review all monuments larger than 100,000 acres proclaimed since January 1, 1996—27 monuments in all—and make recommendations based on compliance with the Antiquities Act and other factors not mentioned in the Act. Compl. ¶ 145. Secretary Zinke's 20-page final report was notably brief and superficial and put forth no specific recommendations.[2] Memorandum for the President from Ryan Zinke, Sec'y of Interior, on Final Report Summarizing Findings of the Review of Designations Under the Antiquities Act (Dec. 5, 2017), https://www.doi.gov/sites/doi.gov/files/uploads/revised_final_report.pdf, ("Zinke Memorandum").

On December 5, 2017 President Trump issued a proclamation ("Trump Proclamation") purporting to revoke the Bears Ears National Monument and replace it with two new units ("Trump

---

[2] After nine pages of formalities and background information, the remaining eleven pages were dedicated to the impossible task of making recommendations on no fewer than 10 monuments. The report included just one page on Bears Ears, recommending only that "the boundary should be revised." Zinke Memorandum at 10-11.

Units") that included only 15 percent of the original designation. Proclamation No. 9681, 82 Fed. Reg. 58081, 58085 (Dec. 4, 2017); Compl. ¶ 148. It was the largest rollback, whether by a President or Congress, of federally protected lands in United States history. The Trump Proclamation provided almost no justification for removing Antiquities Act protections from 1.1 million acres of public lands and tens of thousands of historical objects. Instead it stated in conclusory fashion that "[s]ome of the objects [the Obama Proclamation] identifies are not unique to the monument and some of the particular examples of these areas within the monument are not of scientific or historic interest."[3] Trump Proclamation at 58081. This is false. Compl. ¶¶ 150-52. It is also pretext for the real reason for the rollback, which was to pave the way for extractive development. *See, e.g.*, Hiroko Tabuchi, *Uranium Miners Pushed Hard for a Comeback. They Got Their Wish*, New York Times (Jan. 13, 2018), https://www.nytimes.com/2018/01/13/climate/trump-uranium-bears-ears.html (describing how a uranium producer accompanied Secretary Zinke on his trip to Bears Ears before the boundaries were set and then sent a letter to the Administration two weeks later noting that the land could produce valuable uranium and mineral resources in the future).

### STANDARD OF REVIEW

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Except for allegations of fraud or mistake, Fed. R. Civ. P. 9(b), "detailed factual allegations" for a claim to survive a motion to dismiss are not required. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[3] The proclamation also asserted that the omitted lands did not need monument protection because protection was provided by other laws, not recognizing that federal land protection designations, including many monuments, often are overlays on existing land designations. Trump Proclamation at 58081. In addition, as described *infra* at I. B., monument protection is different and stronger than that provided by other laws.

(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). All the well-pleaded factual allegations of the complaint are accepted as true and the court draws "all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128–29 (D.C. Cir. 2015) (citation omitted). Thus, to survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to state a *plausible* claim that each of the standing elements is present and that the Plaintiffs are entitled to relief. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it is not a "probability requirement." *Banneker Ventures*, 798 F.3d at 1128 (quoting *Twombly,* 550 U.S. at 556).

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016). Thus, the Tribes may rely on "mere allegations" rather than "specific facts" to establish standing at the motion to dismiss stage. *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 340 (D.C. Cir. 2018). Further, under Rule 12(b)(1), the court is not limited to the allegations of the complaint, and a court may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case. *Smith v. United States*, 237 F. Supp. 3d 8, 11 (D.D.C. 2017) (citations omitted).

## ARGUMENT

## I.    The Tribes have Article III Standing.

It should be self-evident that the Tribes have standing to challenge President Trump's unlawful decision to remove protections afforded by the Antiquities Act pursuant to the Obama Proclamation. These protections, granted at the Tribes' request, affect their sacred ancestral lands and a myriad of enumerated objects of significance to the Tribes' histories and cultures. "Indian nations have substantial interests in access to and control of their cultural resources." Cohen's Handbook of Federal Indian Law §20.01[1] (2012 ed.) (discussing, *inter alia*, tribal liberty and property interests in tribal cultural resources); *cf. Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident. . . .").[4] By unilaterally removing one million acres of lands and the tribal cultural objects they contain from Monument protections and abrogating the Tribes' rights to participate as sovereign governments in the collaborative management of all of the original Monument lands through the Bears Ears Commission, the Trump Proclamation causes concrete injuries to the Tribes and creates a substantial risk of future additional injuries. These injuries can be redressed by the Court declaring the Trump Proclamation unlawful and entering an injunction prohibiting the Departments of the Interior and Agriculture from implementing it. The Tribes have thus established the three requirements for constitutional standing: injury, causation, and redressability. *Lujan*, 504 U.S. at 560-61.

---

[4] While this case is not a petition for review filed directly in the court of appeals, the standing of the Tribes is manifest on the face of the relevant proclamations, supporting memoranda, other pleadings in this matter and documents incorporated therein, and materials of which a court may take judicial notice.

**A.    President Trump Injured the Tribes by Abrogating Their Right to Participate on a Government-to-Government Basis in the Management of All Lands Within the Original Monument Boundaries through the Bears Ears Commission.**

The Trump Proclamation abrogates the Tribes' right to engage, on a government-to-government basis with the United States, in collaborative management of all of the lands within the original boundaries of the Bears Ears National Monument. President Trump stripped the Bears Ears Commission of the vast majority of its purview and destroyed its character as a representative body of the Tribal governments. The Secretaries have implemented the Trump Proclamation and proceeded with developing monument management plans for the remnants of the Monument without "meaningfully engag[ing] the Commission, or should the Commission no longer exist, the tribal governments through some other entity composed of elected tribal government officers . . ., in the development of the management plan," as they were required to do pursuant to the Obama Proclamation. Obama Proclamation at 1144. This deprivation of rights conferred upon the Tribes is present, manifest, discrete, and certain, and it clearly demonstrates injury for purposes of standing.

"The United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive Orders, and court decisions." Exec. Order No. 13,175 § 2(a), 65 Fed. Reg. 67,249 (Nov. 9, 2000); *see also* Sec'y of the Interior Order No. 3342 § 2(b) (Oct. 21, 2016) (recognizing that the "Federal trust responsibility to tribes . . . is a well-established legal obligation that originates from the unique, historical relationship between the United States and tribes."). From this unique relationship

emanates the consultation doctrine.[5] "Consultation" in this context specifically denotes treating tribal governments *as governments*. The relationship between sovereign tribes and the United States is one that requires government-to-government engagement and "regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications." Presidential Memorandum on Tribal Consultation (Nov. 5, 2009); Exec. Order No. 13,175 §§ 1(a), 2(b). Numerous statutes, such as the National Historic Preservation Act and Native American Graves Protection and Repatriation Act, and almost every federal agency, have specific regulations and policies that direct how consultation is to occur. *E.g.*, 36 C.F.R. §800.2-6 (NHPA Regulations).  The Defendant Department of Interior has one of the strongest and most detailed tribal consultation policies. *See* U.S. Department of Interior, *Tribal Consultation Policy*, https://www.doi.gov/sites/doi.gov/files/migrated/cobell/upload/FINAL-Departmental-tribal-consultation-policy.pdf (last visited Nov. 15, 2018), and failure to follow these mandates can result in a regulation being struck down or a federal permit being withdrawn. *See, e.g., Pit River Tribe v. U.S. Forest Serv.,* 469 F.3d 768, 788 (9th Cir. 2006). Tribal consultation is not therefore satisfied

