# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HOPI TRIBE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No.17-cv-2590 (TSC) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| UTAH DINÉ BIKÉYAH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No. 17-cv-2605 (TSC) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| NATURAL   RESOURCES   DEFENSE | ) |
| COUNCIL, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Case No. 17-cv-2606 (TSC) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP, *et al.*, | ) |
| | ) **CONSOLIDATED CASES** |
| Defendants. | ) |
| | ) |

## UDB PLAINTIFFS' AMENDED AND SUPPLEMENTAL COMPLAINT

## INTRODUCTION

1.      Plaintiffs Utah Diné Bikéyah; Friends of Cedar Mesa; Archaeology Southwest; Conservation Lands Foundation, Inc.; Patagonia Works; The Access Fund; the National Trust for Historic Preservation; and the Society of Vertebrate Paleontology, on behalf of themselves, their members, and other affiliates ask this Court to declare unlawful President Trump's December 4, 2017 proclamation that purported to revoke Bears Ears National Monument and replace it with two new "units."  That unprecedented action exceeded the authority Congress delegated to the President in the Antiquities Act of 1906 ("the Antiquities Act").  54 U.S.C. §§ 320301 *et seq.* Plaintiffs request that this Court enjoin implementation of the President's unlawful action and restore the original configuration of Bears Ears National Monument.

2.      The President has limited authority under the Antiquities Act.  The Property Clause of the Constitution vests Congress with the sole authority to dispose of and make all needful Rules and Regulations respecting property of the United States, U.S. Const. art. IV, § 3, cl. 2, and Congress has delegated to the President, through the Antiquities Act, only the authority to create national monuments through public proclamation.  Congress did *not* give the President the authority to revoke or modify those monuments, or to nullify the protections created for those monuments.  Only Congress can do that.

3.      Pursuant to the Antiquities Act, President Barack Obama proclaimed Bears Ears National Monument in southeastern Utah on December 28, 2016, thereby protecting a landscape named for the distinctive twin buttes rising above geologically diverse terrain that has been sacred to native peoples since time immemorial.  *See* Proclamation 9558, 82 Fed. Reg. 1139 (Jan. 5, 2017) ("Proclamation 9558").  The landscape is so distinctive that in each of the native

1

languages of the region the twin buttes' name is the same: Hoon'Naqvut, Shash Jáa, Kwiyagatu Nukavachi, Ansh An Lashokdiwe, or "Bears Ears." *Id.* This Monument has two components: a wide range of culturally significant, archaeological, paleontological, geographic, geological, and ecological objects designated for protection under the Antiquities Act, *see id.* at 1139-43, and a reservation of approximately 1.35 million acres of public land, which includes landscape that is "profoundly sacred to many Native American tribes." *See id.* at 1143. Proclamation 9558 came after years of advocacy by Native American tribes and Native advocates, among others. The public discussions and engagement enabled the administration to gather and consider the full range of views from government, industry, Indian tribes, non-profit representatives, and the American public. Proclamation 9558 carried the full force of Congress' delegated authority.

4.      On December 4, 2017, President Donald J. Trump signed a proclamation (the "Revocation Proclamation") purporting to erase the designation of thousands of objects of historic and scientific interest, including significant numbers of Native American cultural resources, and to remove over 1 million acres from Bears Ears National Monument. Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 8, 2017). The Revocation Proclamation is unlawful. It exceeds the limits on the President's authority under the Antiquities Act and arrogates to the President authority reserved to Congress by the Constitution.

5.      Plaintiffs and their members have suffered and will continue to suffer direct and immediate injuries as a result of the Revocation Proclamation. In particular, the Revocation Proclamation has harmed Plaintiffs' members by interfering with their use and enjoyment of the land for cultural, spiritual, ceremonial, aesthetic, and research purposes within the former Monument. Further, each Plaintiff organization has had to divert significant resources to combat the impacts of the Revocation Proclamation, which has impaired other organizational activities.

Among other things, Plaintiffs and their members now must monitor impacts to the newly

excluded lands, provide information to the public about actual and threatened impacts, and

restructure their operations internally in order to deploy resources to counteract the present and

future consequences of the Revocation Proclamation.  The Revocation Proclamation has further

harmed Plaintiffs and their members as it has reduced funding available to do work in the areas

excised from the Monument.  And it has removed protections from the lands to which Plaintiffs

are dedicated and which have been a sacred landscape for Native Americans since time

immemorial.

## JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under the Antiquities Act, 54 U.S.C. §§ 320301-320303,

the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the United States Constitution.

These claims concern the scope of the President's authority to revoke a national monument.  As

a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e), because Defendants reside in

the District of Columbia and a substantial part of the events or omissions giving rise to this

action occurred in the District of Columbia.  Upon information and belief, a substantial part of

the development of the two Presidential Proclamations at issue in this litigation, as well as the

issuance of Proclamation 9558, occurred in the District of Columbia.  Advocacy work performed

by Plaintiffs in support of President Obama's Proclamation 9558 occurred in the District of

Columbia.  Plaintiff National Trust for Historic Preservation maintains its headquarters in the

District of Columbia, and Plaintiff Conservation Lands Foundation, Inc. maintains an office in

the District of Columbia to assist its advocacy efforts.

8.      The requested relief is proper under 28 U.S.C. §§ 2201-2202, the Administrative

Procedure Act, and Article III of the Constitution of the United States.

**PARTIES**

**I.  Plaintiffs**

**Utah Diné Bikéyah**

9.      Utah Diné Bikéyah ("UDB") is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), organized under the laws of Utah, and headquartered in Salt Lake City.

10.      UDB has an all Native American Board of Directors comprised of Navajo and Ute community leaders, an eleven person staff, and works to elevate Native voices and integrate knowledge and Native leadership in public land planning.  UDB recognizes the deep and ongoing spiritual connection between Indigenous Peoples and the land.  As an organization founded and focused on Native American traditional and cultural principles, UDB operates at the intersection between culture and conservation by promoting land protection that honors and includes human societies that have co-existed with ecosystems since time immemorial.

11.      UDB is a member of the Friends Grassroots Network, which is supported by Plaintiff Conservation Lands Foundation, Inc. ("CLF"), and, like CLF, UDB has long been involved in stewardship and advocacy to protect the Bears Ears area.

12.      UDB began its work in 2010 through another 501(c)(3) non-profit, Round River Conservation Strategies, by gathering traditional cultural knowledge from Navajo elders about the Bears Ears region.  Beginning in 2011, UDB formed itself as a separate non-profit organization.  In June 2014, UDB renewed its efforts to work with the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute tribes (the "Tribes") to improve preservation of the region.  By late 2015, UDB and the Tribes settled on a common goal: designating the Bears Ears region a monument under the Antiquities Act.

4

13.     As part of this effort, UDB worked with high-ranking officials at the Department

of the Interior (including then-Director of the Bureau of Land Management (the "BLM"), Neil

Kornze, and then-Secretary Sally Jewell) to form the Bears Ears Inter-Tribal Coalition,

comprised of leaders from the five Tribes.  Together UDB and the Bears Ears Inter-Tribal

Coalition adopted proposed boundaries and presented a more detailed proposal to federal

officials in Washington, D.C.  The National Congress of American Indians, representing

hundreds of tribes from across the United States, later endorsed the proposal.

14.     Proclamation 9558 establishing Bears Ears National Monument was a significant

achievement for UDB and the Tribes to which UDB's members belong.  For one thing, Bears

Ears National Monument was designated at the request of sovereign Tribes.  The designation

also provided protection to the Bears Ears area and its significant cultural, natural, and scientific

resources.  And it assured UDB tribal members that their traditional way of life would continue

undisturbed.

15.     Under Proclamation 9558, the Tribes were given an integral role in developing

management plans for the area, and UDB was and remains poised to provide important

institutional and traditional knowledge to the Tribes and the federal government in the

development of these plans.  This assistance includes the identification of cultural resources in

Bears Ears National Monument, development of programs for traditional use of ecological

resources, and promoting sustainable practices based on cultural and historical use of the area.

For instance, before the monument designation, UDB provided the results of an exhaustive three-

year ethnographic study to the federal government that efficiently summarized important cultural

uses and conservation values provided by 70 Diné elders within a proposed 1.9 million acre

monument boundary.  UDB also analyzed collaborative management practices for protected

areas.  *See, e.g.*, Utah Diné Bikéyah, Collaborative Management of Protected Areas, with

Examples of Collaboration between Native American Tribes and US Federal and State Agencies

(Jan. 20, 2012).[1]  This study exemplifies the type of organizational expertise UDB can offer to

help shape management plans.  UDB has also conducted an extensive literature review report,

developed a decision support tool that included all publicly available geographic information

system ("GIS") data for the region, and commissioned a gap analysis to identify differences

between the desires of the Navajo community and BLM management practices.  With sufficient

resources, UDB will bring these same skills to the Tribes and the Monument's land management

planning process.

16.     UDB has suffered direct and immediate injury from the revocation of the

designation of the landmarks, structures, and objects of the former Bears Ears National

Monument.  Bears Ears is a sacred landscape with traditional cultural properties, village sites,

petroglyphs, sacred medicines, ceremonial places, historic culinary resources, and more—all of

which are integral to the cultural and religious freedoms of the Native Americans in the region.

The Revocation Proclamation has directly impacted tribal communities, including causing

significant distress to the physical and spiritual health and wellbeing of tribal community

members and disrupting the interconnected and sacred landscape of Bears Ears.  As a result,

UDB has had to divert many resources to protecting the Monument and its sacred uses, which

would not have otherwise been required.

17.     UDB has also lost opportunities to contribute to the management and preservation

of sacred lands as a result of the Revocation Proclamation.  Proclamation 9558 specified that the

---

[1] Available at http://www.roundriver.org/wp-content/uploads/pubs/navajo/reports/
Co-mgt-Backgrounder-Report-1-20-12.pdf.

Tribes would play an integral role in developing management plans for the area and UDB was poised to provide important institutional and traditional knowledge to the Tribes and the federal government in the development of these plans.  Underscoring the important role that UDB was to play in this process is the fact that the work of UDB and the Tribes led to the creation of Bears Ears National Monument in the first place.  Since the Revocation Proclamation, contributions from UDB and the Tribes to the management plan and preservation of the Monument have been reduced or outright eliminated.

18.     The original Bears Ears National Monument is home to sacred landscapes and many sacred sites and resources of significant cultural and spiritual value to the Tribes.  The protection of these landscapes is the central mission of UDB.  The Navajo, Ute, and Pueblo people, as well as members of other Tribes, have used and continue to use the area for traditional medicine and herb gathering, pinyon gathering, and ceremonies.  UDB members, in response to the Revocation Proclamation, have been forced to continuously monitor the spiritual, cultural, and ecological health of the landscape.  This includes conducting ceremonies that, but for the Revocation Proclamation, UDB members would not otherwise have conducted.

19.     UDB and its members are committed to ensuring that the ancestral lands within the boundary of the original Bears Ears National Monument remain protected, so that the vital historic record of the native peoples and opportunities for the land's modern, sustainable, and cultural use are preserved for future generations.  Threats to the landscape of the former Monument are also threats to the cultural heritage and identity of the Tribes and their members. In response to the Revocation Proclamation, UDB has dedicated time, money, and effort to the campaign to protect these now-threatened areas, to support the Tribes in their individual and collective efforts to oversee the management of their ancestral lands, and to educate the public

about why these particular lands are significant.  Similarly, UDB members have dedicated time and resources to ensure that ancestral lands are protected by monitoring the area, including photographing and cataloging the land which was removed from the Monument by the Revocation Proclamation.  They have done this by visiting vulnerable sites, observing the ecological health of the area, and documenting changes, such as the removal of cultural items, off-road vehicle damage, visitation increases, and observing the ecological health of the area.

20.     As a result of the Revocation Proclamation, UDB has reallocated its limited resources from essential ethnographic and educational activities to costly, contentious activities to protect the area.  UDB has diverted funding and staff time to defending and preserving the objects and landscapes within Bears Ears National Monument against resource development efforts, looting, vandalism, and other adverse impacts on the spiritual and aesthetic value of the area that resulted from the Revocation Proclamation.  As part of reallocating its limited resources to defend and preserve the objects and landscapes, UDB members have been traveling through the area to monitor, photograph, and document sensitive areas, such as petroglyphs that are directly under threat of removal or destruction by unsupervised visitors.  UDB has been forced to re-mobilize community members to inform decision-makers about the valuable resources within Bears Ears National Monument, draft comments and engage in efforts to restore Bears Ears National Monument, compose materials detailing the values and importance of Bears Ears National Monument, alter its communication strategies, and re-analyze its fundraising efforts including determining which grants UDB is eligible for.

21.     As part of its mission, UDB seeks to develop a stable and thriving local economy in San Juan County, Utah by investing in native-owned and -staffed businesses, artists, and community leaders—especially those whose products and arts use resources from the Bears Ears

area.  In order to support these individuals and activities, UDB received several grants designed

for the promotion of native arts, businesses, and activities—and in doing so, committed these

funds to development within Bears Ears.  However, since the Revocation Proclamation, UDB

has been unable to foster economic growth as it intended.  This harm resulted because:  (1) UDB

has been forced to shift its resources toward publishing educational newsletters and other

defensive activities, such as monitoring the area for mining, destruction, and looting; and (2)

because UDB has lost the opportunity to collaborate with the federal government in developing

local economic opportunities.  As a result, UDB has not been able to fulfill some grant

obligations, which may have hindered UDB's ability to fund necessary work on the ground.

Consequently, UDB's economic development program is struggling and may have to close in

2020.  This outcome would not have resulted absent the Revocation Proclamation.

      22.     As a result of the Revocation Proclamation, UDB has been forced to reallocate

resources and time to undertake defensive work, including public education, information

campaigns, and native cultural advocacy.

      23.     UDB members have deep personal ties to Bears Ears National Monument, many

having lived their entire lives close to or within the boundaries outlined by Proclamation 9558.

The areas protected by the original Bears Ears National Monument are central to their religious

and cultural practices and freedoms, and their community.  UDB members regularly visit the

Bears Ears region to gather herbs and firewood, pray, conduct ceremonies, hike, camp, and

explore the areas formerly protected by Bears Ears National Monument.  Bears Ears National

Monument and the interconnected historical and cultural resources of its landscape are of

significant cultural and spiritual value to UDB members.  President Trump's revocation of the

designation of the landmarks, structures, and objects, and reduction of the Monument's

boundaries, allows for uses that will desecrate this sacred place of worship.

**Friends of Cedar Mesa**

24.     Friends of Cedar Mesa is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of Utah, and headquartered in Bluff, Utah. Friends of Cedar Mesa is also a member of CLF's Friends Grassroots Network, and, like CLF, has long been involved in stewardship and advocacy to protect the historical and natural aspects of the Bears Ears area.

25.     Friends of Cedar Mesa was founded in 2010 by a former BLM employee to foster stewardship and advocacy for the Cedar Mesa area, with a particular focus on protecting cultural resources.  The organization's mission is to ensure that the federal public lands in San Juan County, Utah—with all their cultural, natural, and recreational value—receive appropriate protection and respect.  Friends of Cedar Mesa works to achieve its mission in four core areas: policy and advocacy; education and interpretation; stewardship and monitoring; and cultural-resource research.  Friends of Cedar Mesa also works to create local, regional, and national support for greater protection of Cedar Mesa through education, advocacy for national designations, support for smart local policy-making, and organization of research and volunteer service activities.

26.     Friends of Cedar Mesa has a significant interest in Bears Ears National Monument.  The greater Cedar Mesa area is located within the boundaries of Bears Ears National Monument and much of Cedar Mesa was excluded in President Trump's attempted reduction. Over the past several years, Friends of Cedar Mesa has observed damage to cultural resources in the area caused by looting, vandalism, irresponsible driving of off-road vehicles, wood harvesting in wilderness study areas and cultural sites, inadequate signage or protective barriers,

and careless, under-educated visitors. Damage to the cultural assets in this area results primarily from a lack of resources necessary for sufficient visitor education, law enforcement, monitoring, protective fencing, and erosion mitigation. Due to the Revocation Proclamation, the BLM is focusing its limited resources only on the reduced Monument area at the expense of the excluded lands.

27.     Friends of Cedar Mesa is involved in, and has committed substantial resources to, protecting the Bears Ears region. In 2013, Friends of Cedar Mesa began focusing its efforts on advocating for protection of Cedar Mesa as a conservation area or national monument as a means to secure additional management resources and legal protections for the area. As part of this effort, Friends of Cedar Mesa worked with UDB, Archaeology Southwest, and other co-litigants to advocate for national monument status and protection for the Bears Ears landscape.

28.     Friends of Cedar Mesa devoted significant resources to bringing awareness to and educating the public on the value of designating the Bears Ears region as a national monument. Friends of Cedar Mesa also undertook a landmark project to identify archaeological resources in the area. Friends of Cedar Mesa staff prepared a 300-plus page report detailing the archaeological resources within Bears Ears National Monument. This project required a significant commitment of staff time and resources, took hundreds of hours to complete, and represented a culmination of the organization's on-the-ground knowledge of cultural resources within the Bears Ears region. For the summer of 2016, this project was the organization's single largest undertaking. Friends of Cedar Mesa staff and board members travelled to Washington, D.C. on multiple occasions to advocate for the permanent protection of the Bears Ears landscape. After President Trump asked then-Secretary Zinke to initiate a review of national monuments—including Bears Ears—Friends of Cedar Mesa also created a 179-page report, including a

detailed bibliography, entitled "A Cultural Landscape Overview of Archaeological Resources in the Bears Ears National Monument," with the assistance of professional archaeologists and Archaeology Southwest.  Both of these reports were provided to the Department of the Interior, the BLM, and then-Secretary Ryan Zinke prior to the Revocation Proclamation.

29.     Friends of Cedar Mesa also serves as a leading resource in the area for monitoring all issues surrounding the land that was once part of Bears Ears National Monument.  This has required the organization to commit significant resources to track impacts in the area.  For example, on or around January 8, 2019, Friends of Cedar Mesa's Executive Director visited the Easy Peasy mine to observe the mine exploration activities there and document any archaeological or paleontological resources located nearby.  A claim for mining at Easy Peasy had previously been recorded in 2005, but operations were only permitted to proceed in February 2019, *after* the issuance of the Revocation Proclamation.  Mining operations in and around the Easy Peasy mine disrupt the cultural and historical resources near the site and also cause ground-disturbing activities to lands in Cedar Mesa that are now outside the protection of the Monument. Friends of Cedar Mesa has been forced to expend—and will continue to expend—a significant amount of its resources to fight the mining leases and activities as they encroach further and further into Cedar Mesa and the Bears Ears area.

