**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOPI TRIBE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-2590 (TSC) |
| UTAH DINÉ BIKÉYAH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-2605 (TSC) |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-2606 (TSC)<br><br>**CONSOLIDATED CASES** |
| AMERICAN FARM BUREAU FEDERATION, *et al.*,<br><br>Intervenor-Defendants. | |

**NRDC PLAINTIFFS' [PROPOSED]**
**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Plaintiffs Natural Resources Defense Council *et al.*[1] (collectively, "NRDC Plaintiffs") file this second amended and supplemented complaint pursuant to Federal Rule of Civil Procedure 15 challenging President Donald J. Trump's repeated unlawful attempts to dismantle Bears Ears National Monument ("Bears Ears" or "the Monument").

2. When Congress enacted the Antiquities Act of 1906 ("the Act"), it gave presidents a narrowly defined portion of its exclusive authority under the Property Clause, U.S. Const. art. IV, § 3, cl. 2, to "declare" national monuments and "reserve" land for their protection, but not to abolish them in whole or in part. Pub. L No. 59-209, 34 Stat. 225 (codified at 54 U.S.C. § 320301(a)-(b)). Yet President Trump has attacked multiple national monuments and twice exceeded his defined statutory delegation with respect to Bears Ears. He first did so in December 2017 by purporting to remove nearly 1.15 million acres from Bears Ears, which Plaintiffs swiftly challenged in this lawsuit. Proclamation No. 9681, 82 Fed. Reg. 58,081 (Dec. 4, 2017) ("the 2017 Dismantling Proclamation"). He then made deeper cuts on July 13, 2026, when he purported to revoke monument status for over 1.2 million acres—or 91% of the Monument. Proclamation No. 11,043, 91 Fed. Reg. 45,169 (July 13, 2026) ("the 2026 Dismantling Proclamation"). Plaintiffs now challenge that action as well.

3. The rich history and scientific wonders of Bears Ears give it national significance. Despite millennia of human habitation, Bears Ears is one of the most ecologically intact and least-roaded regions in the contiguous United States. As a result, the lands of Bears Ears tell a

[1] Natural Resources Defense Council, Southern Utah Wilderness Alliance, The Wilderness Society, Grand Canyon Trust, National Parks Conservation Alliance, Great Old Broads for Wilderness, Western Watersheds Project, WildEarth Guardians, Sierra Club, and Center for Biological Diversity. As noted in NRDC Plaintiffs' Motion for Leave to Amend and Supplement, this complaint reflects the withdrawal of Defenders of Wildlife.

story stretching back millions of years to today. Paleontologists have found fossils in Bears Ears—from freshwater sharks and giant amphibians to ferns the size of trees—that reflect the landscape's evolution over millions of years from a tropical sea to its current desert climate. Cliff dwellings, granaries, rock paintings, and the remnants of villages show how people in the region interacted with each other and the environment over the course of thousands of years. To this day, Bears Ears holds deep spiritual, historic, and cultural significance for the Native American tribes for whom it is an ancestral homeland.

4. President Trump's unlawful actions imperil these and other irreplaceable resources by opening the lands around them to hard rock mining; oil and gas leasing; and other destructive uses that the default federal land laws generally authorize. Indeed, mining companies located claims on the excised lands following the 2017 Dismantling Proclamation and have already done so again following the 2026 Dismantling Proclamation.

*5.* Plaintiffs ask the Court to enforce the limits of Congress's narrow delegation of power to the President. A "monument" by definition is something that lasts—"[a]n enduring evidence or example."[2] Abolishment in whole or in part is antithetical to the Act's plain language, and the President's claim of such authority is utterly unreasonable and a patent misconstruction of the Act.

6. Through the Act, Congress entrusted the President with a defined delegation of authority to swiftly protect resources and the lands surrounding them from destructive uses. Thanks to Congress's foresight, Americans enjoy a diverse system of national monuments that tell the country's story from its earliest inhabitants to the present. Some, like the many national monuments designated by President Theodore Roosevelt (who signed the Act into law), protect

[2] 6 Oxford English Dictionary 636 (1913).

natural features thousands of years, sometimes eons, in the making.[3] Others celebrate pivotal historic events and honor courageous people who lived up to our country's highest ideals.[4] And others memorialize darker aspects of our history so we can commemorate and learn from lessons of the past.[5] The weighty power to remove monument protections and erase the history embedded in the country's public lands is one Congress reserved for itself.

7. President Barack Obama added to this rich tapestry when he exercised his authority under the Act and declared Bears Ears a national monument in 2016. Proclamation No. 9558, 82 Fed. Reg. 1139 (Dec. 28, 2016) ("the 2016 Designating Proclamation"). The designation of Bears Ears brought the Act's history full circle. Reports about the richness of the Bears Ears region were among the reasons Congress passed the Act. *See* Proclamation No. 10,285, 86 Fed. Reg. at 57,321, 57,321 (Oct. 8, 2021) ("the 2021 Restoration Proclamation"). The 2016 Designating Proclamation also reflected the country's gained wisdom in the ensuing century by including a co-stewardship model for Native American tribes that subsequent national monument proclamations employed. 82 Fed. Reg. at 1144.[6]

---

[3] *See, e.g.*, Proclamation No. 793, 35 Stat. 2174 (Jan. 9, 1908) (protecting the "primeval" forest of old-growth trees in Muir Woods National Monument); Proclamation No. 794, 35 Stat. 2175 (Jan. 11, 1908) (declaring the Grand Canyon a National Monument).

[4] *See, e.g.*, Proclamation No. 9565, 82 Fed. Reg. 6151 (Jan. 12, 2017) (Birmingham Civil Rights National Monument); Proclamation No. 8327, 73 Fed. Reg. 75,293 (Dec. 5, 2008) (World War II Valor in the Pacific).

[5] *See, e.g.*, Proclamation No. 7395, 66 Fed. Reg. 7347 (Jan. 17, 2001) (Minidoka Internment National Monument); Proclamation No. 10,870, 89 Fed. Reg. 100,289 (Dec. 9, 2024) (Carlisle Federal Indian Boarding School National Monument).

[6] *See, e.g.*, Proclamation No. 10,533, 88 Fed. Reg. 17,987, 17,995 (Mar. 21, 2023) (creating co-stewardship memorandum of understanding for Avi Kwa Ame); Proclamation No. 10,882, 90 Fed. Reg. 6727, 6733 (Jan. 14, 2025) (directing Interior to support commission if established by Tribal Nations for Sáttítla Highlands National Monument).

8. Yet the 2017 Dismantling Proclamation stripped the Monument of protections shortly after its designation. Although President Joseph R. Biden, Jr. restored the Monument in 2021, 86 Fed. Reg. at 57,321, that was not soon enough to prevent new hard rock mining claims and destructive ground-disturbing activity.

9. President Trump has once again dismantled Bears Ears, this time with deeper cuts that will cause greater harm to Plaintiffs. Like the 2017 Dismantling Proclamation, the 2026 Dismantling Proclamation quickly opens Bears Ears to mining and sets the stage for wider-scale destruction.

10. Congress did not authorize presidents to revoke national monument status. As demonstrated here, such revocations lead to erratic ping-ponging of monument designations and inevitably result in irreplaceable loss of the scientific and historic "objects" the Act authorizes the President to protect. Instead, Congress intended national monuments to be durable—unless Congress itself acts using its Property Clause powers. The continuing harm to Plaintiffs from President Trump's 2017 unlawful action underscores why Congress reserved for itself the consequential, and distinct, power to revoke national monument protections.

11. By revoking protections from Bears Ears, the President has, without lawful authority, put at risk countless irreplaceable resources, nullified Congress's exercise of its constitutional powers to consolidate and expand the Monument, and created uncertainty for people who rely on the lands remaining in their undeveloped state for their livelihoods, recreational pursuits, studies, and spiritual sustenance. Accordingly, this Court should declare President Trump's 2017 and 2026 Proclamations to be unlawful. Actions by the Department of the Interior, the Bureau of Land Management ("the Bureau"), the Department of Agriculture, and the Forest Service ("the Service"), under the direction of the Secretary of Interior, Director of the

Bureau, Secretary of Agriculture, and Chief of the Service (collectively, "Agency Defendants"), to implement the President's unlawful proclamation are likewise unlawful and should be enjoined.

## JURISDICTION AND VENUE

12. This case arises under the Constitution and the laws of the United States. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question).

13. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and its inherent authority to issue equitable relief. Relief addressed to the Agency Defendants is also authorized by 5 U.S.C. §§ 703, 706.

14. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiffs The Wilderness Society and National Parks Conservation Association reside in this District, and because the Southern Utah Wilderness Alliance, Natural Resources Defense Council, Center for Biological Diversity, and Sierra Club maintain offices in the District.

16. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1) because the Defendants reside in this District. Additionally, the events giving rise to the action challenged here took place in this judicial district. President Trump signed and issued the 2026 Dismantling Proclamation in this District. Former Interior Secretary Ryan Zinke's national monument review and transmittal of his recommendations to the President concerning Bears Ears took place in this District. Any review and recommendations by current Interior Secretary Doug Burgum concerning Bears Ears took place in this District. Department of the Interior and Agriculture officials' actions in furtherance of the 2017 and 2026 Dismantling Proclamations took place in this District.

**PLAINTIFFS**

17. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC. ("NRDC") is a non-profit environmental membership organization with hundreds of thousands of members nationwide. Part of NRDC's core mission is to preserve the earth's wild places and wildlife, to safeguard the integrity of undeveloped lands, and to prevent the destructive impacts of extractive industry exploration and development on public lands.

18. NRDC has a longstanding commitment to the protection of federal public lands in Utah, and it was actively involved in advocating for the protection of the Bears Ears National Monument.

19. NRDC has individual members, including Moab resident Susan Harrington, who use and enjoy the Monument for a variety of purposes, including scientific study, hiking and recreation, wildlife viewing, meditation and quiet contemplation, and aesthetic appreciation. These NRDC members intend to continue visiting Bears Ears (including lands that have now been stripped of protection, such as the Cheesebox and White Canyon) in the future, including in the next year.

20. Plaintiff THE WILDERNESS SOCIETY is a non-profit national membership organization founded in 1935. Headquartered in Washington, D.C., The Wilderness Society has members who reside throughout the nation, including in Utah. The Wilderness Society's mission is uniting people to protect America's wild places.

21. Prior to the Monument's designation, The Wilderness Society had already worked for years to protect wilderness and other sensitive lands ultimately included within Bears Ears. The Wilderness Society has been actively involved in land-use and travel-management planning on the Monument's lands.

22. Many of The Wilderness Society's members, including Scott Miller, visit the lands within Bears Ears (including lands that have been stripped of protection) to experience its remote wilderness quality and to view plants and wildlife, camp, take photographs, hike, backpack, explore, and enjoy the natural beauty of the area. Additionally, Mr. Miller and The Wilderness Society's members are drawn to Bears Ears to view the numerous archaeological, rock art, geological, historic, and paleontological resources found throughout the area. Mr. Miller and other members of The Wilderness Society plan to visit the area regularly in the future, including in the next year.

23. Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION ("NPCA") is a non-profit national organization whose primary mission is to address major threats facing protected federal lands such as national parks and national monuments. NPCA has more than 1.9 million members and supporters throughout the United States.

24. NPCA advocates to decision-makers and the public for the protection of federal lands. NPCA has been a strong and consistent advocate for safeguarding the threatened cultural and sacred sites in Bears Ears.

25. NPCA has members, including Ray Bloxham, who regularly visit the Monument (including lands that have now been stripped of protection) to camp, sightsee, view native wildlife and vegetation, hike, and enjoy the many cultural sites that can be found there. Mr. Bloxham and other members also plan to visit the Monument regularly in the future, including in the next year.

26. Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a non-profit environmental membership organization with members in all fifty states and offices in Washington, D.C., and Utah. SUWA is dedicated to the sensible management of federal public

lands within the State of Utah, the preservation and protection of plant and animal species, the protection of clean air and water found on federal public lands, the preservation and protection of cultural and archeological resources, and the permanent preservation of Utah's remaining wild lands.

27. SUWA staff and members actively encouraged Presidents Obama and Biden to protect the Bears Ears National Monument for current and future generations of Americans.

28. SUWA has individual members—including Ray Bloxham and Neal Clark—who often visit Bears Ears (including Cheese and Raisins, Dark Canyon, Harts Point, Hatch Canyon, Comb Wash, Fry Canyon, and the San Juan River, all areas stripped of protection) for a host of reasons, including spiritual renewal, recreation, and appreciation of the area's significant cultural resources, flora and fauna, and geology. SUWA members, including Mr. Bloxham and Mr. Clark, plan to visit the area in the future, including in the next year.

29. Plaintiff GRAND CANYON TRUST is a non-profit public lands advocacy organization with members and staff who live and work throughout the Colorado Plateau. Through its advocacy, Grand Canyon Trust ensures that the Colorado Plateau remains characterized by vast open spaces, healthy ecosystems, and communities enjoying a sustaining relationship with the natural environment.

30. Grand Canyon Trust's members and staff have long advocated for the protection of federal public lands within Bears Ears. Grand Canyon Trust staff, its board of trustees, and its members provided support and technical assistance to the Bears Ears Inter-Tribal Coalition, elected tribal officials, and cultural and spiritual leaders. They work to educate the broader public, federal government, and local communities about the need for permanent protection of Bears Ears.

31. Grand Canyon Trust's members and staff, including Tim Peterson, regularly visit areas in the Monument, including areas stripped of protection—such as Elk Ridge, Cedar Mesa, Dark and White Canyons, Comb Wash, Cheese and Raisins, Grand Gulch, Cottonwood Canyon, Valley of the Gods, Blue Creek Canyon, and the Indian Creek corridor—to recreate, find solitude, view pictographs and petroglyphs, experience wilderness, hunt and fish, and monitor and study wildlife and plants. Its members, including Mr. Peterson, will continue to visit the Monument in the future to engage in these activities, including in the next year.

32. Plaintiff GREAT OLD BROADS FOR WILDERNESS ("Great Old Broads") is a national grassroots non-profit organization, led by elders, that seeks to protect the interests of senior populations who value roadless areas, enjoy them without mechanized means of transportation, and want to see these areas protected in their natural state for future generations. Great Old Broads has over 10,000 members and supporters, located in 46 states, many of whom reside or engage in recreational activities in Utah.

33. Great Old Broads has conducted educational and advocacy activities on the significance of the lands included in the Monument, including by monitoring illegal motorized use, evaluating rangeland health, and working with agencies on stewardship projects.

34. Members of Great Old Broads, including Steve Allen, visit the federal public lands in the Monument (including lands stripped of protection) to hike, backpack, enjoy the outstanding scenery and fascinating archaeological sites, view native plant and animal life, take photographs, and experience the remoteness and quiet of the area. Mr. Allen and other members regularly visit the Monument and will continue to do so, including in the next year.

35. Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit environmental organization founded in 1993 with the mission of protecting and restoring western

watersheds and wildlife. WWP works to influence and improve public lands management throughout the West and protect the ecological, biological, cultural, historic, archeological, and scenic resources; wilderness; and other natural values found there.

36. WWP supported the Monument's creation and has worked for many years to protect and restore the federal public lands included in Bears Ears.

37. WWP staff and members, including Erik Molvar, Laura Welp, and Cyndi Tuell, regularly visit Bears Ears (including lands stripped of protection) for hiking, camping, enjoyment and appreciation of structures left by Ancestral Puebloan people, geological wonders, and natural beauty. Mr. Molvar, Ms. Welp, Ms. Tuell, and many others have plans to return there in the near future, including in the next year.

38. Plaintiff SIERRA CLUB is a national nonprofit organization with 64 chapters and about 599,549 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the continued protection, use, and enjoyment of Bears Ears National Monument for its members and supporters within Utah and across the United States. The Utah Chapter of Sierra Club has approximately 4,155 members.

39. Sierra Club's particular interests in this case stem from its work with numerous federal, state, and local government officials, environmental organizations, and the local Tribes to obtain long overdue protections for Bears Ears. Sierra Club has actively supported Bears Ears by, among other things, organizing meetings and letter writing campaigns, providing public comments, and helping to organize public rallies in support of the Monument. Sierra Club

members live near, use, and enjoy Bears Ears (including lands stripped of protection) for outdoor recreation and scientific study of various kinds, including nature study, birdwatching, photography, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities; they will continue to do so in the future.

40. For example, Sierra Club Utah Chapter member James Catlin has camped and hiked in most of the major canyons within Bears Ears. Mr. Catlin has also co-led trips into these lands for many decades, including trips with members of Congress. He plans to continue visiting the lands excluded from the Monument on a regular basis into the future, including in the next year.

41. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national non-profit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 120,000 members and is headquartered in Tucson, Arizona.

42. The Center has a long history of environmental advocacy within the southwestern United States generally, and in relation to public lands conservation in particular. The Center participated in efforts to protect the Bears Ears National Monument.

43. The Center's members, including Taylor McKinnon, have visited the federal public lands within Bears Ears (including lands stripped of protection) and intend to continue to do so for hiking, camping, viewing and studying wildlife, photography, and other vocational and recreational activities. The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members and staff, including Mr. McKinnon, have specific intentions to continue using and enjoying these areas frequently and on an ongoing basis in the next year.

44. Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit organization with over 176,000 members that is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Protection of Bears Ears is vital to this work because the Monument preserves tracts of unfragmented wildlife habitat and migration routes.

45. Guardians has a longstanding interest in the preservation of Bears Ears. Over the last decade, Guardians has advocated for prohibitions on oil and gas leases and other development that would harm the natural and cultural values on public lands in the region.

46. Guardians staff and members, including Tim Peterson, regularly visit Bears Ears (including lands stripped of protection) for the purposes of hiking, observing archeological sites like cliff dwellings, bird watching, observing wildlife, spiritual rejuvenation, photography, and other recreational and professional pursuits. Guardians staff and members, including Mr. Peterson, have engaged in these activities in the past and have firm plans to participate in these activities in the Monument in the next year.

47. The Plaintiff organizations actively supported the protection of Bears Ears in 2016 and its restoration in 2021. Since then, Plaintiffs have participated in numerous public processes to safeguard the Monument's resources, including commenting on the development of the Monument management plans, grazing authorizations and allotment availability designations, oil and gas drilling on pre-existing leases, motorized vehicle management, watershed restoration, and recreation management.

48. In their efforts to support the Bears Ears National Monument's designation, many of the Plaintiff groups submitted comments on the Department of the Interior's review of the Monument between May and July 2017; submitted comments and protests relating to the management planning process; and advocated for the Monument's restoration.

49. The interests Plaintiffs seek to protect are germane to each organization's purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in this lawsuit.

**DEFENDANTS**

50. Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States. He currently resides and conducts his duties in Washington, D.C.

51. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States.

52. Secretary Burgum is responsible for ensuring that the Department of the Interior and its constituent agencies, including the Bureau, comply with the applicable law, including the 2016 and 2021 Proclamations' direction and requirements for managing the Monument.

53. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

54. Defendant STEVE PEARCE is sued in his official capacity as the Director of the Bureau of Land Management, a bureau within the U.S. Department of the Interior.

55. The Director of the Bureau is responsible for ensuring that the Bureau complies with the applicable law, including the 2016 and 2021 Proclamations' direction and requirements for managing the Monument.

56. The Director of the Bureau presently resides and conducts his duties in Washington, D.C.

57. Defendant BROOKE ROLLINS is sued in her official capacity as the Secretary of Agriculture of the United States.

58. Secretary Rollins is responsible for ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service, comply with the applicable law,

including the 2016 and 2021 Proclamations' direction and requirements for managing the Monument.

59. The Secretary of Agriculture resides and conducts her duties in Washington, D.C.

60. Defendant TOM SCHULTZ is sued in his official capacity as Chief of the U.S. Forest Service within the U.S. Department of Agriculture.

61. Mr. Schultz is responsible for ensuring that the U.S. Forest Service complies with the applicable law, including the 2016 and 2021 Proclamations' direction and requirements for managing the Monument.

62. The Chief of the U.S. Forest Service resides and conducts his duties in Washington, D.C.

63. The above-named Defendants have the authority, ability, and obligation to remedy the harms alleged to Plaintiffs and their members.

## BACKGROUND

### I. Congress enacted the Antiquities Act to protect historic or scientific resources on federal lands for future generations

64. The U.S. Constitution's Property Clause gives Congress the exclusive "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Exercising this power, Congress has enacted laws setting up default rules for federally owned lands while also creating "reservations" of lands for specific purposes (such as national parks) or placing limitations on lands' use. *Compare, e.g.*, 30 U.S.C. § 22 *et seq.* (General Mining Act of 1872 that makes lands open to the location of mining claims unless withdrawn), *with* An Act Establishing Yellowstone National Park, 17 Stat. 32 (1872) (codified at 16 U.S.C. § 21) (reserving land for the first national park and withdrawing it from "settlement, occupancy, or sale").

65. The President, in contrast, has no independent constitutional authority over federal public lands. Congress may delegate certain aspects of its Property Clause authority to the President, but when it does so, the President may exercise authority only within the defined scope of the delegation.

66. Starting in the 1800s, Congress began enacting legislation delegating authority to the President to protect resources on federal lands in its stead. For example, the Forest Reserve Act of 1891 authorized the President to "declare the establishment of [forest] reservations and the limits thereof." Act of March 3, 1891, § 24, 26 Stat. 1095, 1103 (1891). Whether done by Congress directly or through a delegation to the President, such reservations were necessary to prevent resource loss facilitated by the general land laws that promoted resource extraction or conversion of public lands to private ownership.

67. As Congress delegated aspects of its land-reservation authority to the Executive Branch, Congress faced the question of what to do if it disagreed with the reservation. When Congress wanted the President to have the ability to revoke a reservation in whole or in part, it delegated the authority expressly. *See, e.g.*, 1897 Organic Act, 30 Stat. 11, 36 (1897) (codified at 16 U.S.C. § 473) (amending Forest Reserve Act to authorize the President to "modify any Executive order . . . establishing any forest reserve").

68. By the turn of the twentieth century, Congress saw a need to delegate to the Executive Branch authority to swiftly protect historic and scientific resources on federal lands. *See* H.R. Rep. No. 59-2224, at 2-3 (1906). Without protections, private parties looted these lands and sold off valuable objects, entered the lands to extract minerals (destroying the scientific and historic resources in the process), or sought to profit by claiming lands for themselves and then charging admission to the public.

69. With an eye towards preserving America's distinct heritage for future generations, Congress enacted the Antiquities Act in 1906. The Act authorizes the President to do two things: (1) to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and (2) to "reserve parcels of land as a part of the national monuments" that comprise "the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b).

70. A national monument designation immediately confers enhanced protection for the identified "objects of historic or scientific interest" and for the reserved lands on which they are found. *See* 54 U.S.C. § 320301(a). Once designated as a national monument, those lands must be "manage[d]" for the "protect[ion]" of the objects of historic or scientific interest located there. *Id.* § 320301(b). The land is also "reserve[d]" for purposes of monument protection and thereafter exempt from the operation of certain laws that facilitate extractive use, like the General Mining Act of 1872.

71. Congress has time and again demonstrated its approval of national monuments, and the durability of the protections they confer.

72. When Congress updated federal land law in 1976 through the Federal Land Policy and Management Act, it rescinded numerous public lands provisions but notably left the President's authority to create national monuments intact.

73. In 2009, Congress enacted the Omnibus Public Land Management Act, which included all Bureau-managed national monuments within a newly established "National Landscape Conservation System." *See* 16 U.S.C. § 7202(b)(1)(A). The National Landscape Conservation System's purpose is to "conserve, protect, and restore nationally significant

landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." Pub. L. No. 111-11, § 2002, 123 Stat. 991, 1095 (2009) (codified at 16 U.S.C. § 7202(a)).

74. In addition to approving of national monuments generally, Congress has invested in particular national monuments in reliance of their protections being stable. In some instances, Congress expanded a national monument's boundaries to include lands it believed were also worthy of protection. *See, e.g.*, Bandelier National Monument Administrative Improvement & Watershed Protection Act of 1998, Pub. L. No. 105-376, §§ 2-4, 112 Stat. 3388, 3388-89 (adding 935 acres to Bandelier National Monument and summarizing prior congressional expansions to provide "enhanced protection"). In others, Congress appropriated funds to buy out (and thus end) harmful extractive uses on monument land. *See, e.g.*, Department of the Interior and Related Agencies Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-215 (appropriating $19.5 million to buy back existing coal leases in Grand Staircase).

## II. The Bears Ears region was an impetus for the passage of the Act due to its rich historic, cultural, and scientific significance

### *A. Objects of historic or scientific interest are found throughout the Monument*

75. Both President Obama's 2016 Designating Proclamation establishing the Bears Ears National Monument, and President Biden's 2021 Proclamation restoring it, describe in detail the geological, paleontological, ecological, archaeological, historic, and cultural significance of Bears Ears and the objects of historic or scientific interest found there, and they set forth requirements essential to their future protection. 82 Fed. Reg. at 1142-46; 86 Fed. Reg. at 57,330-33. The density of cultural and archaeological sites in the Bears Ears region "was an impetus for the passage of the Antiquities Act" itself. 86 Fed. Reg. at 57,321. The fossils,

geological formations, plants, animals, habitats, and cultural objects described below are among the objects of historic or scientific interest identified in the Proclamations.

76. The Bears Ears National Monument lies in the heart of the Colorado Plateau in one of the least developed areas in the contiguous United States. Near its center are the iconic twin buttes known as the Bears Ears. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,321.

77. For thousands of years, the area has been inhabited by members of Native American tribal groups, including the Navajo Nation, Hopi Tribe, Ute Indian Tribe, Ute Mountain Ute Tribe, and the Pueblo of Zuni. The Bears Ears National Monument is an ancestral homeland for these Tribes, and it has deep spiritual, historic, and cultural significance for them. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,321.