---

[5] "Indian tribes" are acknowledged three times in the U.S. Constitution. U.S. Const. art. I, § 2, cl. 3; U.S. Const. art. I, § 8 (the "Indian commerce clause" that treats tribes as separate from the federal government and states); U.S. Const. amend, XIV, § 2 (amending art. I, § 2). These specific provisions in the Constitution grant the federal government the power to make treaties and engage in commerce with tribes as foreign governments, and recognize the pre-existing sovereignty of the tribes. Congress dealt with tribes in their sovereign capacity as they would foreign governments. Today, the United States government still deals with tribes as sovereigns through a government-to-government relationship and presidents still issue orders directing all executive agencies to consult with tribes on a government-to-government basis. *E.g.*, Exec. Order No. 13,175.  For a more complete history of the legal origins of the federal-tribal relationship and how it evolved into the consultation duty, *see* Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 U. Mich. J.L. Reform 417 (2013); Robert J. Miller, *Consultation or Consent: The United States' Duty to Confer with American Indian Governments*, 91 N.D.L. Rev. 37 (2015).

by a public meeting to which tribes are also invited; it is an enforceable right to a role in decision-making.

To strengthen this government-to-government relationship, President Obama established the Bears Ears Commission to enable the Tribes to draw upon their "tribal expertise and traditional and historic knowledge" to collaboratively manage their sacred ancestral lands at Bears Ears and their cultural, historical, and spiritual patrimony that exist upon those lands. Obama Proclamation at 1144. After the Tribes' years of unprecedented cooperation and advocacy to protect the Bears Ears region as a national monument, the establishment of the Commission in the Obama Proclamation represented a commitment made by the federal government to the Tribes that they would be able to engage directly *with the United States*, in a collaborative manner, in ensuring proper protection of their collective patrimony. Compl. ¶ 139; *id.* ¶¶ 55-72. The Commission consisted *only* of the federally recognized Tribes and their peer federal agencies. The Obama Proclamation exemplified the very essence of this government-to-government relationship, in which the two sovereigns share one table to manage together.

President Trump first repudiated that promise when he purported to "exclude . . . 1,150,860 acres of land" from the Monument and then further sought to limit the Commission's purview to just one of the two greatly reduced remnant Trump Units (Shash Jáa). So while the Trump Proclamation reduced the Monument by 85 percent, it also removed more than 90 percent of Monument lands from the Commission's scope of influence in the collaborative management regime, and removed 100 percent of the Commission's ability to ensure cohesive and meaningful protection of all objects located on lands removed from the Monument. This alone constitutes enormous harm.

President Trump caused an additional independent harm to the Tribes' management interests by designating a San Juan County official as a member of the Commission. Trump Proclamation at 58085-86. This added a sixth seat to what was formerly a purely tribal Commission. This undermines the entire legal underpinning of government-to-government relationship because local governments do not have a relationship on par with that of federally recognized tribes. By adding the San Juan County Commissioner to the Tribal Commission, the Trump Proclamation undermined the government-to-government relationship the Tribes enjoy with the federal government and impaired the Tribes' right to collaboratively manage the lands within the original Monument boundaries. Not to mention, this change in the composition of the Commission poisoned the collaborative environment by bringing a fierce Monument opponent to the planning table. This injury to tribal sovereignty suffices for purposes of standing, *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1230 (11th Cir. 2000), in part because the Tribes, like states, are owed "special solicitude" in analyzing standing. *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (quoting *Massachusetts v. EPA,* 549 U.S. 497, 520 (2007)).

   **B.    President Trump's Action Endangers Sacred Lands and Objects of Cultural and Historic Importance to the Tribes.**

Through the Obama Proclamation, the United States identifies in detail the Tribes' interests at stake in this litigation, explaining that the Bears Ears region "is profoundly sacred to" the five Tribes who filed this lawsuit. Obama Proclamation at 1139; Presidential Memorandum at 2; *see also* Trump Proclamation at 58083; Compl. ¶ 74. The Obama Proclamation further describes the region as an area dense with migration routes, great houses, villages, granaries, hogans, wikiups, sweat lodges, corrals, tipi rings, shade houses, kivas, rock paintings, petroglyphs, cliff dwellings, and other footprints of the Tribes' ancestors, both ancient and recent. Obama Proclamation at 1140;

*see also* Compl. ¶ 75. Because of this connection, the Proclamation acknowledges that "the area's cultural importance to Native American tribes continues to this day." Obama Proclamation at 1140. The Trump Proclamation creates "a substantial risk that harm will occur" to these historic, cultural, and spiritual resources of the Tribes from which Monument protections have been lifted, and that is all that is necessary for the Tribes to establish standing. *Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334, 2341 (2014).[6]

Although President Trump claimed he disagreed with some parts of the Obama Proclamation, he did not dispute the tribal interests that President Obama recognized in his Proclamation. Those identified interests remain vested because the Tribes and their members continue to use Bears Ears "for ceremonies, for collection of medicinal and ceremonial plants, and for visitation of sacred sites" as well as to carry forward longstanding traditions of hunting, fishing, gathering and wood cutting. Presidential Memorandum at 8; *see also* Compl. ¶ 80.

Federal law recognizes that tribes have an interest in preserving their cultural practices, beliefs, ways of life, and cultural and historic patrimony. *See, e.g.* 25 U.S.C. § 3001 (codifying tribal ownership of items of cultural patrimony);[7] 16 U.S.C. § 470cc(c) (requiring notice to tribes

---

[6] Defendants rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), to insist that Plaintiffs must demonstrate that their injuries are "certainly impending." Defs.' Br. at 15. The D.C. Circuit has, however, held that the Supreme Court's subsequent decision in *Susan B. Anthony List* "clarified that a plaintiff can establish standing by satisfying *either* the 'certainty impending' test *or* the 'substantial risk' test." *Attias*, 865 F.3d at 626-27(quoting *Susan B. Anthony List*, 134 S. Ct. at 2341).

[7] 25 U.S.C. § 3001 is a provision of the Native American Graves Protection and Repatriation Act. That Act distinguishes between interests of individual tribal members and the interests of the Tribe as a sovereign government. In general, where human remains and associated funerary objects can be traced to lineal descendants, those individuals have the primary interest, but for older objects or others that cannot be traced to a lineal descendant, the Tribe has the primary interests. 25 U.S.C. § 3002(a).

18

for applications for permits for activities that "may result in harm to, or destruction of, any religious or cultural site" which the Tribe "may consider" to be of religious or cultural importance); 25 U.S.C. § 2901 (congressional finding that the United States has the responsibility to work with tribes to ensure the survival of tribal cultures); 16 U.S.C. § 668a (recognizing that tribes have their own interests in the religious practices of their people, and authorizing tribes, in certain circumstances, to engage in the taking of bald and golden eagles); 54 U.S.C § 302706(b) (congressionally recognizing that tribes possess important interests in protecting historic properties of religious and cultural importance, and requiring federal agencies to consult with tribes as sovereign governments before undertaking actions that may affect those properties); *see also* Cohen's Handbook of Federal Indian Law §1.05 (discussing how the Indian Reorganization Act shifted federal policy from one seeking to destroy tribal cultures to one seeking to preserve them); *e.g.*, Ute Const., art. IV, §1(q) (under the Indian Reorganization Act, the United States approved the Ute Tribe's constitutional provision providing that the Tribe, through its governing body, has the duty to preserve the Tribe's "culture and Indian Ceremonials.").