30.     Additionally, on or around May 26, 2019, Friends of Cedar Mesa's Communications/Development Director devoted a full day and two nights to visiting Mancos Mesa, one of the most well preserved and geologically diverse areas in all of the Bears Ears area, to observe and report on potential ground-disturbing activity from a proposed road development. While there, she observed regular off-road vehicle traffic and took photographs and videos to document the activity.  Efforts like these demand significant time from Friends of Cedar Mesa

staff that otherwise would be spent on projects to educate visitors and protect Monument resources.

31.     Friends of Cedar Mesa has suffered direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of the original Bears Ears National Monument.  As a result of the Revocation Proclamation, Friends of Cedar Mesa has diverted its limited resources from preservation efforts to educating visitors and monitoring impacts on the lands and objects comprising Bears Ears National Monument.  For example, Friends of Cedar Mesa has had to delay creating a research fund designed to support a better understanding of the area's internationally significant cultural resources due to a necessary diversion of resources caused by the Monument reduction.  Likewise, Friends of Cedar Mesa has been unable to purchase threatened archaeological sites on private lands due to the same diversion of resources.  Similarly, Friends of Cedar Mesa has had to put aside plans to create a scientific advisory council, an educational curriculum for commercial guiding services, two planned educational videos, and an educational book about rock art—all due to the massive diversion of resources required to address the impacts of the Revocation Proclamation.

32.     Before the Revocation Proclamation, ranger stations provided services to the Cedar Mesa area; however, those ranger stations are now overburdened and understaffed to the point that they can no longer spend sufficient time in the field to educate visitors or engage in adequate management of the lands.  And because the rangers' attentions are now dedicated to the areas that remain within the new boundaries of the Monument, agency staff are spending far less time managing visitors in the lands excluded under the Revocation Proclamation.  Friends of Cedar Mesa's President of the board of directors, who also owns a company that guides visitors to Bears Ears, has encountered significantly fewer rangers in the field since the Revocation

Proclamation.  For example, in years past he would regularly encounter rangers during his guided trips, but during the 2019 guiding season he did not encounter even a single ranger.

33.     In order to make up for insufficient services provided by the rangers, Friends of Cedar Mesa opened a Bears Ears Education Center after the issuance of the Revocation Proclamation.  To open the Education Center, Friends of Cedar Mesa had to fundraise, purchase a building, increase its staff hours, and hire new employees—all of which would not have occurred if not for the Revocation Proclamation.  Maintaining the Education Center has also required Friends of Cedar Mesa to divert resources from other projects to which the organization has been unable to return, including a signage campaign and the production of two educational videos for visitors, as mentioned above.  The Education Center was an immense undertaking for a small organization, which meant that many of the organization's other efforts suffered as a result of this diversion of resources.

34.     Despite the efforts of Friends of Cedar Mesa, many day visitors to the lands do not receive any education regarding visitor use and stewardship.  As a result, larger numbers of uninformed visitors are impacting the lands in a variety of detrimental ways.  First, larger and larger groups are visiting Bears Ears in violation of group size limitations.  These larger group sizes, which were once better controlled by rangers, have gone mostly unaddressed since the Revocation Proclamation.  And these visitors are increasingly hiking, biking, and driving off the designated trails.  Cyclists and vehicles are visiting the lands now excluded from the Monument in greater numbers.  Tires leave grooves in the fragile desert soils causing erosion over time. Increased visitation has also brought an increase in the amount of human waste.

35.     Further, due to a combination of increased visitation, lower rates of impact education, and a lack of rangers in the field, more and more visitors are looting artifacts.  For

example, Bannister Ruin in Grand Gulch, which was once rich with artifacts, has suffered

increased looting since the Revocation Proclamation.  This increased rate of looting resulted in a

dramatic loss of artifacts associated with the site.  Friends of Cedar Mesa's President of the

board of directors has witnessed similar disregard for artifacts and historic sites throughout the

excluded lands.  Not only do visitors loot artifacts from sites and middens (refuse piles left by

former inhabitants, often containing rich troves of artifacts), visitors have also been witnessed

sitting on walls of prehistoric structures.

36.     The Revocation Proclamation has also negatively impacted Friends of Cedar

Mesa's ability to obtain grants and funding for conservation activities.  A number of public and

private funding options are no longer available to Friends of Cedar Mesa to perform work in the

Cedar Mesa area, due to formal policies or informal stances regarding the funding of land

acquisitions in areas now excluded under the Revocation Proclamation.

37.     The BLM has declined to work with Friends of Cedar Mesa on numerous

occasions since the Revocation Proclamation because Friends of Cedar Mesa has proposed

projects involving land in areas excluded by the Revocation Proclamation, on both BLM and

state lands.  For example, Friends of Cedar Mesa proposed a small project for the building of

fences around Slickhorn Canyon in order to protect sensitive cultural resources and riparian

corridors from cattle grazing.  The proposal called for building approximately 100 feet of fencing

in order to protect this vulnerable and archaeologically rich area.  Cattle grazing has already

impacted the land:  Cattle have trampled archaeological sites and degraded water quality for

wildlife and backpackers.  This problem will only worsen with time.  To date, the BLM has

declined to approve Friends of Cedar Mesa's proposal as some of the proposed fencing would

fall on excluded land.

38.     Friends of Cedar Mesa has also proposed at least twenty-three projects to the BLM since the Revocation Proclamation that have not been approved due to the political and administrative environment created by the Revocation Proclamation.  Prior to the Revocation Proclamation, the BLM worked with Friends of Cedar Mesa on numerous projects in both included and (now) excluded areas.  In one recent and notable incident, Friends of Cedar Mesa was performing a visitor readiness and mitigation project that it had proposed to the BLM prior to the Revocation Proclamation.  A survey conducted by professional archaeologists for that project identified two historic properties being damaged by vehicular traffic.  Friends of Cedar Mesa's work plan, which was reviewed and approved by the BLM, called for the two tracks going through the archaeological sites to be closed.  However, after a complaint by a local hunter to County officials, the BLM demanded that Friends of Cedar Mesa reverse its protective work.  Upon being asked when the sites might be protected, BLM officials told Friends of Cedar Mesa that no routes—illegal or designated—would be changed, and therefore no affected archaeological sites would be protected, for an indefinite time until a Travel Management Plan could be created pursuant to the Revocation Proclamation.  This, despite the fact that one of the two off-road vehicle tracks was clearly an illegal route not included on the BLM's travel plan in place at the time of Proclamation 9558.  These two cultural sites remain unprotected and at risk of further damage.

39.     The staff and board members of Friends of Cedar Mesa use and enjoy the area designated as Bears Ears National Monument for several activities, including hiking, rock climbing, rafting, backpacking, canyoneering, river running, photographing, and observing the area's unique archaeology, geology, paleontology, and habitat.  The objects of historic and scientific interest comprising Bears Ears National Monument are critical to the use and

enjoyment of the Monument by board members.  Many of the board members of Friends of

Cedar Mesa enjoy clean drinking water from the Navajo aquifer, which lies under land within

Bears Ears National Monument and is thereby protected from the impacts of extractive activities.

The enjoyment of these areas by staff and board members has been significantly curtailed by

obvious damage occurring at sites—such as the disappearance of artifacts—due to a lack of

resources to protect the area.

### Archaeology Southwest

40.     Archaeology Southwest is a 26 U.S.C. § 501(c)(3) nonprofit organization

headquartered in Tucson, Arizona.  Archaeology Southwest is also a member of CLF's Friends

Grassroots Network.

41.     Since its inception, Archaeology Southwest's core mission has been to pursue

preservation archaeology in the southwestern United States—Arizona, New Mexico, Colorado,

and Utah.  Preservation archaeology is a holistic, conservation-based approach to exploring the

places of the past and is focused on preserving cultural landscapes, archaeological sites, artifact

collections, and archives.  Archaeology Southwest undertakes a broad range of preservation

initiatives on behalf of these resources.  For example, Archaeology Southwest conducts low-

impact research, educates the public on archaeological issues, and protects irreplaceable

archaeological sites through education, easements, and fee ownership.

42.     Archaeology Southwest has a specific interest in supporting the designation of

landscapes like Bears Ears as national monuments to preserve the land and its resources.  In fact,

in 2001, Archaeology Southwest published a special issue of its quarterly magazine that

highlighted the Antiquities Act and each of the new national monuments in the Southwest

designated by President Clinton.  And since 2009, Archaeology Southwest has advocated for the

establishment of a Great Bend of the Gila National Monument in an 84,000-acre area that follows the Gila River for roughly 80 miles southwest of Phoenix.

43.     Archaeology Southwest is involved in, and has committed substantial resources to, protecting the Bears Ears area.  In 2014, Archaeology Southwest identified the protection of the Bears Ears area as a priority for the organization.  As part of this initiative, Archaeology Southwest worked with Friends of Cedar Mesa to propose a national monument or conservation area.

44.     Archaeology Southwest also sent a letter to President Obama explaining the importance of this area.  Archaeology Southwest staff visited Washington, D.C. to advocate for the permanent protection of Bears Ears.  Additionally, Archaeology Southwest's Executive Director engaged with then-Secretary Jewell regarding the importance of designating the Bears Ears region a national monument.

45.     Due to the threats posed by the Revocation Proclamation, Archaeology Southwest has changed its model to increase its public education and advocacy efforts.  To this end, Archaeology Southwest has devoted significant resources to bringing awareness to, and educating the public on the value of Bears Ears National Monument, including by devoting two double issues of Archaeology Southwest's quarterly magazine to the Bears Ears area and Grand Staircase-Escalante.  The issue devoted to the Bears Ears area highlights the value and importance of preserving the land as a Monument.  For its part, the Grand Staircase-Escalante issue includes a column from Archaeology Southwest's President and CEO calling attention to the reduction of Bears Ears National Monument.  Both issues stemmed from Archaeology Southwest's growing concern over the Revocation Proclamation and its potential impact on funding for archaeological research.  Since the Revocation Proclamation, Archaeology

Southwest has frequently devoted a significant portion of its weekly electronic newsletter to the Bears Ears area, including announcements of public events and news stories on the Revocation Proclamation.  Significant staff time has been devoted to compiling these posts for publication in the newsletter.

46.     Archaeology Southwest has suffered and will continue to suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of Bears Ears National Monument.  Archaeology Southwest has diverted its limited resources from other preservation efforts in order to support the original Bears Ears National Monument.  For example, in 2019, Archaeology Southwest helped organize two events to raise awareness of the Revocation Proclamation and its impact on the Bears Ears area.  Those events took place in Tucson, Arizona on January 23, 2019, and October 6, 2019.  The Arizona State Museum hosted the first event, with Archaeology Southwest making arrangements for the photographer, Stephen Strom, and principal speaker, Carleton Bowekaty of the Pueblo of Zuni tribal council, to attend.  The second event presented the work of journalist Rebecca Robinson and photographer Stephen Strom, from their book "Bears Ears: Views from a Sacred Land."  Both events presented information on the cultural importance of the Bears Ears area.  Each event required that Archaeology Southwest devote significant staff time and resources to cover event logistics— time and resources that would have otherwise been expended on different projects.  Additional efforts related to Bears Ears will be necessary.

47.     There is an immediate threat of degradation of the landscape in the excluded areas of Bears Ears National Monument.  For example, Archaeology Southwest's President and CEO visited an archaeological site in the now-excluded area of Red Knobs in March of 2019.  This site contains painted pottery and a structure from the twelfth century that, under the Revocation

Proclamation, are no longer fully protected.  Meanwhile, a Boy Scout camp is under development in nearby Bluff, Utah, which will bring increased traffic to the area.  If the area was still on Monument land, money would have been spent to educate the new visitors about conservation.  Without funding for visitor education, however, uninformed visitors will increasingly visit sites like the one at Red Knobs without proper education.  Increased visitation of such sites without education will result in trampling and degradation.  As a result, upon information and belief, degradation of sites such as Red Knobs will only worsen.

48.     But for the Revocation Proclamation, Archaeology Southwest would focus its resources and publications on other areas and projects.  Archaeology Southwest has had to divert the time and effort of its staff as well as its financial resources toward raising awareness for Bears Ears National Monument—actions that would be unnecessary if its monument designation had not been illegally dismantled by President Trump.  Because it is a small non-profit organization, the diversion of resources has a significant effect on Archaeology Southwest's ability to carry out its mission of preservation archaeology for other areas in need of protection.  For example, Archaeology Southwest's efforts to promote the Great Bend of the Gila National Monument and to share information about the cultural landscape of the Greater Gila watershed, which are two high priorities on its strategic plan, have suffered significantly due to the need to invest time in educational efforts related to the Bears Ears area.

**Conservation Lands Foundation, Inc.**

49.     Conservation Lands Foundation, Inc. ("CLF") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of the State of Delaware, and headquartered in Durango, Colorado.  CLF maintains regional offices in the District of Columbia and five states.  Upon information and belief, CLF is the only non-profit in the country

specifically dedicated to establishing and safeguarding National Conservation Lands (formerly known as the "National Landscape Conservation System") under the care of the BLM. To fulfill its purpose, CLF works to protect, restore, and expand the National Conservation Lands through education, advocacy, and partnership. Bears Ears National Monument is a unit of the National Conservation Lands, and the management of and authority for appropriations to Bears Ears National Monument are governed in part by the Omnibus Public Land Management Act of 2009.

50.     CLF promotes conservation of public lands and the historic, cultural, and natural benefits that those lands provide. It does so by supporting the National Conservation Lands, which encompass approximately 36 million acres and 2,400 river miles of National Monuments, National Conservation Areas, Wilderness and Wilderness Study Areas, Wild and Scenic Rivers, National Scenic and Historic Trails, and other special designations. Congress recognized and codified the existence of the National Conservation Lands in 2009, *see* Omnibus Public Land Management Act of 2009, Pub. L. 111-11, 123 Stat. 991 (2009) (codified as 16 U.S.C. §§ 7201-7203), and mandated that those lands be managed in accordance with the statute or proclamation establishing them.

51.     Critical to CLF's success and mission is CLF's Friends Grassroots Network. CLF's founding organizational vision was to combine local grassroots power with a sophisticated national office that could educate Congress, the Executive Branch, and the public about the National Conservation Lands. CLF provides individual conservation and stewardship groups with technical advice, mentoring, tools, trainings and other services to ensure successful on-the-ground projects; CLF also offers guidance to groups on effective advocacy and community education. CLF's resources and expertise in government relations, advocacy, communications, and outreach provide local advocates with insights into developments affecting

the National Conservation Lands, including Bears Ears National Monument, as well as the tools needed to influence those developments powerfully and persuasively.

52.     Designation of Bears Ears National Monument has been a central initiative of CLF for more than six years.  CLF's primary focus has been providing strategic support to the local non-profits, particularly Utah Diné Bikéyah, Archaeology Southwest, and Friends of Cedar Mesa, that played important roles in the designation effort.  CLF has devoted thousands of hours of its staff time and significant resources to securing the designation of the Bears Ears area as a Monument.

53.     During the last six years, CLF provided strategic support to tribal organizations and others leading the effort to protect the Bears Ears region.  CLF also invested resources, provided services, and undertook significant advocacy efforts of its own.  CLF actively engaged in the creation of Bears Ears National Monument by supporting and participating in the collection of critical data and information on the natural, cultural, historic, and scientific resources and values supporting Proclamation 9558.  Additionally, CLF engaged with Department of the Interior officials (such as former Secretary Sally Jewell) regarding the significance of the Bears Ears region, including providing critical data and information on the area's resources.  CLF's efforts continue to date.

54.     CLF has suffered and will continue to suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of Bears Ears National Monument.  By virtue of its mission, CLF acts as a representative for preservation of the natural cultural, historic, and scientific values of Bears Ears National Monument and has suffered irreparable injury by the revocation of the original Monument and the diminution or elimination of the protections provided by Proclamation 9558.  Due to the actions of Defendants, CLF has

diverted some of its limited resources away from its ongoing designation campaigns in the states

of Arizona, California, and New Mexico, and toward activities designed to communicate about,

monitor, and mitigate adverse impacts to the excised area of the Monument.  CLF and the

organizations it supports have also diverted resources from other important stewardship projects

and toward programs designed to address protecting the Bears Ears region—such as conducting

indigenous advocacy training which, but for the Revocation Proclamation, CLF would not have

initiated.

  55. Additionally, since the Revocation Proclamation, CLF has been unable to invest

in training and capacity building with its partner organizations in Friends of Grassroots Network.

Specifically, CLF diverted $40,000 and 120 staff hours away from the network and toward new

training programs, such as a special indigenous advocacy training.  Further, CLF diverted staff

time and resources away from providing services to groups within the Network to develop their

organizational capacity, engage in conservation and stewardship work, and develop new

conservation programs.  Instead, CLF directed its staff time and resources to offering its Bears

Ears Network partners training on the Freedom of Information Act, and on monitoring and

dealing with threats from oil and gas development and livestock and travel managements within

the excised portions of Bears Ears National Monument.  These new training offerings cost CLF

approximately $1,000 per webinar and are resources that would normally go to community-

based stewardship and leadership projects.  Overall, because of CLF's need to develop new

training and education services in response to the Revocation Proclamation, it has been forced to

scale back its planned 2020 investment in the Grassroots Advancement Program by $50,000.

  56. CLF's mission is to preserve public lands because of the natural, cultural, historic,

and scientific value of those lands.  CLF has worked with dozens of local partners to advocate

for the preservation of many public lands.  But as a result of the Revocation Proclamation, the

organization has had to make significant changes:  It reorganized its internal governance

structure; it reworked its fundraising strategy; and it recrafted its budget to devote more time and

resources to protecting areas that were previously part of Bears Ears National Monument and to

supporting CLF partners who work in the Bears Ears region.  These changes mean that CLF is

not able to provide other previously planned services.  For instance, CLF is not able to grant

$40,000 to Friends of Missouri Breaks, and CLF had to reduce a grant to Archeology Southwest

by $50,000 for its work in the Gila Bend proposed national monument and Chaco Canyon.  Both

of these grant reductions have harmed CLF's ability to work with local partners, and have

reduced CLF's ability to work with local tribes in those regions.

57.      Moreover, CLF traditionally provides grants in a three-year commitment to

nascent organizations in order to build and sustain community-led organizations.  However, as a

result of the time, resources, and services shifted to address the Revocation Proclamation, CLF

has had to reduce or forgo commitments to dozens of organizations in almost every state in the

west, including Arizona, California, Colorado, Idaho, Montana, Nevada, Utah and Wyoming.