78. The Tribes' history is written on the landscape today: the Bears Ears area is intensely rich with petroglyphs and rock paintings, cliff dwellings, granaries, graves, ceremonial sites, and the remnants of carefully planned and constructed villages. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,321. These objects draw much of their meaning from the context and landscape in which they are embedded.

79. The concentration and locations of cultural objects have contributed to understanding how people in the region have interacted with one another and with the surrounding environment—including by hunting, introducing plants for cultivation, and domesticating animals—for more than a thousand years. *See* 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,327-29. Systems of steps carved into cliff faces offer insight into the trading patterns, economy, and social organization of Ancestral Pueblo communities. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,321, 57,327. Rock art panels throughout the Monument provide insights into the daily lives and rituals of the people who created them. *See* 82 Fed. Reg. at 1139; 86 Fed. Reg. at

57,324, 57,326-27, 57,328-29. Dispersed throughout the Monument are structures including family homes, granaries, towers, ceremonial sites, and kivas from Archaic, Ancestral Pueblo, and Basketmaker cultures—including sites containing multiple structures that show how communities organized their villages. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,325. Overall, the Monument reflects 13,000 years of human occupation and deep connections to the landscape that persist to this day. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,328.

80. Bears Ears also contains rich resources for scientific study. Throughout the Monument are canyons and exposed layers of sedimentary rock that offer geologists a view of our continent that stretches millions of years back in time. Paleontologists have found taxa of dinosaurs and extinct reptiles whose ranges are exclusive to Bears Ears or whose discovery in Bears Ears significantly extended their known ranges. 82 Fed. Reg. at 1141; 86 Fed. Reg. at 57,323. The range of fossils found—freshwater sharks, giant amphibians, ferns the size of trees, and unique taxa of mammal-like reptiles—reflects how the Bears Ears landscape evolved over millions of years from a tropical sea to the current desert climate. *See* 82 Fed. Reg. at 1140-41; 86 Fed. Reg. at 57,328.

81. Despite millennia of human habitation, Bears Ears is one of the most ecologically intact and least-roaded regions in the contiguous United States. As a result, Bears Ears provides habitat to a variety of threatened, endangered, sensitive, endemic, or otherwise rare species of wildlife, fish, and plants that attract scientific interest. 82 Fed. Reg. at 1141-42; 86 Fed. Reg. at 57,323. One species—the *Eucosma navajoensis* moth—has been found nowhere else in the world. *See* 82 Fed. Reg. at 1142; 86 Fed. Reg. at 57,328.

***B. The 2016 Designating Proclamation***

82. To protect the objects of historic or scientific interest in the region, in 2016, President Obama exercised his authority under the Act to declare the Bears Ears National

Monument. 82 Fed. Reg. at 1143. Given the high concentration and interconnectedness of the Monument's resources, President Obama determined that 1.35 million acres represented the smallest reservation compatible with the proper care and management of the Monument's objects. *Id.*

### *C. The 2017 Dismantling Proclamation*

83. On April 26, 2017, President Trump issued Executive Order 13,792, 82 Fed. Reg. 20,429 (Apr. 26, 2017), which directed the Secretary of the Interior to "review" national monuments designated since 1996.

84. In May 2017, representatives from the mining company Energy Fuels, Inc. attended an on-site field trip with then-Secretary Zinke and presented a map depicting lands then within the Monument that Energy Fuels proposed be removed from protection, including areas near its existing uranium mines just outside of Bears Ears. Two weeks later, Energy Fuels submitted comments to Interior requesting that the Monument be reduced.

85. On December 4, 2017, President Trump issued his proclamation revoking monument status from nearly 85% of Bears Ears. 82 Fed. Reg. at 58,085-86. The 2017 Dismantling Proclamation replaced the original continuous monument with two fragmented, smaller "units," which the President named the "Indian Creek" and the "Shash Jáa" units. *Id.* at 58,085.

86. The 2017 Dismantling Proclamation abolished monument status for nearly 1.15 million acres of lands, stranding numerous objects of historic or scientific interest outside the Monument's boundaries and without monument protections. President Trump claimed at that time that this was the smallest area compatible with the protection of the remaining objects. *Id.* at 58,085.

*87.* The 2017 Dismantling Proclamation added to the Monument 11,200 acres of federal lands that were not included in the 2016 Designating Proclamation. *See* 86 Fed. Reg. at 57,330. The 2017 Dismantling Proclamation excised lands that Energy Fuels had proposed for removal.

### *D. The 2021 Restoration Proclamation*

88. On the first day of his presidency, President Biden directed the Secretary of the Interior to determine whether he should restore national monuments that President Trump had dismantled, including Bears Ears. *See* Exec. Order No. 13, 990, § 3, 86 Fed. Reg. 7037, 7038 (Jan. 20, 2021).

89. In June 2021, then-Secretary of the Interior Deb Haaland released her report after meeting with the Governor of Utah, the entire Utah congressional delegation, and tribal Leaders. U.S. Dep't of the Interior, Report on Restoring National Monuments (2021). Noting "[q]uestions about the legality" of the 2017 Dismantling Proclamations (and other monument reductions), the Secretary stated that "pressing threats" to monument resources that emerged after the 2017 Dismantling Proclamation proved that the original proclamation establishing the Monument was "prudent and prescient." *Id.*. As a result, the Secretary recommended restoring Bears Ears to its pre-2017 boundaries and retaining the 11,200 acres added by President Trump. *Id.* at 15.

90. On October 8, 2021, President Biden adopted the Secretary's recommendations in full. 86 Fed. Reg. at 57,321. The 2021 Restoration Proclamation found that the 2017 Dismantling Proclamation "remove[d] protection objects of historic and scientific interest" including "some resources [the designating] Proclamation . . . specifically identifie[d]." *Id.* at 57,322. Anything short of national monument status was insufficient because other laws neither "provide[d] the Department of the Interior with the specific mandate to ensure proper care and management" of

the Monument's resources" nor "withdraw the lands from the operation of the public land, mining, and mineral leasing laws." *Id.* at 57,331.

91. The 2021 Restoration Proclamation found that the 2017 Dismantling Proclamation provided insufficient protection for the objects of historic or scientific interest found throughout Bears Ears and that action was necessary to "correct[] the exclusion of lands and resources profoundly sacred to Tribal Nations." *Id.* at 57,332. Thus, the 2016 Designating Proclamation boundaries (with President Trump's additions) were the "smallest area compatible with the proper care and management of the objects of historic and scientific interest" named in both the 2021 Restoration Proclamation and the 2016 Designating Proclamation. *Id.* at 57,331.

### *E. The 2026 Dismantling Proclamation*

92. Early in his second term, President Trump issued multiple executive orders prioritizing extractive activity on federal lands. *See, e.g.*, Exec. Order No. 14,154, §§ 2(a), 3(b), 90 Fed. Reg. 8353, 8353 (Jan. 20, 2026) (directing agency heads to review all agency actions that "burden" the development of "domestic energy resources," including oil and critical minerals).

93. President Trump dismantled Bears Ears a second time on July 13, 2026. The 2026 Dismantling Proclamation claimed that many of the geological features of the Monument were "generic" and merely "scenic" and not objects of historic or scientific interest. 91 Fed. Reg. at 45,169. It further asserted that other cultural, paleontological, and geological resources in the Monument were of "relative commonness" and therefore not of particular historic or scientific interest. *Id.* at 45,170.

94. Based on the President's assertion that the 2021 Restoration Proclamation protected "objects that lack the necessary historic or scientific interest," the 2026 Dismantling Proclamation determined a smaller reservation of land was warranted. *Id.* at 45,170. The 2026

Dismantling Proclamation also claimed that other laws protected some of the objects of historic or scientific interest named in the 2021 Restoration Proclamation (although it did not identify which objects) so a reservation of land was not necessary. *Id.* The 2026 Dismantling Proclamation also expressed a desire to use the Monument as a domestic supply of minerals and generally alluded to "greater budgetary and resource constraints" as reasons to exclude lands included in the Monument by the 2021 Restoration Proclamation. *Id.* at 45,172-73.




*Fig. 1: Map of the Monument's boundaries under the 2016, 2017, 2021, and 2026 Proclamations (Credit: SUWA)*

95. The 2026 Dismantling Proclamation replaced the Monument with two fragmented "units": the Shash Jáa Unit (covering 106,816 acres) and the Indian Creek Unit (14,279 acres). *Id.* at 45,171-72. The Shash Jáa Unit also included five small non-contiguous parcels protecting specific sites. *Id.*

96. In total, the 2026 Dismantling Proclamation abolished monument status for objects of historic or scientific interest on over 1.2 million acres of land from Bears Ears—including tens of thousands of acres that President Trump himself declared in 2017 were eligible for national monument protection and that met the "smallest area" criteria. The new boundaries excluded objects specifically named by the previous proclamations as objects of historic or scientific interest such as Bridger Jack and Lavender Mesas, which the 2017 Dismantling Proclamation found worthy of protection due to their unique plant life that provided opportunity for scientific study. *See* 82 Fed. Reg. at 58,084.