Consistent with the numerous federal laws that recognize tribal interests in tribal cultural patrimony, courts have routinely exercised jurisdiction in cases brought to vindicate those interests. *E.g.*, *Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) (National Historic Preservation Act ("NHPA") claim); *Pit River Tribe*, 469 F.3d at 789 (NEPA claim, holding that the Tribe "adequately demonstrated an injury in fact" based on threatened harm to lands the Tribe used "for cultural and religious ceremonies 'for countless generations.'"). The same principle applies here: the Tribes have their own standing based on the injuries to their collective cultural and religious practices as described in the complaint. *See* section I, *supra.* Courts have recognized that tribes possess concrete and particularized interests in protecting the sacred lands and cultural

patrimony of their people and in protecting the ability of their tribal members to continue to engage in cultural practices. *Havasupai Tribe v. Provencio,* No. 15-15754, 2018 WL 5289028, at *4, n.3 (9th Cir. Oct. 25, 2018) (Tribe had standing because "[c]ontinued uranium mining . . . causes concrete injury to the Tribe's religious and cultural interests"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 60 (D.D.C. 2018) (Tribe had standing because of members' "use of the areas" affected by agency's decision for traditional and religious purposes). In other words, the Tribes themselves have standing based on their own particularized cultural and spiritual interests.

As the brief filed by NRDC explains, the Trump Proclamation creates, at the very least, a "substantial risk" of more extensive mining activities, oil and gas leasing, and motorized vehicle use that threatens harm to lands and resources removed from the Bears Ears National Monument. In order to avoid duplicative briefing as directed by the Court in its order on consolidation of these cases, the Tribes incorporate by reference Section I. A., pages 4-13, of the brief filed by the Natural Resources Defense Council (NRDC), under Case No. 17-cv-2606. The fact that Defendants now admit that such activity is occurring only confirms that the Tribes' fears were well-founded. Defendants' arguments specifically with respect to archaeological and paleontological resources are equally unavailing. Defendants make a half-hearted assertion that existing statutes already protect these resources. Defs.' Br. at 19. However, this is unconvincing because these statutes do not protect against damage caused by mining claims or other notice-level mining activities, or any other resource extraction-based activity. In fact, the Archaeological Resources Protection Act ("ARPA") has a savings clause specifically allowing mining activities. 16 U.S.C. §470kk(a). Moreover, ARPA even allows "casual collecting" – the very thing the Tribes want to avoid. 16 U.S.C. §470kk(b).Whether a looter destroys, keeps for his or her own use, or sells these precious

items makes no difference; the irreparable damage is done. Moreover, as described in Section I. A(3), on page 19 of the brief filed by UDB in Case No. 17-cv-2605 and incorporated here by reference, these statutes have already proven ineffective at deterring this conduct.  In contrast, when the objects were under the protection of a national monument, the lands were to be *managed specifically for the protection* of these objects. Compl. ¶70.

### C.    The Tribe's Injuries are Traceable to the Defendants' Conduct, and Redressable by this Court.

President Trump, through issuance of his Proclamation, directly caused current injury to the Tribes by impairing their right as sovereigns to engage with the federal government on a government-to-government basis, by diminishing the Commission's role in collaboratively developing a cohesive management plan for the Monument that would adequately protect the Tribes' interests in their historical, cultural, and spiritual patrimony in Bears Ears, and by creating a "substantial risk" of injury to the Tribes' interests in those lands and that patrimony. The Trump Proclamation is, therefore, the cause of these many injuries for purposes of standing. *Lujan*, 504 U.S. at 590 (injury must be "fairly traceable to the defendant's allegedly unlawful conduct"). The Secretaries are also causally connected to those injuries because they are charged with implementing the Trump Proclamation and have already begun to develop monument management plans for the greatly reduced Trump Units without engaging the originally comprised Commission. 83 Fed. Reg. 41, 111 (Aug. 17, 2018) (Notice of Availability of the Draft Bears Ears Nat'l Monument Management Plan and Associated Impact Statement). The Court can redress the Tribes' injuries through a favorable decision by declaring the Trump Proclamation unlawful and enjoining its implementation, thereby reaffirming the original boundaries of the Bears Ears National Monument and the makeup and purview of the Commission. Federal courts (including the Supreme Court) have adjudicated numerous claims under the Antiquities Act and never once

21

dismissed for lack of jurisdiction on redressability grounds. *E.g.*, *United States v. California*, 436 U.S. 32 (1978); *Cappaert v. United States*, 426 U.S. 128 (1976); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir 2002); *Tulare Cty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002); *Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094 (10th Cir. 2006); *Mass. Lobstermen's Ass'n v. Ross*, No. 17-406, 2018 WL 4853901 (D.D.C. Oct. 5, 2018). In order to avoid duplication of arguments on this point, the Tribes further incorporate by reference Section I. B., pages 20-21, of the brief filed by UDB in Case No. 17-cv-2605.

## II.    Plaintiffs' Claims Are Ripe.

As the Defendants acknowledge, so long as the Tribes have met the injury requirement of constitutional standing—which they have—then their claims satisfy the constitutional dimensions of ripeness. Defs.' Br. at 24 (citing *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922 (D.C. Cir. 2013)). In order to avoid duplication of arguments on this issue, the Tribes incorporate by reference Section I. C., pages 21-24, of the brief filed by UDB in Case No. 17-cv-2605.

As described, the Trump Proclamation caused immediate injury to the Tribes' sovereign interests and threatens imminent injury to their interests in the lands and resources in the Bears Ears area. These injuries require no further action on the part of the federal government, and therefore distinguish this case from the one presented in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998). In *Ohio Forestry*, plaintiffs challenged forest plans that had *no immediate effect* whatsoever: "they do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Id.* at 733. The Trump Proclamation, on the other hand, immediately opened the affected lands to prospecting for hard rock minerals *without any federal oversight.*

Equally as important, it specifically deprived the Tribes of the vested right to participate in the collaborative management of the entire Monument and its objects. The Bears Ears Commission was so unique because it created a requirement that agencies would follow its management recommendations unless they could justify their departures in writing. This represented a different, more elevated role that -- while based on the unique, historical relationship between the United States and the Tribes -- was more than that. It represented a profound step forward and its loss certainly renders the Tribes' claims ripe for resolution.

III.    **The Tribes Have Stated a Claim that the President Violated the Antiquities Act.**

The Court should not dismiss the Tribes' Antiquities Act claim because the President both lacks authority to revoke the monument status of *objects* designated for protection—the Defendants do not argue to the contrary in their motion—and to remove *lands* from the monument.

A.    **The Defendants Fail to Argue that the President has Authority to Revoke the Monument Status of Objects Designated as Part of the Bears Ears National Monument.**

The Tribes allege that the Trump Proclamation violates the Antiquities Act because it "reduces the public lands reserved as part of the Monument" and "revokes the national monument protection of numerous objects declared a national monument in the [Obama] Proclamation," Compl. ¶ 199. Defendants assert only that "the President possesses broad power . . . to modify reservations of *land* for national monuments." Defs.' Br. at 26 (emphasis added). While it stretched credulity to describe stripping 85 percent of the land from a monument as a mere boundary modification, the Defendants have entirely failed to address the second aspect of the Tribes' claim – that the President lacked authority to revoke monument protection of the numerous *objects* declared to be a monument. This is reason enough for the Court to deny the motion to dismiss, because "a complaint should not be dismissed unless the court determines that the allegations do

23

not support relief on any legal theory." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1078 (D.C. Cir. 1984); *cf. Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (holding that dismissal is inappropriate where a complaint includes an "imperfect statement of the legal theory supporting the claim asserted.").