58.      Additionally, CLF's executive staff has set up a new fund for on-the-ground work

and services to monitor unprotected areas that are no longer part of the Monument, to develop

strategies for preserving these areas, to support the tribal coalition, and to work on the new

management plan.  This new fund, which would not have been created but for the Revocation

Proclamation, diverted time and resources away from other programs, including programs which

sought to connect indigenous youth to the lands through visits, and education programs designed

to protect sensitive cultural and natural resources.

59.      CLF has also shifted its communication and media resources in order to provide

services related to the Bears Ears region that, but for the Revocation Proclamation, it would not need to provide.  CLF has reallocated staff time, resources, and training to field media inquiries about the Bears Ears region, prepare remarks for interviews, create documents and materials to educate audiences and the Friends Grassroots Network about the Bears Ears region, and to drafting fact sheets and information material for educating community members.  In short, the Revocation Proclamation has impeded CLF's ability to provide services to its Friends Grassroots Network Partners, and CLF has diverted and redirected organizational resources to counteract the effects of the Revocation Proclamation on the treasured landscape and objects of national significance within the original Bears Ears National Monument.

60.     CLF officers and board members regularly visit the Bears Ears region to hike, camp, and explore in the areas no longer protected by Bears Ears National Monument.  The objects of historic and scientific interest comprising the original Bears Ears National Monument are critical to the officers' and board members' use and enjoyment of the land.

61.     Members of the entities within CLF's Friends Grassroots Network use and enjoy Bears Ears National Monument regularly.  This use includes hiking, rock climbing, rafting, backpacking, canyoneering, river running, photographing, and observing the area's unique archaeology, geology, and habitat.  The objects of historic and scientific interest comprising Bears Ears National Monument are critical to the members' use and enjoyment of the Monument.

**Patagonia Works**

62.     Patagonia Works ("Patagonia") is an outdoor apparel company with a 40-year history of environmental conservation and activism.  Protecting and preserving the environment is a core business tenet as reflected in Patagonia's mission statement: "We're in business to save

our home planet."  The company's specific purposes of business, conservation, and social equity are recognized and mandated by California law because Patagonia is a California benefit corporation.  Cal. Corp. Code §§ 14600 *et seq.*; *see* Patagonia Works, Restated Articles of Incorporation (filed with Cal. Sec'y of State, Oct. 30, 2013).  Among other things, Patagonia is legally required to: (i) contribute one percent of its annual net revenue to non-profit charitable organizations that promote environmental conservation and sustainability; (ii) create a material positive impact on society and the environment, and (iii) consider the impact of any action on its workforce, customers, and the environment.  Patagonia's corporate headquarters are located in Ventura, California.

63.     Consistent with its statutorily recognized specific public benefit purposes, Patagonia has donated more than $100 million to thousands of grassroots environmental groups since 1985.  In addition to providing funding to these groups, Patagonia has invested substantial company resources to amplify their messages, using its own marketing platforms and employee time to advocate for their shared conservation goals.  Patagonia has also provided tactical support for the groups it funds, including hosting a bi-annual "Tools for Grassroots Activists" conference, where it brings together environmental nonprofits with advocacy experts to train nonprofit employees on executing their mission.

64.     Many of the groups receiving Patagonia's support over the past forty years have worked to protect threatened wild places and other special public landscapes in their local communities, including through national monument designations.  These groups have galvanized local support for the designations that now ensure the protection of the following national monuments: (1) Basin and Range National Monument in Nevada; (2) Berryessa Snow Mountain National Monument in California; (3) Castle Mountains National Monument in California; (4)

Mojave Trails National Monument in California; (5) Sand to Snow National Monument in California; (6) Gold Butte National Monument in Nevada; and (7) Bears Ears National Monument in Utah.

65. Patagonia has a long history in the Bears Ears area because it provides some of the best rock climbing in North America. Patagonia's employees have visited Bears Ears numerous times for various purposes including, but not limited to, product testing, marketing, professional training, fitness, education, recreation, spiritual and aesthetic enjoyment, and other purposes. Bears Ears is used for similar purposes by Patagonia's customers and sponsored athletes. Patagonia's workforce and many of its customers intend to visit Bears Ears in the future.

66. In 2013, recognizing the Bears Ears area as one under threat from development that would materially alter the landscape and irreparably harm the cultural objects inexorably linked to the land, Patagonia became directly engaged in the effort to preserve and protect it. Since that time, Patagonia has collaborated with and provided grants to groups supporting the creation and preservation of Bears Ears National Monument. Since the Revocation Proclamation, Patagonia has provided additional grants specifically dedicated to supporting organizations that provide advocacy and services related to the reduction of Bears Ears National Monument. But for the Revocation Proclamation, Patagonia would have provided grants to different organizations in support of different environmental and conservation goals.

67. Patagonia has also dedicated substantial resources to creating—and now preserving—the Bears Ears National Monument designation, as well as educating the public on the unique and unrivaled natural setting of the Bears Ears area and the threats posed to natural and cultural resources in the area. This effort included the production of the 2015 film "Defined

by the Line," which followed Josh Ewing of Friends of Cedar Mesa as he described the unique

and threatened features of the region and depicted oil and gas development threats, and the 2017

interactive film allowing viewers to tour Bears Ears and experience the landscape that is

preserved within the Monument to build awareness of and support for the Monument.  Since the

Revocation Proclamation, Patagonia has dedicated additional resources to creating another film

addressing public lands and, specifically, addressing Bears Ears National Monument.  Patagonia

also advocated for creating a Monument at Bears Ears through its marketing channels, including

its company website, its social media platforms—which have several million followers—and its

catalogs and company blog.  Since the Revocation Proclamation, Patagonia has diverted

resources and staff time to providing regular updates and calls to action to its audience of

customers, athletes, and employees.  In addition, Patagonia has used its marketing channels,

including its website and marketing staff to create and administer a Bears Ears and public lands

website platform which allows stakeholders to communicate directly with the Trump

Administration about the reduction of Bears Ears National Monument and to provide comments

about the management planning process.

       68.     Patagonia's advocacy efforts supporting the protection of Bears Ears also include

organizing phone, social-media, and letter-writing campaigns, and meeting with state and federal

government officials—including staff at the U.S. Department of the Interior, the BLM, and the

White House Council on Environmental Quality, as well as Utah's governor and congressional

representatives.  Patagonia's CEO, Rose Marcario, and the Outdoor Industry Alliance brought

together industry leaders and companies to present a unified industry position in support of Bears

Ears.  The company's founder, Yvon Chouinard, penned opinion pieces in the *Los Angeles Times*

and *Salt Lake Tribune* supporting the Bears Ears National Monument designation and the

preservation of public lands.  Additionally, Patagonia's Director of Environmental Activism dedicated time and resources to testify before the House Natural Resources Subcommittee on National Parks, Forests, and Public Lands where he emphasized the importance of protecting public lands and waters and the negative effects of the reduction of Bears Ears National Monument.  Patagonia has had to, and must now continue to, divert resources from ongoing and future strategic priorities.  This has and will continue to impair Patagonia's ability to expand upon its mission and its specific public benefit purposes as a benefit corporation.  Patagonia's executives and many others have redirected their time and attention from other corporate goals and priorities to the effort to preserve Bears Ears National Monument.

69.     Patagonia has suffered and will continue to suffer direct and immediate injury from the revocation of the designation of the landmarks, structures, and objects of Bears Ears National Monument.  By virtue of Patagonia's statutory purposes and obligations as a California benefit corporation—which  require it to use its business to create a material positive impact on the environment, including by conserving public lands like Bears Ears, and its substantial investment of financial support and employee time into the establishment and defense of Bears Ears National Monument—the  revocation of Bears Ears National Monument has caused Patagonia to suffer an immediate and irreparable injury.  As a result of President Trump's actions, Patagonia has been forced to divert resources away from other organizational activities supporting conservation and social equity, and towards protection and restoration of the objects comprising Bears Ears National Monument.

70.     Patagonia's employees and sponsored athletes regularly visit the region to climb, run, and explore areas that are no longer part of Bears Ears National Monument.  The objects of

historic and scientific interest comprising Bears Ears National Monument are critical to the use and enjoyment of Patagonia's employees and sponsored athletes.

**The Access Fund**

71.     The Access Fund ("Access Fund" or "AF") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3) and an accredited land trust representing the interests of millions of climbers and mountaineers nationwide.  AF is headquartered in Boulder, Colorado.

72.     AF has a dual mission to create, protect, and enhance access to rock climbing areas nationwide, and to conserve the climbing environment.  To achieve its conservation mission, AF encourages and promotes environmental stewardship within the nation's rock climbing community and also engages in specific land management issues that threaten to affect the environmental quality of the nation's climbing areas.

73.     AF is the largest U.S. organization dedicated to advocating for climbers with approximately 20,000 members and 130 local affiliates, including the Friends of Indian Creek, which was established to focus on stewardship projects at Indian Creek, an area within Bears Ears National Monument.  AF provides climbing-management expertise, stewardship, project-specific funding, and educational outreach.  Utah is one of AF's largest member-states.  AF members from Utah and across the country regularly climb in Bears Ears National Monument.

74.     For over twenty years, AF's policy program has engaged in land management issues within Utah.  AF's efforts in Utah include participating as a leading stakeholder in the BLM Monticello Field Office's 2005 Indian Creek Corridor planning process, as well as advocating for climbing interests for three years during attempts to pass Utah Congressman Rob Bishop's Public Lands Initiative.

75.     AF also employs six professional trail builders and conservation specialists ("AF

30

Conservation Team") to help local climbing communities assess impacts and climbing area conservation needs, address general conservation needs, and provide training on stewardship planning and best practices for keeping climbing areas healthy.  The AF Conservation Team has spearheaded and worked on numerous stewardship projects within Bears Ears National Monument, resulting in camping and parking improvements, the installation of toilets, and the construction and maintenance of climbing access trails.

76.     AF staff dedicated hundreds of hours engaging with a wide range of stakeholders, including tribal interests, local government, the conservation community, and recreation groups to advocate for permanent protection for the Bears Ears region through a Monument designation. This collaborative process resulted in the Bears Ears Inter-Tribal Coalition submitting a letter to the Secretary of the Interior endorsing the inclusion of climbing as a legitimate use of Monument lands in the presidential proclamation.  AF later submitted its own letter to the Secretary of the Interior formally endorsing the establishment of a Bears Ears National Monument and advocating for the inclusion of climbing as a legitimate use of Monument lands in the presidential proclamation.  Ultimately, for the first time in history, Proclamation 9558 expressly mentioned rock climbing as one of the recreational opportunities to be protected through the establishment of Bears Ears National Monument.

77.     The Revocation Proclamation has caused direct harm to AF and its programmatic priority of protecting, conserving and stewarding the outstanding ecological, cultural, and recreational values of the Bears Ears landscape.  As a result of the Revocation Proclamation, AF has diverted its limited resources from other programs to monitor, defend, and advocate for areas that were previously protected as Monument lands but are now without such protections.

78.     Since the Revocation Proclamation, AF has committed substantial programmatic

31

resources to preparing geospatial mapping and analysis of the areas that are no longer protected as Monument lands and collecting information on potential resource extraction activities within those same areas. For instance, AF's Policy Director worked directly with the GIS Lab for Outdoor Alliance to prepare maps of the climbing resources that are in the areas that are no longer protected as Monument lands.[2]  There are several world-class climbing areas that are impacted by the Revocation Proclamation, including the Cliffs of Insanity, The Wall, and Hart's Draw.  When these geospatial maps are overlaid with publicly available geospatial information on proposed oil and gas lease parcels and uranium resource potential, the resulting maps demonstrate the ongoing risk of resource extraction in areas utilized by AF members for climbing and recreation that were removed from Bears Ears National Monument by the Revocation Proclamation.

79.    Based on the information developed regarding potential risks to climbing resources removed from Bears Ears National Monument, AF engaged in extensive programmatic activities to monitor and protect these areas.  In particular, AF's policy program engaged in extensive monitoring activities to determine whether any oil and gas leases and/or mineral claims were proposed or asserted within the areas withdrawn from Bears Ears National Monument. These monitoring activities became more urgent when, on January 31, 2018, the BLM issued Instruction Memorandum (IM) 2018-034, which made previously mandatory public comment processes optional and recommended slashing the 30-day administrative protest period for oil and gas lease sales to only 10 days.  Thus, AF was forced to increase its vigilance to ensure it did not miss any potential oil and gas or mineral decisions that could impact the lands removed from

---

[2] *See* https://outdooralliance.maps.arcgis.com/apps/webappviewer/index.html?id= 761b13c82eaa47dbbe876319ef00d379.

Bears Ears National Monument.

80.     In addition to these monitoring activities, AF conducted extensive community outreach and education activities to keep its membership and the broader climbing and outdoor-recreation community informed and involved in the management and protection of the public lands that were removed from Bears Ears National Monument by the Revocation Proclamation. In particular, AF committed substantial programmatic resources (community presentations, interactive online maps, news articles, social media, conference panels, and educational videos) to explain the impact of the Revocation Proclamation, how that decision could impact climbing and other recreational resources, and what the public can do to advocate for the restoration of the Monument designation.

81.     As a result of the Revocation Proclamation, AF and its policy program have been deeply engaged in developing strong partnerships with other interested stakeholders who have been injured by, and expressed concern about, the impacts of the Revocation Proclamation.  AF has diverted programmatic resources to this coalition work, investing numerous hours in partnering with the Bears Ears Inter-tribal Coalition, Outdoor Alliance, Outdoor Industry Association, local climbing organizations like Friends of Indian Creek and Salt Lake Climbers Alliance, and professional athletes who depend on Monument protections.  AF has also worked with funding organizations like the Conservation Alliance, Pew Charitable Trusts, and others. For example, AF will host a "Creeksgiving" fireside chat and film night in Indian Creek in November 2019 to discuss issues and share experiences related to the Revocation Proclamation with several stakeholders and recreation community influencers.  This type of work, sometimes referred to "grasstops advocacy," allows for information-sharing with other like-minded organizations and builds strong relationships, often with non-traditional allies that form a

foundation for effective policy advocacy.

82.     Because of the Revocation Proclamation, AF has been forced to monitor and defend the Bears Ears landscape from attack and threats of extraction instead of affirmatively stewarding the land, mitigating the impacts of outdoor recreation, planning recreational infrastructure with local land managers, educating climbers on low-impact practices, and promoting the outstanding values of this unique landscape.  AF's ability to devote time and resources to these other programmatic priorities has been and is currently severely limited based on actions AF has been forced to make to protect the integrity of the Bears Ears area.

83.     AF has extensive experience monitoring and stewarding other national monuments around the country that have climbing resources, including Devils Tower National Monument and Joshua Tree National Park (which was a monument before it became a national park in 1994).  The years of first-hand experience AF has working with these national monuments has allowed AF to understand how monument designation protects their outstanding historical, cultural, and ecological values from the adverse impacts of resource extraction while managing the heavy visitor traffic common at extraordinary American landscapes.  In national monuments, land managers work in partnership with nonprofit organizations like AF to affirmatively promote stewardship, conservation, and recreation.  *See* BLM Manual 6220: National Monuments, Conservation Areas, and Similar Designations (Jan. 25, 2017).  With these protections in place at other national monuments like Devils Tower and Joshua Tree, AF has been able to focus its limited resources on stewardship, policy, and climber education to ensure that climbers and other outdoor recreationalists protect and enhance these areas.  Because of the Revocation Proclamation, AF has been prevented from engaging in this kind of affirmative stewardship and conservation work in partnership with local land managers in the Bears Ears

region.

84.     AF members have visited areas that were subject to the Revocation Proclamation since the filing of this action, including the Cliffs of Insanity and The Wall, both well-known climbing resources that are now outside of the Monument boundaries.  AF members have witnessed substantial growth in visitor use of these areas since the Revocation Proclamation, and their use and enjoyment of these areas has been injured by the increased visitor traffic, overcrowding, increased human waste, and increased impacts to desert soils and other natural resources.  Heightened visitor use and its associated impacts to the sensitive desert environment are not being managed and mitigated with the same level of resources and agency focus as they would have been absent the Revocation Proclamation.  Without the protection that comes with a national monument designation, these harms to AF members will continue to occur.

85.     AF members regularly visit the Bears Ears region to climb, hike, camp, canyoneer, and explore in the areas now protected by Bears Ears National Monument.  In addition to the beauty and solitude afforded by the Bears Ears region, AF members enjoy visiting and viewing the vast cultural resources contained in the Bears Ears region, which contribute significantly to their spiritual and aesthetic enjoyment of the area.  Thus, the objects of historic and scientific interest comprising Bears Ears National Monument are critical to AF members' use and enjoyment of the Monument.

**The National Trust for Historic Preservation**

86.     Plaintiff the National Trust for Historic Preservation in the United States (the "National Trust") is a private charitable, educational, non-profit corporation chartered by Congress in 1949 to protect and defend America's historic resources, to further the historic preservation policy of the United States, and to facilitate public participation in the preservation

of our nation's heritage.  *See* 54 U.S.C. § 312102.

87.     The mission of the National Trust is to provide leadership, education, and advocacy to save America's diverse historic places and revitalize our communities.  The statutory powers of the National Trust include the power to bring suit in its corporate name.  *Id.* § 312105(c).  Consistent with its congressional charter and its statutory powers, the National Trust has participated in numerous actions to enforce federal laws that protect historic and cultural resources, including actions to protect national monuments.

88.     The National Trust is headquartered in Washington, D.C., has a number of field offices around the country and twenty-seven Historic Sites that are open to the public across the United States.  The National Trust has more than one million members and supporters around the country.

89.     For more than a decade, the National Trust has been intensively involved in and has contributed substantial funding to protect cultural resources within the Bears Ears area and to support the effort to designate Bears Ears a monument.  For example, the National Trust has made grants totaling approximately $50,000 to support research projects in areas within Bears Ears, including providing funding to the BLM that was used for stabilizing Chacoan walls in Arch Canyon.  The National Trust helped fund a publication called "Cliff Dwellers of Cedar Mesa" intended to increase public awareness and understanding of the history of the Bears Ears area.