*Fig. 2: Bridger Jack Mesa (Credit: SUWA)*

## III. Repeated dismantling has harmed, and will continue to harm, Bears Ears

### *A. Bears Ears' national monument designation had immediate benefits*

97. The 2016 monument designation protected Bears Ears from extractive uses and human disturbances that would have destroyed its resources. Overlapping statutes set the default rules for what activities are allowed on federal public lands. Some statutes govern specific types of extractive activities that apply on all federal lands that are not reserved or withdrawn for special purposes. *See, e.g.*, 30 U.S.C. § 22 et seq. (General Mining Act of 1872). Other statutes provide default principles for the agency managing the lands. *See* 43 U.S.C. § 1732 (general mandate for the Bureau); 16 U.S.C. § 1604 (Forest Service). These principles guide an agency's decisions on where and at what levels to allow certain types of ground-disturbing activity (such as off-road vehicles) when the agency creates land management plans governing particular areas. *See* 43 U.S.C. § 1712(c) (establishing criteria for Bureau land management plans); 16 U.S.C. § 1604(e)-(f) (Forest Service).

98. Although agencies must conduct environmental reviews before permitting destructive activity, these reviews are insufficiently protective on lands dense with historic or scientific resources. On such lands, any ground disturbance poses a substantial risk of inadvertently unearthing and destroying treasures millennia in the making. Moreover, the foundation of the southern Utah desert ecosystem is a fragile soil composed of living organisms such as algae, bacteria, and fungi. Left undisturbed, these "cryptobiotic" soils form a hard protective crust that prevents erosion and provides nutrients that make it possible for plants to grow in an otherwise harsh environment. Cryptobiotic soil crusts can take hundreds of years to recover from ground-disturbing activity, while unique plant communities, and the life they sustain, suffer or perish in the meantime.

99. National monument status changed the default principles for managing Bears Ears. The 2016 Designating Proclamation conferred immediate protections and placed the protection of objects of historic or scientific interest at the forefront of the managing agencies' decisions.

100. ***Prohibiting hard rock mining.*** The Monument designation immediately withdrew the Monument's lands from the location of new hard rock mining claims. *See* 82 Fed. Reg. at 1143. The General Mining Act of 1872, 30 U.S.C. § 22 et seq., governs the mining of hard rock minerals such as uranium, copper, zinc, and lead, all of which are present in Bears Ears. *See* 91 Fed. Reg. at 45,171. Under the Bureau's regulations implementing the General Mining Act, prospectors do not need permits or other prior authorization before locating, recording, and conducting certain types of surface-disturbing operations on hard rock mining claims on open lands. *See, e.g*., 43 C.F.R. §§ 3809.10(a), 3809.5 (allowing non-mechanized sample collection); *id.* §§ 3809.5, 3809.10(b) 3809.21(a) (allowing exploratory activities causing surface disturbances of five acres or less).[7] Prospectors may stake—that is, mark the ground with wooden stakes, flags, or other signage—hard rock mining claims on any federal land that is open to mineral entry. *See id*. § 3832.11(c). Paying a fee to the county recorder and the Bureau records the claim. See *id.* §§ 3832.1(a)(2), 3832.12.

101. The harms from hard rock mining activity are substantial and long-lasting. Even exploratory activity can pollute the soil, produce unsightly waste and debris, scrape lasting scars into the soil, remove native vegetation, disturb wildlife habitat, increase erosion, harm water quality, and damage the cultural and paleontological resources dispersed throughout the

---

[7] The Forest Service has similar regulations for the lands it manages at 36 C.F.R. §§ 228.1 *et seq*. For simplicity, the complaint refers just to the Bureau's regulations.

Monument's lands. Full-scale mining operations can excavate large pits in the ground and mar or destroy geological formations.

102. Although a national monument designation does not void valid pre-existing mining claims, additional approval procedures and restrictions apply to their development to minimize harm to objects of historic or scientific interest. *See* 43 C.F.R. § 3809.11(c)(7) (requiring Bureau review and approval for almost all ground-disturbing activity); *id.* § 3809.100(a)-(b) (requiring the Bureau to determine whether claims are valid before allowing ground-disturbing activity).

103. Prior to the 2016 Designating Proclamation, the uranium industry had significant interest in exploiting the lands in Bears Ears. More than 100 past-producing uranium mines existed inside Bears Ears prior to its designation as a national monument. But because of the 2016 Designating Proclamation, the Bureau could not accept new mining claims and was obligated to more closely scrutinize development on existing ones.

104. ***Prohibiting oil, and gas leasing.*** The Monument designation also withdrew the Monument's lands from mineral leasing. *See* 82 Fed. Reg. at 1143. The Mineral Leasing Act of 1920 governs, among other things, oil and gas extraction on federal lands. 30 U.S.C. § 181 et seq. In general, the Bureau may lease non-withdrawn or unreserved federal lands once certain statutory procedures have been completed.

105. When lands are open to mineral leasing, the managing agency will accept nominations for new leases and conduct lease sales at which interested parties may bid. The federal government retains ownership of the land, but a leaseholder may apply for permits to extract mineral resources, and the government generally extends a lease as long as the

leaseholder continues extracting. *See, e.g.*, 43 C.F.R. § 3107.21 (requiring lease extension so long as paying quantities of oil or gas are produced).

106. Oil and gas leasing was active in Bears Ears until President Obama acted. For example, the Bureau had sold leases in Hatch Point, near the town of Moab.

107. Oil and gas drilling harm the leased land and surrounding areas over the long term. Those harms include the excavation of mines and unsightly pits; the construction of well pads and other facilities; the scraping of surface vegetation and displacement of native fauna; the construction of new roads and pipelines (with resulting truck traffic, fumes, introduction of noxious weeds, and other damage); and air and water pollution. All these incidents of mining and drilling activity scar the landscape and cause dust, haze, and light pollution—disrupting not only the leased parcels themselves, but also the surrounding areas.

108. ***Limiting off-road vehicles.*** In addition to automatically limiting mining and leasing, the 2016 national monument designation permeated all decisions made by the Bureau and Forest Service by requiring the agencies to "manage the monument" in a manner consistent with "the purposes of this proclamation." 82 Fed. Reg. at 1143. Protecting objects of historic or scientific interest became the paramount management objective.

109. In furtherance of the new management objective, the 2016 Designating Proclamation directed the agencies to prepare a monument management plan to replace the existing, more permissive management plans. 82 Fed. Reg. at 1143.

110. One of the most important elements of the management planning process is the designation of off-road vehicle areas and trails. One pass of a motorized vehicle can leave visible tracks, marked by crushed vegetation and long-lasting scars on fragile cryptobiotic soil crusts. These tracks invite follow-on use, which exacerbates the harm of the initial impact.

111. While the agencies prepared new plans, the 2016 Designating Proclamation prohibited the construction and designation of any new roads or trails except those needed "for the purposes of public safety or protection of [the Monument's] objects." 82 Fed. Reg. at 1145. This prohibition had immediate on-the-ground benefits. For example, shortly before the 2016 Designating Proclamation, the Bureau had approved the construction of a new motorized vehicle trail and three parking lots in the Indian Creek area within the Monument's boundaries. On March 13, 2017, the Interior Board of Land Appeals stayed construction of the trail and parking lots, concluding that the 2016 Designating Proclamation prohibited the "new roads and trails" and that appellants (including SUWA, the Grand Canyon Trust, and Great Old Broads) had established that the commencement of construction would cause their members irreparable harm. *See* Order, *S. Utah Wilderness Alliance et al.*, IBLA 2017-75, *5-7 (Mar. 13, 2017).

***B. The 2017 Dismantling Proclamation harmed Bears Ears***

112. Because of the 2017 Dismantling Proclamation, the Departments of the Interior and Agriculture and the Bureau and the Forest Service stopped prioritizing the "proper care and management of the objects to be protected" on the lands removed from Bears Ears. 54 U.S.C. § 320301(b). In the nearly four years that it was in effect, the 2017 Dismantling Proclamation allowed new mining claims and exploration on those claims that harmed Bears Ears in ways that cannot easily be undone.

113. The 2017 Dismantling Proclamation revoked protections from hard rock mining for Bears Ears by providing that within 60 days after the proclamation's issuance "the public and National Forest System lands excluded from the monument reservation shall be open to: (1) entry, location, selection, sale or other disposition under the public land laws and laws applicable to the U.S. Forest Service; (2) disposition under all laws relating to mineral . . .

leasing; and (3) location, entry, and patent under the mining laws." 82 Fed. Reg. at 58,085. Thus, claimants could start locating new claims in the excised lands as soon as February 2, 2018.