> **B.**    **The Antiquities Act Does Not Delegate Authority to President Trump to Revoke the Monument Status of Objects Designated as Part of the Bears Ears National Monument or to Remove Virtually All of the Lands Reserved as Part of It.**

The Antiquities Act is the sole source of authority invoked by the Defendants as the basis for the Trump Proclamation, Federal Defendant's Brief at 41; Trump Proclamation at 58085, and therefore the only issue here is one of "statutory interpretation." *Dalton v. Specter*, 511 U.S. 462, 474, n.6 (1994). But the text of the Act, its purpose and history, the contrast between it and other contemporaneous public lands statutes, and subsequent indications of Congress's understanding of Presidential authority all demonstrate that President Trump does not possess the authority he claims. *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) (analyzing traditional tools of statutory construction); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (same); *see also Dames & Moore v. Regan*, 453 U.S. 654, 671-674 (1981) (analyzing statutory text, legislative history, and purpose to determine whether President had statutory authority for action). The President also has not acquired additional statutory authority under the doctrine of acquiescence. Thus, the Court should deny the motion to dismiss the Tribes' Antiquities Act claim.

> **1.**    **The text of the Antiquities Act does not authorize the President's action.**

The Antiquities Act vests two explicit and limited powers in the President. These powers do not encompass the powers President Trump claims. In fact, Defendants have turned the law on its head, relying on cases that *upheld* designations of national monuments to instead support the President's *destruction* of Bears Ears. For the President to say that he has declared a national

monument by revoking it, or reserved lands by removing the vast majority of lands from a monument, "is to utter a *non sequitur* or an oxymoron, like a dirty, clean handkerchief." *Greater Yellowstone Coalition v. Bosworth*, 209 F. Supp. 2d 156, 161 (D.D.C. 2002) (rejecting agency's interpretation of the verb "adhere" to include "modify" and "amend" because they "are antonyms"). That is, Defendants improperly rely solely on cases that examined a President's discretion to establish monuments when the reality is that there is *no caselaw* to support what the President has done to Bears Ears. In order to avoid duplication of this argument as directed by this Court's order on consolidation, the Tribes incorporate by reference Section II, pages 24-28, of the brief filed by UDB in Case No. 17-cv-2605.

### 2.    The President's claimed powers contravene the protective purposes of the Antiquities Act.

The purpose of the Antiquities Act, as demonstrated by its structure and history, reinforces that Congress did not intend for Presidents to revoke monuments and restore their lands to the public domain. From beginning to end, the Act aims to *protect* objects of historic and scientific interest, and "[t]he words of the statute should be read in context, the statute's place in the 'overall statutory scheme' should be considered, and the problem Congress sought to solve should be taken into account." *PDK Labs. Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 796 (D.C. Cir. 2004) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Congress designed the Antiquities Act to protect historic and scientific resources from potentially irreversible and swift harm. The imminence of threats to those resources from looting, mining, and other uses of federal lands, Congress concluded, required equally swift action ill-suited to the deliberative legislative process, and so it delegated only the power to protect to the President. Carol Hardy Vincent, Congressional Research Service, *National Monuments and the Antiquities Act* 2 (2016), https://fas.org/sgp/crs/misc/R41330.pdf ("The Antiquities Act was a

response to concerns over theft from and destruction of archaeological sites and was designed to provide an expeditious means to protect federal lands and resources."); *see also* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 553-54 (2003) ("The impetus to pass the law came from the concern that spectacular public land resources might be harmed before Congress could act to protect them."); Kelly Y. Fanizzo, *Separation of Powers and Federal Land Management: Enforcing the Direction of the President Under the Antiquities Act*, 40 Envtl. L. 765, 781 (2010) ("It was clear that the protection to be offered to American antiquities must be expeditious.") (quotation marks omitted)).

Congress infused each of the Act's original four sections with its protective purpose: Section 1 made it a federal crime to "appropriate, excavate, injure, or destroy any historic or prehistoric ruin or monument, or any object of antiquity" on federal land. 34 Stat. 225 § 1, *codified at* 18 U.S.C. § 1866(b). Section 2 authorized the President to unilaterally designate objects of historic and scientific interest as a national monument and reserve lands for protection of those objects without any process other than the issuance of a public proclamation, and it also authorized the Secretary of the Interior to accept private lands needed to protect designated objects if relinquished by their owners. 34 Stat. 225 § 2, *codified at* 54 U.S.C. § 320301(a); 54 U.S.C. §§ 320301(a)-(b). Section 3 created a permitting regime for the study and excavation of "ruins," "archeological sites" and "objects of antiquities" on federal land, ensuring that the study of these resources would not endanger them. 34 Stat. 225 § 3, *codified at* 54 U.S.C. § 320302. Finally, section 4 authorized the Secretary of the Interior to promulgate regulations to effectuate the Act's

purposes. 34 Stat. 225 § 4, *codified at* 54 U.S.C. § 320303.[8] These provisions created a sensible solution to the problem with which Congress was concerned: rapid and emerging threats require a rapid response. Congress reserved for itself the decision of whether a monument ought to be revoked or modified based on the virtually limitless other considerations that could counterbalance the public's interest in protecting historic and scientific resources, and as will be discussed, Congress has demonstrated its competency to carry out that task.

The history leading up to the enactment confirms this understanding of the Antiquities Act. In the late 1880s settlers in the Southwestern United States discovered evidence of Native American habitation dating back millennia, and news soon spread of rampant looting of artifacts from these sites. Lee, *supra* at 47.[9] These events led to public outcry and between 1900 and 1906 legislation was introduced to protect scientific and historic resources on public lands. *E.g.*, H.R.

---

[8] In their brief supporting the motion to dismiss, Defendant-Intervenors argue that "several provisions of the [Antiquities] Act show that Congress expected monuments to be updated" because as originally enacted, the Secretaries charged with overseeing established monuments were vested with authority to "make and publish from time to time uniform rules and regulations for the purpose of carrying out the provisions of this act." Intervenors' Br. at 8, 10. That language was excluded when the Antiquities Act was recodified, 54 U.S.C. § 320303, but that itself does not affect the Intervenors' argument, because Congress did not intend the recodification to have substantive effect. What Intervenors overlook, however, is that Congress' decision to suggest that regulations implementing the Antiquities Act could be updated "from time to time" only underscores the absence of any such similar language in the provisions authorizing the President to establish monuments.

[9] Ronald Lee served as Special Assistant to the National Park Service Director when he prepared this report to "fill a gap in knowledge of one of the foundation stones of the National Park System" as part of a "series devoted to the evolution of Federal participation in historic preservation in the United States." Lee*, supra* at I-II.