90.     The National Trust also commissioned additional research within the past decade, including Class I cultural resource surveys for Cedar Mesa, and the National Trust prepared a heritage and eco-tourism report.  The National Trust has also provided technical assistance and support to grassroots groups, and has undertaken efforts to educate the public and policymakers

about the history and significance of Bears Ears National Monument and the threats to its

preservation.  In September 2014, the National Trust designated the area that later became Bears

Ears National Monument as a National Treasure, and in September 2016 Bears Ears was named

to the National Trust's annual list of "America's 11 Most Endangered Historic Places."  These

designations helped to build public awareness of the cultural resources at Bears Ears.

91.     The National Trust has found it difficult to adequately protect the vast number of

archaeological sites found within Bears Ears due, in large part, to a lack of comprehensive

information about those sites.  Conservation efforts to identify additional cultural resources and

map those resources will not be prioritized in the lands excluded under the Revocation

Proclamation.  As a result of the Revocation Proclamation, National Trust's mission of

increasing the availability of cultural resource survey data in Bears Ears is further frustrated.

92.     The National Trust has also participated in advocacy and other efforts it would

not have otherwise undertaken if not for the Revocation Proclamation.  These efforts have

included attending the BLM meetings on developing management priorities for the smaller

Monument area, submitting written comments objecting to the planning process for the smaller

Monument area, filing an administrative protest to the proposed Monument Management Plan

with the BLM, and coordinating and leading advocacy against the proposed Monument

Management Plan directed at the federal Advisory Council on Historic Preservation ("ACHP").

The National Trust has also expended substantial time and resources educating the public about

the importance of the legal, policy, and resource issues implicated by the Revocation

Proclamation.  This has included coordinating public comments expressing concerns about the

proposed Monument Management Plan.  Most recently, in September 2019, the National Trust

coordinated the submission of 6,470 public comments following the BLM's release of the

proposed final Monument Management Plan. The National Trust has also been forced to divert resources to address congressional efforts to respond to the Revocation Proclamation. This includes drafting communications and attending meetings regarding a proposed bill that would codify the smaller Monument boundaries, as well as drafting communications and attending meetings regarding two bills that would codify expanded Monument boundaries. This required additional staff time and resources that would have been expended on the preservation of other historical sites.

93.     Members of the National Trust regularly visit the Bears Ears region to hike, camp, and explore in the areas within Bears Ears National Monument. The objects of historic and scientific interest within Bears Ears National Monument are critical to the members' use and enjoyment of the Monument. Member Wesley White, for instance, has visited Bears Ears six times and has observed damage to archaeological resources due to inadequate management and a lack of visitor education. In March 2018, Senior Vice President of Field Services Barbara Pahl hiked in the Valley of the Gods, an area excluded under the Revocation Proclamation.

**The Society of Vertebrate Paleontology**

94.     The Society of Vertebrate Paleontology ("SVP") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3). It is incorporated under the laws of California and headquartered in Bethesda, Maryland.

95.     SVP is the world's largest paleontological organization. SVP's mission is four-fold: (1) to promote and advance the science of vertebrate paleontology around the world; (2) to serve the common interest of and facilitate cooperation between all persons concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds

in which they are found; (3) to support and encourage the discovery, conservation, and preservation of vertebrate fossils and fossil sites; and (4) to foster scientific, educational, and personal appreciation and understanding of vertebrate fossils and fossil sites by its paleontologists and the general public.

96.     As of December 2018, SVP's membership includes more than 2,400 students, artists, and other individuals interested in the science of vertebrate paleontology across the United States and abroad.

97.     Founded in 1940, SVP has been a leader in the paleontological community for nearly eighty years.  It holds an annual scientific conference, publishes journals and a memoir series of vertebrate paleontological research, engages in education and outreach, and participates in activities relating to the preservation of scientifically important vertebrate paleontological resources.

98.     SVP has been advocating for decades to conserve public lands as a means of ensuring access to, and protection of, paleontological resources.  Beginning in 1991, SVP successfully argued against bills in the United States Senate that would have permitted commercial collecting on public lands, and SVP continued to work with Congress and executive agencies to increase protections for vertebrate fossils.  In 2009, SVP was instrumental in passing the Omnibus Public Land Management Act of 2009, specifically the Paleontological Resources Preservation Act section.

99.     SVP and its members have devoted substantial time and resources to the protection of paleontological resources within Bears Ears National Monument.  SVP especially focused its advocacy efforts on explicit recognition of paleontology as a value to be protected by the Monument designation.  As the organization learned through its experience with the

designation of Grand Staircase-Escalante National Monument, that recognition prompts federal agencies to prioritize paleontological research over other uses of the land, and it enhances funding opportunities for research through the National Landscape Conservation System.

100.     Since the Revocation Proclamation, SVP has devoted additional resources to organizing public events and resources related to the effects of the reduction on paleontological science.  SVP has also devoted additional time and resources to engaging in public education and advocacy.  For example, on March 13, 2019, SVP Immediate Past President P. David Polly testified before the U.S. House Committee on Natural Resources to highlight the paleontological effects of improper alteration of national monuments, including Bears Ears.  Between November 2018 and October 2019, SVP also prepared presentations in Bloomington, Indiana; Belfast, Maine; Riverside, California; and Brisbane, Australia regarding the effects of funding cuts to paleontological science.

101.     In collaboration with the BLM, SVP members have also participated in educational outreach activities about the paleontological research at Bears Ears National Monument before and after its designation.  The objects of historic and scientific interest within Bears Ears National Monument are critical to the members' present and future research within the Monument.  Several known fossil sites, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods, are now within the excised area and stripped of Monument protection.  Casual collection of paleontological objects was prohibited in these areas when they were part of Bears Ears National Monument, but is no longer prohibited due to the Revocation Proclamation.  Such collection frequently destroys the geological context of the surrounding area and harms paleontological research and resources.

102.     SVP members regularly visit Bears Ears National Monument to conduct research

on paleontological resources within the boundaries described by Proclamation 9558. SVP members have also published extensively on paleontological research within that area and have done so since at least 1965.

103.     At least 22 SVP members had ongoing research interests in the excluded areas of the Monument when the boundary cuts were made. Approximately forty percent of the currently known paleontological sites of scientific importance at Bears Ears were removed by the cuts. SVP members are no longer eligible for research funding from National Landscape Conservation System for work at these sites or in areas with high paleontological potential that have yet to be surveyed. This harm is directly caused by the Revocation Proclamation.

104.     At least one SVP member, Robert Gay, has been denied external research funding because of the uncertainties surrounding research in the excluded areas of the Monument. Another member, Stuart Sumida, has not applied for any additional funding in the Bears Ears area given uncertainties about the land's status. Additionally, a grant previously obtained by Stuart for work in the excised area is currently on hold based on uncertainties about the land's status and restrictions that may now apply to the grant. Several SVP members are currently operating as "paleontological tourists," only monitoring these sites to ensure that they remain intact, and surveying potential sites for future research until the status of the land and the ability to obtain and utilize funding becomes clear. The turmoil caused by the Revocation Proclamation has directly harmed each of these SVP members.

105.     Furthermore, the Revocation Proclamation has and will harm the effectiveness of SVP-member research in the excluded areas, because the specialized management structures for paleontological resources that should have been put in place across the entire Monument will now be limited to the Shash Jáa and Indian Creek units when the BLM issues its final Monument

Management Plan and Environmental Impact Statement.  Other BLM-managed national monuments that were established for their paleontological resources, notably Grand Staircase-Escalante, have specialist paleontology managers who proactively survey for scientifically important paleontological resources, proactively recruit researchers to study those resources, and coordinate the synthesis and interpretation of the findings made by all of the researchers who work there.  Monument managers often provide crucial information regarding recent activity in the Monument area as well as scientific expertise.  SVP research in the excluded areas has and will continue to suffer from the inability to take advantage of these resources.

**II.  Defendants**

106.    Defendant Donald Trump is the President of the United States.  In his official capacity, he signed and issued the Revocation Proclamation revoking and replacing Bears Ears National Monument.  The President resides and conducts his duties in Washington, D.C.

107.    Defendant David Bernhardt is the Secretary of the United States Department of the Interior.  In his official capacity, he is charged with ensuring that the Department of the Interior and its constituent agencies, including the BLM, fulfill their duties.  These duties include management of Bears Ears National Monument in accordance with the mandates of the Omnibus Public Land Management Act of 2009 and Proclamation 9558.  The Secretary of the Interior resides and conducts his duties in Washington, D.C.

108.    Defendant Sonny Perdue is the Secretary of the United States Department of Agriculture.  In his official capacity, he is charged with ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service (the "USFS"), fulfill their duties.  These duties include management of areas within Bears Ears National Monument in accordance with law and Proclamation 9558.  The Secretary of Agriculture resides and conducts his duties in Washington, D.C.

109.     Defendant William Perry Pendley is the Deputy Director, Programs and Policy, of the BLM.  In his official capacity, he exercises the authority of the Director of the BLM and is charged with ensuring that the BLM fulfills its duties.  These duties include management of Bears Ears National Monument in accordance with the mandates of the Omnibus Public Land Management Act of 2009 and Proclamation 9558.  Upon information and belief, the Deputy Director, Programs and Policy, of the Bureau of Land Management resides and conducts his duties in Washington, D.C.

110.     Defendant Tony Tooke is the Chief of the USFS.  In his official capacity, he is charged with ensuring that the USFS fulfills its duties.  These duties include the management of areas within Bears Ears National Monument in accordance with law and Proclamation 9558. The Chief of the USFS resides and conducts his duties in Washington, D.C.

**LEGAL FRAMEWORK**

111.     The Property Clause of the United States Constitution states that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"  U.S. Const. art. IV, § 3, cl. 2.  The United States Constitution thus grants Congress the exclusive authority for regulation of public lands.  Absent a congressional delegation under the Property Clause, the President lacks any authority over public lands.

112.     The Antiquities Act provides that "[t]he President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."  54 U.S.C. § 320301(a).

113.     The Antiquities Act also states that "[t]he President may reserve parcels of land as

43

a part of the national monuments.  The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."  54 U.S.C. § 320301(b).

114.    The Antiquities Act does not authorize the President to revoke the national monument status of landmarks, structures, and objects previously designated as such.

115.    The Antiquities Act does not authorize the President to modify the reservation of land for a national monument, or to modify land use restrictions, in such a way as to deprive the landmarks, structures, and objects comprising the monument of proper care and management.

116.    The Antiquities Act does not authorize the President to modify the parcels of land reserved for a national monument.

117.    The Omnibus Public Land Management Act of 2009 provides that all lands within national monuments administered by the BLM become part of the National Landscape Conservation System.  16 U.S.C. § 7202(b)(1)(A).

118.    The Omnibus Public Land Management Act of 2009 commands the Secretary of the Interior to manage all lands within the National Landscape Conservation System in accordance with any applicable law (including regulations) relating to any component of the system and in a manner that protects the values for which the components of the system were designated.  *Id.* § 7202(c).

## FACTS

### I.  The Creation of Bears Ears National Monument

119.    On December 28, 2016, President Obama signed Proclamation 9558 establishing Bears Ears National Monument.  82 Fed. Reg. at 1139.

120.    Bears Ears National Monument, which is located in the southeastern corner of Utah, encompasses a wide variety of historic landmarks, historic and prehistoric structures, and

other objects of historic or scientific interest situated on approximately 1.35 million acres of federal land.  This federal land includes parts of the Manti-La Sal National Forest managed by the USFS and other land managed by the BLM.

121.    The area that makes up Bears Ears National Monument under Proclamation 9558 has played an integral part in the long history of the West.  Tribes have been here since time immemorial.  The landscape reflects the presence of these peoples, with petroglyphs and pictographs dating back at least 5,000 years, and "[t]he area's cultural importance to Native American tribes continues to this day."  *Id.* at 1140.

122.    Proclamation 9558 sets forth a wide variety of objects of historic and scientific interest as a result of the objects' cultural importance.  These objects include "[a]bundant rock art, ancient cliff dwellings, ceremonial sites, and countless other artifacts [that] provide an extraordinary archaeological and culture record[.]"  *Id.* at 1139.  That record contains, among other items, tools, projectile points and other weapons, baskets, pottery, family dwellings, granaries, kivas, towers, villages, roads, Moki steps carved into canyon walls, petroglyphs, pictographs, Ancestral Puebloan villages, Ute home sites, and Navajo hogans.  *See id.* at 1139-40.

123.    These objects also include unique natural formations that are tied to Native American stories of creation, of danger, of protection, and of healing.  *Id.* at 1140.  And the ecological resources of the area provide medicinal and ceremonial plants, edible herbs, and crafts.  *Id.*  Moreover, Native American knowledge of those ecological resources itself provides a resource for managing the landscape on behalf of future generations.  *Id.*

124.    Other objects of historic and scientific interest within the Monument played a central role in the Euro-American development of the West.  *Id.*  Observers of the Mormon faith

traced their route through the area, "smooth[ing] sections of the rock surface and construct[ing] dugways and other features still visible along their route[.]"  *Id.*  And outlaws like Butch Cassidy and the Sundance Kid used a complex trail network "to avoid detection."  *Id.*

125.    The area is also home to "stunning geology," extensive paleontological resources, and innumerable ecological resources.  *Id.* at 1140-41.  The landscape and geography includes cliffs, canyons, desert, mesas, mountains, meadows, forests, grasslands, rivers, ridges, rock formations, stone spires, hoodoos, and, naturally, the buttes that give the Bears Ears area its name.  *Id.* at 1139-42.

126.    The designated objects of Bears Ears National Monument also include habitat supporting plant life of scientific, cultural, and ecological significance, including many species or subspecies of trees, shrubs, yucca, cacti, grasses, and wildflowers.  In particular, the area offers a wide diversity of soils and microenvironments that can support a breadth of flora and fauna.  *Id.* at 1141-42.

127.    The Monument protects habitats supporting animal life of scientific, cultural, and ecological significance, including mule deer, elk, bighorn sheep, foxes, bobcats, mountain lions, eagles, falcons, hawks, owls, and bats.  *Id.* at 1142.

128.     Paleontological evidence of past landscapes and life are also preserved in Proclamation 9558.  "The paleontological resources in the Bears Ears area are among the richest and most significant in the United States, and protection of this area will provide important opportunities for further archaeological and paleontological study."  *Id.* at 1141.  There is a wealth of fossil resources in the following areas of the Monument: Arch Canyon, Comb Ridge, the Valley of the Gods, Indian Creek, and the Chinle, Wingate, Kayenta, and Navajo Formations. *Id.*

129.    The designation of Bears Ears National Monument preserves critical values connected with these numerous, unique landmarks, structures, ceremonial places, traditional cultural properties, and objects of scientific, cultural, and ecological significance, and preserves culturally important and interconnected sacred landscape across 1.35 million acres of federal land.  These values include at least:

a.    preservation and appreciation of an extraordinary archaeological and cultural record, *see* 82 Fed. Reg. at 1139;

b.    the landscape's sacredness to the Tribes and its continuing cultural importance to their members, *see id.*;

c.    preservation and appreciation of ancient artistry and architecture, *see id.*;

d.    opportunities to study the landscape's stunning geology, *id.* at 1140;

e.    preservation and appreciation of paleontological resources, *id* at 1141;

f.    appreciation of the landscape's visual and auditory aesthetic value, *id.*;

g.    preservation of the landscape's ecological resources and systems, which provide habitat, water-filtering, hunting, pasturing, and other goods, *see id.* at 1141-42;

h.    enjoyment of the landscape through outdoor recreation, *id.* at 1143;

i.    economic opportunity through travel and tourism, *id.*; and

j.    recognition of the importance of tribal participation in the care and management of the objects identified in Proclamation 9558 and a commitment to ensuring that management decisions affecting the Monument reflect tribal expertise and traditional and historical knowledge, *see id.* at 1144.

130.    To protect these values, Proclamation 9558 reserved lands from certain uses and imposed certain conditions and directives in that reservation.  *See id.* at 1143-44.

131.    Most notably, Proclamation 9558 established a Bears Ears Commission composed of one representative from each of the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute Tribes (the Tribes, as referenced above).  *Id.* at 1144.  The Secretaries of the Interior and Agriculture must "meaningfully engage the Commission" or its successor entity in the development of management plans for and management of Bears Ears National Monument.  *Id.* The Secretaries must "carefully and fully consider integrating the traditional and historical knowledge and special expertise" of the Commission.  *Id.*

132.    Proclamation 9558 established a boundary encompassing 1.35 million acres of federal land and withdrew all federal lands within Bears Ears National Monument from all forms of entry, location, selection, sale, or other disposition under the public land laws, including mining laws, or the laws applicable to the USFS.  *Id.* at 1143.

133.    Proclamation 9558 also protected lands within Bears Ears National Monument from oil and gas leasing and development.  *Id.* at 1143.  The Mineral Leasing Act of 1920, which governs oil and gas leasing on federal land, excludes from mineral leasing land designated as a national monument.  30 U.S.C. § 181.  Applying this authority, Proclamation 9558 mandated that all federal public land within the Monument was "appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws . . . and from disposition under all laws relating to mineral and geothermal leasing."  82 Fed. Reg. at 1143.  As a result, the proclamation protects the entirety of the over 1.35 million-acre designation and permanently withdraws it from future oil and gas leasing and development.

134.    Under Proclamation 9558, the Secretary of the Interior and the Secretary of Agriculture are responsible for the management of Bears Ears National Monument through the BLM and the USFS, respectively.  *Id.*

135.    The Secretary of the Interior is responsible for managing those parts of Bears Ears National Monument not contained within the boundaries of the National Forest System.  All such lands within the Secretary's responsibility are to be managed as part of the National Landscape Conservation System.  *Id.*

136.    Under Department of the Interior policy, all National Conservation Lands must be managed "to protect the values for which they were designated, including, where appropriate, prohibiting uses that are in conflict with those values."  Ken Salazar, Sec'y of the Interior, Order 3308: Management of the National Landscape Conservation System, ¶ 4a (2010).  The same policy directs that National Conservation Lands, including national monuments, "shall be managed as an integral part of the larger landscape[.]"  *Id.* ¶ 4b.