114. Between February 2, 2018, and October 8, 2021 (the date on which President Biden restored protections), claimants located at least twenty new mining claims on lands protected by the 2016 Designating Proclamation but excluded by the 2017 Dismantling Proclamation. Many of these claims were located near unique geological formations that Plaintiffs' members visited while the 2017 Dismantling Proclamation was in place and still visit to this day. For example, a company called Kimmerle Mining LLC located five uranium claims that it calls "Geitus" near where Bears Ears abuts the Natural Bridges National Monument. The Geitus claims are located on lands that the Bureau has acknowledged include habitation structures with artifacts corresponding to the Pueblo I-III periods (from approximately 750 to 1350 CE).

115. Claimants typically notify others of their claims through flags, posts, and other markers. Location activities are noticeable by design and do not require agency approval.

116. Claimants could and did quickly engage in ground-disturbing activity.

117. Although large-scale mining requires a "plan of operations," a claimant may undertake extensive "notice"-level activities—that is, activities "causing surface disturbance" of up to five acres—by sending the Bureau "notice" of planned operations, paying a bond, and waiting fifteen calendar days after the Bureau receives the notice. 43 C.F.R §§ 3809.10(b), 3809.21(a), 3809.503(c), 3809.312(c). Unless the Bureau requests additional information or takes other specific actions within that fifteen-day window, the claimant may proceed with ground-disturbing work. The Bureau is not required to, and often does not, notify the public that

it has received a notice from a claimant, let alone take public input before allowing notice-level activity to move forward.

118. Notice-level activity can include road construction, the use of mechanized earth-moving equipment, and the use of truck-mounted drilling equipment. *See* 43 C.F.R. §§ 3809.5, 3809.10, 3809.21(a), 3809.312(a). The environmental harms of notice-level mining activities are substantial: polluting the air and soil, scraping lasting scars into the soil, removing native vegetation, disturbing wildlife habitat, increasing erosion, and harming water quality. Notice-level activity also increases truck traffic on the roads near the mine site.

119. The auditory and visual effects of notice-level mining activities—including dust, mechanical noise, and light pollution—can extend well beyond the boundaries of the mining claims themselves, broadly impacting large areas that would otherwise be quiet and pristine. Visual and auditory disturbances can be seen and heard for miles, especially on mesas and slickrock expanses in the Monument's rocky desert landscape, where there is relatively little vegetation to dampen sound or to obstruct viewsheds.

120. Notice-level mining activities can also harm fragile cultural, archaeological, and paleontological resources, which are widely dispersed throughout the excised lands. The Bureau does not require National Historic Preservation Act review or surveys for archaeological resources before notice-level operations proceed. *See, e.g.*, 36 C.F.R. Part 800; 43 C.F.R. § 3809.313.

121. Notice-level activity could and did occur in Bears Ears. For example, Kimmerle Mining LLC also located a claim it called "Easy Peasy" in October 2018. Easy Peasy is located near Cheese and Raisin and Whiskers Draw in the southeastern portion of the Monument. Uranium and vanadium mining operations commenced at Easy Peasy 1 in February 2019

pursuant to a notice. Those operations included the use of heavy equipment to excavate and remove materials and the deposit of waste rock and tailings and discarded highly visible bright orange fencing, machinery, mining and ventilation equipment, fuel and water tanks, trash, and other mining-related detritus.

122. The 2017 Dismantling Proclamation also paved the way for more widespread destructive activities including increased off-road vehicle use and oil and gas leasing. Because President Trump issued the 2017 Dismantling Proclamation before the agencies could promulgate monument management plans, the existing permissive plans remained in effect.

123. The Bureau also received an expression of interest for a new oil and gas lease on lands that the 2017 Dismantling Proclamation removed from the Monument near the popular Hatch Point and Canyonlands Overlook. President Biden restored monument status to these lands before leases could be offered.

### *C. The 2021 Restoration Proclamation did not completely undo the harms to Bears Ears from the 2017 Dismantling Proclamation*

124. The 2021 Restoration Proclamation benefited Plaintiffs' members in the same ways that the 2016 Designating Proclamation did. *See supra* ¶¶ 97-111. Incorporating the 2016 Designating Proclamation by reference, the 2021 Restoration Proclamation restored national monument status to the unlawfully excised lands; withdrew them from hard rock mineral entry and location; withdrew them from oil and gas leasing; and protected them from excessive motorized vehicle use. The 2021 Restoration Proclamation once again placed the protection of objects of historic or scientific interest at the forefront of the managing agencies' decisions and required the agencies to issue monument management plans for their respective areas. The resulting 2025 management plans added concrete protections such as closing 32 miles of off-road vehicle trails.

125. Nonetheless, the 2017 Dismantling Proclamation harmed and continues to threaten a substantial risk of harm to Bears Ears and Plaintiffs' members. Despite the 2021 Restoration Proclamation, the Bureau has continued to treat mining claims located on or after February 2, 2018 (60 days after the 2017 Dismantling Proclamation's issuance) and before October 8, 2021 (the date of the 2021 Restoration Proclamation) as valid existing rights, even though President Trump lacked lawful authority to open that land to mining claims during that period. After October 8, 2021, the Bureau corresponded with claimants as if their claims were validly located.

126. The mining claims staked under the 2017 Dismantling Proclamation harmed, and continue to threaten a substantial risk of harm to, Bears Ears and Plaintiffs' members. Plaintiffs' members, including Mr. Allen, Mr. Bloxham, Mr. Clark, and Mr. Peterson, recreate in areas near where the Easy Peasy mining claims are located, including Cheese and Raisins and Whiskers Draw. Moreover, Plaintiffs' members including Mr. Allen and Ms. Harrington, recreate in the Cheesebox and White Canyon, and others, including Mr. Clark, recreate near Natural Bridges National Monument, all of which are near the Geitus claims. Activity on these claims harms the recreational and aesthetic interests of Plaintiffs' members.

127. Plaintiffs' injuries are directly traceable to the 2017 Dismantling Proclamation. Had the 2016 Designating Proclamation remained in place, the new mining claims could not have been located or developed.

128. Allowing mining claims and development on monument lands means that irreplaceable resources are damaged: objects of historic or scientific interest may be destroyed, as may the context on which scientists and archaeologists depend when studying resources on undisturbed lands.

### *D. The 2026 Dismantling Proclamation will further harm Plaintiffs and their members.*

129. The 2026 Dismantling Proclamation creates a substantial and imminent risk of harm to the lands and objects of interest stranded outside the Monument's diminished boundaries and, thus, to Plaintiffs and their members. Indeed, a prospector has already attempted to locate new mining claims on recently excised Monument land. Moreover, Agency Defendants have already indicated that they have decided not to comply with the 2021 Restoration Proclamation by taking down signage on lands excised by the 2026 Dismantling Proclamation.

130. Each of the Plaintiff organizations has individual members who regularly use and enjoy Bears Ears, including the lands stripped of monument status by the 2026 Dismantling Proclamation. Many of these members live in Utah or northern Arizona within driving distance of the Monument. They know the landscape intimately and return to it multiple times each year for hiking and recreation, wildlife viewing, exploration, and spiritual renewal. Some also perform fieldwork in the Monument, documenting landscape conditions and wilderness characteristics.

131. Plaintiffs' members value the beauty, remoteness, natural quiet, and largely unspoiled nature of the landscape and the geological, paleontological, archaeological, historic, cultural, and ecological resources found throughout the Monument, including in areas that the 2026 Dismantling Proclamation excluded from the Monument.

132. The 2026 Dismantling Proclamation excludes lands replete with objects of historic or scientific interest, many of which the 2021 Restoration Proclamation expressly names. These include Beef Basin, Cheese and Raisins, Ruin Park, Dark Canyon Plateau, White Canyon, Valley of the Gods, Mancos Mesa, Moqui Canyon, Indian Creek, Cedar Mesa, Hart's Draw,

stretches of the San Juan River and adjacent canyons, and Lockhart Basin. Plaintiffs' members have visited, and intend to continue visiting, these areas.



*Fig. 3: Structure in Beef Basin (Credit: SUWA)*



*Fig. 4: Valley of the Gods (Credit: SUWA)*

133. Lands that have been stripped of monument protection are at immediate risk of harm.

134. The 2026 Dismantling Proclamation removes restrictions on existing mining claims such as Easy Peasy and Geitus. While monument protections were in place, claimants could not engage in notice-level activity. *See* 43 C.F.R. § 3809.11(c)(7). Now that monument protections have been lifted, there is a substantial risk that claimants will quickly commence notice-level activities, such as using mechanized earth-moving equipment and truck-mounted drilling equipment, similar to the activities Kimmerle Mining conducted at Easy Peasy before 2021.