11021, 56th Cong. (1900).[10] [11]Congress considered, but declined to enact, legislation authorizing temporary, rather than permanent, reservations to protect antiquities. *E.g.*, Amendment to S. 5603 § 2, 58th Cong. (Apr. 26, 1904) (Rep. Teller proposed, but Congress did not approve, an amendment which would have provided "[T]he Secretary of the Interior may make temporary withdrawals of the land on which prehistoric ruins, monuments, archaeological objects, and other antiquities are located, including only the land necessary for such preservation and not exceeding in one place one section of land."). In 1906, Congressman John Lacey, the chairman of the House Public Lands Committee, introduced the bill that would become the Antiquities Act eschewing this temporary approach in favor of permanent protection. H.R. 11016, 59th Cong. (1906); Lee, *supra*, at 71. *See* General Land Office (GLO), Report of the Commissioner of the General Land Office to the Secretary of the Interior For the Year Ended June 30, 1906 47–48 (indicating that passage of the Antiquities Act fulfilled GLO's prior request for permanent protection legislation); General Land Office, Report of the Commissioner of the General Land Office to the Secretary of the Interior For the Fiscal Year Ended June 30, 1908 at 19–20 ("All of the national monuments are worthy, in the broadest sense, of that fostering care of the Government necessary to preserve them intact for the benefit and enjoyment of the people for all time.").

---

[10] H.R. 11021 would have authorized the President to reserve public lands for a range of purposes, including to protect "scenic beauty, natural wonders or curiosities, ancient ruins or relics, or other objects of scientific or historic interest, or springs of medicinal or other properties." H.R. 11021 § 1, 56th Cong. (1900). For this and other legislative predecessors to the Antiquities Act, *see* Department of the Interior, *History of Legislation Relating to The National Park System Through the 82d Congress* (Compiled by Edmund B. Rodgers, 1964).

[11] All Congressional materials not available on Westlaw are being contemporaneously herewith in a Plaintiffs' Joint Appendix.

While Congress intended the Antiquities Act to protect America's legacy, President Trump has invoked it for the opposite purpose, revoking protections for over 1.1 million acres of public land and tens of thousands of historic and scientific objects of national importance. Nothing could more starkly conflict with Congress's intention. For example, the Trump Proclamation excludes archeological and historic sites that evidence human habitation and activity over the millennia and areas that remain "closely tied to native stories of creation, danger, protection and healing," including the Valley of the Gods and Hideout Canyon. *Compare* 82 Fed. Reg. at 58,084 *with* 82 Fed. Reg. 1139; Compl. ¶¶ 149-196. The implications of the Trump Proclamation sweep more broadly still, because the President has claimed an unlimited, unilateral power to revoke national monuments and restore their lands to the public domain for any reason, or no reason at all. Such a power would upend the permanent protection envisioned by Congress and, if left unchecked by the Court, render all national monuments subject to the impulse of every new President.

3.    **In contrast to the Antiquities Act, other contemporaneous public lands statutes expressly authorized the President to revoke and modify reservations and withdrawals.**

Unlike the Antiquities Act, other public lands statutes from the same period expressly provided the Executive Branch with authority to revoke or modify withdrawals and reservations

of federal land.[12] Because "Congress did not enact" the Antiquities Act "in a vacuum," *Kokoska v. Belford*, 417 U.S. 642, 650 (1974), its "silence . . . becomes more eloquent" in contrast to the alternative approach taken elsewhere. *United States v. Vermont*, 317 F.2d 446, 449-450 (2d Cir. 1963) (quoting Friendly, J.). These other statutes demonstrate that when Congress wanted to authorize the President or other Executive Branch officials to restore lands to the public domain, it "did so in explicit terms." *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 877 (1999); *see W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99 (1991) (holding that "attorney's fees" did not include expert fees because "contemporaneous statutes" explicitly included both).

The Forest Service Organic Act of 1897 has particular significance because it arose from congressional deliberation over whether a law enabling the President to reserve public lands also vested him with the implied power to restore lands to the public domain, and because both it and the Antiquities Act were sponsored by Congressman John Lacey, the chairman of the House Committee on Public Lands.[13] *See Great N. Ry. Co. v. United States*, 315 U.S. 262, 274 (1942) (considering statements sponsor of legislation made about legislation on similar topic); *United States v. Otherson*, 637 F.2d 1276, 1279 n. 2 (9th Cir. 1981) (contrasting related bills "proposed

---

[12] Reservations and withdrawals are similar, but somewhat distinct, mechanisms to protect public lands by removing them from the public domain, and the terms are sometimes used interchangeably. For example, Congress authorized the President to "set apart and reserve . . . public land bearing forests" as national forests, General Revision Act of 1891 § 24, 26 Stat. 1103 (1891) (repealed by Pub. L. 94-579 § 704(a) (1976)), yet the Supreme Court described these lands as "withdrawn as a 'Government reservation.'" *United States v. N. Pac. Ry. Co.*, 311 U.S. 317, 354 (1940). Where the two terms are distinguished, "[a] withdrawal makes land unavailable for certain kinds of private appropriation under the public land laws. . . . A reservation, on the other hand, goes a step further: it not only withdraws the land from the operation of the public land laws, but also dedicates the land to a particular public use." *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 784 (10th Cir. 2005).

[13] Congress enacted the Forest Service Organic Act as part of the Sundry Civil Appropriations Act of 1897. 30 Stat. 11-61 (1897).

by same senator"); *United States v. Dupris*, 612 F.2d 319, 326 (8th Cir. 1979), *vacated as moot* 446 U.S. 980 (1980) (comparing bills on similar subject "sponsored by essentially the same Congressmen").

Prior to 1897, the General Revision Act of 1891 authorized the President, by "public proclamation," to reserve "public lands wholly or in part covered with timber or undergrowth," but was silent about restoration of lands to the public domain. General Revision Act of 1891 § 24. Exercising that authority, President Grover Cleveland reserved 21 million acres of national forests in 1897. Gerald W. William, *The USDA Forest Service – The First Century* (2005), https://www.fs.fed.us/sites/default/files/media/2015/06/The_USDA_Forest_Service_TheFirstCe ntury.pdf. This action caused significant concern and opposition in Congress, particularly because the President's proclamation was based on factual errors about the character and extent of development within the areas reserved. *E.g.*, 30 Cong. Rec. 1284 (May 27, 1897) (statement of Sen. Pettigrew) (explaining that the new national forests included areas "where there are no forests, but where there are cities and towns and railroads and mills and mines and farms"). The President acknowledged his mistake, and "President Cleveland conceded that if he had the power to modify these forest reservations he would do so; but he contended the law gave him no such power, and that consequently he could not modify them." 30 Cong. Rec. 982 (May 10, 1897) (statement of Sen. Shafroth); *see also* 30 Cong. Rec. 914 (May 6, 1987) (statement of Sen Gray) (noting President Cleveland's view that he lacked authority). Representative Lacey and other members of Congress shared the view that the President's authority to reserve national forests did not include a correlative power to revoke or modify them. *E.g.*, 29 Cong. Rec. 2677 (Mar. 2, 1897) (statement of Rep. Lacey) ("The Act of 1890 gave [the President] the power to create a reserve, but no power to restrict it or annul it. . . ."); *id.* at 2679 (statement of Rep. Cannon) (describing bill as making it

"possible for the President of the United States to repeal . . . or to modify" President Cleveland's forest reserve proclamation); 30 Cong. Rec. 911 (May 6, 1897) (statement of Sen. Allison) (describing as "rightfully claimed" and "correct" the view the President could not modify reserves); *id.*at 916 (statement of Sen. Gray) ("I am willing now to put into the power of the President an order that will modify . . . those orders issued by President Cleveland. . . .").