137.    Under BLM policy, the agency takes a variety of actions to incorporate the values of a national monument designation and implement the commands of the Omnibus Public Land Management Act of 2009.  *See* BLM Manual 6220: National Monuments, National Conservation Areas, and Similar Designations, ¶ 1.1 (Jan. 25, 2017).  These actions include:

a.      managing national monuments to conserve, protect, and restore nationally significant landscapes, *see id.* ¶ 1.6.A.1;

b.      managing discretionary uses in a manner consistent with the protection of a national monument's values, including prohibiting such uses where necessary, *see id.* ¶ 1.6.A.2;

c.      inventorying and monitoring the objects and values for which a national monument was designated, *see id.* ¶ 1.6.A.3;

49

d.  managing valid existing rights and other non-discretionary uses in a manner that mitigates, to the greatest extent possible, impacts to the objects and values for which a national monument was designated, *see id.* ¶ 1.6.A.4;

e.  engaging the public on national monument lands through education, interpretation, partnerships, and volunteer and job opportunities, *see id.* ¶ 1.6.A.5;

f.  fostering active volunteer programs for national monuments to enhance a public sense of stewardship and to accomplish high-priority work, *see id.* ¶ 1.6.A.6;

g.  utilizing the best available science to manage national monuments, *see id.* ¶ 1.6.A.7;

h.  appointing a manager for each new national monument who has decision-making and supervisory authority and whose primary duty is to manage the national monument, *see id.* ¶ 1.6.D.3;

i.  clearly identifying objects and values described in the proclamation during land use planning, and, where those objects and values are described in broad categories, identifying the specific resources within the national monument that fall into those categories, *see id.* ¶ 1.6.G.4.a;

j.  developing and sustaining diverse partnerships dedicated to conserving, protecting, restoring, and interpreting national monuments, *see id.* ¶ 1.6.J.1;

k.  supporting formalized partnership agreements, such as Friends' Groups, for each national monument, *see id.* ¶ 1.6.J.2;

l.  providing access for recreational opportunities within a national monument, where recreational values are identified in the proclamation, and conserving, protecting, and restoring those values, *see id.* ¶ 1.6.K.1;

50

m.   promoting national monuments as sites for scientific research, *see id.* ¶ 1.6.M.2; and

n.   developing and updating science plans for each national monument, with particular attention to organizing scientific reports and compiling and synthesizing prior research, *see id.* ¶ 1.6.M.3.f.

138.   The Secretary of Agriculture is responsible for managing those parts of Bears Ears National Monument contained within the boundaries of the National Forest System.  All such lands within the Secretary's responsibility are to be managed as part of the Manti-La Sal National Forest.  82 Fed. Reg. at 1143.

139.   As part of their management responsibilities, the Secretary of the Interior and the Secretary of Agriculture must, "to the maximum extent permitted by law and in consultation with Indian tribes, ensure the protection of Indian sacred sites and traditional cultural properties in the Monument and provide access by members of Indian tribes for traditional cultural and customary uses[.]"  *Id.* at 1145.  These traditional uses include "collection of medicines, berries and other vegetation, forest products, and firewood for personal noncommercial use in a manner consistent with the care and management of the objects" comprising the Monument.  *Id.*

140.   The Secretaries must together prepare a transportation plan for Bears Ears National Monument "[f]or the purposes of protecting and restoring" those same objects.  *Id.* at 1145.  Under this plan, "motorized and non-motorized mechanized vehicle use shall be allowed only on roads and trails designated for such use, consistent with the care and management of such objects."  *Id.*  "Any additional roads or trails designated for motor vehicle use must be for the purposes of public safety or protection of such objects."  *Id.*

141.     As described in Proclamation 9558, Bears Ears National Monument contains

objects of historic and scientific interest that are integral to our identity as a nation and should,

accordingly, be protected for the public good consistent with the authority that the Antiquities

Act grants the President to so designate these areas.

**II.  The Process Leading to Creation of Bears Ears National Monument**

142.     The designation of Bears Ears National Monument through Proclamation 9558 is

the product of years of public advocacy and engagement by Plaintiffs, tribal nations, and other

groups with interests in protecting the cultural, historic, and ecological heritage of southeastern

Utah.

143.     Members of Native American tribes with ties to the southeastern Utah area began

organizing a proposal for protection of the Bears Ears area in 2010.  Bears Ears Inter-Tribal

Coalition, *Proposal to President Barack Obama for the Creation of Bears Ears National*

*Monument* 3 (2015).[3]

144.     In 2011, the President of the Navajo Nation sent a letter to then-Secretary of the

Interior Ken Salazar proposing a new national monument protecting the Bears Ears area.  The

Navajo Nation is located in northwestern New Mexico, northern Arizona, and Southeastern

Utah.

145.     By mid-2013, UDB had conducted more than 70 interviews of Native elders and

experts to understand traditional cultural uses in San Juan County, Utah.  UDB also carried out

research from all seven Utah Chapter Houses (local government entities of the Navajo Nation),

held dozens of community meetings on this issue, obtained tens of thousands of statements of

---

[3]       Available at http://utahdinebikeyah.org//wp-content/documents/
Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf.

support, developed GIS data of the area for its decision support tool, and held several gatherings of the Tribes at Bears Ears to discuss land protection strategies.

146.    In 2013, UDB and the Navajo Nation presented a proposal to the San Juan County Commission for a national conservation area to be jointly managed by Tribal Nations.  This proposal anticipated the enactment of a federal Public Lands Initiative program in which the County would play a role.  Congress never enacted the Public Lands Initiative, and the San Juan County Commission did not respond to the proposal.  In fact, the San Juan County Commission later advocated for the creation of an "energy zone" across a vast swathe of the Bears Ears area. *Id*. at 11.

147.    In September 2014, the Hopi Tribe, located in Arizona, petitioned President Obama and the Utah congressional delegation for designation of the Bears Ears region as a national conservation area or a national monument.  The Hopi Tribe emphasized the cultural importance of the Bears Ears region and explained the need for monument designation since the region's archaeological, natural, and geographic resources had been degraded by "looting, federal management inadequacies, industrial development," and "inappropriate all terrain vehicle use."  The Hopi Tribe, *Letter from Herman Honanie* (Sept. 30, 2014).[4]

148.    On November 19, 2014, the All Pueblo Council of Governors, which represents the Pueblo tribes located largely in New Mexico, passed a resolution supporting the "permanent, long-term protection of cultural resources and sacred sites on public land in the Greater Cedar Mesa region through designation such as a National Conservation Area or a National Monument."  Resolution: All Pueblo Council of Governors Resolution No. APCG 2014-17,

---

[4]      Available at https://bearsearscoalition.org/wp-content/uploads/2015/04/hopi-nca-letter-scanned.pdf.

*Support for the Protection of Cultural Resources and Sacred Sites on Public Lands in the*
*Greater Cedar Mesa region* (Nov. 19, 2014).[5]

149.    On February 9, 2015, the Hualapai Tribal Council of the Hualapai Tribe in
Arizona approved a resolution supporting the designation of the Bears Ears area as a National
Conservation Area or a National Monument.

150.    In March 2015, the Naabik' í yáti' Committee of the 23rd Navajo Nation Council
unanimously approved a resolution supporting UDB's proposal for federal designation of the
Bears Ears area as a national conservation area or a national monument.  The resolution
concluded that designation of the area as a national conservation area or national monument
"will provide important consistency and quality to management of these lands," especially
because "protection will be permanent, part of a national system of protected lands that carry
strong and clear legal definitions of the primacy of conservation of cultural, historical and
ecological values[.]"  Resolution of the Naabik' í yáti' Committee of the Navajo Nation Council,
*Relating to the Resources and Development Committee and the Naabik' í yáti' Committee;*
*Supporting the Utah Diné Bikéyah Conservation Proposal for the Federal Designation of Bear's*
*Ears National Conservation Area/National Monument in San Juan County, Utah, to Protect*
*Native Rights and Interests of Federal Lands for Future Generations* (2015).[6]

151.    In April 2015, groups including CLF, Friends of Cedar Mesa, and UDB united
their ongoing efforts as a group of supporting organizations to advance and publicize proposals
for federal protection of the Bears Ears region.

---

[5]      Available at https://bearsearscoalition.org/wp-content/uploads/2015/04/2014-17-Support-for-Protection-of-Cedar-Mesa-Area.pdf.
[6]      Available at http://www.bearsearscoalition.org/wp-content/uploads/2015/10/Bears-Ears-Complete-Resolution-Packet-10-1-15.pdf.

152.    On July 14, 2015, the Tribal Business Committee of the Ute Indian Tribe, located in northeastern Utah, resolved to support the permanent protection of the Bears Ears region.  The Committee explained that "Native American traditional and cultural sites need protection from outside threats such as mineral development, indiscriminate off-road vehicle use, and looting." Ute Indian Tribe, *Ute Indian Tribe's Support for Preserving the Bears Ears Region* (July 14, 2015).[7]

153.    That same month, the Assistant Secretary of Indian Affairs for the Department of the Interior, the National Park Service Director, the Deputy Director of the Bureau of Land Management, and the Deputy Under Secretary for Natural Resources and Environment for the Department of Agriculture attended the Second Bears Ears Inter-tribal Gathering.  There, the federal officials met with Tribal leaders and representatives from other stakeholders to discuss protection of the Bears Ears area.

154.    In October 2015, the Bears Ears Inter-Tribal Coalition released a formal proposal for the designation of Bears Ears National Monument under the Antiquities Act.  This proposal called for a monument encompassing 1.9 million acres, based on the boundaries proposed in the Public Lands Initiative, to be jointly managed by a group of Tribes.

155.    On March 7, 2016, the Executive Directors of CLF and Friends of Cedar Mesa, along with their counterparts from five other conservation non-profits, wrote President Obama to express their support for the proposal of the Bears Ears Inter-Tribal Coalition.  On the same day, the Zuni Tribal Council passed a resolution supporting "the permanent protection of the Bears Ears region and its cultural and natural resources through a national monument designation[.]"

---

[7].    Available at https://bearsearscoalition.org/wp-content/uploads/2015/03/Northern-Ute-letter.pdf.

Zuni Tribal Council, *Permanent Protection of Bears Ears Region Through National Monument Designation* (Mar. 7, 2016).[8]

156.    On March 25, 2016, the Hopi Tribal Council approved a resolution supporting "the long term protection of cultural and natural resources and sacred sites on these public lands through a proposal for a Presidential Proclamation designating Bears Ears National Monument." The Hopi Tribe, *Approval to Support Proposal for a Presidential Proclamation Designating Bears Ears National Monument*, (Mar. 25, 2016).[9]

157.    On June 9, 2016, members of the Utah Tribal Leaders Association passed a joint resolution calling for protection of the Bears Ears area as a national monument.

158.    In June 2016, Archaeology Southwest and Friends of Cedar Mesa issued an open letter to President Obama, signed by several hundred professional archaeologists, calling for the protection of artifacts in the Bears Ears area through the Antiquities Act.  The archaeologists explained: "The Bears Ears cultural landscape is full of stunning and remarkably well preserved cliff dwellings.  Countless mesa-top pueblos, shrines and ancient roads attest to the tenacity of ancient inhabitants.  Internationally important petroglyph and pictograph panels inspire visitors with the artistry of ancient storytellers.  Undisturbed burials still cradle the ancestors of many regional Native American tribes.  The preservation and density of these cultural resources rival and perhaps exceed those found within many nearby national parks and  monuments.  With more than 100,000 archaeological sites, the Bears Ears region is filled with exactly the kinds of 'objects' the 1906 Antiquities Act was created to protect."  *Open Letter From the Below Signed*

---

[8]      Available at https://bearsearscoalition.org/wp-content/uploads/2016/03/M70-2016-P014-Bears-Ears-Designation-7MAR2016.pdf.
[9].     Available at https://bearsearscoalition.org/wp-content/uploads/2016/04/Bears-Ears-letter-Hopi-approval-resolution.pdf.

*Archaeologists to President Barack Obama* 3 (2015).[10]  The archaeologists further explained that vandalism and removal of artifacts "continue at an alarming rate, with several dozen incidents in the last two years.  Increasing visitation combined with a severe lack of resources for effective management and enforcement also create newer but no less menacing challenges to archaeology in the region."  *Id.*

159.    On July 16, 2016, then-Secretary of the Interior Sally Jewell, the Directors of the Bureau of Land Management and the National Park Service, the Under Secretary for Natural Resources and Environment for the Department of Agriculture, and other federal officials held a public meeting on community preferences for the federal lands at the Bluff Community Center in Bluff, Utah.  Over 1,500 citizens attended this meeting, with most of those who spoke supporting permanent protection for Bears Ears.  The majority of nearly 600 written comments also supported further federal protection.

160.    In November 2016, SVP sent a letter on behalf of the entire organization urging President Obama to protect the paleontological resources within the Bears Ears area and explaining that the area holds some of the richest and most significant paleontological resources in the United States, many of which have yet to be scientifically examined.  The letter asked the President to exercise his authority under the Antiquities Act to protect the known and as-yet-undiscovered paleontological resources from collection or destruction; the letter also sought designation to promote scientific research in the area.  SVP specifically requested that the President recognize the value of promoting paleontological research, and, to that end, provided draft language on the area's paleontological resources for use in a proclamation.  Much of the information in Proclamation 9558 about the paleontological resources within Bears Ears

---

[10]/      Available at https://www.blm.gov/download/file/fid/7955.

National Monument draws directly from this letter and the input from SVP members and other

paleontologists, as well as from information provided in meetings between representatives of

SVP and the Departments of the Interior and Agriculture.

161.    On November 30, 2016, Archaeology Southwest, Friends of Cedar Mesa, and

sixteen other archaeological or historical preservation groups wrote President Obama to explain

the need for national monument status to protect the Bears Ears area from "illegal looting,

mismanaged recreational use, and inappropriate energy development."  Bears Ears Letter from

Cultural Resources Groups (Nov. 30, 2016).[11]

162.    By the time of its creation, representatives from at least ten tribal government

bodies, thirty local Utah officials, over 500 members of the scientific community, sixty-five

national business leaders, 180 health professionals, sixteen religious leaders, and numerous non-

profit organizations wrote federal officials to express their support for protection of the Bears

Ears area.

### III. President Trump's Attempt To Revoke Bears Ears National Monument Executive Order 13,792

163.    The President has repeatedly attributed his decision to revoke Bears Ears National

Monument to requests from former Senator Orrin Hatch.  When the President signed Executive

Order 13,792, which commenced the review of existing national monuments in the Spring of

2017, he stated he was signing the Order to "end another egregious abuse of federal power," and

"this massive federal land grab . . . has gotten worse, and worse, and worse and now we're going

to free it up."  White House Office of the Press Secretary, *Remarks by President Trump at*

---

[11]    Available at
https://www.crowcanyon.org/images/PDFs/Bears%20Ears%20Letter%20from%20Cultural%20
Resources%20Groups%2011-30-2016.pdf.

*Signing of Executive Order on the Antiquities Act*, WhiteHouse.gov (Apr. 26, 2017).[12]  At the signing ceremony for the Revocation Proclamation, Senator Hatch stated that he approached President Trump in January 2017 with a request for aid in "fixing" Bears Ears National Monument.  *See President Trump Remarks in Utah*, C-SPAN.org (Dec. 4, 2017).[13]  The President agreed to "fix it" "without hesitation," according to Senator Hatch.  *Id*.

164.    On April 26, 2017, President Trump signed Executive Order 13,792, entitled "Review of Designations Under the Antiquities Act."  82 Fed. Reg. 20,429 (May 1, 2017).

165.    The Executive Order commands the Secretary of the Interior to review all presidential monument designations or expansions since January 1, 1996, where the designation covers more than 100,000 acres, where the monument after expansion covers more than 100,000 acres, or where the Secretary determines that the designation or expansion occurred without adequate public outreach.  *Id.*  Executive Order 13,792 does not explain the basis for the selection of 1996 or 100,000 acres as criteria for determining the monuments reviewed.

166.    The Executive Order required the Secretary of the Interior to assess issues outside the scope of the legal parameters of the Antiquities Act.  For instance, the Executive Order instructs the Secretary of the Interior to review whether "designated lands are appropriately classified under the [Antiquities] Act as 'historic landmarks, historic and prehistoric structures, [or] other objects of historic or scientific interest[.]'"  *Id.* (first alteration in original) (quoting 54 U.S.C. § 320301(a)).

167.    The Executive Order directed the Secretary of the Interior to provide, within 45

---

[12]     Available at https://www.whitehouse.gov/the-press-office/2017/04/26/remarks-president-trump-signing-executive-order-antiquities-act.
[13]     Available at https://www.c-span.org/video/?438061-1/president-trump-reverses-obama-administration-utah-monuments.

days, an "interim report" on the findings of his review "with respect to Proclamation 9558 of

December 28, 2016 (Establishment of the Bears Ears National Monument), and such other

designations as the Secretary determines to be appropriate for inclusion in the interim report."

*Id.* at 20,430.  The interim report had to include recommendations for executive, legislative, or

other action with respect to Bears Ears National Monument and any other national monument

included.

168.    Executive Order 13,792 further directed the Secretary of the Interior to provide a

"final report" to the President on his review of all designations and expansions.  This final report

had to include recommendations for executive, legislative, or other action with respect to each

national monument.  *Id.*

**Secretary Zinke's Interim Report**

169.    In response to Executive Order 13,792, the Department of the Interior issued a

notice in the *Federal Register* inviting public comment for review by the Secretary.  *See* Review

of Certain National Monuments Established Since 1996, 82 Fed. Reg. 22,016 (May 11, 2017).

The notice identified twenty-seven Monuments subject to the review, including Bears Ears

National Monument.  *See id.* at 22,017.

170.    The Department of the Interior's notice did not solicit comments on the need to

expand any existing national monument.

171.    For the twenty-six national monuments besides Bears Ears, the notice set the

deadline for comments at July 10, 2017.  *See id.* at 22,016.  For Bears Ears National Monument,

however, the notice set the comment deadline at May 26, 2017—a mere fifteen days from its

publication.  *See id.*

172.    UDB, Friends of Cedar Mesa, Archaeology Southwest, CLF, Patagonia, AF, the

60

National Trust, and SVP each submitted at least one comment letter in support of the designation

as described in Proclamation 9558.

173.    UDB organized a comment-writing drive in which many of its members

submitted comments to the Department of the Interior urging the continuation of Bears Ears

National Monument and each providing an explanation of the personal and cultural importance

of the Monument.  *See, e.g.*, Docket ID DOI-2017-0002-114138 (May 26, 2017).[14]  UDB also

filed a separate comment letter requesting an extension of the comment period and explaining

that government officials had made little-to-no effort to gather traditional knowledge of the

Bears Ears area held by Native Americans that live in and around the land.  *See* Letter from

Gavin Noyes, Executive Director, Utah Diné Bikéyah, Docket ID DOI-2017-0002-83535, at 1-2

(May 24, 2017).[15]  Without engaging these stakeholders, the Secretary of the Interior would lack

"critical information regarding cultural resources that may be harmed if the boundary is shrunk."

*Id.* at 1.