135. The noise and destruction of resources from notice-level activity and associated increase in traffic will harm the recreational and aesthetic interests of Plaintiffs' members who hike, camp, backpack, photograph, and enjoy quiet recreation and meditation in areas surrounding mining claims. Noise and visual disturbances from mining would interfere with Plaintiffs' members' ability to engage in these activities.

136. For example, Ms. Harrington and Mr. Clark use the lands surrounding the Geitus claims for hiking, camping, quiet recreation, aesthetic appreciation, and other activities. There is a substantial risk that mining activity, including notice-level activity, will commence on the Geitus claims, harming the ability of Plaintiffs' members to use and enjoy the surrounding lands for their current activities.

137. The 2026 Dismantling Proclamation also creates a substantial risk of additional harmful activity at the Easy Peasy mine. Mr. Allen, Mr. Bloxham, Mr. Clark, and Mr. Peterson use the lands surrounding the Easy Peasy site for hiking, camping, quiet recreation, and other activities. Prior exploration activity at the Easy Peasy mine under the 2017 Dismantling

Proclamation harmed the recreational and aesthetic interests of Plaintiffs' members, and there is a substantial risk of additional notice-level activity that will harm the ability of Plaintiffs' members to use and enjoy the surrounding lands for their current activities.

138. The injuries to Plaintiffs' members are directly traceable to the 2026 Dismantling Proclamation. If the 2021 Restoration Proclamation were still in place, notice-level mining activity could not occur on the Easy Peasy or Geitus mining claims. *See* 43 C.F.R. § 3809.11(c)(7) (requiring a plan of operations for most ground-disturbing activity on existing claims in national monuments). Under the 2026 Dismantling Proclamation, however, notice-level activity can occur at the Easy Peasy and Geitus claims without such constraints, and with minimal (if any) agency restrictions or opportunity for the public to object. *See* 43 C.F.R. §§ 3809.10(b), 3909.21(a). The Bureau is unlikely to restrict notice-level activity on the Geitus or Easy Peasy claims given the 2026 Dismantling Proclamation's express purpose of promoting mining of certain minerals, including uranium and vanadium. *See* 91 Fed. Reg. at 45,171.

139. There is now a substantial risk that the managing agencies will approve larger mining operations on existing claims, including the Easy Peasy and Geitus mining claims. If the 2021 Restoration Proclamation remained in place, the Bureau could not approve a plan of operations on those claims unless and until it conducted a validity determination. *See* 43 C.F.R. § 3809.100(a). Even after a validity determination, the Bureau could approve a plan of operations only if it conducted an environmental analysis and determined that mining operations would not harm the Monument's objects. *See* 86 Fed. Reg. at 57,322.

140. Without the Monument's protections in place, claimants on preexisting claims, such as the Easy Peasy and Geitus claims, can submit plans of operation for a mine without needing to undergo a validity determination. When reviewing a plan of operations, the Bureau no

longer has to consider or effectuate the protection of the Monument's objects as its paramount objective. There is a substantial likelihood of more destructive activity occurring than the Bureau would have allowed under the 2021 Restoration Proclamation at these preexisting claims, particularly given the given the 2026 Dismantling Proclamation's express purpose of promoting mining.

141. In addition to existing claims, there is a substantial risk that prospectors will locate new claims and engage in similarly destructive activity. The 2026 Dismantling Proclamation directed the managing agencies, as of September 11, 2026 (60 days after the proclamation was issued), to disregard the 2021 Restoration Proclamation's ban on mineral entry and location for the lands excised from Bears Ears. After September 11, 2026, the Agency Defendants will comply with the 2026 Dismantling Proclamation and allow mineral entry and location on the excised lands.

142. Industry has already given several indications that mining development will expand on the excised Monument lands. For one, a mining company has already tried to file new claims even before the 60-day waiting period has lapsed. On July 14, 2026, Kimmerle Mining—the company that holds the Easy Peasy mining claims—filed seven mining claims with the San Juan County Recorder's Office on lands near the existing Easy Peasy mine that the 2026 Dismantling Proclamation unlawfully stripped of protection. And the chairman and chief executive officer of uranium processor Energy Fuels each bought company stock less than a week before President Trump issued the 2026 Dismantling Proclamation, triggering an insider trading inquiry by Congress.[8] Due to the 2026 Dismantling Proclamation, prospectors will be

[8] Press Release, House Nat. Res. Comm., Huffman, Dexter Open Investigation into Insider Trading at Energy Fuels After Trump Guts Bears Ears (Aug. 10, 2026), *available at* https://perma.cc/SBR8-VQ2F.

able to locate new mining claims on lands that Plaintiffs' members use for recreation and field study. Prospectors will advertise their claims using posts, flags, and other markings that harm the aesthetic, recreational, and other interests of Plaintiffs' members, including by impairing members' ability to experience solitude and engage in spiritual renewal.

143. Moreover, there is a substantial risk that prospectors will quickly begin destructive notice-level mining operations, such as using mechanized earth-moving equipment, similar to the activities Kimmerle Mining conducted at the Easy Peasy mine under the 2017 Dismantling Proclamation. Notice-level activities on new mining claims would further harm the recreational, scientific, spiritual, aesthetic, and other interests of Plaintiffs' members. For prospectors who submit plans of operation, there is a substantial likelihood that the Agency Defendants will impose fewer restrictions before authorizing ground-disturbing activity than they would have when the Monument was intact under the 2021 Restoration Proclamation. The risk is particularly high for claims potentially containing silver, copper, molybdenum, lead, uranium, vanadium, and zinc, which the 2026 Dismantling Proclamation names as "critical minerals" for which "domestic supplies" should be increased. 91 Fed. Reg. at 45,171.

144. Because of the 2026 Dismantling Proclamation, Agency Defendants will prepare one or more new management plans that will replace the existing 2025 Monument Management Plan. There is a substantial risk that these new management plans will re-open areas to off-road vehicles that the 2025 Monument Management Plan closed, particularly because the 2026 Dismantling Proclamation places emphasis on "public access" through motorized and non-motorized vehicles. *See* 91 Fed. Reg. at 45,174. Opening more areas to off-road vehicles will harm Plaintiffs' members' aesthetic, cultural, spiritual, recreational, scientific, and educational interests by authorizing increased noise and physical damage to the land, water, wildlife habitat,

scenery, and cultural resources that Plaintiffs' members wish to enjoy in their pristine state when they visit the Monument.

145. The new management plans will likely treat most of the excised lands as open to mineral leasing—including for oil and gas—under the Mineral Leasing Act. 30 U.S.C. § 181 et seq. The risk of oil and gas leasing on these lands is heightened by the passage of the One Big Beautiful Bill Act, which the Bureau interprets as dramatically limiting its discretion to refrain from offering lands for oil and gas leasing and imposing new requirements mandating leasing of oil and gas. *See* Pub. L. No. 119-21, tit. V, subtit. A, § 50101(a)-(d), 139 Stat 72, 137-39 (2025) (amending leasing laws).

146. There is a substantial risk of leasing in areas where leasing had previously occurred, such as Hatch Point. There is a substantial risk that the Bureau will once again offer these lands for lease, despite their high natural, archaeological, and paleontological resource concentrations.

147. Defendants' actions adversely affect and irreparably injure the Plaintiffs and their members, and those injuries will continue unless the Court grants the relief Plaintiffs seek.

148. Plaintiffs' injuries would be redressed by the Court declaring the 2017 and 2026 Dismantling Proclamations void *ab initio* and enjoining Agency Defendants from implementing them. With the Court declaring the 2026 Dismantling Proclamation void *ab initio*, the 2021 Restoration Proclamation controls Agency Defendants' conduct going forward. *See* 86 Fed. Reg. at 57,332 (directing the Secretaries of the Interior and Agriculture to manage the Monument "in accordance with the terms, conditions, and management direction provided by [the 2021 Restoration] proclamation and, unless otherwise specifically provided herein, those provided by [the 2016 Designating Proclamation], the latter of which are incorporated herein by reference").

149. Reinstatement and implementation of the 2021 Restoration Proclamation would redress Plaintiffs' injuries by preventing all future mining claims, stopping mineral leasing, and limiting development on valid existing claims. Voiding the 2026 Dismantling Proclamation would redress the injuries that Plaintiffs are suffering, and will continue to suffer, from new mining claims, mineral leases, and permits issued while the Agency Defendants implement the 2026 Dismantling Proclamation.

150. With the Court declaring the 2017 Dismantling Proclamation void *ab initio*, the 2016 Designating Proclamation would have controlled the Monument lands up until 2021. Implementation of the 2016 Designating Proclamation for that period—2016 to 2021—would redress Plaintiffs' injuries by rendering a legal nullity all mining claims located while the Agency Defendants treated the 2017 Dismantling Proclamation as operative, thereby redressing the ongoing harm those illegal mining claims inflict upon Plaintiffs.