Congress enacted the Forest Service Organic Act to "remove any doubt which may exist pertaining to the authority of the President thereunto, the President of the United States is hereby authorized and empowered to revoke, modify, or suspend any and all [] Executive orders and proclamations [reserving national forests], or any part thereof, from time to time as he shall deem best for the public interest." Forest Service Organic Act of 1897, ch. 2, 30 Stat. 34, 36 (1897) (codified as amended at 16 U.S.C. § 473).[14] This amendment demonstrates that the President did not previously possess the powers it provided. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.* 332 F.3d 654, 670 (D.C. Cir. 2003) (same).

Even if a few Members of Congress questioned the need for the Forest Service Organic Act in 1897, it belies logic that Congress would soon thereafter intend the Antiquities Act to silently authorize the President to revoke national monuments or restore their lands to the public domain without expressly saying so. More telling still, the very same member of Congress, Representative Lacey, introduced the first bill designed to protect antiquities (and also the bill that

---

[14] The current version of the United States Code omits the introductory clause included in the Forest Service Organic Act. 16 U.S.C. § 473.

became the Antiquities Act) only one year after enacting the Forest Service Organic Act. H.R. 11021, 56th Cong. (1st Sess. 1900). Over the next few years, Congress considered numerous bills of varying breadth to authorize reservation of public lands to protect scientific and historic resources, yet Congress did not include language addressing revocation of monuments or modification of reservations.[15]

During this same period, Congress enacted two other laws with the explicit provisions lacking in the Antiquities Act. The Reclamation Act of 1904 authorized the Secretary of the Interior to "withdraw . . . those lands required for any irrigation works contemplated under the provisions of this Act," and to "restore to public entry the lands so withdrawn when, in his judgment, such lands are not required." 32 Stat. 388, Ch. 1093 § 3 (1902). It also authorized the Secretary to "withdraw . . . any public lands believed to be susceptible of irrigation from said works," but to restore "said lands to entry" if the Secretary determined that an irrigation project was "impracticable or unadvisable." *Id.* Congress selected a different, but similarly explicit, approach in the Pickett Act of 1910, authorizing the President to "temporarily withdraw . . . public

---

[15] H.R. 13478 § 1, 58th Cong. (1904) (authorizing reservation of lands to protect historic, scientific, or scenic resources); H.R. 12447 § 1, 58th Cong. (1904) (authorizing reservation of lands "on which are located aboriginal monuments, ruins, or other antiquities"); S. 4127 § 1, 58th Cong. (1904) (same); H.R. 10451, 56th Cong. (1900) (authorizing reservations in certain states and territories of up to 320 acres to protect historic resources); H.R. 9245, 56th Cong. (1900) (authorizing reservations up to 320 acres to protect "ruins"); H.R. 8066 § 7, 56th Cong. (1900) (authorizing reservations to protect historic sites and "any natural formation of scientific or scenic value or interest"). Other proposals considered by Congress to protect historic or scientific resources did not authorize the reservation of public lands. *E.g.,* S. 5603, 58th Cong. (1904) (creating criminal penalties and permitting regime and requiring Secretary of the Interior to recommend to Congress public lands to be reserved to protect historical resources); H.R. 13349, 56th Cong. (1904) (same); H.R. 12141, 58th Cong. (1904) (creating criminal penalties and permitting regime); H.R. 14227, 56th Cong. (1901) (creating criminal penalties and permitting regime); H.R. 8195, 56th Cong. (1900) (creating criminal penalties).

lands . . . and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals" and providing that "such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." 36 Stat. 847 § 1 (1910).

Before, during, and after enactment of the Antiquities Act, Congress explicitly delegated the power to revoke or modify reservations of public lands in other public lands statutes, but it did not do so in the Antiquities Act. Therefore, Congress's silence as to that power with respect to national monuments cannot be viewed as inadvertence. *Cf. Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 729 (1989) (explaining that it was "quite inconceivable that the same legislators who opposed" imposing vicarious liability on municipalities in congressional debates about one statute "would have silently adopted the same principle" in another).

### 4.    Subsequent legislation demonstrates that Congress retained for itself authority over National Monuments after they are established.

Congress has repeatedly demonstrated its competency to review national monuments after they are established and also confirmed that the President lacks authority to revoke national monuments or remove lands from them, first by considering—and rejecting—legislation to grant the President those very powers (at the request of the Executive Branch), and then by enacting the Federal Land Policy and Management Act in 1976, which was predicated on Congress's understanding that no such authority existed.

Congress has enacted legislation to transform national monuments into some of America's most cherished national parks, like the Grand Canyon, Bryce Canyon, Olympic, and Zion. Pub. L. 75-778, 52 Stat. 1241 (1938) (Olympic); Pub. L. 68-227, 43 Stat. 593 (1924) (Bryce Canyon, originally called Utah National Park); Pub. L. 66-83, 41 Stat. 356 (1919) (Zion); Pub. L. 65-277, 40 Stat. 1175 (1919) (Grand Canyon). It has transferred national monuments to states and cities

34

where it has determined that local management will better serve the public interest. *E.g.*, Pub. L. 83-360, 68 Stat. 98 (1954) (transferring Shoshone Cavern National Monument to city of Cody, Wyoming); Pub. L. 75-343, 50 Stat. 746 (1937) (transferring Lewis and Clark Caverns National Monument to Montana). It has removed lands from national monuments and added others. *See* Pub. L. 108-480 § 203, 118 Stat. 3907 (2004) (removing 3.1 acres and adding 0.45 acres to the Castillo de San Marcos National Monument); Pub. L. 104-333 § 205, 110 Stat. 4093, 4106 (1996) (modifying boundaries of national monuments including by removing 315 acres and adding 210 acres to Craters of the Moon National Monument); 95 Pub. L. No. 625 § 301, 92 Stat. 3467, 3474-75 (1978) (modifying boundaries of national monuments including by adding 7 acres and removing 0.11 acres from Tumacacori National Monument). And it has revoked national monuments where it determined the lands were better put to different uses. *E.g.,* Pub. L. 84-179, 69 Stat. 380 (1956) (revoking Old Kasaan National Monument); Pub. L. 81-648, 64 Stat. 404 (1950) (revoking Holy Cross National Monument).

While Congress has legislatively administered national monuments, it has rebuffed efforts to expand the authority of the President. The 68th and 69th Congresses considered legislation to grant the President the authority to modify the boundaries of national monuments. In 1925, the Secretary of the Interior transmitted a letter to the House and Senate explaining that the land within a national monument was "a fixed reservation subject to restoration only by legislative act," and the Executive Branch requested that Congress give the President the power to "restore lands to the public domain reserved by public proclamation as national monuments, and validating any such restorations heretofore so made by Executive Order." S. Rep. No. 68-849, 68th Cong. (1925) (reprinting letter); H. Rep. No. 68-1119, 68th Cong. (1925). The House and Senate considered, but declined to give the President that power. S. 3840, 68th Cong. (1925); H.R. 11357, 68th Cong.

(1925). Yet now the President asserts that he can, with the stroke of a pen, create the very power over federal land that Congress chose not to give him.  While subsequent legislative history or events ordinarily cast little light on the meaning of earlier enactments, this circumstance is unusual because it so closely resembles the issue presented to Congress with respect to national forests, at which time Congress *did amend* an earlier statute in precisely the manner that it declined to do for the Antiquities Act.