174.    Friends of Cedar Mesa submitted a comment letter asking then-Secretary Zinke to

retain the current boundaries and protections of Bears Ears National Monument.  *See* Letter from

Josh Ewing, Executive Director, Friends of Cedar Mesa, Docket ID No. DOI-2017-0002-81604

(May 24, 2017).[16]  That letter recounted the seven-year involvement of Friends of Cedar Mesa,

and many other local community members, in the movement that eventually culminated with

Proclamation 9558.  *See id.* at 1-2.  Friends of Cedar Mesa also stressed the need for Monument

status to protect the 100,000 estimated archaeological and cultural sites in the Bears Ears area—

more than any other national park or national monument.  *Id.* at 2-3.  The vastness of these

---

[14]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-114138.
[15]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-83535.
[16]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-81604.

resources necessitated the increased management attention, extra legal protections, inclusion of all designated objects and lands reserved, and prevention of new extractive activities mandated by Proclamation 9558. *Id.* at 3-5.

175.    Archaeology Southwest submitted a resolution by its board of directors affirming the obligation to maintain Bears Ears National Monument. *See* Resolution of Board of Directors for Archaeology Southwest in opposition to any efforts to revoke or diminish Bears Ears National Monument, Docket ID DOI-2017-0002-82235, at 1-2 (May 24, 2017).[17] This resolution rebutted the assumption behind Executive Order 13,792 that Proclamation 9558 did not follow a thorough process of public discussion and stakeholder engagement. *Id.* at 2. Archaeology Southwest also submitted a letter joined by six other non-profit organizations, including Friends of Cedar Mesa, that urged then-Secretary Zinke to recognize the scientific, cultural, and economic value protected by the boundaries of Bears Ears National Monument. *See* Letter from Archaeology Southwest, *et al.*, Docket ID DOI-2017-0002-57625, at 1-2 (Mar. 3, 2017).[18]

176.    CLF submitted a comment letter explaining the years of local stakeholder engagement that went into the designation of Bears Ears National Monument. *See* Letter from Edward Norton, Chairman, Conservation Lands Foundation, Inc., Docket ID DOI-2017-0002-90566, at 1-2, 3-4 (May 25, 2017).[19] CLF also detailed the extensive cultural, ecological, geological, paleontological, and other resources that comprise the Monument. *Id.* at 1-3. National monument designation is necessary, CLF explained, to prevent extractive uses that will disrupt or destroy these resources, prevent disposition of the land to non-federal entities, deter

---

[17]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-82235.
[18]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-57625.
[19]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-90566.

looting and vandalism, and generally ensure long-term, landscape-level management planning. *Id.* at 2-3.

177.    Patagonia submitted a comment letter explaining that, in sharp contrast to the Secretary's review, "the process to establish a National Monument often takes years, if not decades[,]" and that was exactly the case for Bears Ears National Monument.  Letter from Yvon Chouinard, Founder, Patagonia, Inc., and Rose Marcario, President & CEO, Patagonia, Inc., Docket ID DOI-2017-0002-133733, at 1 (May 4, 2017).[20]  Patagonia also informed the Department of the Interior of "the enormous economic benefits of protected public lands for nearby communities," as demonstrated by recent empirical research and by job growth near the Grand Staircase-Escalante National Monument.  *Id.* at 3.  "Rescinding or shrinking the National Monuments under review[,]" including Bears Ears National Monument, "would significantly impact the strength of the outdoor recreation economy and limit [Patagonia's] ability to create and sustain jobs."  *Id.*

178.    AF submitted a comment letter explaining that "the process leading to the Bears Ears National Monument designation adequately incorporated public outreach and coordination with relevant stakeholders, and conforms to the requirements of the Antiquities Act of 1906."  Letter from Erik Murdock, Policy Director, Access Fund, Docket ID DOI-2017-0002-94640, at 1 (May 25, 2017).[21]  In particular, AF explained that its "members from Utah and across the country regularly climb in Bears Ears National Monument because it is a world-class climbing area with unique exceptional natural and cultural resource values[,]" and AF provided a map of some of the canyoneering and rock climbing resources most important to its members.  *Id.* at 2.

---

[20]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-133733.
[21]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-94640.

Inadequate federal resources and attention, however, endanger these resources. *Id.* AF therefore urged the Department of the Interior to maintain the existing Bears Ears National Monument because "a monument [land management] plan can bring long-overdue landscape-level management to an area threatened by over-use, resource extraction, and a chronic lack of management and agency resources needed to address multiple-use impacts." *Id.* at 3. Moreover, AF explained the importance of maintaining Proclamation 9558's explicit recognition of rock climbing as a valued use and the impact of that recognition on the land management process. *Id.* at 3-4.

179.    The National Trust submitted a comment letter opposing any reduction or rescission of "protections provided by the existing national monument designation." Letter from Stephanie K. Meeks, President and CEO, National Trust for Historic Preservation, Docket ID DOI-2017-0002-364407, at 1 (May 25, 2017).[22] The National Trust recounted its history of working hand-in-hand with the Utah congressional delegation to promote conservation initiatives within the state, as well as the National Trust's efforts in support of the designation of Bears Ears National Monument. *See id.* at 1-3. Furthermore, the National Trust explained that no reductions in the boundary of the Monument could be compatible with the proper care and management of the objects designated by Proclamation 9558. *Id.* at 3. For instance, "archaeologists have overwhelmingly confirmed that there are highly significant prehistoric structures and objects throughout the [Bears Ears National] Monument, along with significant paleontological, geologic, and other scientific resources." *Id.* at 4. Resources are in fact so numerous, the National Trust explained, that "[r]ather than being conceived of as a collection of individual or noncontiguous historic sites, the lands within Bears Ears are best treated as a

---

[22]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-364407.

collection of interrelated resources, and their historic significance is best understood in the context of the landscape and setting." *Id.*

180.    SVP submitted a comment letter defending the boundaries of Bears Ears National Monument and urging an expansion to protect more paleontological resources. *See* Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-100908, at 1 (May 25, 2017).[23]  SVP explained that it had provided significant input to the Department of the Interior on paleontological resources protected by Bears Ears National Monument. *Id.* at 2.  SVP further identified the critical role of Monument status, and especially recognition of paleontology in Proclamation 9558, in promoting research and public understand of "scientifically invaluable" fossils within "[a]ll of the areas of Bears Ears[.]". *Id.* at 2-3; *see also id.* at 10.  And SVP explained the types and importance of fossils that research indicated were located within each of area of Bears Ears National Monument. *Id.* at 3-5.

181.    An independent analysis of the comments submitted found the overwhelming majority support the designation of Bears Ears National Monument as described in Proclamation 9558. *See* A. Weiss, *Utah Residents to Ryan Zinke: Hands off Bears Ears!*, (June 9, 2017)[24]; *see also* A. Weiss, *New Analysis Shows National Monument Support Dominates Public Comment Period*, Medium.com (May 25, 2017).[25]

182.    Before the close of the comment period for Bears Ears National Monument, then-Secretary Zinke visited Utah to tour part of the Bears Ears area.  On May 8, 2017, he met with representatives of Friends of Cedar Mesa, who provided him with extensive information on the

---

[23]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-100908.
[24]    Available at https://medium.com/westwise/utah-residents-to-ryan-zinke-hands-off-bears-ears-e2684046a3b4.
[25]    Available at https://medium.com/westwise/new-analysis-shows-national-monument-support-dominates-public-comment-period-7550888175e.

antiquities within Bears Ears National Monument.  Friends of Cedar Mesa also provided the Secretary with an extensive bibliography of archaeological and paleontological research related to areas within the Monument.

183.    On the same day, SVP wrote to then-Secretary Zinke in order to bring his "attention to the scientifically valuable fossil resources found at the Bears Ears National Monument as you tour the area this week."  SVP encouraged him to visit Valley of the Gods, Cedar Mesa, Honaker Trail, Red Canyon and similar formations, Indian Creek, and the Wingate, Kayenta, and Navajo formations.  SVP also offered the services of local members to help inform his visit.  SVP did not receive a formal reply to its invitation.

184.    On June 10, 2017, before the close of the public comment period for all other monuments, then-Secretary Zinke issued an interim report on Bears Ears National Monument. *See* Memorandum from Sec'y Ryan Zinke to President Donald Trump, "Interim Report Pursuant to Executive Order 13792," DOI.gov at 1 (June 10, 2017).[26]  In just over one page of analysis, the interim report concludes that the boundary of Bears Ears National Monument should be reduced.  *Id.* at 4-5.

185.    The interim report discusses only certain subsets of objects of historic or scientific interest designated under Proclamation 9558 and ignores others.  The interim report names, for instance, "archeological sites" as objects of historic or scientific interest, *see id.* at 1, but it nowhere mentions paleontological sites, animal species, plant species, or their habitat.

186.    And even for the types of objects it does acknowledge, the interim report does not explain where those objects can be found in the land reserved for the Monument, which areas of

---

[26]    Available at https://www.doi.gov/sites/doi.gov/files/uploads/ interim_report_eo_13792.pdf.

reserved land should be excluded from the Monument, what changes, if any, have occurred to the objects designated under Proclamation 9558, or what impacts the removal of Monument status would have on those objects. The interim report offers no analysis or record in support of its conclusion, nor does it address any of the substantive comments provided as part of the truncated public comment period.

187.    On the same day that it released then-Secretary Zinke's interim report, the Department of the Interior issued a press release giving public notice that it would extend the comment period on Bears Ears National Monument to July 10, 2017, despite the fact that then-Secretary Zinke had concluded in the interim report that the boundaries of Bears Ears National Monument should be "modified." *See* Press Release, Dep't of the Interior, at 1 (June 10, 2017).[27]

### Secretary Zinke's Final Report

188.    Friends of Cedar Mesa, Archaeology Southwest and Access Fund submitted supplemental comments in response to then-Secretary Zinke's interim report. These comments reiterated the need to protect the entirety of the landscape and resources within Bears Ears National Monument.

189.    After the issuance of then-Secretary Zinke's interim report in June, SVP submitted an additional comment defending all non-marine national monuments. *See* Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-655559, at 1 (July 9, 2017).[28] In this letter, SVP expanded on the need for national monument status, explaining that such status "allows protection of many sensitive paleontological sites and makes it easier for

---

[27]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-153322.
[28]    Available at https://www.regulations.gov/document?D=DOI-2017-0002-655559.

vertebrate paleontologists to conduct scientific research." *Id.* at 2.  As SVP members had learned from the designation of the Grand Staircase-Escalante National Monument, researchers can more readily obtain permits for access to public lands, and, critically, a national monument designation preserves "the geological context" of fossil sites even after collection of the fossils.  *Id.* at 3.  The preservation of this context allows later replication of studies essential to the scientific method. *Id.*  And thanks to their landscape-level scale, national monuments preserve this context across a wide variety of locations and topographies, which allows study of a representative sample of past life in the area.  *Id.*  In sum, "[n]ational monuments provide an almost ideal level of protection because they are more accessible for research than the more heavily protected national parks and are better protected than undesignated public lands."  *Id.*  Rescinding Bears Ears National Monument, SVP explained, would imperil fossil sites, their geological context, and the future research related to both.  *Id.* at 4.

190.    The government's website for the national monument review lists over 2.8 million comments received.  *See Review of Certain National Monuments Established Since 1996; Notice of Opportunity for Comment*, Regulations.gov (last visited Dec. 6, 2017).[29]  Upon information and belief, the vast majority of comments on Bears Ears National Monument submitted through July 10, 2017, support the designation of the Monument as described in Proclamation 9558.

191.    On August 21, 2017, Friends of Cedar Mesa transmitted to the Department of the Interior an exhaustive expert report compiling the current significant archaeological research of the area comprising Bears Ears National Monument, the subject of Proclamation 9558.  This report conclusively demonstrates that current research has identified significant archaeological and cultural resources throughout each of ten sub-regions of Bears Ears National Monument,

---

[29]     Available at https://www.regulations.gov/document?D=DOI-2017-0002-0001.

including areas excluded by the Revocation Proclamation.  Upon information and belief, the

Department of the Interior had available to it the archaeological research comprising the

foundation of the Friends of Cedar Mesa expert report at the time then-Secretary Zinke issued his

interim report, but the Department of the Interior and then-Secretary Zinke did not address the

findings contained therein.  The Department of the Interior has not provided any substantive

response to the content of the report.

192.    Upon information and belief, then-Secretary Zinke transmitted a "draft" final

report to President Trump on or about August 24, 2017.  That draft report was not immediately

made public by the Department of the Interior; instead, it issued a two-page document that

purports to summarize then-Secretary Zinke's recommendations to the President.  *See generally*

Report Summary by U.S. Secretary of the Interior Ryan Zinke, DOI.gov.[30]  This public summary

gives no details about particular national monuments but states that "monument status has a

potential economic benefit of increased visitation, particularly to service related industries,

outdoor recreation industries, and other businesses dependent on or supported by tourism."  *Id.* at

2.  The public summary also states that "[c]omments received were overwhelmingly in favor of

maintaining existing monuments[.]"  *Id.*  Opponents of current national monuments, the

summary notes, were commonly associated with timber, mining, and motorized recreation

industries.  *Id.*

193.    Upon information and belief, the Department of the Interior did not engage in

government-to-government consultations with the Tribes on the content of the final report.

194.    The Department of the Interior made then-Secretary Zinke's final report public on

---

[30]      Available at https://www.doi.gov/sites/doi.gov/files/uploads/monument-report-summary.pdf.

December 5, 2017, one day after President Trump signed the Revocation Proclamation. *See*

Dep't of the Interior, *Secretary Zinke Recommends Keeping Federal Lands in Federal*

*Ownership, Adding Three New Monuments*, DOI.gov (Dec. 5, 2017).[31]  The final report

acknowledges that Bears Ears National Monument contained "cultural and archaeological sites,

unique geologic features, and areas important to the practicing of tribal cultural traditions and

ceremonies[,]" as well as "areas . . . home to significant recreational opportunities, including

hiking, backpacking,  canyoneering, mountain biking, and rock climbing." *See* Memorandum

from Sec'y Ryan K. Zinke to President Donald Trump, "Final Report Summarizing Findings of

the Review of Designations Under the Antiquities Act," at 10 (Dec. 5, 2017).[32]  But the report

also expressly disparages the national monument status of objects designated under Proclamation

9558, stating that Bears Ears National Monument "contains many objects that are common or

otherwise not of particular scientific or historic interest."  *Id.*  The final report does not identify

the areas of the Monument where these objects could be found or describe other characteristics

of these objects.

      195.    The final report also rejects the designation of many of the types of objects under

Proclamation 9558.  For example, without reference to facts or evidence, the report claims that

"[a]dherence to the Act's definition of an 'object' . . . on some monuments [was] either arbitrary

or likely politically motivated[.]"  *Id.* at 2.  The final report also criticizes designation of

"geographic areas, viewsheds, and ecosystems" as objects of historic or scientific interest, and

the report suggests that objects should not be designated under the Antiquities Act if there other,

similar objects that exist on separate parcels.  *See id.* at 7.  The final report particularly criticizes

---

[31]     Available at https://www.doi.gov/pressreleases/secretary-zinke-recommends-keeping-federal-lands-federal-ownership-adding-three-new.

[32]     Available at https://www.doi.gov/sites/doi.gov/files/uploads/revised_final_report.pdf.

the designation of landscapes as objects of historic or scientific interest, reserving an entire

section for that stance. *See id.* The final report does not refer to any legal precedent, such as an

updated analysis from the Office of Legal Counsel, U.S. Department of Justice, or prior case law,

to support its stance on objects designated under Proclamation 9558.

196.    The final report appearing in press reports did not address with any specificity the

comments submitted by Plaintiffs.

197.    On September 18, 2017, Archaeology Southwest submitted to the Department of

the Interior a report based on publicly releasable information demonstrating how the more than

100,000 archaeological sites that are present within Bears Ears National Monument represent a

dynamic cultural landscape that conveys 13,000 years of human history. The Department of the

Interior provided no substantive response to this submission.

**The Revocation Proclamation**

198.    On December 4, 2017, President Trump signed the Revocation Proclamation. *See*

Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 8, 2017).

199.    The Revocation Proclamation purports to "modify" the boundaries of Bears Ears

National Monument under Proclamation 9558, leaving two smaller "units" or "areas" to be

known as Indian Creek and Shash Jáa. *Id.* at 58,082. Together, these putative units would

encompass approximately 201,397 acres, thus removing protections from over 1.1 million acres

included in Proclamation 9558 as well as landmarks, structures, and thousands of objects of

scientific or historic interest contained on or within those lands—including removing objects or

locations specifically identified for protection by Proclamation 9558. *Id.* at 58,085.

200.    The Revocation Proclamation purports to revoke the Monument status of those

objects designated by Proclamation 9558 that "are not unique to the monument . . . [or] are not of

71

*significant* scientific or historic interest." *Id.* at 58,085 (emphasis added). Instead, the

Revocation Proclamation protects only what it considers the "*important* objects of scientific or

historic interest" designated as part of Bears Ears National Monument under Proclamation 9558.

*Id.* at 58,082 (emphasis added).

201.     The Revocation Proclamation further purports to "modify" the boundaries of the

Monument to be confined to the "smallest area compatible with the proper care and

management" of only some, but not all, of the objects designated under Proclamation 9558. The

Revocation Proclamation states, for instance, that "[s]ome of the existing monument's objects, or

certain examples of those objects, are not within the monument's revised boundaries[.]" *Id.* at

58,084. Any lands not contained within the boundaries of the new units will be excluded from

the protections of the Antiquities Act.

202.     The Revocation Proclamation erroneously asserts that the eliminated areas of the

Monument will still be protected under other federal statutes, without any legal analysis as to

how these laws provide equivalent, permanent protections akin to national monument status. *Id.*

203.     The Revocation Proclamation directs that, within 60 days after December 4, 2017,

the excluded areas of the Monument will be open to "entry, location, selection, sale, or other

disposition under the public land laws[,]" "disposition under the laws relating to mineral and

geothermal leasing," and "location, entry, and patent under the mining laws." *Id.* at 58,085.

This directive does not specify how the BLM and the USFS are to implement this directive.