151. Plaintiffs have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**
**The 2017 Dismantling Proclamation is *ultra vires***
***(All Defendants)***

152. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

153. Judicial review is available to ensure that the President's actions are consistent with constitutional principles; that the President's actions are within the scope of his statutory and constitutional authority; and that the President's actions do not violate laws enacted by Congress.

154. The President has the authority to regulate federal lands only to the defined extent that Congress has delegated that authority to the President.

155. In issuing his December 4, 2017 Proclamation, President Trump acted wholly without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301. Under the Act, Congress authorized the President to declare national monuments and reserve lands, not to abolish national monuments either in whole or in part. In issuing the December 4, 2017 Proclamation, President Trump did not purport to rely on a source of authority other than the Antiquities Act. See 82 Fed. Reg. at 58,085.

156. In the alternative, even if the Act gives presidents some narrow authority to remove protections for national monuments, the 2017 Dismantling Proclamation exceeds that authority. That Proclamation's own language and the context surrounding it show that it was in furtherance of unrelated policy goals—energy and mineral extraction—rather than based on any statutory criteria. Eliminating protections for the Monument's numerous objects of historic or scientific interest in order to advance unrelated policy goals rebuts any presumption of regularity. The President therefore did not exercise any statutory authority delegated to him under the Act in issuing the 2017 Dismantling Proclamation.

157. As a result, the 2017 Dismantling Proclamation revoking monument status from Bear Ears National Monument, and stripping monument protection from innumerable objects of scientific and historic importance, lacked any authority and is *ultra vires* and unlawful. The President has no such authority to dismantle a national monument.

**SECOND CLAIM FOR RELIEF**
**The 2017 Dismantling Proclamation violates**
**the U.S. Constitution and the separation-of-powers doctrine**
***(All Defendants)***

158. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

159. Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not unlawfully intruded on Congress's exclusive power over federal public lands under the Property Clause of the U.S. Constitution. U.S. Const. art. IV, § 3, cl. 2.

160. The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." U.S. Const. art. IV, § 3, cl. 2. The President has the authority to regulate such property only to the defined extent that Congress has delegated that authority to the President.

161. Congress has not delegated the President any authority to rescind or reduce the national monument designations of his predecessors or of Congress. Nor has Congress delegated the President any authority to remove lands from national monuments that Congress itself has added.

162. To the contrary, Congress has repeatedly exercised its sole prerogative to reduce or rescind national monuments once designated.

163. The President has no independent authority to reduce or rescind a national monument.

164. In issuing his December 4, 2017 Proclamation, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power to regulate federal property under the Property Clause, in violation of the doctrine of separation of powers.

**THIRD CLAIM FOR RELIEF**
**Agency implementation of the 2017 Dismantling Proclamation violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.***
***(Agency Defendants)***

165. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

166. The Administrative Procedure Act confers a right of action on any person adversely affected by a final agency action or a failure to act and waives the federal government's sovereign immunity. 5 U.S.C. §§ 701-706.

167. Because President Trump had no lawful authority to dismantle the Bears Ears National Monument, any action by Agency Defendants to implement the 2017 Dismantling Proclamation is arbitrary and capricious and not in accordance with law.

168. As a result of the 2017 Dismantling Proclamation, Agency Defendants made a final decision to adhere to the 2017 Dismantling Proclamation rather than to the 2016 Designating Proclamation for mining claims located between February 2, 2018 and October 8, 2021. Agency Defendants are violating the terms of the 2016 Designating Proclamation by treating hard rock mining claims located in the excluded lands during that period (which the 2016 Designating Proclamation prohibited) as valid and allowing mining activity to move forward. Agency Defendants will not carry out their duties under the 2016 Designating Proclamation with respect to mining claims located between February 2, 2018 and October 8, 2021 unless and until this Court declares the 2017 Dismantling Proclamation invalid.

**FOURTH CLAIM FOR RELIEF**
**The 2026 Dismantling Proclamation is *ultra vires***
***(All Defendants)***

169. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

170. In issuing his July 13, 2026 Proclamation, President Trump acted wholly without authority under, and thus violated, the Antiquities Act, 54 U.S.C. § 320301. President Trump did not purport to rely on a source of authority other than the Antiquities Act. See 91 Fed. Reg. at 45,173.

171. In the alternative, even if the Act gives presidents some narrow authority to remove protections for national monuments, the 2026 Dismantling Proclamation exceeds that authority. The Proclamation's own language and the context surrounding it show that it was in furtherance of unrelated policy goals—energy and mineral extraction—rather than based on any statutory criteria. *See, e.g., id.* at 45,171-72 (promoting mining interests). Eliminating protections for the Monument's numerous objects of historic or scientific interest—many of which the President previously recognized were of such interest—in order to advance unrelated policy goals rebuts any presumption of regularity. The President did not exercise any statutory authority delegated to him under the Act in issuing the 2026 Dismantling Proclamation.

172. As a result, the 2026 Dismantling Proclamation revoking monument status from over 90% of the Bears Ears National Monument, and stripping monument protection from innumerable objects of scientific and historic importance, lacked any authority and is *ultra vires* and unlawful. The President has no such authority to dismantle a national monument.

**FIFTH CLAIM FOR RELIEF**
**The 2026 Dismantling Proclamation violates**
**the U.S. Constitution and the separation-of-powers doctrine**
***(All Defendants)***

173. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

174. The President has no independent authority to reduce or rescind a national monument.

175. In issuing his July 13, 2026 Proclamation dismantling Bears Ears National Monument, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power to regulate federal property under the Property Clause, in violation of the doctrine of separation of powers.

**SIXTH CLAIM FOR RELIEF**
**Agency implementation of the 2026 Dismantling Proclamation violates the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.***
***(Agency Defendants)***

176. Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

177. Because President Trump had no lawful authority to dismantle Bears Ears, any action by Agency Defendants implementing the 2026 Dismantling Proclamation is arbitrary and capricious and not in accordance with law.

178. Since President Trump issued the 2026 Dismantling Proclamation, Agency Defendants have made a final decision to implement the 2026 Dismantling Proclamation, rather than the 2021 Restoration Proclamation going forward as evidenced by their actions such as removing signs from excised lands. Agency Defendants are violating and will violate the terms of the 2021 Restoration Proclamation by managing the excised monument lands as available for mineral exploration and development under the General Mining Act of 1872; by treating new hard rock mining claims located in the excluded lands (which were prohibited by the 2021 Restoration Proclamation) as valid and allowing mining activity to move forward; by allowing development on existing mining claims to move forward without restrictions or protections required for claims on national monument lands; and by preparing a monument management plan incorporating the 2026 Dismantling Proclamation's diminishment of the Monument's boundaries.

179. Agency Defendants will not carry out their duties under the 2021 Restoration Proclamation with respect to the excised lands so long as the 2026 Dismantling Proclamation remains in place.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully request that the Court:

1. Declare that President Trump's 2017 and 2026 Dismantling Proclamations are *ultra vires*, invalid, and void *ab initio*;
2. Declare that the 2017 and 2026 Dismantling Proclamations exceed the scope of the President's authority under Article II of the U.S. Constitution, violate the separation of powers doctrine, and are invalid and void *ab initio*;
3. Issue injunctive relief against Agency Defendants barring their implementation of the 2017 and 2026 Dismantling Proclamations (including any management plans or subsidiary plans premised on the Dismantling Proclamations), directing them to carry out the duties imposed on them by the 2021 Restoration Proclamation, and directing them to carry out the duties imposed by the 1996 Designating Proclamation with respect to the mining claims located between February 2, 2018, and October 8, 2021;
4. Declare that any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2017 and 2026 Dismantling Proclamations are void *ab initio*;
5. Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and
6. Grant such other relief as the Court deems just and proper.

Dated September 2, 2026.

Respectfully submitted,

*/s/ Thomas Delehanty*
Heidi McIntosh (*pro hac vice*)
Thomas Delehanty (*pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 623-9466
Fax: (303) 623-8083
E-mail: hmcintosh@earthjustice.org
E-mail: tdelehanty@earthjustice.org

*Counsel for The Wilderness Society, Grand Canyon Trust, National Parks Conservation Association, Great Old Broads for Wilderness, Western Watersheds Project, WildEarth Guardians, Sierra Club, and Center for Biological Diversity*

*/s/ Jacqueline Iwata*
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
E-mail: jiwata@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Stephen Bloch*
Stephen H.M. Bloch (*D.D.C. admission pending)*
Hanna Larsen (*D.D.C. admission pending*)
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
E-mail: steve@suwa.org
E-mail: hanna@suwa.org

*Counsel for Southern Utah Wilderness Alliance*