In 1925, the Secretary also requested legislation to modify the boundaries of the Casa Grande Ruins National Monument to eliminate lands needed for an irrigation project, explaining that "such elimination would not affect or injure the monument for the purpose for which it was created." S. Rep. No. 68-1127, 68th Cong. (1925) (reprinting letter). *Id.* Bills were introduced in the House and Senate to remove the identified lands and to generally authorize the President "to eliminate lands from national monuments by proclamation." S. 3826, 68th Cong. (1925); H.R. 11363, 68th Cong. (1925). These bills were not enacted.

The following year, the Secretary again asked for legislation to remove lands from Casa Grande National Monument. S. Rep. No. 423, 69th Cong. (1926) (reprinting letter); H. Rep. No. 69-1268, 90th Cong. (1968) (same). A bill was again introduced in the Senate to both remove those lands and generally authorize boundary modifications. S. 2703, 60th Cong. (1926), 67 Cong. Rec. 6805 (1926). The Senate Committee on Indian Affairs amended the bill to strip out the general provisions, S. Rep. No. 423, 69th Cong. (1926); 69 Cong. Rec. 6805 (1926), and Congress enacted legislation to remove the lands requested.

Until recently, Congress never again considered legislation to vest the President with authority to generally revoke or modify national monuments.[16] Numerous laws support the plain language of the Antiquities Act as vesting the President with only affirmative authority to establish national monuments and reserve lands as part of them. The Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1782 (1976), further demonstrates that same principle. FLPMA overhauled the land management system and during its passage there was extensive discussion reaffirming that only Congress holds the power to modify or revoke monuments. In order to avoid duplicative briefing on this issue, the Tribes incorporate by reference Sections II A and B, pages 28-36, of the brief filed by UDB at 17-cv2605.

> **5.    The President has not acquired Antiquities Act authority to revoke and modify the Bears Ears National Monument through Congressional acquiescence.**

Congress did not authorize the President to revoke national monuments or remove lands from them when it enacted the Antiquities Act and nothing has transpired since that time to re-write the Act to confer those authorities. The Defendants' invocation of the doctrine of acquiescence does not change that fact.

The UDB plaintiffs catalogue reasons that the doctrine of acquiescence does not validate President Trump's action, including that 1) Congress repealed implied presidential authority over withdrawals of public lands when it enacted FLPMA, UDB Br. at 2) the executive practice of removing lands from national monuments has neither been consistent nor unbroken, 3) to the contrary, the Executive Branch has specifically requested that Congress grant the President the

---

[16] Congress is currently considering legislation to allow the President to "remove" lands from national monuments. H.R. 3990 § 2, 115th Cong. (2017).

authority now claimed, and Congress has denied those requests, and 4) the few examples of president's removing lands from national monuments arose in unique circumstances that do not provide insight to Congress's view of general presidential authority.[17] Moreover, a very close review of Congressional actions from 1906 to 2017 reveals that Congress repeatedly claimed the power of reduction and revocation to itself alone. In order to avoid duplicative briefing on this subject, the Tribes incorporate by reference Section III B (3), pages 28-37, of the brief filed by The Wilderness Society in consolidated Case No. 1:17-cv-02587.

IV.    **To Avoid a Constitutional Question, the Antiquities Act Should Not Be Construed to Delegate the Unfettered Power over National Monuments that President Trump Has Claimed.**

If the text, history, and context of the Antiquities Act left any ambiguity about the scope of the President's authority under the Antiquities Act—and they do not—the Act should not be interpreted to grant the President the unfettered power to revoke national monuments and remove reservations of monument lands for any reason, or no reason at all, because such an interpretation would present a constitutional question under the nondelegation doctrine. The Supreme Court "repeatedly ha[s] said that when Congress confers decisionmaking authority upon agencies Congress 'must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.'" *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472

---

[17] Professor John Ruple identifies six separate opinions issued by the Department of the Interior addressing presidential authority to remove lands from a national monument: opinions in 1915, 1935, and 1947 concluding that President possesses such authority and opinions in 1924, 1932, and 1943 reaching the opposite conclusion. John C. Ruple, *The Trump Administration and Lessons Not Learned from Prior National Monument Modifications*, 43 Harv. Envtl. L. Rev. _, at 36 (forthcoming 2019), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3272594. Such a history of inconsistent interpretation hardly comprises an unbroken and consistent history of executive action.

(2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).[18] Interpreting the Antiquities Act to vest the President with an implied power to revoke or modify national monuments would be entirely unchecked by any principle established by Congress.

The Antiquities Act establishes "clear standards and limitations" to govern the two express powers granted to the President. *Tulare Cty*, 185 F. Supp. 2d at 26; *Utah Ass'n of Ctys.*, 316 F. Supp. 2d at 1191. He may identify only certain types of objects—those of "historic and scientific interest"—to be protected by a national monument. 54 U.S.C. § 320301(a). And he may reserve only those federal lands that are "the smallest area compatible with the proper care and manage of the objects to be protected." *Id.* § 320301(b). The Antiquities Act, thus, "details the types of objects that can be included in monuments and a method for determining the size of monuments." *Tulare Cty.*, 185 F. Supp. 2d at 26. While the President's discretion in exercising these two express powers may be broad, it is governed by clear and specific statutory criteria.

The purported authority of the President to *revoke* the designation of objects as national monuments and to reverse the reservation of public lands stands on different footing entirely. If that were so, the Antiquities Act includes no "intelligible principle" to govern such a revocation. *J.W. Hampton*, 276 U.S. 394. Congress has said nothing about when and why a President could exercise those powers, because they do not arise from the text of the statute. Inferring such presidential authority, therefore, could constitute the rare circumstance where "there is an absence of standards for the guidance [of delegated authority] . . . so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed," *Yakus v. United States*,

_____

[18] The principle that Congress must provide an intelligible principle to guide the exercise of authority delegated to the Executive Branch applies with equal force whether the delegation is to an agency or the President. *Tulare Cty.*, 185 F. Supp. 2d at 26 .

321 U.S. 414, 426 (1944), and the Court should not interpret the Act to delegate a constitutionally questionable power to the President. *See Misretta v. United States*, 488 U.S. 361, 373 n.7 (1989) ("In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional."); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

President Trump's treatment of national monuments generally, and the Bears Ears National Monument specifically, reveal that the power he claims lacks any congressional sideboards or guidance. Executive Order 13792, which initiated his review of national monuments, is full of concerns and criteria that have nothing to do with the Antiquities Act. It suggests that national monuments interfere with "achieving energy independence" and were created without "public outreach and proper coordination" with non-federal actors. 82 Fed. Reg. at 20,429. Not a word about energy can be found in the Antiquities Act, and it requires no public process.[19] The Executive Order then requires the Secretary of Interior to "consider" a laundry list of public policies also untethered to the Antiquities Act, including: 1) the effects a monument may have on "the available uses of designated Federal lands . . . [and] the available uses of Federal lands beyond the monument boundaries," 2) "the use and enjoyment of non-Federal lands within or beyond monument

---

[19] While a lengthy public process would undermine the Act's immediate, protective purpose, President Obama did utilize a public process when creating Bears Ears.