204.     The Revocation Proclamation also purports to change the conditions or directives

of the land reservation effected under Proclamation 9558. *Id.*

a.     First, the Revocation Proclamation removes the requirement for the BLM and the

USFS to consult the Bears Ears Commission on land management decisions for

72

any areas not contained within the purported Shash Jáa unit. *Id.*

b.       Second, the Revocation Proclamation adds an additional seat on the Bears Ears

Commission for the elected officer of the San Juan County Commission

representing District 3, in that officer's official capacity. *Id.* at 58,086.

c.       Third, the Revocation Proclamation authorizes the Secretaries of the Interior and

Agriculture to permit motorized and non-mechanized vehicle use on roads and

trails designated for such use prior to Proclamation 9558. *Id.*

d.       Fourth, the Revocation Proclamation authorizes the Secretaries of the Interior and

Agriculture to permit road and trail maintenance. *Id.*

e.       Fifth, the Revocation Proclamation removes any effect of Proclamation 9558 on

livestock grazing. *Id.*

f.       Sixth, the Revocation Proclamation authorizes the Secretaries of the Interior and

Agriculture to permit active vegetation management activities in the Monument.

Upon information and belief, these activities can include the use of prescribed

burning, wildfire, mechanical equipment, herbicides, or other techniques to

destroy or remove naturally occurring vegetation. *Id.*

**The Proposed Monument Management Plan**

205.     Because Shash Jáa and Indian Creek retain their Monument status under the

Revocation Proclamation, each will be governed by a Monument Management Plan ("MMP").

Proclamation 9558 had provided that the "lands administered by BLM shall be managed as a unit

of the National Landscape Conservation System," which in turn compelled the BLM to manage

the lands so as to protect certain historic and scientific interests identified in Proclamation 9558.

*See* 16 U.S.C. § 7201 *et seq.*; 82 Fed. Reg. at 1144. Accordingly, Proclamation 9558 directed

73

the BLM and the USFS to "jointly prepare a management plan for the monument" in order to "protect[] and restor[e] the objects identified" in the proclamation.  82 Fed. Reg. at 1143. Although the Revocation Proclamation purports to protect the same objects "identified in Proclamation 9558," it only does so within the lands designated under the Revocation Proclamation.  82 Fed. Reg. at 58,084.  As a result, the BLM has proposed a management plan that only protects areas within the two remaining "units."

206.    All of the land removed from the Monument by the Revocation Proclamation will not be subject to the MMP, and will not be afforded the same protections.  As the Revocation Proclamation dramatically reduced the land protected by the Monument designation, eighty-five percent of the land designated under Proclamation 9558 no longer falls within the protected units.  Currently, the excluded lands are managed under the BLM's Monticello and Moab Field Office Resource Management Plans.  The MMP will supersede those plans for the Shash Jáa and Indian Creek units.  But the Resource Management Plans will remain in effect for the excluded lands.  Accordingly, the excluded lands are vulnerable to precisely the types of harms that the BLM and the USFS have concluded that—if no action were taken under the MMP—will likely occur in the Shash Jáa and Indian Creek units.  Specifically, the land excised by the Revocation Proclamation, without the protections afforded by Proclamation 9558, is vulnerable to adverse impacts to natural and cultural resources from mineral entry, unmonitored recreation, threats to wildlife from off-highway vehicle use, increased preventable human-caused wildfire ignitions, and human and pet waste.

207.    On July 26, 2019, Edwin Roberson, in his capacity as Utah State Director for the BLM, proposed a MMP and Final Environmental Impact Statement ("FEIS") for the remaining portions of the Monument—the Shash Jáa and Indian Creek units.  BLM, Bears Ears National

Monument: Proposed Monument Management Plan (Jul. 26, 2019).[33]  Though it has not yet been

formally adopted, upon information and belief, the MMP will be adopted in the coming months.

Several of the Plaintiffs in this case filed public opposition to the MMP.

208.    The MMP's stated purpose is "to provide for the proper care and management of

Monument objects and values including the 'object[s] of antiquity' and 'objects of historic or

scientific interest' of the Bears Ears National Monument . . . as modified by [the Revocation

Proclamation]."  BLM, Bears Ears National Monument: Proposed Monument Management Plan

and Final Environmental Impact Statement Executive Summary (Jul. 2019).[34]  However, the land

and numerous objects removed from the Monument by the Revocation Proclamation remain

managed under the existing plans with no additional protections.

209.    Once approved, the proposed MMP will be the operative management plan for all

lands within the Shash Jáa and Indian Creek units and will remove all land and objects within

these units from the current Resource Management Plan.  Additionally, the USFS will use the

MMP to amend the Manti-La Sal National Forest Land and Resource Management Plan to guide

future management of USFS-administered lands within the Monument.  BLM, Bears Ears

National Monument: Proposed Management Plan (Jul. 26, 2019).

210.    The BLM and the USFS agree that the additional protections afforded to the

Shash Jáa and Indian Creek units' lands and objects are important to their preservation.  In the

MMP, the BLM and the USFS concluded that, if no action were taken to continue to preserve the

Shash Jáa and Indian Creek units, several harms would likely result.  For one, fewer restrictions

---

[33]*Available at* https://eplanning.blm.gov/epl-front-office/projects/lup/94460/20000105/
250000108/Volume1_Chapters_1-4_Bears_Ears_Proposed_MMPs-Final_EIS.pdf.
[34] *Available at* https://eplanning.blm.gov/epl-front-office/projects/lup/94460/
20000100/250000103/Executive_Summary_Bears_Ears_Proposed_MMPs-Final_EIS.pdf.

on recreation "would have more potential to result in adverse impacts to natural and cultural resources." *Id.* at 3-51.  Lack of management decisions regarding pets in Indian Creek "would likely result in greater impacts to other resources." *Id.*  Proper management of human and other waste "would help prevent potential impacts to water quality, as well as potential adverse impacts to wildlife attracted by discarded waste." *Id.*  Appropriate management of off-highway vehicle use "would reduce potential impacts to Mexican spotted owl, a federally threatened species." *Id.* at 3-50.  And management of campfires and fuelwood collection could "prevent unintentional human-caused wildfire ignitions and damage to living and downed vegetation and deadwood that provide habitat for wildlife." *Id.*

211.    By definition, "no action" will be taken in the lands excised from the original Bears Ears Monument, because the MMP only governs the two new units created by the Revocation Proclamation.  The excised lands will continue to be governed by the field office Resource Management Plans.  And the likely harms identified by the BLM and the USFS that would occur if "no action" were to be taken within the new boundaries of the Monument will likely occur in the areas revoked from the Monument where no action will be taken.

212.    Per the Revocation Proclamation, the MMP diminishes the role of the Tribes in the management of the Monument.  Proclamation 9558's Bears Ears Commission, composed of one representative from each of the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute Tribes, was intended to be "meaningfully engage[d]" in the development of management plans for and management of Bears Ears National Monument, with the Secretaries of the Interior and Agriculture specifically directed to "carefully and fully consider integrating the traditional and historical knowledge and special expertise" of the Commission.  82 Fed. Reg. at 1144.  However, the Revocation Proclamation purports to change the scope and composition of the Commission.

76

Now named the Shash Jáa Commission, the Commission only applies to the Shash Jáa unit, not to the Indian Creek unit nor to any of the revoked lands.  Further, it has been modified to dilute the influence of the Tribes by adding the elected officer of the San Juan County Commission. BLM, Bears Ears National Monument: Proposed Monument Management Plan at 4-4 (Jul. 26, 2019).

213.    Proclamation 9558 protected the lands within the original Monument area from mineral entry and location, subject to valid existing rights.  The Revocation Proclamation only preserves this protection for the lands within the boundaries of the Shash Jáa and Indian Creek units.  *Id.* at 2-1.  Under the MMP, the revoked lands are available for exploration and development of mineral resources, including in the San Juan County Energy Zone.  *Id.* at 1-6.

214.    Proclamation 9558 also protected lands that contain significant paleontological resources, including the Cedar Mesa Sandstone, Wingate Sandstone, Kayenta Formation, Navajo Sandstone, and Chinle Formation rock units, Arch Canyon, Comb Ridge, Cedar Mesa, and Valley of the Gods, and extinct animals and plants from these units and places.  The Revocation Proclamation removed those resources, making them vulnerable to mineral extraction activities, grazing, and other destructive uses, and the proposed MMP has no plan for managing them.

215.    As part of the proposed MMP's development, the BLM and the USFS purported to perform their public consultation obligations under the National Historic Preservation Act ("NHPA").  *See* 36 C.F.R. § 800.2(d)(3).  The NHPA requires that all federal agencies "take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108.  An agency must also afford the ACHP a "reasonable opportunity to comment with regard to [any federal undertaking]" on historic property.  *Id.*

77

216.     On August 2, 2019, the BLM and the USFS issued a finding of "no adverse effect" for the Bears Ears National Monument Management Plan pursuant to 36 C.F.R. § 800.5(b).  *See, e.g.,* BLM, U.S. Dep't of the Interior, Finding of No Adverse Effect for the Bears Ears National Monument Management Plan (Aug. 2, 2019).[35]

217.     On August 30, 2019, Plaintiffs UDB, the National Trust, and Friends of Cedar Mesa in their capacities as consulting parties under the NHPA objected to the BLM's Finding of No Adverse Effect.  Letter from Sharee Williamson, Assoc. Gen. Counsel, Nat'l Trust for Historic Pres., Josh Ewing, Exec. Dir., Friends of Cedar Mesa & Gavin Noyes, Exec. Dir., Utah Diné Bikéyah, to Jared Lundell, Archaeologist, BLM (Aug. 30, 2019).[36] Specifically, these Plaintiffs cited as sources of adverse effects to historic properties the MMP's proposals for Public Use sites, construction of the Shay Mountain Vista Campground, target shooting, off-highway vehicle use, private firewood harvesting outside of Doll House and Moon House, recreational climbing activities, inadequately designated campsites, chaining to manage vegetation, group sizes, livestock grazing, and the postponement of protective measures.  *Id.* These Plaintiffs also objected to BLM's failure to satisfy its consultation obligations with Tribes and the consulting parties.  *Id.*

218.     The NHPA requires agencies to consult with objecting parties to resolve disagreements over no adverse effect findings or request the ACHP review the finding pursuant to 36 C.F.R. § 800.5(c)(3)(i) & (c)(3)(ii).  36 C.F.R. § 800.5(c)(2)(i).  ACHP's advisory opinion regarding an agency's finding of no adverse effect must be taken into account when reaching a

---

[35] *Available at* https://eplanning.blm.gov/epl-front-office/projects/lup/94460/20004049/250004761/ConsultPartyBENMFOEExample.pdf.

[36]     Available at https://eplanning.blm.gov/epl-front-office/projects/lup/94460/20004054/250004766/NTHP_FCM_UDB_NAE_Objection_08_30_2019_FINAL.pdf.

final decision regarding the agency's finding of no adverse effect.  36 C.F.R. §

800.5(c)(3)(ii)(B).

219.     On September 9, 2019, the BLM and the USFS requested that the ACHP review

the Finding of No Adverse Effect.  BLM, U.S. Dep't of the Interior, Finding of No Adverse

Effect for the Bears Ears National Monument Management Plan Letter (Sept. 9, 2019).[37]

220.     In response, on October 4, 2019, ACHP issued a review of the BLM's and the

USFS's Finding of No Adverse Effect and determined that this finding "is not adequately

supported at this time."  Advisory Council on Historic Pres., Review of "no adverse effect"

finding Bears Ears National Monument Indian Creek and Shash Jáa Units Proposed Monument

Management Plans, San Juan County, Utah (Oct. 4, 2019).

221.     According to ACHP, the failure stemmed from the BLM's and the USFS's choice

to delay considering the effects of various proposals until the MMP was actually implemented,

which means the MMP "contains too few prescriptive measures as to how these future land uses

would be restricted or excluded to support the current no adverse effect finding."  *Id.*

222.     Additionally, ACHP noted that it "shares the concerns expressed" by Plaintiffs the

National Trust, Friends of Cedar Mesa, and UDB that the review of effects "to date has not

adequately identified, evaluated, or considered potential effects to large, landscape level historic

properties as well as effects to other historic properties that may be challenging, if not

impossible, to avoid once the MMP is finalized and land use allocations are decided."  *Id.*

**Impacts of the Revocation Proclamation**

223.     Plaintiffs and their members, directors, officers, employees, or sponsored athletes

---

[37] *Available at* https://eplanning.blm.gov/epl-front-office/projects/lup/94460/20004048/
250004760/BLMUSFSRequestForCommentACHP.pdf.

have suffered and will continue to suffer direct and immediate injury from the revocation of the

designation of the landmarks, structures, and objects of Bears Ears National Monument.  That

revocation impacts the following areas and objects among others within the sacred and

interconnected landscape of the Bears Ears area:

  a.     tens of thousands of historic and pre-historic structures, indigenous burial sites,

         ceremonial places, cliff dwellings, rock art panels (pictographs and petroglyphs),

         kivas, open service sites, medicine gathering sites, pueblos, towers, middens,

         ancient roads, historic trails, and archaeological resources generally located in the

         vicinity of:

    i.       Cedar Mesa, including Grand Gulch;

    ii.      Red Knobs;

    iii.     Valley of the Gods;

    iv.      Tank Mesa, Cottonwood Wash, and the Bluff Bench;

    v.       Bowdie Canyon, Fable Valley, Ruin Park and the Beef Basin area;

    vi.      the Dark Canyon complex;

    vii.     the Abajo Mountains and drainages of Allen, Dark, and Chippean

             Canyons;

    viii.    White Canyon and its many drainages;

    ix.      Mossback Mesa, Red House Cliffs, and Tables of the Sun;

    x.       the Mancos Mesa and Moqui Canyon;

    xi.      the San Juan River corridor, including the Sand Island petroglyph panels;

    xii.     Slickhorn Canyon;

    xiii.    Bannister Ruin in Grand Gulch;

xiv.      Harts Draw and Lockhart Basin; and

xv.      the entirety of the Grand Gulch Archaeological District, which is listed on the National Register of Historic Places;

b.      numerous paleontological resources in the vicinity of:

i.      Indian Head Pass;

ii.      Beef Basin;

iii.      House Park Butte;

iv.      Cathedral Butte;

v.      Jacobs Chair;

vi.      the Lockhart Basin;

vii.      Indian Creek;

viii.      Allen Canyon;

ix.      White Canyon;

x.      Fry Canyon;

xi.      Kaiparowits Plateau;

xii.      Valley of the Gods; and

xiii.      Red Canyon;

c.      numerous recreational objects and sites, including:

i.      44 of 120 climbing cliffs (which are discrete and documented rock climbing sites that include one or more established climbing routes that ascend a rock outcrop), as well as all 22 named summits in the Valley of the Gods and hundreds of routes in Harts Draw and Lockhart Basin;

ii.      undocumented or yet-to-be-climbed climbing cliffs;

iii.        world-class canyoneering routes in White Canyon, Gravel Canyon, Cheesebox Canyon, Hideout Canyon, Fry Canyon, and other drainages of White Canyon;

iv.        mountain biking trails;

v.        whitewater paddling river segments;

vi.        tributaries providing water to wildlife and backpackers alike;

vii.        equestrian trails; and

viii.        hiking and backpacking trails, in particular the iconic Fable Valley trail and the Dark Canyon trail system, and trails to historic mining and cowboy sites in or around Beef Basin, the Abajos Mountains, and Indian Creek;

d.        numerous geological and ecological objects of cultural, scenic, and scientific interest, including at least:

i.        Native American hunting and wood- and herb-gathering grounds in the vicinity of Cedar Mesa, Elk Ridge, and the Abajo Mountains;

ii.        the White Canyon complexes;

iii.        towers and sandstone structures in Chimney Park, Hammond Canyon, Dark Canyon, and Lockhart Basin, and especially those in the Valley of the Gods considered spiritually important to the Navajo Nation;

iv.        distinctive arches and natural bridges in many canyons, including Wetherill Arch, Neville's Arch, Polly's Canyon Arch, Bowdie Canyon Window, Causeway Arch, Cliff Dweller's Pasture Arch, and Fable Valley Jug Handle Arch; and

v.       distinctive, endemic subspecies, including mammals, in the Abajo
Mountains.

224.     Approximately seventy-three percent of documented archaeological sites that
were part of the original Monument were in areas removed from the Monument by the
Revocation Proclamation.  For example, the following sites are excised by the Revocation
Proclamation: Two Kiva House, Eight Room Pueblo, Baby Mummy Cave, Baby Mummy Great
Road, Bannister Ruin, Battle Panel, BB Ruin, Beam Ruin, Bernheimer Alcove, Best Forgotten
Kiva, Big Man Panel, Big Panel, Bird's Nest (also known as Dry Wash Ruin), Cap Rock Ruin,
Castle Ruin, Ceiling House, Citadel, Clay Hills Kiva, Collins Cowboy Camp, Cottonwood Falls
Great House, Cow Tank, Cradleboard Site, Crawl on Your Belly, Cut-in-Two Cave, Dancing
through Time, Dark Horse (also known as Cliff Village), Decker Road, Digging Sticks, Double
Decker Ruin, Et Al Great House, Fable Fortress, Fable Valley Pueblo, Fallen Roof Ruin, Farm
House, Flat House, Fortified Mesa, Goat-on-a-Bicycle, Goldbar Panel, Gotta Wear Shades,
Granary Row, Green House, Green Mask Site, Grocery Store, Halfway House, Hammond Good
House, Harts Horse Panel, High House, large portions of the Hole-in-the-Rock Trail, Horse
Panel, Horse Rock Ruin, Jailhouse Ruin, Junction Ruin, Kiva Cave, Knob Ruins, L Pueblo,
Ledge Ruin, Lion Track, Little Doll House, Long House, M080 Observatory, Many Hands,
Marcia's Stonehenge, Moss Back Rock Art, Mountain Sheep & the Flute Player, Owen's Great
House, Owl Kiva, Painted Kiva, Pappy's Pasture, Pass Rock Art Site, Perfect Kiva (Bullet),
Perfect Kiva (Slickhorn), Picket Fork, Polly's Island, Polychrome House, Pottery Shine, Rattler
Cave, Red and White House, Red Knobs, Red Lines Panel, Redman, Roof Ruin, Ruin Canyon
Tower, Sacred Mesa, Sagsteters Ruin, Sand Dune Site, Sand Island Lower Petroglyph Panel,
Sand Island Upper Petroglyph Panel, Scotty's Kiva, Seven Kivas, Shield Cave Ruin,

Showstopper, Split Boulder Archaic Panel, Split-Level Ruin, Swallows Nest, Tabernacle Ruin, Tank Mesa Great Road, Telluride Blanket Site, the Hideaway, the Hunting Panel, the Playhouse, the Rincon, Three Fingers, Three Moons Kiva, Tower Ruin, Turkey Pen, Turner's Cabin (historic), Water House, Wetherill Arch Site, Witchy Woman, Wooden Kiva, Wrong-Side Ruin, and Yellow House.