40

boundaries," 3) "concerns of State, tribal, and local governments . . . including th[eir] economic development and fiscal condition," 4) "the availability of Federal resources to properly manage designated areas," and 5) "such other factors as the Secretary deems appropriate." *Id.*[20] The Department of the Interior followed the President's directive and focused its review on the location of mineral and oil and gas resources and whether "mines or processing facilities [are] near or adjacent to a National Monument."[21]

The Trump Proclamation also relies on considerations apart from those identified by the Antiquities Act. It is based on the assertion that some objects identified for protection "are not unique to the monument," and that "many of the objects . . . were not under threat of damage or destruction." 82 Fed. Reg. at 58,082. Those are not, however, statutory criteria. The decision also relies on the mistaken understanding that objects protected under other legal regimes cannot properly be designated as objects under the Antiquities Act. *Id.* The D.C. Circuit directly considered—and rejected—that legal view in *Mountain State Legal Foundation*, explaining that "federal laws . . . provide[] overlapping sources of protection," 306 F.3d at 1138, and that mistake of law is alone a sufficient basis for invalidating the President's decision. *Cf. Ark Initiative v.*

---

[20] The Executive Order also requires the Secretary to consider the "requirements and original objects of the Act," including the size of the reserved lands and whether objects were appropriately designated. 82 Fed. Reg. at 20,429.

[21] Email from Kenneth Mahoney to Sheldom Wimmer et al., (Jun. 1, 2017), available at https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p110/a407706 (document starts at page 110 of 208); Email from Brandon Boshell to Rody Cox et al., (May 22, 2017) available at https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p82/a407703 (document starts at page 82 of 208); Larry Garahana, Memorandum, Cursory Review of the Mineral Potential/Occurrence within the Bears Ears NM (Jan. 31, 2017), available at https://www.documentcloud.org/documents/4391967-National-Monuments-a-Look-at-the-Debate-From.html#document/p61/a07706 (document starts at page 62 of 208).

*Tidwell*, 64 F. Supp. 3d 81, 90 (D.D.C. 2014) ("[C]ourts 'have held it an abuse of discretion for [an agency] to act if . . . the decision was based on an improper understanding of the law.") (quoting *Kazarian v. Citizenship & Immigration Servs.*, 596 F.3d 1115, 1118 (9th Cir. 2010).

## V.    The Tribes Have Stated a Claim that the President Violated the Separation of Powers Doctrine

Defendants fail in their attempt to dismiss the Constitutional claims for the same reasons that they fail in their attempts to dismiss the Antiquities Act claims: the President simply does not have the power he asserts here. In order to avoid duplicative briefing on this subject, the Tribes incorporate by reference Section IV. B., pages 17-20, of the brief filed by NRDC in Case No. 1:17-cv-2606.

In addition, the Tribes have alleged in their second claim for relief (separation of powers) that in claiming power he does not have, the President violates the Presentment Clause. To the degree the President seeks to "coopt Congress's power to legislate," *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018), he is effectively amending the Antiquities Act to grant to himself new powers in addition to those delegated by Congress. The Constitution, however, does not "authorize[] the President to enact, to amend, or to repeal statutes." *Clinton v. N.Y.C.*, 524 U.S. 417, 438 (1998). Rather, the Antiquities Act may be amended only through bicameralism and presentment, *see I.N.S. v. Chadha*, 462 U.S. 919, 946 (1983). By unilaterally rewriting the Antiquities Act according to his own policy preferences, the President has ignored these "integral parts of the constitutional design for the separation of powers," and thereby acted unconstitutionally. *Id.*; *see also City & Cty. of S.F.*, 897 F.3d at 1235 (holding that an "Executive Order violates the constitutional principle of the Separation of Powers" by withholding funds in a manner unauthorized by Congress). Given the facts alleged, this claim is plausible and should not be dismissed at this stage.

**VI.     The Tribes Have Stated a Claim that the Trump Proclamation Violates the APA**

Defendants allege that the Tribes and NRDC plaintiffs have failed to state a claim under the APA.  In order to avoid duplicative briefing, the Tribes incorporate by reference Section IV. C., pages 19-20, of the NRDC brief in Case No. 1:17-cv-2606. The Defendants claim that the Tribes are asking only that the agency "comply with the general protective mandates" in the Obama Proclamation. Not so. In addition to requesting that monument protection be restored to the objects in the excluded lands, the Tribes requested an order that their specific, vested right to jointly manage the entire Bears Ears National Monument (as described above at pages X) be restored to them.

## CONCLUSION

If any parties have standing in this case, it is the Tribes. Their unbroken connection to and reliance on Bears Ears spans millennia before the United States existed. In an act untethered to principle or caselaw, President Trump did what no other President has done: revoked a national monument and replaced it with two small units comprising less than 15 percent of the original size of the Monument. In so doing, he acted well beyond the law and well beyond the Constitutional limits of his power.  For the foregoing reasons, the Defendants' motions to dismiss should be denied in its entirety.

Respectfully submitted, this 15 day of November, 2018.

/s/       nlandreth

Natalie A. Landreth
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: (907) 257-0501
Fax: (907) 276-2466

43

Email: landreth@narf.org

Matthew Lee Campbell
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Phone: (303) 447-8760
Fax: (303) 443-7776
Email: mcampbell@narf.org

Justin Robert Pidot
University of Denver Sturm College of Law
(for identification purposes only)
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6168
jpidot@law.du.edu

***Attorneys for the Hopi Tribe, Ute Mountain Ute
Tribe and Pueblo of Zuni***

Ethel B. Branch, Attorney General
Office of the Attorney General
THE NAVAJO NATION DEPARTMENT OF
JUSTICE
Post Office Box 2010
Window Rock, Arizona (Navajo Nation) 86515
Phone: (928) 871-6345
Fax: (928) 871-6177
Email: ebranch@nndoj.org

Paul Spruhan, Asst. Attorney General
Litigation and Employment Unit
NAVAJO NATION DEPARTMENT OF JUSTICE
Post Office Box 2010
Window Rock, Arizona (Navajo Nation) 86515
Phone: (928) 871-6210
Fax: (928) 871-6177
Email: pspruhan@nndoj.org

***Attorneys for the Navajo Nation***

Rollie Wilson
FREDERICKS PEEBLES & MORGAN, LLP
401 9th St., N.W.
Washington, D.C. 20004

44

Phone: (202) 450-4887
Fax: (202) 450-5106
Email: rwilson@ndnlaw.com

Jeffrey S. Rasmussen, *pro hac vice pending*
FREDERICKS PEEBLES & MORGAN, LLP
1900 Plaza Drive
Louisville, CO 80027
Phone: (303) 673-9600
Fax: (303) 673-9155
Email: jrasmussen@ndnlaw.com

***Attorneys for the Ute Indian Tribe***

Lloyd Miller
SONOSKY, CHAMBERS, SACHSE, MILLER &
MONKMAN LLP
725 East Fireweed Lane
Suite 420
Anchorage, AK 99503
Phone: (907) 258-6377
Fax: (907) 272-8332
Email: lloyd@sonosky.net

David Mielke
SONOSKY, CHAMBERS, SACHSE, MILLER,
MIELKE & BROWNELL LLP
500 Marquette Avenue, NW
Suite 660
Albuquerque, NM 87102
Phone: (505) 247-0147
Fax: (505) 843-6912
Email: dmielke@abqsonosky.com

***Attorneys for the Zuni Tribe***

45

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15 day of November, 2018, I filed the above pleading with the Court's CM/ECF system, which provided notice of this filing by e-mail to all counsel of record.


*/s/ Natalie A. Landreth*
Natalie A. Landreth