225.    The Revocation Proclamation opens areas previously protected by Bears Ears National Monument to activities in otherwise pristine and undeveloped areas.  Such incompatible uses have resulted and will continue to result in the destruction and degradation of irreplaceable cultural, historic, and scientific resources from surface disturbance, ecosystem impacts, and waste disposal, among other adverse impacts.  While these activities may be subject to certain environmental and wildlife statutes, those statutes will only require procedural reviews, mitigation and minimization of adverse impacts, and penalties once damage is done, as opposed to Monument status which ensures avoidance of all harm.  These impacts threaten current and ongoing use and enjoyment of the objects and land constituting Bears Ears National Monument, and thus result in direct injury to the cultural, aesthetic, recreational, spiritual, and scientific interests of the Plaintiffs and to those of the:

    a.      officers and board members of Conservation Lands Foundation, Inc.;

    b.      members of CLF's Friends Grassroots Network organizations;

    c.      members and board of Utah Diné Bikéyah;

    d.      board members of Friends of Cedar Mesa;

    e.      employees of and athletes sponsored by Patagonia;

    f.      members of Access Fund;

    g.      members of Archeology Southwest;

h.      members of the National Trust; and

i.      members of the Society of Vertebrate Paleontology.

226.    In particular, and as a result of the Revocation Proclamation, cultural,

archaeological and paleontological objects of scientific or historic interest designated as part of

Bears Ears National Monument receive less legal protection.  The reduced legal protections have

increased looting, vandalism, collection, and "pot hunting" of these objects.  Several cases of

looting of paleontological sites have been documented over the years.  For instance, unknown

parties removed the skull of a phytosaur skeleton discovered in Fry Canyon in 2016.

Disturbance or removal of such objects directly reduces the scientific, recreational, aesthetic,

cultural, and spiritual value of the area to Plaintiffs and their or similar affiliates.

227.    The Revocation Proclamation has also increased threats to cultural,

archaeological, paleontological, and scientifically significant objects by reducing enforcement

resources.  Upon information and belief, Monument status for all objects and lands protected or

reserved under Proclamation 9558 would increase funding available for the management of

Bears Ears National Monument, which would allow for the hiring of more personnel for

monitoring and law enforcement.  Thus, the Revocation Proclamation has reduced the amount of

funding available to manage the excluded 1.1 million acres, which has reduced the availability of

law enforcement personnel, and increase the likelihood that objects within the Monument will be

looted, destroyed or vandalized.  Increased traffic through this area has only exacerbated these

risks.

228.    As a result of the Revocation Proclamation, much of the land reserved as part of

Bears Ears National Monument is open to oil-and-gas leasing.  Before Proclamation 9558, areas

of the Monument were designated for oil and gas development under the 2016 Moab Master

Leasing Plan and the 2008 Monticello Resource Management Plan.  Industry has pushed for new

drilling sites in many areas of the Monument.  For instance, oil-and-gas developers had already

submitted expressions of interest for more than 105,187 acres in or near Bears Ears National

Monument since 2013, including 88 requested parcels clustered in and around the northeastern

part of Bears Ears National Monument near Indian Creek.  *See* Center for Biological Diversity,

*Analysis of Oil and Gas Industry Interests* and *Mining Potential on Federal Public Lands within*

*Bears Ears National Monument*, (Aug. 19, 2017);[38] *see also* Brian Maffly, "Oil and Gas Industry

Will Pounce if Bears Ears Shrinks," *Salt Lake Tribune* (June 19, 2017).[39]  The Indian Creek area

of Bears Ears National Monument is widely recognized as a world-class rock climbing area for

its sandstone crack climbing.  Members or similar affiliates of the Plaintiffs regularly travel to

Indian Creek to ascend its cliffs and admire the landscape.

229.    The oil-and-gas development allowed by the Revocation Proclamation within

Bears Ears National Monument harms Plaintiffs and their members or similar affiliates.  First,

Plaintiffs or their members have invested significant resources in mapping areas threatened by

potential resource extraction and continuously monitoring potential resource extraction plans.

Second, Plaintiffs or their members or similar affiliates must answer efforts by the BLM and

developers to lease land in Bears Ears National Monument through formal protests to the BLM

and informal advocacy.  Third, oil-and-gas leasing threatens the pristine landscapes of Bears

Ears National Monument.  Exploration and development will impair the aesthetic value of the

Monument to Plaintiffs and their members or similar affiliates.  Road construction, increased

heavy vehicle usage, traffic, drilling, and other energy development activities will corrode the

---

[38] *Available at* https://www.documentcloud.org/documents/3985752-Bears-Ears-Oil-Gas-and-Hard-Rock-Mining-Analysis.html.

[39] *Available at* http://archive.sltrib.com/article.php?id=5351997&itype=CMSID.

undeveloped areas of Bears Ears National Monument.  Likewise, exploration and development

will disturb the soundscape and viewscape in the Monument.  Fourth, increased private

development will diminish the climbing experience for, and recreational value to, Plaintiffs and

their members or similar affiliates.

230.    As a result of the Revocation Proclamation, and by the very terms of the

Revocation Proclamation, areas previously within the boundary of Bears Ears National

Monument are open to location, entry, and patenting for mining of uranium and other minerals.

*See* 30 U.S.C. § 22 (Mining Law of 1872).

231.    "Casual use" collection of minerals can immediately begin without any

notification to the BLM.  43 C.F.R. § 3809.10(a); *see also id.* § 3809.5(1)-(2) (defining "casual

use").  More intensive "notice-level" operations may begin within 15 days of submitting notice

to the BLM.  *See id.* § 3809.21(a); *see also id.* § 3809.10(b).

232.    The increased exploratory and extractive activities within the boundary of Bears

Ears National Monument will destroy or harm objects of significant scientific or historic interest,

including cultural, paleontological, and ecological objects.  Furthermore, increased mineral

development will degrade the scientific, recreational, aesthetic, cultural, and spiritual value of the

area through disturbance of the surface soil and ecology, increased noise, harmful impacts to

viewsheds, the creation of safety and other conflicts resulting from an increase in industrial

traffic and infrastructure development at areas of high aesthetic value and popular recreational

use.

233.    The Revocation Proclamation has impeded paleontological research on the 1.1

million acres excluded from Monument status.  First, as those lands are no longer covered by a

proclamation explicitly recognizing the value of paleontology, other uses might receive higher

priority in agency planning decisions, with the result that paleontological research permits become more difficult to secure.  Second, even if fossils avoid collection or destruction, other uses within the Monument can harm the geological context critical to scientific replication and understanding.  Third, the entirety of the Monument is no longer eligible for funding through the National Landscape Conservation System; for other national monuments like Grand Staircase-Escalante, the majority of public funding for paleontological activities originated with the National Landscape Conservation System.  This has directly impacted paleontologists, including SVP members, who maintained ongoing research interest in lands excised from the Monument and who can no longer apply for this funding to continue their research, and who have ceased work under current funding, given uncertainties about land designations and any funding restrictions now in place.  Fourth, paleontologists, including SVP members, have been denied funding for projects in the Monument area due to the uncertainty surrounding its status.  Others have discontinued their work in the area because of the Revocation Proclamation.  Fifth, specialized management structures for paleontological resources will now be limited to the Shash Jáa and Indian Creek units, denying resources and support to paleontological work in the excised areas.  Sixth, "casual collection" of paleontological objects, a practice that destroys and disturbs paleontologically significant sites, is now allowed in the Monument outside of the Shash Jáa and Indian creek units.  Casual collection is generally allowed on lands managed by the USFS and the BLM, *see* 36 C.F.R. §§ 291.5, 291.10; 43 C.F.R. § 83651-5(b)(2), but was forbidden by Proclamation 9558, *see* 82 Fed. Reg. at 1145 ("Warning is hereby given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument.").  Disturbance or removal of paleontological objects directly degrades the scientific, recreational, aesthetic, cultural, and spiritual value of the land, and such collection can destroy the geological

context of paleontologically important sites and thereby harm paleontological research and resources. Plaintiffs have already suffered a loss of paleontological research and funding opportunities, and these injuries are ongoing and will continue to directly injure Plaintiffs and their members or similar affiliates.

234.    Upon information and belief, the Revocation Proclamation will impede rock climbing and other recreational activities on the 1.1 million acres excluded from national monument status. As those lands will no longer be covered by a proclamation explicitly recognizing the value of rock climbing and other recreational activities, other uses might receive higher priority in agency planning decisions, with the result that access to or other support for these activities becomes more difficult to secure. Loss of or reduction in these activities directly injures Plaintiffs and their members and affiliates.

235.    As a result of the Revocation Proclamation, areas within the boundary of Bears Ears National Monument are no longer managed in a manner that protects the values specified by Proclamation 9558. Moreover, the benefits of Secretarial Order 3308 and BLM Manual 6220 no longer extend to the 1.1 million acres deprived of Monument status. The loss of these benefits impairs Plaintiffs' interests, as well as the cultural, aesthetic, recreational, or scientific interests of their members or similar affiliates.

236.    In particular, excluded lands are no longer subject to BLM policies to inventory and monitor cultural resources, which in turn would have resulted in the development of cultural resource management plans. Completing these plans requires additional cultural resource surveys. Conducting detailed cultural resource surveys in the Bears Ears area is especially important because currently no more than ten percent of the area has been surveyed for cultural resources, notwithstanding the extraordinary significance of historic resources in the area. Upon

information and belief, Monument status for all objects and lands protected or reserved under Proclamation 9558 would increase funding available for the management of the lands within Bears Ears, including surveys to identify, evaluate, and protect cultural resources, and will foster meaningful tribal consultations with the Bears Ears Commission.  The Revocation Proclamation reduced the amount of funding available for these activities and impairs Plaintiffs' interests, as well as the cultural, aesthetic, recreational, or scientific interests of their members and affiliates. Moreover, the Revocation Proclamation has lessened opportunities to work collaboratively with the federal government to preserve, protect, and develop the area in ways that balances conserving the land and Plaintiffs' interests, including through the diminution of the scope of Bears Ears Commission to only the Shash Jáa unit and the dilution of tribal voices on the Shash Jáa Commission.

237.    As a result of the Revocation Proclamation, several Plaintiffs have restructured internal operations and diverted significant time and resources away from other projects to advocate for areas excised from the Monument.  The Revocation Proclamation and its attendant harms directly conflict with several Plaintiffs' mission statements, and have resulted in numerous actions taken by Plaintiffs to monitor and protect areas no longer within the Monument. Plaintiffs have held educational meetings, created presentations, compiled interactive maps, authored news articles, posted on social media, participated in conference panels, testified before government officials, monitored legislative activities, and developed educational videos to support and defend lands no longer within the Monument.

**COUNT I – *ULTRA VIRES* EXECUTIVE ACTION AND
VIOLATION OF THE ANTIQUITIES ACT
54 U.S.C. § 320301(a)
[All Plaintiffs against All Defendants]**

238.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through Paragraph 237.

239.    Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against *ultra vires* actions by Defendants.  They also have a right of action under the Administrative Procedure Act.

240.    Section 320301(a) of Title 54 of the United States Code provides that the "President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."

241.    The Revocation Proclamation revokes the Monument status of numerous historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest designated by Proclamation 9558.

242.    Upon information and belief, Defendants are complying with the directives of the Revocation Proclamation and not implementing, and have not implemented, those of Proclamation 9558.

243.    Neither § 320301(a) nor any other section of the Antiquities Act authorizes the President to revoke the  Monument status of, or the protections for, objects designated under Proclamation 9558, as determined under the discretion of the establishing President.  Congress has not delegated to the President the power to revoke the designation of "historic landmarks, historic and prehistoric structures, and other objects of scientific or historic interest" once they

have been lawfully proclaimed national monuments.  Such power remains reserved for Congress

under Article IV, Section 3, Clause 2 of the U.S. Constitution.

244.    The Antiquities Act does not authorize the Revocation Proclamation's action to

revoke the designation of landmarks, structures, and objects comprising Bears Ears National

Monument.

245.    Defendants' attempt to revoke the designation of landmarks, structures, and

objects comprising Bears Ears National Monument is an *ultra vires* action: The Revocation

Proclamation exceeds the limited authority to declare national monuments Congress provided to

the Executive under the Antiquities Act.

### COUNT II – VIOLATION OF THE ANTIQUITIES ACT
### 54 U.S.C. § 320301(b)
### [All Plaintiffs against All Defendants]

246.    Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1

through 245.

247.    Plaintiffs have a non-statutory right of action to injunctive and declaratory relief

against unlawful actions by Defendants.  They also have a right of action under the

Administrative Procedure Act.

248.    Section 320301(b) of Title 54 of the United States Code provides that the

"President may reserve parcels of land as a part of the national monuments.  The limits of the

parcels shall be confined to the smallest area compatible with the proper care and management of

the objects to be protected."

249.    The Revocation Proclamation purports to "modify" the reservation of parcels of

land that were made a part of Bears Ears National Monument.  This action excludes from the

Monument's reservation a land area of approximately 1.1 million acres.

250.    By excluding vast land areas from the reservation made pursuant to Proclamation 9558, the Revocation Proclamation excludes from the Monument reservation the landmarks, structures, and objects on those land areas that had been lawfully designated under Proclamation 9558.

251.    As a result, the Revocation Proclamation purports to remove these objects from the protection against entry, location, patent, selection, sale, or other disposition, among other protections established by Proclamation 9558.  The Revocation Proclamation directs Defendants other than President Trump not to provide such protection to approximately 1.1 million acres of land.  Upon information and belief, Defendants are complying with the directives of the Revocation Proclamation and are not implementing, and have not implemented, those of Proclamation 9558.

252.    The two "units" comprising the reservation under the Revocation Proclamation are not sufficient for, and thus not compatible with, the proper care and management of the objects designated as part of the Monument by Proclamation 9558.

253.    The Revocation Proclamation also purports to eliminate beneficial conditions and directives of the reservation established by Proclamation 9558 even for the two new "units."  The Revocation Proclamation changes the scope of consultation with and composition of the Bears Ears Commission, allows motorized and non-mechanized vehicle use on roads and trails designated for such use prior to Proclamation 9558, allows maintenance of roads and trails for such use, and allows active vegetation management activities.

254.    The elimination of the reservation conditions and directives established by Proclamation 9558 is not compatible with the proper care and management of the objects designated as part of the Monument by Proclamation 9558.

255.     Neither section 320301(b) nor any other section of the Antiquities Act authorizes the President to "modify" the reservation of land or reduce the parcels of land reserved as part of Bears Ears National Monument in a manner that precludes the proper care and management of the objects protected by Proclamation 9558.  Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

256.     The Antiquities Act does not authorize the Revocation Proclamation's actions to exclude vast areas of land from the Monument's reservation or to eliminate beneficial conditions of that reservation.

257.     Defendants' attempt to alter the reservation of Bears Ears National Monument is unlawful.

### COUNT III – VIOLATION OF THE SEPARATION OF POWERS
### U.S. Const. art. IV, § 3, cl. 2
### [All Plaintiffs against All Defendants]

258.     Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 257.

259.     The Constitution vests the power to dispose of and regulate the property of the United States solely in Congress.  Specifically, the Property Clause provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"  U.S. Const. art. IV, § 3, cl. 2.

260.     The Antiquities Act only empowers the President to declare national monuments and does not delegate authority to the President to revoke, abolish, diminish, or replace them.  54 U.S.C. § 320301.

261.     Defendants, through the Revocation Proclamation, purport to dispose of and regulate federal property, namely, the landmarks, structures, and objects of historic or scientific

interest that comprise Bears Ears National Monument and the land reserved for that Monument, without a delegation of such power from Congress.

262.    Defendants, through the Revocation Proclamation, have arrogated to themselves Congress' exclusive power to dispose of and regulate the property of the United States.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that this Court:

(a) DECLARE

    i.    that the Revocation Proclamation is unlawful and an *ultra vires* action;

    ii.    that, pursuant to the Antiquities Act, the President may not unilaterally revoke the designation of landmarks, structures, or objects, and may not substantially alter the reservation of land, which together comprise a lawfully created national monument;

    iii.    that the President's power under the Antiquities Act is limited to:

        A.    declaring historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the federal government to be national monuments, and

        B.    reserving, as part of a national monument, the smallest parcels of land compatible with the proper care and management of the objects to be protected;

    iv.    that Proclamation 9558 is controlling with respect to the objects comprising, the parcels of land reserved as, and the management of Bears Ears National Monument;

v.     that all Defendants other than President Donald J. Trump have duties to manage Bears Ears National Monument to the fullest extent described in, in the manner provided for by, and in a manner that protects the values of Proclamation 9558; must withdraw lands within Bears Ears National Monument, as described in Proclamation 9558, from all forms of entry, location, selection, sale, or other disposition under the public land laws or laws applicable to the USFS, from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral and geothermal leasing; and must not exchange any lands within Bears Ears National Monument, as described in Proclamation 9558, other than by exchange that furthers the protective purposes of the Monument.

(b) ORDER Defendants other than President Donald J. Trump to expeditiously comply with all mandates of Proclamation 9558;

(c) ENJOIN Defendants other than President Donald J. Trump from further actions or inaction inconsistent with Proclamation 9558;

(d) AWARD qualifying Plaintiffs fees and costs as appropriate under 28 U.S.C. § 2412 or other applicable authority; and

(e) GRANT Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  November 7, 2019

Respectfully submitted,

*/s/ Hunter J. Kendrick*
James T. Banks (DC Bar # 261156)
Adam M. Kushner (DC Bar # 426344)
Douglas P. Wheeler III (DC Bar # 463959)
Hunter J. Kendrick (DC Bar # 144629)
Hogan Lovells US LLP
555 Thirteenth Street NW

Washington, DC 20004
Telephone: 202-637-5600
Fax: 202-637-5910
Email: james.banks@hoganlovells.com
Email: adam.kushner@hoganlovells.com
Email: douglas.wheeler@hoganlovells.com
Email:  hunter.kendrick@hoganlovells.com

Thomas P. Schmidt
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Telephone: 212-918-3000
Email:  thomas.schmidt@hoganlovells.com

*Attorneys for Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, the National Trust for Historic Preservation, and the Society of Vertebrate Paleontology*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of November 2019, I filed the above pleading with the Court's CM/ECF system, which provided notice of this filing by e-mail to all counsel of record.

*/s/ Hunter J. Kendrick*
Hunter J. Kendrick