**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOPI TRIBE, *et al.*,<br>Plaintiffs,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 17-cv-2590 (TSC) |
| UTAH DINÉ BIKÉYAH, *et al.*,<br>Plaintiffs,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 17-cv-2605 (TSC) |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., *et al.*,<br>Plaintiffs,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 17-cv-2606 (TSC)<br><br>**CONSOLIDATED CASES** |

**UDB PLAINTIFFS' SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

## INTRODUCTION

1. Plaintiffs Utah Diné Bikéyah; Archaeology Southwest; Conservation Lands Foundation, Inc.; Patagonia Works; The Access Fund; the National Trust for Historic Preservation; the Society of Vertebrate Paleontology, and A'Nuche, Inc., on behalf of themselves, their members, and other affiliates, ask this Court to declare unlawful President Trump's December 4, 2017 and July 13, 2026 proclamations purporting to revoke Bears Ears National Monument (the "Monument") and replace it with two new "units" (the "Revocation Proclamations"). Those unprecedented actions exceed the authority Congress delegated to the President in the Antiquities Act of 1906 ("the Antiquities Act"), 54 U.S.C. §§ 320301 *et seq*. Plaintiffs request that this Court enjoin implementation of the President's unlawful revocations and restore the 2021 configuration of Bears Ears National Monument.

2. The President has limited authority under the Antiquities Act. The Property Clause of the Constitution vests Congress with the sole authority to dispose of and make all needful Rules and Regulations respecting property of the United States, U.S. Const. art. IV, § 3, cl. 2. Through the Antiquities Act, Congress delegated to the President only the authority to *create* national monuments through public proclamation—but not the authority to revoke those monuments or to nullify their protections. Only Congress can do that.

3. Pursuant to the Antiquities Act, President Obama proclaimed Bears Ears National Monument in southeastern Utah on December 28, 2016, thereby protecting an area named for the distinctive twin buttes rising above geologically diverse terrain that has been sacred to Native peoples since time immemorial. *See* Proclamation 9558, 82 Fed. Reg. 1139 (Jan. 5, 2017) ("2016 Designating Proclamation"). The landscape is so distinctive that in each of the Native languages of the region the twin buttes' name is the same: Hoon'Naqvut, Shash Jáa, Kwiyagatu

Nukavachi, Ansh An Lashokdiwe, or "Bears Ears." *Id.* This Monument originally had two components: a wide range of culturally significant, archaeological, paleontological, geographic, geological, and ecological objects designated for protection under the Antiquities Act, *see id.* at 1139–43, and a reservation of approximately 1.35 million acres of public land, which includes landscape that is "profoundly sacred to many Native American tribes." *See id.* at 1139, 1143. The 2016 Designating Proclamation came after years of advocacy by Native American tribes and Native advocates, among others. The public discussions and engagement enabled the Administration to gather and consider the full range of views from government, industry, Indian tribes, non-profit representatives, and the American public. The proclamation carried the full force of Congress's delegated authority.

4. On December 4, 2017, President Donald J. Trump signed a proclamation ("2017 Revocation Proclamation") purporting to erase the designation of thousands of objects of historic and scientific interest, including significant numbers of Native American cultural resources, and to remove over 1 million acres from Bears Ears National Monument. Proclamation 9681, 82 Fed. Reg. 58,081 (Dec. 8, 2017). The 2017 Revocation Proclamation is unlawful. It exceeds the limits on the President's authority under the Antiquities Act and arrogates to the President authority reserved to Congress by the Constitution.

5. On December 6, 2017, this lawsuit was filed, challenging the 2017 Revocation Proclamation.

6. But on the first day of the Biden Administration, President Biden directed the Department of the Interior to review whether to reinstate the Monument. 86 Fed. Reg. 7037 (Jan. 25, 2021). After the Department of the Interior consulted with various stakeholders, including Native American tribes, President Biden issued a new proclamation restoring and

expanding Bears Ears National Monument. *See* Proclamation No. 10285, 86 Fed. Reg. 57321 (Oct. 15, 2021) ("2021 Restoration Proclamation").

7. On July 13, 2026, President Trump issued yet another proclamation purporting to erase the monument designation for thousands of objects with cultural, archeological, religious, spiritual, and historic significance ("2026 Revocation Proclamation"). Proclamation 11043, 91 Fed. Reg. 45,169 (July 17, 2026). This time, the proclamation purported to reduce the area encompassed by the Monument by almost 90%—an even larger reduction of the Monument than attempted by the unlawful 2017 Revocation Proclamation. *See id.* And it terminated and disbanded the Bears Ears Commission, a unique advisory body representing five sovereign Tribal Nations that had previously exercised joint stewardship over the Monument's management. *Id.* at 45,174.

8. Plaintiffs and their members have suffered and will continue to suffer direct and immediate injuries as a result of the Revocation Proclamations. In particular, the Revocation Proclamations have harmed Plaintiffs' members by interfering with their use and enjoyment of the land for cultural, spiritual, ceremonial, aesthetic, and research purposes within the Monument. And they have removed from Monument protection the lands that Plaintiffs have dedicated themselves to maintaining—lands that have served as a sacred landscape for Native Americans since time immemorial.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Antiquities Act, 54 U.S.C. §§ 320301–320303, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the United States Constitution.

10. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02. This Court also has authority to issue equitable relief under its inherent equitable powers, *see, e.g.*, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–327 (2015), and the APA, 5 U.S.C. § 706.

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

12. Sovereign immunity does not bar this suit. *See, e.g.*, 5 U.S.C. § 702 (general waiver of sovereign immunity in suits for declaratory and injunctive relief); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (sovereign immunity does not bar suits against federal officers who "allegedly acted in excess of [their] legal authority").

13. Venue is proper pursuant to 28 U.S.C. § 1391(e), because Defendants reside in the District of Columbia and a substantial part of the events or omissions giving rise to this action occurred in the District of Columbia. Upon information and belief, a substantial part of the development of the Revocation Proclamations, as well as the issuance of the 2016 Designating Proclamation and 2021 Restoration Proclamation, occurred in the District of Columbia. Advocacy work performed by Plaintiffs in support of the 2016 Designating and 2021 Restoration Proclamations occurred in the District of Columbia. Plaintiff National Trust for Historic Preservation maintains its headquarters in the District of Columbia, 54 U.S.C. § 312103, and Plaintiff Conservation Lands Foundation, Inc. maintains an office in the District of Columbia to assist its advocacy efforts.

## PARTIES

### I. Plaintiffs

**Utah Diné Bikéyah**

14. Utah Diné Bikéyah ("UDB") is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), organized under the laws of and headquartered in Utah.

15. UDB's mission and core business activity is to preserve and protect the cultural and natural resources of ancestral Native American Lands, including Bears Ears. UDB has an all-Native American Board of Directors comprised of Navajo and Ute community leaders. It works to elevate Native voices and integrate knowledge and Native leadership in public land planning in recognition of the deep and ongoing spiritual connection between Indigenous Peoples and the land. As an organization founded and focused on Native American traditional and cultural principles, UDB operates at the intersection between culture and conservation by promoting land protection that honors and includes human societies that have co-existed with ecosystems since time immemorial.

16. UDB members, including Mark Maryboy, have deep personal ties to Bears Ears National Monument, many having lived their entire lives close to or within the boundaries outlined by the 2016 Designating Proclamation and restored and expanded by the 2021 Restoration Proclamation. The areas protected by the Monument are central to their religious and cultural practices and freedoms, and their community. UDB members regularly visit the Bears Ears region to gather herbs and firewood, pray, conduct ceremonies, hike, camp, and explore the areas protected by the Monument before the Revocation Proclamations. Bears Ears and the interconnected historical and cultural resources of its landscape are of significant cultural and spiritual value to UDB members. Maintaining the landscape in its unspoiled form, and

keeping the historical and cultural resources free from disturbance, is foundational to UDB members' ability to continue engaging in these cultural and spiritual practices.

17. UDB has been involved in stewardship and advocacy to protect the Bears Ears region dating back to UDB's formation in 2011. From 2014 through 2015, UDB engaged extensively with the Navajo, Hopi, Zuni, Ute Indian, and Ute Mountain Ute tribes (the "Tribes") to improve preservation of the Bears Ears region, ultimately settling on a common goal: designating the Bears Ears region as a national monument under the Antiquities Act. As part of this effort, UDB worked with high-ranking officials at the Department of the Interior to form the Bears Ears Inter-Tribal Coalition, comprised of leaders from the five Tribes that were instrumental in the establishment of the Bears Ears National Monument. In addition, UDB is a member of the Friends Grassroots Network, which is supported by Plaintiff Conservation Lands Foundation, Inc.

18. The 2016 Designating Proclamation was a significant achievement for UDB and the Tribes to which UDB's members belong, as it was the first national monument designated at the request of sovereign Tribes. The designation not only provided protection to the Bears Ears area and its significant cultural, natural, and scientific resources, but also assured UDB tribal members that their traditional way of life would continue undisturbed. The 2016 Designating Proclamation further enshrined permanent tribal co-stewardship of the monument lands by establishing the Bears Ears Commission, comprised of representatives of the Tribes to which UDB's members belong. The 2026 Revocation Proclamation, however, disbanded and terminated the Commission, stripping tribal members of the opportunity (and authority) to influence the Monument's management.

19. UDB and its members are committed to ensuring that the ancestral lands within the boundary of the original Bears Ears National Monument remain protected, so that the vital historic record of the Native peoples and opportunities for the land's ongoing, sustainable, and cultural use are preserved for future generations. The Revocation Proclamations have caused enduring harm and constitute an existential threat to this sacred landscape and cultural heritage.

**Archaeology Southwest**

20. Archaeology Southwest ("ASW") is a 26 U.S.C. § 501(c)(3) nonprofit organization headquartered in Tucson, Arizona. Archaeology Southwest is also a member of Plaintiff Conservation Lands Foundation's Friends Grassroots Network.

21. Since its inception, Archaeology Southwest's core business activity has been to pursue preservation archaeology in the southwestern United States—Arizona, New Mexico, Colorado, and Utah. Preservation archaeology is a holistic, conservation-based approach to exploring the places of the past and is focused on preserving cultural landscapes, archaeological sites, artifact collections, and archives. Archaeology Southwest undertakes a broad range of preservation initiatives on behalf of these resources. For example, Archaeology Southwest conducts low impact research, educates the public on archaeological issues, and protects irreplaceable archaeological sites through education, easements, and fee ownership. Archaeology Southwest member and employee Skylar Begay often frequents Bears Ears in his personal and professional capacities to practice preservation archaeology within the Monument for Archaeology Southwest, and to collaborate with tribal leaders in the management of the Monument.

22. Archaeology Southwest has a specific interest in supporting the designation of landscapes like Bears Ears as national monuments to preserve the land and its resources. As a

result, for over a decade Archaeology Southwest has been involved in, and has committed substantial resources to, protecting the Bears Ears area. In 2014, Archaeology Southwest identified the protection of the Bears Ears area as a priority for the organization and worked to propose a national monument or conservation area. Since that time, Archaeology Southwest has engaged in extensive public education and advocacy around the value of the archaeological resources within Bears Ears. Those efforts increased markedly following the 2017 Revocation Proclamation and will once again be necessary as a result of the 2026 Revocation Proclamation.

**Conservation Lands Foundation, Inc.**

23. Conservation Lands Foundation, Inc. ("CLF") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of the State of Delaware, and headquartered in Durango, Colorado. CLF maintains regional offices in the District of Columbia and seven states. Upon information and belief, CLF is the only non-profit in the country specifically dedicated to establishing and safeguarding National Conservation Lands (formerly known as the "National Landscape Conservation System") under the care of the Bureau of Land Management ("BLM"). Congress recognized and codified the existence of the National Conservation Lands in 2009, *see* Omnibus Public Land Management Act of 2009, Pub. L. 111-11, 123 Stat. 991 (2009) (codified as 16 U.S.C. §§ 7201–7203), and mandated that those lands be managed in accordance with their implementing statutes or proclamations. Bears Ears National Monument is a unit of the National Conservation Lands, and the management of and authority for appropriations to Bears Ears National Monument are governed in part by the Omnibus Public Land Management Act of 2009. *See* 16 U.S.C. § 7202 (b)(1)(A) (defining the National Landscape Conservation System to include national monuments).

24. To fulfill its purpose, CLF works to protect, restore, and expand the National Conservation Lands through education, advocacy, and partnership. CLF's core business activity is to promote conservation of public lands and the historic, cultural, and natural benefits that those lands provide. It does so by supporting the National Conservation Lands, which encompass approximately 38 million acres and 2,700 river miles of National Monuments, National Conservation Areas, Wilderness and Wilderness Study Areas, Wild and Scenic Rivers, National Scenic and Historic Trails, and other special designations.

25. Critical to CLF's success and mission is CLF's Friends Grassroots Network. CLF's founding organizational vision was to combine local grassroots power with a sophisticated national office that could educate Congress, the Executive Branch, and the public about the National Conservation Lands. CLF's core business activities include providing individual conservation and stewardship groups with technical advice, mentoring, tools, trainings, and other services to ensure successful on-the-ground projects; CLF also offers guidance to groups on effective advocacy and community education. CLF's resources and expertise in government relations, advocacy, communications, and outreach provide local advocates with insights into developments affecting the National Conservation Lands, including Bears Ears National Monument, as well as the tools needed to influence those developments powerfully and persuasively.

26. CLF affiliates, including Charlotte Overby, regularly visit the Bears Ears region to hike, camp, and explore in the areas that are no longer protected under the 2026 Revocation Proclamation. The objects of historic and scientific interest comprising the Bears Ears National Monument (under the 2016 Designation and 2021 Restoration Proclamations) are critical to affiliates' use and enjoyment of the land.

27. Moreover, members of the entities within CLF's Friends Grassroots Network use and enjoy Bears Ears National Monument regularly (including those areas that are no longer protected) and will continue to do so in the future. This use includes hiking, rock climbing, rafting, backpacking, canyoneering, river running, photographing, and observing the area's unique archaeology, geology, and habitat. In addition, the objects of historic and scientific interest that are now excluded from Bears Ears National Monument due to the 2026 Revocation Proclamation are critical to the members' use and enjoyment of the Monument.

28. Designation of Bears Ears National Monument has been a central initiative of CLF for fifteen years. CLF's primary focus has been providing strategic support to the local non-profits that played important roles in the designation effort, particularly UDB and Archaeology Southwest. CLF devoted thousands of hours of its staff time and significant resources to securing the designation of the Bears Ears area as a Monument and its restoration in 2021.

29. Over the past fifteen years, CLF provided strategic support to tribal organizations and others leading the effort to protect the Bears Ears region. CLF invested resources, provided services, and undertook significant advocacy efforts of its own. CLF actively engaged in the creation of Bears Ears National Monument by supporting and participating in the collection of critical data and information on the natural, cultural, historic, and scientific resources and values supporting the 2016 Designating Proclamation. And CLF engaged with Department of the Interior officials (such as former Secretary Sally Jewell) regarding the significance of the Bears Ears region, including providing critical data and information on the area's resources. CLF undertook similar efforts in support of the 2021 Restoration Proclamation. CLF's efforts continue to date.

**Patagonia Works**

30. Patagonia Works ("Patagonia") is an outdoor apparel company with a 50-year history of environmental conservation and activism. Protecting and preserving the environment is a core business tenet as reflected in Patagonia's mission statement: "We're in business to save our home planet." The company's specific purposes of business, conservation, and social equity are recognized and mandated by California law because Patagonia is a California benefit corporation. Cal. Corp. Code §§ 14600 *et seq.*; *see* Patagonia Works, Seventh Amended and Restated Articles of Incorporation (filed with Cal. Sec'y of State, Aug. 5, 2022). Among other things, Patagonia is legally required to: (i) contribute one percent of its annual net revenue to non-profit charitable organizations that promote environmental conservation and sustainability; (ii) create a material positive impact on society and the environment; and (iii) consider the impact of any action on its workforce, customers, and the environment. Patagonia's corporate headquarters are located in Ventura, California.

31. Consistent with its statutorily recognized specific public benefit purposes, Patagonia has donated more than $240 million to thousands of grassroots environmental groups since 1985. In addition to providing funding to these groups, Patagonia has invested substantial company resources to amplify their messages, using its own marketing platforms and employee time to advocate for their shared conservation goals.

32. Many of the groups receiving Patagonia's support over the past forty years have worked to protect threatened wild places and other special public landscapes in their local communities, including through national monument designations. These groups have galvanized local support for the designations that now ensure the protection of the following national monuments: (1) Basin and Range National Monument in Nevada; (2) Berryessa Snow Mountain

National Monument in California; (3) Castle Mountains National Monument in California; (4) Mojave Trails National Monument in California; (5) Sand to Snow National Monument in California; (6) Gold Butte National Monument in Nevada; (7) Basin and Range National Monument in Nevada; (8) Baaj Nwaavjo I'tah Kukveni National Monument in Arizona; (9) Avi Kwa Ame National Monument in Nevada; (10) Camp Hale – Continental Divide National Monument in Colorado; (11) Castner Range National Monument in Texas; (12) Chuckwalla National Monument in California; and (13) Sáttítla Highlands National Monument in California; as well as the expansion of the San Gabriel Mountains National Monument in California; and the 2021 redesignations of Bears Ears and Grand Staircase Escalante National Monuments in Utah.

33. Patagonia has a long history in the Bears Ears area because it provides some of the best rock climbing in North America. The objects of historic and scientific interest comprising Bears Ears National Monument are also critical to the use and enjoyment of Patagonia's employees and sponsored athletes. Patagonia's employees have visited Bears Ears numerous times, including those areas now stripped of protection, for various purposes including, but not limited to, product testing, marketing, professional training, fitness, education, recreation, spiritual and aesthetic enjoyment, and other purposes. Bears Ears is used for similar purposes by Patagonia's customers and sponsored athletes. Patagonia's workforce and many of its customers intend to visit Bears Ears in the future.

34. In 2013, recognizing the Bears Ears area as one under threat from development that would materially alter the landscape and irreparably harm the cultural objects inexorably linked to the land, Patagonia became directly engaged in the effort to preserve and protect it. Since that time, Patagonia has collaborated with and provided grants to groups supporting the

creation and preservation of Bears Ears National Monument and engaged in substantial advocacy devoted to the same purpose.

**The Access Fund**

35. The Access Fund ("Access Fund" or "AF") is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3) and an accredited land trust representing the interests of millions of climbers and mountaineers nationwide. AF is headquartered in Boulder, Colorado.

36. AF's core business activity is to create, protect, and enhance access to rock climbing areas nationwide, and to conserve the climbing environment. To achieve this, AF encourages and promotes environmental stewardship within the nation's rock climbing community and also engages in specific land management issues that threaten to affect the environmental quality of the nation's climbing areas.

37. AF is the largest U.S. organization dedicated to advocating for climbers with approximately 10,300 members and 122 local affiliates, including the Friends of Indian Creek, which was established to focus on stewardship projects at Indian Creek, an area formerly within Bears Ears National Monument before the Revocation Proclamations. AF provides climbing-management expertise, stewardship, project-specific funding, and educational outreach. Utah is one of AF's largest member-states. AF members from Utah and across the country regularly climb in Bears Ears National Monument.

38. AF members, including Eve Tallman and Michael Kennedy, regularly visit the Bears Ears National Monument to climb, hike, camp, canyoneer, and explore within the Monument—including areas now stripped of protection because of the 2026 Revocation Proclamation. Some of those areas are in the immediate vicinity of resource-extractive activities that will undoubtedly resume and irreparably alter the natural landscape, impairing and

potentially halting altogether AF's members' recreational uses. In addition to the beauty and solitude afforded by the Bears Ears region, AF members enjoy visiting and viewing the vast cultural resources contained in the Bears Ears region, which contribute significantly to their spiritual and aesthetic enjoyment of the area. Thus, the objects of historic and scientific interest comprising Bears Ears National Monument are critical to AF members' use and enjoyment of the Monument.

39. For over thirty years, AF's policy program has engaged in land management issues within Utah. AF's efforts in Utah have included participating as a leading stakeholder in the BLM's Monticello Field Office's 2005 Indian Creek Corridor planning process, as well as advocating for climbing interests for three years during attempts to pass Utah's Public Lands Initiative.

40. AF also employs seven professional trail builders and conservation specialists ("AF Conservation Team"), as well as eight education specialists ("AF Climber Stewards"), to help local climbing communities assess impacts and climbing area conservation needs, address general conservation needs, and provide training on stewardship planning and best practices for keeping climbing areas healthy. This work has resulted in camping and parking improvements, the installation of toilets, and the construction and maintenance of climbing access trails.

41. AF staff dedicated hundreds of hours engaging with a wide range of stakeholders, including tribal interests, local government, the conservation community, and recreation groups to advocate for permanent protection for the Bears Ears region through a national monument designation. This collaborative process resulted in the Bears Ears Inter-Tribal Coalition and AF submitting letters to the Secretary of the Interior endorsing the inclusion of climbing as a legitimate use of Monument lands in the presidential proclamation. Ultimately, for the first time

in history, the 2016 Designating Proclamation expressly mentioned rock climbing as one of the recreational opportunities to be protected through the establishment of Bears Ears National Monument. The 2021 Restoration Proclamation similarly recognized the unparalleled rock climbing available within the Monument boundaries. The Revocation Proclamations have unwound these historic gains and stripped the rock climbing resources of protection.

**The National Trust for Historic Preservation**

42. Plaintiff the National Trust for Historic Preservation in the United States (the "National Trust") is a private charitable, educational, non-profit corporation chartered by Congress in 1949 to protect and defend America's historic resources, to further the historic preservation policy of the United States, and to facilitate public participation in the preservation of our nation's heritage. *See* 54 U.S.C. § 312102 *et seq*.

43. The mission and core business activity of the National Trust is to provide leadership, education, and advocacy to save America's diverse historic places and revitalize our communities. The statutory powers of the National Trust include the power to bring suit in its corporate name. *Id.* § 312105(c). Consistent with its congressional charter and its statutory powers, the National Trust has participated in numerous actions to enforce federal laws that protect historic and cultural resources, including actions to protect national monuments.

44. The National Trust is headquartered in Washington, D.C., and protects and promotes a diverse collection of twenty-seven Historic Sites that are open to the public across the United States. The National Trust has more than one million members and supporters around the country.

45. Members of the National Trust regularly visit the Bears Ears region to hike, camp, and explore in the areas within Bears Ears National Monument, including those areas stripped of

protection by the 2026 Revocation Proclamation. Its members will continue to visit the monument in the future. The objects of historic and scientific interest within Bears Ears National Monument are critical to the members' use and enjoyment of the Monument. Wesley White, for instance—a member, former trustee and current member of the board of advisors—has visited Bears Ears at least six times and has observed damage to archaeological resources due to inadequate management and a lack of visitor education.

46. For two decades, the National Trust has been intensively involved in and has contributed substantial funding to protect cultural resources within the Bears Ears area and to support the effort to designate Bears Ears as a monument. For example, the National Trust has made grants totaling approximately $50,000 to support research projects in areas within Bears Ears, including providing funding to BLM that was used for stabilizing Chacoan walls in Arch Canyon. The National Trust helped fund a publication called "Cliff Dwellers of Cedar Mesa" intended to increase public awareness and understanding of the history of the Bears Ears area.

47. The National Trust also commissioned additional research, including Class I cultural resource surveys for Cedar Mesa, and prepared a heritage and eco-tourism report. The National Trust has also provided technical assistance and support to grassroots groups and undertaken efforts to educate the public and policymakers about the history and significance of Bears Ears National Monument and the threats to its preservation. In September 2014, the National Trust designated the area that later became the Monument as a National Treasure. In the summer of 2016, Pam Bowman, the National Trust's Senior Director of Government Relations, attended a public meeting in Bluff, Utah, to express the National Trust's strong support for the designation of Bears Ears as a National Monument. And in September 2016, Bears Ears was named to the National Trust's annual list of "America's 11 Most Endangered

Historic Places." When President Biden redesignated the Bears Ears National Monument on October 8, 2021, the National Trust was invited to attend the signing ceremony at the White House, and Elizabeth Merritt, the Trust's Deputy General Counsel, proudly attended the ceremony on behalf of the National Trust. These designations helped to build public awareness of the cultural resources at Bears Ears. The National Trust has continued to fund and advocate for protection of these cultural resources, augmenting its efforts in the wake of the Revocation Proclamations.

**The Society of Vertebrate Paleontology**

48. The Society of Vertebrate Paleontology ("SVP") is a non-profit organization of professional vertebrate paleontologists exempt from taxation under 26 U.S.C. § 501(c)(3). It is incorporated under the laws of California and headquartered in McLean, Virginia.

49. SVP is the world's largest paleontological organization. Its core business activity is to promote the science of vertebrate paleontology, on its own behalf and on behalf of its members. SVP's mission is four-fold: (1) to promote and advance the science of vertebrate paleontology around the world; (2) to serve the common interest of and facilitate cooperation between all persons concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found; (3) to support and encourage the discovery, conservation, and preservation of vertebrate fossils and fossil sites; and (4) to foster scientific, educational, and personal appreciation and understanding of vertebrate fossils and fossil sites by its paleontologists and the general public.

50. As of August 2026, SVP's membership includes approximately 1,900 students, artists, and other individuals interested in the science of vertebrate paleontology across the United States and abroad.

51. SVP members regularly visit Bears Ears National Monument to conduct research on paleontological resources within the boundaries established by the 2016 Designating Proclamation and reinstated by the 2021 Restoration Proclamation. SVP members have also published extensively on paleontological research within that area and have done so since at least 1965.

52. Founded in 1940, SVP has been a leader in the paleontological community for nearly eighty-five years. It holds an annual scientific conference, publishes journals and a memoir series of vertebrate paleontological research, engages in education and outreach, and participates in activities relating to the preservation of scientifically important vertebrate paleontological resources.

53. SVP has been advocating for decades to conserve public lands as a means of ensuring access to, and protection of, paleontological resources. Beginning in 1991, SVP successfully advocated against bills in the United States Senate that would have permitted commercial collecting on public lands, and SVP continues to work with Congress and executive agencies to increase protections for vertebrate fossils. In 2009, SVP was instrumental in passing the Omnibus Public Land Management Act of 2009, specifically the Paleontological Resources Preservation Act section.

54. SVP and its members have devoted substantial time and resources to the protection of paleontological resources within Bears Ears National Monument. SVP especially focused its advocacy efforts on explicit recognition of paleontology as a value to be protected by

the Monument designation. As the organization learned through its experience with the designation of Grand Staircase-Escalante National Monument, monument status prompts federal agencies to prioritize paleontological research over other uses of the land, and it enhances funding opportunities for research.

55. SVP and its members witnessed firsthand the deterioration and loss of the paleontological resources within Bears Ears following the 2017 Revocation Proclamation—harm that is likely to recur now that these resources are once again left unprotected. SVP increased its public education and advocacy around the risk of grave losses to paleontological knowledge and science due to the 2017 Revocation Proclamation's removal of protections. It is being forced to do so again to counter the losses made possible by the 2026 Revocation Proclamation. And more than a dozen SVP members' research projects were jeopardized or suffered funding cuts because they focused on areas of Bears Ears that were excluded under the 2017 Revocation Proclamation; the 2026 Revocation Proclamation has put these and other projects at risk anew.

**A'Nuche, Inc.**

56. A'Nuche, Inc. ("A'Nuche") is a non-profit organization exempted from taxation under 26 U.S.C. § 501(c)(3), organized under the laws of and headquartered in Utah.

57. A'Nuche is led by members of the Ute Mountain Ute Tribe and located in White Mesa, approximately five miles east of Bears Ears National Monument. A'Nuche's mission and core business activity is to preserve and promote the Tribe's ways of life through cultural education, language preservation, land stewardship, and intergenerational engagement. As part of that activity, it seeks to empower Ute people to take pride in their identity and heritage, restore traditional relationships with the land, and promote conservation and stewardship across the Bears Ears and other Ute ancestral homelands.

58. A'Nuche's core business activity is closely connected to the Monument, as the Ute Mountain Ute Tribe's ancestral homeland is located within it. The cultural preservation, education, stewardship, and transmission of traditional knowledge that A'Nuche fosters are inextricably linked to the Bears Ears landscape, and the Monument serves as a setting for many of the organization's activities. For instance, A'Nuche regularly uses Bears Ears as a place to educate Ute youth about Tribal history, cultural traditions, language, traditional ecological knowledge, land stewardship practices, and the enduring relationship between Ute people and their ancestral lands. And members of A'Nuche's Board of Directors organize an annual hike for Tribal youth and other community members along the Posey trail within the Monument to reflect on the historical events associated with the Posey War, honor the resilience of the Ute people, and emphasize the importance of preserving their cultural heritage. These and other activities within the Monument are important to preserving Ute traditions, strengthening community connections to ancestral lands, and conserving areas that are culturally and historically significant to the Ute people. Moreover, while A'Nuche was formally established as a non-profit in 2025, members of A'Nuche's Board of Directors played a significant role in establishing the Monument in 2016 and have remained actively engaged in efforts to protect, preserve, and advocate for the Monument since then.

59. For A'Nuche and its affiliates, the Monument is more than a collection of features on a map; it embodies the history, culture, identity, and teachings of the Ute people and serves as a living connection to their ancestors. It contains cultural resources, ancestral sites, burial locations, traditional use areas, and places of profound spiritual significance to the Ute community. A'Nuche's affiliates, including Deena Ute, visit the Monument regularly to hike,

pray, meditate, teach and learn from elders, gather traditional foods and plants, observe the landscape, and share cultural knowledge with others, among other activities.

60. The 2026 Revocation Proclamation directly interferes with A'Nuche's mission and core business activities, and with its affiliates' traditional use of areas within the Monument. The reduction of the Monument strips protections from areas that are culturally, spiritually, and historically important to A'Nuche and its members, threatening to irreversibly alter those areas through increased risk of mining, industrial and infrastructure development, looting, vandalism, and irresponsible visitation. Moreover, A'Nuche must now allocate substantial time, attention, and organizational resources to protecting the Bears Ears landscape instead of focusing on strengthening existing programs, preserving traditional knowledge, and developing new cultural initiatives. The 2026 Revocation Proclamation directly impairs A'Nuche's ability to fulfill its core business activity of preserving, documenting, and sharing ecological, cultural, and spiritual knowledge related to Bears Ears for the benefit of future generations.

## II. Defendants

61. Defendant Donald Trump is the President of the United States. In his official capacity, he signed and issued the Revocation Proclamations revoking and replacing Bears Ears National Monument. The President resides and conducts his duties in Washington, D.C.

62. Defendant Doug Burgum is the Secretary of the United States Department of the Interior. In his official capacity, he is charged with ensuring that the Department of the Interior and its constituent agencies, including BLM, fulfill their duties. These duties include management of Bears Ears National Monument in accordance with the mandates of the Omnibus Public Land Management Act of 2009, the 2016 Designating Proclamation, and the 2021

Restoration Proclamation. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

63. Defendant Brooke Rollins is the Secretary of the United States Department of Agriculture. In her official capacity, she is charged with ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service (the "USFS"), fulfill their duties. These duties include management of areas within Bears Ears National Monument in accordance with law, the 2016 Designating Proclamation, and the 2021 Restoration Proclamation. The Secretary of Agriculture resides and conducts her duties in Washington, D.C.

64. Defendant Stevan Pearce is the Director of the Bureau of Land Management. In his official capacity, he is charged with ensuring that BLM fulfills its duties. These duties include management of Bears Ears National Monument in accordance with the mandates of the Omnibus Public Land Management Act of 2009, the 2016 Designating Proclamation, and the 2021 Restoration Proclamation. Upon information and belief, the Director of the BLM resides and conducts his duties in Washington, D.C.

65. Defendant Tom Schultz is the Chief of the U.S. Forest Service. In his official capacity, he is charged with ensuring that the USFS fulfills its duties. These duties include the management of areas within Bears Ears National Monument in accordance with law, the 2016 Designating Proclamation, and the 2021 Restoration Proclamation. The Chief of the USFS resides and conducts his duties in Washington, D.C.

## BACKGROUND

### I. The Antiquities Act of 1906

66. The Property Clause of the United States Constitution states that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the

Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2. The United States Constitution thus grants Congress the exclusive authority for regulation of public lands. Absent a congressional delegation under the Property Clause, the President lacks any authority over public lands.

67. In 1906, in response to widespread looting on federal land and a growing call to provide more lasting protection to landscapes and objects of historic and scientific interest in the American Southwest, Congress passed and President Theodore Roosevelt signed the Antiquities Act. *See* Antiquities Act of 1906, Pub. L. No. 59-209, 34 Stat. 225 (1906) (codified at 16 U.S.C. § 431 *et seq.*); Pub. L. No. 113-287, 128 Stat. 3257 (2014) (re-codified at 54 U.S.C. § 320301 *et seq.*).

68. The Antiquities Act authorizes the President to, in his "discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a).

69. The Antiquities Act further authorizes the President to "reserve parcels of land as a part of the national monuments." *Id.* § 320301(b). Under the Act, "[t]he limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.* § 320301(b).

70. After a President declares a national monument, that land is "reserve[d]" from the operation of mining and other extraction laws. *Id.* The land must also be "manage[d]" to "protect[]" the monument. *Id.*

71. In 2009, Congress passed the Omnibus Public Land Management Act, under which all lands within national monuments administered by BLM became part of the National

Landscape Conservation System. 16 U.S.C. § 7202(b)(1)(A). The National Landscape Conservation System's purpose is to "conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." Pub. L. No. 111-11, § 2002, 123 Stat. at 1095 (codified at 16 U.S.C. § 7202(a), (b)(1)(A)). Under Department of the Interior policy, all National Conservation Lands must be managed "to protect the values for which they were designated, including, where appropriate, prohibiting uses that are in conflict with those values." Ken Salazar, Sec'y of the Interior, Order 3308: Management of the National Landscape Conservation System, ¶ 4a (Nov. 15, 2010). The same policy directs that National Conservation Lands, including national monuments, "shall be managed as an integral part of the larger landscape[.]" *Id.* ¶ 4b. BLM takes a variety of actions to incorporate the values of national monument designation and implement the commands of the Omnibus Public Land Management Act. *See* BLM Manual 6220: National Monuments, National Conservation Areas, and Similar Designations, ¶ 1.1 (Jan. 25, 2017).

## II. Bears Ears National Monument

### A. Objects of historic or scientific interest are found throughout the Monument.

72. President Obama's 2016 Designating Proclamation establishing Bears Ears National Monument and President Biden's 2021 Restoration Proclamation describe in detail the geological, paleontological, ecological, archaeological, historic, and cultural significance of the Monument and the objects of historic or scientific interest found there. *See* 82 Fed. Reg. at 1139–43 (2016 Designating Proclamation); 86 Fed. Reg. at 57,321-30 (2021 Restoration Proclamation). These Proclamations also explain the requirements essential to the Monument's protection. *See* 82 Fed. Reg. at 1143–45; 86 Fed. Reg. at 57,330–33. The fossils, geological

formations, plants, animals, habitats, and cultural objects described below are found throughout the Monument and are among the many historic landmarks, historic and prehistoric structures, and objects of historic or scientific interest identified in the Proclamations.

73. The Monument takes its name from a pair of sandstone buttes that jut upward out of the ruddy expanse of southeastern Utah. 82 Fed. Reg. at 1139; 86 Fed. Reg. at 57,321. The Bears Ears buttes, which are "so distinctive that in each of the native languages of the region their name is the same," anchor a region that is "profoundly sacred to many Native American tribes." 82 Fed. Reg. at 1139; *accord* 86 Fed. Reg. at 57,321. Tribes have been here since time immemorial; Cedar Mesa, for instance, harbors evidence of Native Americans hunting in the area "as early as 13,000 years ago." 82 Fed. Reg. at 1139; *accord* 86 Fed. Reg. at 57,321. "The area's cultural importance to Native American tribes continues to this day." 82 Fed. Reg. at 1139, 1140; *accord* 86 Fed. Reg. at 57,321.

74. The Bears Ears landscape boasts a "unique density of significant cultural, historical, and archaeological artifacts spanning thousands of years." 86 Fed. Reg. at 57,321. These objects include the "remains of single family homes, ancient cliff dwellings, large villages, granaries, kivas, towers, ceremonial sites, prehistoric steps cut into cliff faces, and a prehistoric road system." *Id.*; *accord* 82 Fed. Reg. at 1139–40. They also include the remains of tools, projectile points and other weapons, and shards of pottery that tell the story of how both ancient and more-recent Native peoples survived in the region. *See* 82 Fed. Reg. at 1139–40. To take just one example, there are "alcoves in Whiskers Draw that have sheltered evidence of human habitation for thousands of years[.]" 86 Fed. Reg. at 57,327. The Bears Ears region also contains "[a]bundant rock art," 82 Fed. Reg. at 1139, such as "petroglyphs, pictographs, and

recent rock writings," 86 Fed. Reg. at 57,321. Some of this art is over 5,000 years old. 82 Fed. Reg. at 1139.

75. Bears Ears teems with paleontological resources. Indeed, "[t]he paleontological resources in the Bears Ears area are among the richest and most significant in the United States." 82 Fed. Reg. at 1141; *accord* 86 Fed. Reg. at 57,322. The thousands of individual fossil specimens already studied include insects, and marine organisms and ancient species entirely new to science have been discovered there like *Halgaitosaurus gregarius*, one of the earliest reptiles, and the Early Jurassic sauropod dinosaur *Seitaad ruessi*. These fossils "reveal new insight into the transition of vertebrate life from reptiles to mammals and from sea to land," such as a "new species of plant-eating crocodile-like reptiles," and also include fossilized plants, insects, and marine organisms. 82 Fed. Reg. at 1140–41; *accord* 86 Fed. Reg. 57,323–24. "The discovery of several taxa … have occurred exclusively within Bears Ears region or have significantly extended an extinct species' known range," 86 Fed. Reg. at 57,323.

76. Unique and distinctive geological features dot the region. "The area's stunning geology, from sharp pinnacles to broad mesas, labyrinthine canyons to solitary hoodoos, and verdant hanging gardens to bare stone arches and natural bridges, provides vital insights to geologists." 82 Fed. Reg. at 1140. Not only that, "the mountains, canyons, mesa tops, ridges, rivers, and streams … that make up the Bears Ears landscape hold cultural significance" to Native peoples. 86 Fed. Reg. at 57,323. For instance, "Comb Ridge, the San Juan River, and Cedar Mesa[] are closely tied to native stories of creation, danger, protection, and healing." 82 Fed. Reg. at 1130. "The towering spires in the Valley of the Gods are sacred to the Navajo, representing ancient Navajo warriors frozen in stone." *Id.* And the Bears Ears buttes offered

Native peoples "hiding places to escape the United States military during the forced Long Walk." 86 Fed. Reg. at 57,324.

77. The Bears Ears region also contains evidence of the Euro-American development of the American West. Observers of the Mormon faith traced their route through the area, "smooth[ing] sections of the rock surface and construct[ing] dugways and other features still visible along their route[.]" 82 Fed. Reg. at 1140; *accord* 86 Fed. Reg. at 57,323. And outlaws like Butch Cassidy and the Sundance Kid used a complex trail network "to avoid detection." 82 Fed. Reg. at 1140; *accord* 86 Fed. Reg. at 57,323.

78. The Bears Ears region's diversity of microenvironments provides habitat for a wide array of plant life of scientific, cultural, and ecological significance. *See* 82 Fed. Reg. at 1141–42. Such plants include a "relict species such as Douglas fir," *id.* at 1142, and a "unique vegetative community" in the South Cottonwood Canyon, 86 Fed. Reg. at 57,325. The ecological resources of the area also include medicinal and ceremonial plants and edible herbs. 82 Fed. Reg. at 1140.

79. Bears Ears also offers habitats to "a wide variety of wildlife species" of scientific, cultural, and ecological significance, including mule deer, elk, bighorn sheep, foxes, bobcats, mountain lions, eagles, falcons, hawks, owls, and bats. 82 Fed. Reg. at 1142. For example, Bears Ears offers "eyries for peregrine falcons," "habitat for the threatened yellow-billed cuckoo," and habitat for "two endangered fish species." 86 Fed. Reg. at 57,324, 57,329–30.

**B. President Obama creates Bears Ears National Monument.**

80. Advocates have sought protection for the Bears Ears region since before Congress passed the Antiquities Act in 1906. *See id.* at 57,321. Indeed, "[p]reserving the sacred landscape and unique cultural resources in the Bears Ears region was an impetus for passage of" that Act. *Id.* The House Report supporting the Act specifically highlighted the need to protect "the

numerous ruins in southeastern Utah," including "along Montezuma Creek, Recapture Creek, Cottonwood Creek, Butler Wash, Comb Wash, and Grand Gulch"—all areas within the Bears Ears region. H.R. Rep. No. 59-2224, at 5 (1906). Bears Ears nevertheless remained unprotected for over a hundred years.

81. In 2015, after five years of study, research, and organizing, the Hopi, Navajo, Uintah and Ouray Ute, Ute Mountain Ute, and Zuni Tribal Governments—organized into the Bears Ears Inter-Tribal Coalition—submitted a proposal to President Obama for the creation of Bears Ears National Monument. *See* Bears Ears Inter-Tribal Coalition, *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* (Oct. 15, 2015).[1]

82. Plaintiffs, and many others, supported and advocated for this proposal.

83. In June 2016, Archaeology Southwest issued an open letter to President Obama, signed by several hundred professional archaeologists, calling for the protection of artifacts in the Bears Ears area through the Antiquities Act. The archaeologists warned that vandalism and removal of artifacts from the region "continue at an alarming rate, with several dozen incidents in the last two years. Increasing visitation combined with a severe lack of resources for effective management and enforcement also create newer but no less menacing challenges to archaeology in the region."

84. In November 2016, SVP sent a letter on behalf of the entire organization urging President Obama to protect the paleontological resources within the Bears Ears area and explaining that the area holds some of the richest and most significant paleontological resources in the United States discovered through more than a century of previous scientific study, and many more of which have yet to be scientifically examined.

[1] *Available at* https://perma.cc/H9QV-2MGA.

85. On November 30, 2016, Archaeology Southwest and sixteen other archaeological or historical preservation groups wrote President Obama again to explain the need for national monument status to protect the Bears Ears area from "illegal looting, mismanaged recreational use, and inappropriate energy development." Bears Ears Letter from Cultural Resources Groups (Nov. 30, 2016).[2]

86. By December 2016, representatives from at least ten tribal government bodies, thirty local Utah officials, over 500 members of the scientific community, sixty-five national business leaders, 180 health professionals, sixteen religious leaders, and numerous non-profit organizations wrote federal officials to express their support for protection of the Bears Ears area.

87. In December 2016, President Obama responded to these calls by exercising his authority under the Antiquities Act to declare Bears Ears National Monument in the 2016 Designating Proclamation. 82 Fed. Reg. at 1143. President Obama identified a wide variety of objects of historic and scientific interest in the region, and "proclaim[ed]" them "to be the Bears Ears National Monument." *Id.* And "for the purpose of protecting those objects," President Obama "reserve[d] as part" of that monument an area encompassing "approximately 1.35 million acres." *Id.* President Obama declared that this area is "the smallest area compatible with the proper care and management of the objects to be protected." *Id.*

88. Further, to ensure that decisions about Bears Ears National Monument "reflect[ed] tribal expertise and traditional and historical knowledge," President Obama established the Bears Ears Commission ("Commission"), consisting of representatives from the Hopi Nation, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe of the Uintah Ouray, and

---

[2] *Available at* https://perma.cc/9R5A-CPJ2.

Zuni Tribe. *Id* at 1144. The Commission would "provide guidance and recommendations on the development and implementation of management plans and on management of the monument." *Id.* at 1144. Those recommendations were to be "carefully and fully consider[ed]," and, if not incorporated into the management plan, answered with a written explanation. *Id.* President Obama required "continued meaningful engagement with the Commission" in implementation of the management plan. *Id.*

**C. President Trump issues a proclamation in 2017 purporting to revoke Bears Ears National Monument.**

89. On April 26, 2017, President Trump directed the Secretary of the Interior to review all presidential monument designations or expansions since January 1, 1996, where the designation covers more than 100,000 acres, where the monument after expansion covers more than 100,000 acres, or where the Secretary determines that the designation or expansion occurred without adequate public outreach. *See* 82 Fed. Reg. 20,429 (May 1, 2017). The Secretary was directed to then issue both an interim and a final report on these monuments, including Bears Ears National Monument. *Id.* This final report had to include recommendations for executive, legislative, or other action with respect to each national monument. *Id.*

90. After the Department of the Interior issued a notice in the Federal Register concerning the Interim Report, UDB, Archaeology Southwest, CLF, Patagonia, AF, the National Trust, and SVP each submitted comments supporting President Obama's designation of the Monument. *See* Letter from Gavin Noyes, Executive Director, Utah Diné Bikéyah, Docket ID DOI-2017-0002-83535, at 1–2 (May 24, 2017);[3] Letter from Archaeology Southwest, *et al.*, Docket ID DOI-2017-0002-57625, at 1–2 (Mar. 3, 2017);[4] Letter from Edward M. Norton,

[3] *Available at* https://perma.cc/Y767-HJ7J.
[4] *Available at* https://perma.cc/9XPE-BL4Q.

Chairman, Conservation Lands Foundation, Inc., Docket ID DOI-2017-0002-90566, at 1–2, 3–4 (May 25, 2017);[5] Letter from Yvon Chouinard, Founder, Patagonia, Inc., and Rose Marcario, President & CEO, Patagonia, Inc., Docket ID DOI-2017-0002-133733, at 1 (May 4, 2017);[6] Letter from Erik Murdock, Policy Director, Access Fund, Docket ID DOI-2017-0002-94640, at 1 (May 25, 2017);[7] Letter from Stephanie K. Meeks, President and CEO, National Trust for Historic Preservation, Docket ID DOI-2017-0002-364407, at 1 (May 25, 2017);[8] Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-100908, at 1 (May 25, 2017).[9]

91. On June 10, 2017, the Interior Secretary issued an interim report on Bears Ears National Monument. *See* Memorandum from Sec'y Ryan Zinke to President Donald Trump, "Interim Report Pursuant to Executive Order 13792," DOI.gov at 1 (June 10, 2017).[10] In just over one page of analysis, the interim report concluded that the boundary of Bears Ears National Monument should be reduced. *Id.* at 4–5.

92. That same day, the Department of the Interior extended the comment period on Bears Ears National Monument. *See* Press Release, Dep't of the Interior, at 1 (June 10, 2017).[11] Archaeology Southwest and Access Fund submitted supplemental comments in response to then-Secretary Zinke's interim report. *See* Letter from William H. Doelle, Ph.D., President and CEO of Archaeology Southwest, Docket ID DOI-2017-0002-548672 (July 7, 2017);[12] Brady Robinson, Executive Director of Access Fund, Docket ID DOI-2017-0002-723262 (July 10,

---

5 *Available at* https://perma.cc/U8JT-ZZHN.
6 *Available at* https://perma.cc/V4U4-LZBW.
7 *Available at* https://perma.cc/NSE5-A6HW.
8 *Available at* https://perma.cc/7F3Z-N6HS.
9 *Available at* https://perma.cc/S4YM-7SVK.
10 *Available at* https://perma.cc/6JX6-FTYG.
11 *Available at* https://perma.cc/5SWP-S6NJ.
12 *Available at* https://perma.cc/A6EW-8KCV.

2017).[13] These comments reiterated the need to protect the entirety of the landscape and resources within Bears Ears National Monument. SVP also submitted an additional comment defending the paleontological resources protected within the boundaries of non-marine national monuments, including Bears Ears. *See* Letter from P. David Polly, President of SVP, *et al.*, Docket ID DOI-2017-0002-655559, at 1 (July 9, 2017).[14]

93. The Secretary's Final Report recommended that the Monument's boundaries should be reduced. *See* Memorandum from Sec'y Ryan K. Zinke to President Donald Trump, "Final Report Summarizing Findings of the Review of Designations Under the Antiquities Act," at 10 (Dec. 5, 2017).[15]

94. On December 4, 2017, President Trump issued a proclamation invoking the Antiquities Act and purporting to shrink the Bears Ears National Monument by 85%. *See* 82 Fed. Reg. 58,081 (Dec. 8, 2017).

95. The 2017 Revocation Proclamation purported to "modify" the boundaries of the Monument as established in 2016, leaving two smaller "units" or "areas" to be known as Indian Creek and Shash Jáa. *Id.* at 58,082. Together, these putative units encompassed approximately 228,784 acres in total, including 12,000 acres that were not contained in the original Monument. *See* White House, *President Donald J. Trump Stands with Local Communities Against Government Overreach on Land Management*, Land & Agric. (Dec. 4, 2017).[16]

96. The new units excluded 1,150,860 acres originally included in the Monument ("the Revoked Area"). In addition, the 2017 Revocation Proclamation renamed the Bears Ears Commission the "Shash Jáa Commission," reduced its mandate to only cover the Shash Jáa unit,

---

[13] *Available at* https://perma.cc/J5SB-2Y3L.
[14] *Available at* https://perma.cc/X44M-HJLK.
[15] *Available at* https://perma.cc/HC4X-X77T.
[16] *Available at* https://perma.cc/8CBX-9KAB.

and diluted the Tribes' influence by adding an elected officer of the San Juan County Commission as a member. 82 Fed. Reg. at 58,085–86.

97. In removing over one million acres of land from the Monument, the 2017 Revocation Proclamation removed tens of thousands of structures and objects of cultural, historic, and scientific significance from the Monument. In doing so, it revoked the monument status of numerous landmarks and objects that had been specifically designated as monuments by the 2016 Designating Proclamation. These include the Valley of the Gods, Cedar Mesa, Elk Ridge, the Hole-in-the-Rock Trail, and multiple other historic and cultural sites. In the years that it was in effect, the 2017 Revocation Proclamation also allowed new mining claims and exploration on those claims that harmed the Monument in ways that cannot easily be undone.

**D. President Biden restores and expands Bears Ears National Monument.**

98. On the first day of his Presidency, President Biden reaffirmed the United States' "abiding commitment" to "conserve our national treasures and monuments and places that secure our national memory" by declaring a policy to "restore and expand our national treasures and monuments." 86 Fed. Reg. 7037 (Jan. 25, 2021). To that end, President Biden directed the Secretary of the Interior to determine whether to restore the monuments that President Trump had reduced, revoked, or dismantled, including Bears Ears. *See id.*

99. In June 2021, then-Secretary of the Interior Deb Haaland issued her report after meeting with a variety of stakeholders. *See* U.S. Dep't of the Interior, Report on Restoring National Monuments 3 (June 2021).[17]

100. The Secretary recognized that "[t]he longstanding position of the United States … is that the President lacks authority to revoke or abolish a national monument." *Id.* at 14. The

[17] *Available at* https://perma.cc/QDA6-T8VK.

Secretary referenced this litigation, cautioning that it "raise[s] serious and fundamental questions as to whether a President has authority to reduce boundaries or reduce core protections in a way that is tantamount to revocation of the monument." *Id.* The Secretary continued that, "[q]uestions about the legality of President Trump's actions aside," the "increased threat" to archaeological sites in the Revoked Area proved that the 2016 Designating Proclamation was "prudent and prescient." *Id.*

101. The Secretary accordingly recommended that President Biden restore Bears Ears National Monument to the boundaries and conditions originally established by President Obama in 2016, while also retaining the 12,000 acres added to the monument by President Trump in 2017. *Id.* at 14–15.

102. On October 8, 2021, President Biden acted on the Secretary's recommendations by issuing a proclamation restoring and expanding Bears Ears National Monument. *See* 86 Fed. Reg. at 57,321. As President Biden explained, "[f]ew national monuments more clearly meet the Antiquities Act's criteria for protection than the Bears Ears Buttes and surrounding areas." *Id.*. President Biden accordingly "confirm[ed], restore[d], and supplement[ed] the boundaries and protections provided by [the 2016 Designating Proclamation], including the continued reservation of land added to the monument by [the 2017 Revocation Proclamation]," and restored the Bears Ears Commission to its original scope and purpose. *Id*. Many of the plaintiffs sent representatives to attend the proclamation signing ceremony at the White House.

103. The 2021 Restoration Proclamation found that the 2017 Revocation Proclamation "remove[d] protection[s] from objects of historic and scientific interest across the Bears Ears landscape, including some objects that [the 2016 Designating Proclamation] specifically identifies by name." *Id.* at 57,322.

104. The 2021 Restoration Proclamation identifies many of the same landmarks, structures, and objects of scientific or historic interest identified as in need of protection in the 2016 Designating Proclamation. *Compare* 86 Fed. Reg. 57,321, *with* 82 Fed. Reg. 1139. In addition, the 2021 Restoration Proclamation recognizes that the "Bears Ears landscape . . . is not just a series of isolated objects, but is, itself, an object of historic and scientific interest requiring protection under the Antiquities Act." 86 Fed. Reg. at 57,322; *see also id.* at 57,330–31. As President Biden explained, "Bears Ears is sacred land of spiritual significance, a historic homeland, and a place of belonging for indigenous people from the Southwest." *Id.* at 57,322.

105. The 2021 Restoration Proclamation warns of the "the threat of damage and destruction" to the "objects identified across the Bears Ears landscape." *Id.* The Proclamation also recognizes the "insufficiency of the protections afforded in the absence of Antiquities Act protections," *id.*, including because these laws do not "withdraw the lands from the operation of the public land, mining, and mineral leasing laws[.]" *Id.* at 57,331.

106. President Biden accordingly concluded that the boundaries of the Monument as established in the 2021 Restoration Proclamation, which encompasses approximately 1.36 million acres, "represent the smallest area compatible with the protection of the objects of scientific or historic interest as required by the Antiquities Act." *Id.*

**E. BLM issues a new management plan.**

107. After a multi-year collaborative planning process, the BLM released the Approved Resource Management Plan for Bears Ears National Monument ("2025 Management Plan") on January 14, 2025.[18] U.S. Department of the Interior, Bureau of Land Management, Bears Ears

[18] The Forest Service issued its Resource Management Plan the same day. U.S. Department of Agriculture, Forest Service, Bears Ears National Monument, Bears Ears National Monument Resource Management Plan (Jan. 2025), *available at* https://perma.cc/2VHC-S9ZJ .

National Monument, Record of Decision and Approved Resource Management Plan (Jan. 2025);[19] *see also* 90 Fed. Reg. 4778 (Jan. 16, 2025) (notice of availability). The 2025 Management Plan recognizes that the Monument's "large, remote, rugged, and connected landscapes hold deep cultural and spiritual connections for many communities and include a diversity of ecotypes, geological and paleontological resources, vegetation, and wildlife." 2025 Management Plan at 11. The 2025 Management Plan therefore is designed to maximize protection of, and minimize impact to, the valuable landscapes, objects, and resources within the Monument in accordance with the 2016 Designation and 2021 Restoration Proclamations, while balancing other existing uses. *See, e.g.*, *id.* at 11–12, 27.

108. For example, the 2025 Management Plan permits off-highway vehicle ("OHV") use in designated areas while closing off 591,185 acres to OHV use entirely. *See id.* at 2, 12–13. Citing harms from OHVs like spreading invasive plants, damaging soil, causing habitat fragmentation, and facilitating harm to cultural resources, this management strategy aims to "help avoid these impacts in the more remote portions of BENM while minimizing them in the more visited portions of the Monument by directing motorized travel to higher use, more hardened areas where the impacts from OHVs will be less widespread." *Id.* at 12. Similarly, various recreational activities are allowed in concentrated areas of the Monument to insulate sensitive resources and preserve Monument objects from the impacts of high visitation; certain less common recreational activities are prohibited because of their disruption to tribal cultural practices. *Id.* at 15–16. The 2025 Management Plan also prioritizes educating the public about the sacred cultural significance of the objects and interconnected landscape within Bears Ears to

[19] *Available at* https://perma.cc/KKN3-2KHX.

ensure the public understands how to recreate respectfully in the areas open to visitation. *See, e.g.*, *id.* at 64–68.

109. BLM collaborated heavily with the Bears Ears Commission throughout development of the 2025 Management Plan, including by entering into an Inter-Governmental Cooperative Agreement with Commission representatives regarding co-stewardship of the Monument. *Id.* at 21. As required by the 2016 Designation and 2021 Restoration Proclamations, the 2025 Management Plan confirms tribal co-stewardship of the Monument by establishing a detailed framework for enhanced engagement with the Commission as well as providing for the integration of Traditional Indigenous Knowledge in Monument management decisions going forward. *See, e.g.*, *id.* at 28-30; *id.* at E-1–E-17 (Appendix E). The 2025 Management Plan therefore ensured that the sacred landscapes and cultural resources within Bears Ears would be protected and managed to preserve traditional and ceremonial uses. *See, e.g.*, *id.* at 65.

### F. President Trump issues a second proclamation purporting to revoke Bears Ears National Monument.

110. On January 20, 2025, President Trump directed all agency heads to review all agency actions that "impose an undue burden on the identification, development, or use of domestic energy resources" and to develop and implement action plans that suspend, revise, or rescind all such unduly burdensome actions within 30 days. 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025).

111. The Secretary of the Interior responded by directing all Assistant Secretaries to develop "action plans" to "review and, as appropriate, revise all withdrawn public lands, consistent with existing law," including the Antiquities Act. Doug Burgum, Sec'y of the Interior, Order 3418: Unleashing American Energy, at 6 (Feb. 3, 2025).[20]

[20] *Available at* https://perma.cc/7VBK-HVNJ.

112. On July 13, 2026, President Trump issued another proclamation invoking the Antiquities Act and purporting to shrink Bears Ears National Monument—this time by almost 90%. *See* 91 Fed. Reg. 45,169 (July 17, 2026).

113. The 2026 Revocation Proclamation purported to "revise" the boundaries of the Monument as established in 2021, and again divided the Monument into separate Indian Creek and Shash Jáa units. *Id.* at 45,170. These putative units encompass approximately 121,096 acres in total, but they exclude 1,238,904 acres included in the Monument under the 2021 Restoration Proclamation ("the Second Revoked Area"). *See id.* at 45,173. In addition, the 2026 Revocation Proclamation "disbanded" and "terminated" the Bears Ears Commission, eliminating tribes' co-management authority and stewardship over the Monument. *See id.* at 45,174.

114. In reducing the Monument by over 1.2 million acres, the 2026 Revocation Proclamation removed tens of thousands of structures and objects of cultural, historic, and scientific significance from the Monument. It also revoked the monument status of numerous landmarks and objects that had been specifically designated as monuments by both the 2016 Designating Proclamation and the 2021 Restoration Proclamation.

115. President Trump premised his unlawful reduction of the Monument on a determination that "the structures and objects identified in [the 2016 Designating Proclamation and 2021 Restoration Proclamation] no longer are, or never were, deserving of the Antiquities Act's protections." *Id.* at 45,169. According to the President, the "appropriate protective area," should turn on "the uniqueness and nature of the objects to be protected, the nature of the protection needed, the protection provided those objects by other laws, executive department and agency resources available to manage the parcel, and whether the lands are better suited for other non-monument uses." *Id.* For example, the 2026 Revocation Proclamation deems certain

prehistoric campsites, petroglyphs, pictographs and other cultural resources unworthy of protection because they are supposedly "relative[ly] common[] … within the broader area." *Id.* at 45,170. This despite recognizing that similar cultural resources are worthy of protection within the Shash Jáa and Indian Creek Units. *Id.* at 45,171.

116. The 2026 Revocation Proclamation is also explicit about President Trump's vision for the Second Revoked Area. Vaguely citing "national security," the 2026 Revocation Proclamation claims that its drastic reduction of Bears Ears National Monument will help "ensure that adequate domestic supplies exist" of "critical minerals such as silver, copper, molybdenum, lead, uranium, vanadium, and zinc." *Id.* When President Trump signed the 2026 Revocation Proclamation, he stated that within Bears Ears National Monument, "[y]ou can't go hunting, you can't go fishing, you can't do anything, you can virtually not even walk on it."[21] Documents shared with the White House mere weeks before that Proclamation, however, squarely refute that claim: Utah officials "told the Trump administration in June [2026] that there was 'current recreational access' to Bears Ears." *Id.* In their reports to the White House, Utah leaders "specifically cited two trails popular among hikers, backpackers and off-road vehicle drivers." *Id.*

117. BLM estimates almost 620,000 people visited the Monticello Field Office in San Juan County Utah in 2021, and many of those visitors came to the Indian Creek area. During "Indian Creek Climber Coffees" each week, the Access Fund Climber Stewards speak with approximately 200 to 230 rock climbers. In 2020, Friends of Indian Creek was awarded funding through Access Fund's conservation grant program to help inventory camping and study visitor use at Indian Creek, an internationally recognized climbing destination within Bears Ears

[21] Maxine Joselow, *Documents Undercut Trump's Claims About Utah National Monument*, N.Y. Times (Aug. 3, 2026), *available at* https://perma.cc/BE5F-T4NJ.

National Monument. Overall use in the Indian Creek area (climbers and otherwise) is estimated at more than 180,000 people per year, and use is expected to increase.

## III. Impacts of the Revocation Proclamations

118. Plaintiffs and their members, directors, officers, employees, or sponsored athletes have suffered and will continue to suffer direct, immediate, and irreparable injury from the repeated revocations of the designation of the landmarks, structures, and objects of Bears Ears National Monument. The Revocation Proclamations directly interfere with Plaintiffs' core business activities. And Plaintiffs' members, officers, employees, and sponsored athletes regularly use and enjoy the lands in the revoked area for cultural, aesthetic, recreational, spiritual, and scientific purposes.

### A. Plaintiffs continue to be harmed by the 2017 Revocation Proclamation.

119. The 2017 Revocation Proclamation harmed, and continues to harm, Plaintiffs. The 2017 Revocation Proclamation allowed for new mining claims and exploration in Bears Ears National Monument by providing that 60 days after the date of the proclamation "the public and National Forest System lands excluded from the monument reservation shall be open to: (1) entry, location, selection, sale, or other disposition under the public land laws and laws applicable to the U.S. Forest Service; (2) disposition under all laws relating to mineral and geothermal leasing; and (3) location, entry, and patent under the mining laws." 82 Fed. Reg. 58,085; *see also* 30 U.S.C. § 22 (Mining Law of 1872). By February 2, 2018, claimants were allowed to start establishing claims in the excised areas of Bears Ears. *See* 82 Fed. Reg. 58,085 (opening the areas to mining 60 days post-proclamation).

120. On information and belief, there are at least 13 active mining claims within the boundaries of Bears Ears National Monument as established by the 2021 Restoration Proclamation. While some claims were staked prior to the 2016 Designating Proclamation,

several were established under the 2017 Revocation Proclamation (i.e., between February 2, 2018 and October 8, 2021). These claims include mining operations related to uranium and vanadium.

121. Claimants were allowed to conduct disruptive activities in the revoked areas of Bears Ears. For instance, claimants can engage in "[c]asual use" activities immediately without any requirement to notify BLM. *See* 43 C.F.R. § 3809.10(a). "Casual use" activities include activities "ordinarily resulting in no or negligible disturbance of the public lands or resource" but not those that use "mechanized earth-moving equipment." *See id.* § 3809.5 ("Casual use generally includes the collection of geochemical, rock, soil, or mineral specimens using hand tools; hand panning; or non-motorized sluicing").

122. Claimants can also quickly initiate more intensive "notice-level" operations, which includes "exploration causing surface disturbance of 5 acres or less," by submitting notice to BLM just 15 days before commencing exploration. *See id.* § 3809.21(a); *see also id.* § 3809.10(b). If BLM does not take additional actions during the 15-day period, the claimant can proceed with notice-level operations. *Id.* § 3809.312(a).

123. These actions are not merely theoretical. One claim staked by Kimmerle Mining LLC ("Kimmerle") led to the excavation of 30 tons of uranium ore at Easy Peasy Mine in 2018. Although the site has seemingly ceased active excavations, an open mine shaft, machines, and waste rock piles remain.

124. Kimmerle maintains additional mining claims in the Bears Ears region, including four groups of mining claims known as the "Geitus" claims that are located in the Deer Flats area of Bears Ears. Two of those were staked while the 2017 Revocation Proclamation was in effect. Kimmerle intends to develop these claims and has submitted a proposed plan of operations to

conduct uranium mining to the BLM. Kimmerle Mining LLC, *Geitus Mine Plan of Operations* (Apr. 2021).[22] The plan calls for the "construction of vent holes, exploration drill holes, and associated access roads to support future mining." *Id.* at 11.

125. The environmental harms from these and other notice-level mining activities cannot be overstated. Mining activities pollute the air and soil, produce waste and debris that mar the landscape and vistas, carve permanent scars into the soil, remove native vegetation, disturb wildlife habitat, increase erosion, and taint water quality. With respect to uranium specifically, mining this radioactive ore can lead to environmental contamination lasting hundreds of years. These enduring impacts jeopardize the unique, rare, and endangered flora and fauna that inhabit Bears Ears' diverse ecosystems and microenvironments.

126. Beyond direct ecological injuries, notice-level mining activities generate auditory and visual effects, such as mechanical noise and light pollution. Such disturbances can be seen and heard for miles. This is particularly true in the open expanses of the Monument's rocky desert landscape.

127. Notice-level mining activities also harm the objects Presidents Obama and Biden purposefully protected. The value of the countless cultural, archaeological, and paleontological artifacts is inextricably linked to their location and preservation in situ. Any alteration or disturbance to these easily damaged resources can irreversibly squander historical knowledge, but the Bureau does not require National Historic Preservation Act review or surveys for archaeological resources before notice-level operations proceed. *See, e.g.*, 36 C.F.R. Part 800; 43 C.F.R. § 3809.313. The absence of such review places these resources at direct risk from notice-level mining activities as they may be difficult to detect with the untrained eye.

[22] *Available at* https://perma.cc/GE69-L5PE.

128. The mining activities directly harm Plaintiff SVP's core business activity of facilitating the collection and study of vertebrate fossils and fossil sites, in addition to harming SVP members' paleontological research. For the same reasons, notice-level mining operations impact Archaeology Southwest's core business activity of pursuing preservation archaeology across the revoked area. Mining operations also directly interfere with AF's core business activity of protecting rock climbing areas and the surrounding environment.

129. When President Biden issued the 2021 Restoration Proclamation, he reinstated monument status to the regions of Bears Ears that were previously excised; withdrew the monument lands from "all forms of entry, location, selection, sale, or other disposition"; withdrew the monument lands "from location, entry, and patent under the mining laws"; and withdrew the monument lands from "disposition under all laws relating to mineral and geothermal leasing." 86 Fed. Reg. at 57,321, 57,331.

130. Even so, the 2021 Restoration Proclamation could not, and did not, fully remedy the harms inflicted by the mining claims staked under the 2017 Revocation Proclamation. The 2021 Restoration Proclamation noted that it was "subject to valid existing rights," which include existing valid mining claims. *See id.* at 57,331. Additionally, BLM has treated as valid mining claims established when the 2017 Revocation Proclamation was in effect, despite President Trump lacking the authority to open monument lands to mining claims. After the 2021 Restoration Proclamation was issued, BLM did not invalidate the mining claims staked in Bears Ears during the 2017 Revocation Proclamation. Rather, the Bureau requested further evaluation of those claims by requiring BLM Utah to "prepare a mineral examination report to determine whether the mining claim was valid before the withdrawal, and to determine whether the mining claim remains valid." *See* Bureau of Land Management, Interim Management of the Bears Ears

National Monument 1, 2 (Dec. 16, 2021) (emphasis omitted);[23] 43 C.F.R. § 3809.100(a). The Bureau also corresponded with Kimmerle in December 2021 (after the 2021 Restoration Proclamation) as if its claims were validly located, informing the company that a claim validity examination would have to be completed before operations could proceed. *See* Decl. of Kyle Kimmerle ¶ 12, Dkt. No. 2-6, *Dalton v. Biden*, No. 4:22-cv-00060-DN (D. Utah Aug. 25, 2022).

131. The mining claims established under the 2017 Revocation Proclamation harmed and will continue to threaten harm to Plaintiffs and their members, officers, employees, and athletes. For example, mining claims in the vicinity of Fry Canyon directly impacted Plaintiffs' members, including UDB member Mark Maryboy and AF member Eve Tallman, who use the surrounding area for spiritual and recreational purposes and have personally experienced the devastating impacts of seismic exploration in the area.

132. UDB and its members value the many sacred landscapes, structures, and objects within Bears Ears National Monument. Indeed, facilitating the continued availability and protection of those areas is UDB's core business activity. The mining claims directly impair that activity. For example, the mining claims in the vicinity of Fry Canyon, as well as the mining claims in the Bears Ears region more generally, have harmed and interfered with UDB member Maryboy's ability to pray, conduct ceremonies, and gather in community. These claims have also disrupted UDB members' connections to ancient cultural resources. UDB members like Mark Maryboy view mineral development and exploration in the area as one of the greatest threats to the environment and Native American way of life in the Bears Ears region.

133. The resulting degradation of the natural landscape, including visual and auditory disturbances, also diminishes Access Fund members' and Patagonia's employees', customers',

[23] *Available at* https://perma.cc/CNV7-GNAZ.

and sponsored athletes' use and enjoyment of those areas for activities such as rock climbing and hiking. The mining claims staked during the 2017 Revocation Proclamation have also harmed and will continue to harm the recreational and aesthetic interests of Plaintiffs' members, impairing Access Fund's and Patagonia's core business activity. The degradation of the natural landscape and the visual and auditory disturbances from these claims diminish, for example, Access Fund's members' and Patagonia's employees', customers', and sponsored athletes' ability to perform and enjoy the activities they have and continue to engage in, such as rock climbing and hiking.

134. The exploration activity by these mining claims also harms Plaintiffs' interests in the scientific and paleontological resources in the revoked areas of the Bears Ears region. The renewal of mining and other ground disturbing activities in Bears Ears risks damage or destruction of irreplaceable surface and subsurface paleontological resources. Such damage would be devastating to paleontologists, such as members of SVP and others who rely on these paleontological resources for their research, and who value the knowledge of Earth's past life that is revealed by the study of these unique objects. SVP has already devoted significant staff time to evaluating the impacts of these mining claims. SVP has therefore used its resources to counteract the injuries inflicted by the 2017 Revocation Proclamation.

135. Plaintiffs' continuing injuries are a direct result of the 2017 Revocation Proclamation. Had the protections from the 2016 Designating Proclamation been left in place, these mining claims would not have been established and subject to development.

**B. The 2026 Revocation Proclamation harms Plaintiffs in the same ways that the 2017 Revocation Proclamation harmed Plaintiffs.**

136. The 2026 Revocation Proclamation impacts the following areas and objects among others within the sacred and interconnected landscape of the Bears Ears area:

a. tens of thousands of historic and pre-historic structures, indigenous burial sites, ceremonial places, cliff dwellings, rock art panels (pictographs and petroglyphs), kivas, open service sites, medicine gathering sites, pueblos, towers, middens, ancient roads, historic trails, and archaeological resources generally located in the vicinity of:

   i. Cedar Mesa, including Grand Gulch;

   ii. Red Knobs;

   iii. Valley of the Gods;

   iv. Tank Mesa, Cottonwood Wash, and the Bluff Bench;

   v. Bowdie Canyon, Fable Valley, Ruin Park and the Beef Basin area;

   vi. the Dark Canyon complex;

   vii. the Abajo Mountains and drainages of Allen, Dark, and Chippean Canyons;

   viii. White Canyon and its many drainages;

   ix. Mossback Mesa, Red House Cliffs, and Tables of the Sun;

   x. the Mancos Mesa and Moqui Canyon;

   xi. the San Juan River corridor, including the Sand Island petroglyph panels;

   xii. Slickhorn Canyon;

   xiii. Bannister Ruin in Grand Gulch;

   xiv. Harts Draw and Lockhart Basin; and

   xv. the entirety of the Grand Gulch Archaeological District, which is listed on the National Register of Historic Places;

b. tens of thousands of fossil objects in the vicinity of:

i. Indian Head Pass;

ii. Beef Basin;

iii. House Park Butte;

iv. Cathedral Butte;

v. Jacobs Chair;

vi. the Lockhart Basin;

vii. Indian Creek;

viii. Allen Canyon;

ix. White Canyon;

x. Fry Canyon;

xi. Kaiparowits Plateau;

xii. Valley of the Gods; and

xiii. Red Canyon;

c. numerous recreational objects and sites, including:

i. 44 of 120 climbing cliffs (which are discrete and documented rock climbing sites that include one or more established climbing routes ascending a rock outcrop), as well as all 22 named summits in the Valley of the Gods and hundreds of routes in Harts Draw and Lockhart Basin;

ii. undocumented or yet-to-be-climbed climbing cliffs;

iii. world-class canyoneering routes in White Canyon, Gravel Canyon, Cheesebox Canyon, Hideout Canyon, Fry Canyon, and other drainages of White Canyon;

iv. mountain biking trails;

v. whitewater paddling river segments;

vi. tributaries providing water to wildlife and backpackers alike;

vii. equestrian trails; and

viii. hiking and backpacking trails, in particular the iconic Fable Valley trail and the Dark Canyon trail system, and trails to historic mining and cowboy sites in or around Beef Basin, the Abajos Mountains, and Indian Creek;

d. numerous geological and ecological objects of cultural, scenic, and scientific interest, including at least:

i. Native American hunting and wood- and herb-gathering grounds in the vicinity of Cedar Mesa, Elk Ridge, and the Abajo Mountains;

ii. the White Canyon complexes;

iii. towers and sandstone structures in Chimney Park, Hammond Canyon, Dark Canyon, and Lockhart Basin, and especially those in the Valley of the Gods considered spiritually important to the Navajo Nation;

iv. distinctive arches and natural bridges in many canyons, including Wetherill Arch, Neville's Arch, Polly's Canyon Arch, Bowdie Canyon Window, Causeway Arch, Cliff Dweller's Pasture Arch, and Fable Valley Jug Handle Arch; and

v. distinctive, endemic subspecies, including mammals, in the Abajo Mountains.

137. Approximately seventy-three percent of documented archaeological sites that were part of the original Monument are in areas removed from the Monument by the 2026

Revocation Proclamation. For example, the following sites are excised by the 2026 Revocation Proclamation: Two Kiva House, Eight Room Pueblo, Baby Mummy Cave, Baby Mummy Great Road, Bannister Ruin, Battle Panel, BB Ruin, Beam Ruin, Bernheimer Alcove, Best Forgotten Kiva, Big Man Panel, Big Panel, Bird's Nest (also known as Dry Wash Ruin), Cap Rock Ruin, Castle Ruin, Ceiling House, Citadel, Clay Hills Kiva, Collins Cowboy Camp, Cottonwood Falls Great House, Cow Tank, Cradleboard Site, Crawl on Your Belly, Cut-in-Two Cave, Dancing through Time, Dark Horse (also known as Cliff Village), Decker Road, Digging Sticks, Double Decker Ruin, Et Al Great House, Fable Fortress, Fable Valley Pueblo, Fallen Roof Ruin, Farm House, Flat House, Fortified Mesa, Goat-on-a-Bicycle, Goldbar Panel, Gotta Wear Shades, Granary Row, Green House, Green Mask Site, Grocery Store, Halfway House, Hammond Good House, Harts Horse Panel, High House, large portions of the Hole-in-the-Rock Trail, Horse Panel, Horse Rock Ruin, Jailhouse Ruin, Junction Ruin, Kiva Cave, Knob Ruins, L Pueblo, Ledge Ruin, Lion Track, Little Doll House, Long House, M080 Observatory, Many Hands, Marcia's Stonehenge, Moss Back Rock Art, Mountain Sheep & the Flute Player, Owen's Great House, Owl Kiva, Painted Kiva, Pappy's Pasture, Pass Rock Art Site, Perfect Kiva (Bullet), Perfect Kiva (Slickhorn), Picket Fork, Polly's Island, Polychrome House, Pottery Shine, Rattler Cave, Red and White House, Red Knobs, Red Lines Panel, Redman, Roof Ruin, Ruin Canyon Tower, Sacred Mesa, Sagsteters Ruin, Sand Dune Site, Sand Island Lower Petroglyph Panel, Sand Island Upper Petroglyph Panel, Scotty's Kiva, Seven Kivas, Shield Cave Ruin, Showstopper, Split Boulder Archaic Panel, Split-Level Ruin, Swallows Nest, Tabernacle Ruin, Tank Mesa Great Road, Telluride Blanket Site, the Hideaway, the Hunting Panel, the Playhouse, the Rincon, Three Fingers, Three Moons Kiva, Tower Ruin, Turkey Pen, Turner's Cabin (historic), Water House, Wetherill Arch Site, Witchy Woman, Wooden Kiva, Wrong-Side Ruin, and Yellow House.

138. The 2026 Revocation Proclamation again reopened pristine and undeveloped areas previously protected by Bears Ears National Monument to harmful activities. Such incompatible uses will result in the destruction and degradation of irreplaceable cultural, historic, and scientific resources from surface disturbance, ecosystem impacts, and waste disposal, among other adverse impacts. While these activities may be subject to certain environmental and wildlife statutes, those statutes require only procedural reviews, mitigation and minimization of adverse impacts, and penalties once damage is done. The statutes are significantly less protective than Monument status, which ensures avoidance of all harm. The environmental impacts threaten current and ongoing use and enjoyment of the objects and land constituting Bears Ears National Monument, and thus result in direct injury to the core business activities, cultural, aesthetic, recreational, spiritual, and scientific interests of the Plaintiffs and to those of their members, officers, employees, and sponsored athletes.

139. In particular, and as a result of the 2026 Revocation Proclamation, cultural, archaeological, and paleontological objects of scientific or historic interest designated as part of Bears Ears National Monument receive less legal protection. The reduced legal protections increase the risk of looting, vandalism, collection, and "pot hunting" of these objects. Looting in the Bears Ears area is what originally motivated the passage of the Antiquities Act, and several cases of looting of paleontological sites have been documented in recent years. For instance, unknown parties removed the skull of a phytosaur skeleton discovered in an area that would later be afforded Monument protection by the 2016 Designating Proclamation and the 2021 Restoration Proclamation.[24] Disturbance or removal of such objects directly reduces the

---

[24] Darryl Fears & Juliet Eilperin, *Spectacular fossils found at Bears Ears—right where Trump removed protections*, Washington Post (Feb. 22, 2018), *available at* https://perma.cc/ALZ9-PWAD.

scientific, recreational, aesthetic, cultural, and spiritual value of the area to Plaintiffs and their members and affiliates. Increased risk of damage to the paleontological and archaeological resources within Bears Ears directly interferes with SVP and Archaeology Southwest's core business activities—especially because once an object of scientific or cultural value is harmed or destroyed, it is harmed or destroyed forever. That risk of grave loss also forces both organizations to expend resources to educate the public about the value of archeological and paleontological resources within Bears Ears, and in particular the revoked area.

140. The 2026 Revocation Proclamation also increases threats to cultural, archaeological, paleontological, and scientifically significant objects by reducing enforcement resources. Monument status enables additional funding for the objects and lands previously protected or reserved under the 2016 Designation and 2021 Restoration Proclamations. Additional funding, in turn, allows for the hiring of more personnel for monitoring and law enforcement. Thus, the 2026 Revocation Proclamation has reduced the amount of funding available to manage the excluded 1.2 million acres, which has reduced the availability of law enforcement personnel, and increased the likelihood that objects within the Monument will be looted, destroyed or vandalized. Reduced funding directly harms SVP's core business activity by limiting the quantity and quality of supported research.

141. Within a week of the 2026 Revocation Proclamation's issuance, "federal agencies [began] taking down signs outside of the new boundaries" of Bears Ears National Monument and "removing seals of five tribal nations from those that remain."[25]

---

[25] Brooke Larsen, *Days after slashing Bears Ears, Trump administration removes tribal seals from monument signs*, The Salt Lake Tribune (July 23, 2026), *available at* https://perma.cc/5PMJ-NSHW.

142. Increased traffic through the revoked area only exacerbates these risks. Plaintiffs and their members witnessed substantial growth in visitor use of the areas that were withdrawn from the Monument by the 2017 Revocation Proclamation, and the areas were negatively impacted by increased visitor traffic, overcrowding, increased human waste, and increased impacts to desert soils and other natural resources. For example, Archaeology Southwest's then-President and CEO visited an archaeological site in the excluded area of Red Knobs in March of 2019 to practice preservation archaeology and advance Archaeology Southwest's core business activity. This site contains painted pottery and a structure from the twelfth century that, first under the 2017 Revocation Proclamation and again under the 2026 Revocation Proclamation, lost protection. The 2026 Revocation Proclamation has once again resulted in similar harms to Plaintiffs and their members, officers, and athletes.

143. Plaintiff UDB has suffered singular injuries to its core business activities from the Revocation Proclamations through the de-designation of the landscapes, landmarks, structures, and objects in the Monument. Bears Ears is a sacred landscape with traditional cultural properties, village sites, petroglyphs, sacred medicines, ceremonial places, historic culinary resources, and more—all of which are integral to the cultural and religious freedoms of the Native Americans in the region. UDB members have used and continue to use the area for traditional medicine and herb gathering, pinyon gathering, and ceremonies. UDB will have to expend additional resources to promote land protection.

144. Plaintiff A'Nuche likewise has suffered tangible injuries from the 2026 Revocation Proclamation, which removed protection from the very landscapes and resources that A'Nuche was created to conserve and steward. The 2026 Revocation Proclamation directly impairs A'Nuche's core business activity of conserving the areas that are culturally and

historically significant to the Ute people, including the Ute Tribe's ancestral homeland in Bears Ears. A'Nuche's ability to preserve, document, and share ecological, cultural, and spiritual knowledge of Bears Ears for the benefit of Ute tribal members and future generations is directly impaired by the opening up of the monument to mining and unrestricted public use. As a result, A'Nuche must now allocate substantial resources to renewing protection of the Bears Ears landscape instead of focusing on strengthening existing programs, preserving traditional knowledge, and developing new cultural initiatives.

145. Additionally, A'Nuche and its affiliates have used and continue to use the revoked area for meditation, prayer, and the preservation of historic and cultural traditions that have endured for generations. The interconnectedness of the Bears Ears landscape is crucially important to these religious freedoms. By removing protections for a majority of the Monument, the 2017 Revocation Proclamation caused significant distress to the physical and spiritual health and wellbeing of tribal community members and disrupted the interconnected and sacred landscape of Bears Ears. The 2026 Revocation Proclamation is likewise an affront to the physical and spiritual health and wellbeing of tribal community members, including members of UDB and affiliates of A'Nuche. The proclamation fractured a living embodiment of the community's history and culture. The expected increased visitor use of these areas—and its attendant negative impacts—creates barriers to UDB's members' and A'Nuche's affiliates' ability to connect with the spiritual nature of Bears Ears, particularly since visitor use will no longer be subject to the careful limitations of the 2025 Management Plan.

146. Following the 2026 Revocation Proclamation, the revoked areas will once again be open to new mining claims—and the 2026 Revocation Proclamation itself identifies certain "critical minerals" to prioritize for extraction. 91 Fed. Reg. at 45,171. Indeed, illegal claims have

already been staked. The first of these new claims were staked within "one day" of the 2026 Revocation Proclamation's announcement, when "Kimmerle Mining filed seven claims within the old boundaries of Bears Ears in San Juan County."[26] These claims are in the same vicinity as the mining claims staked following the 2017 Revocation Proclamation, and they thus threaten to injure Plaintiffs in the same ways set out above.

147. As explained above, such mining claims will destroy or harm objects of significant scientific or historic interest, including cultural, paleontological, and ecological objects. Furthermore, increased mineral development will degrade the scientific, recreational, aesthetic, cultural, and spiritual value of the area through disturbance of the surface soil and ecology, increased noise, harmful impacts to viewsheds, and the creation of safety and other conflicts resulting from an increase in industrial traffic and infrastructure development at areas of high aesthetic value and popular recreational use. In addition, "casual use" collection of minerals can immediately begin without any notification to BLM. Mining activities directly injure the cultural, aesthetic, recreational, spiritual, and scientific interests of Plaintiffs and their members, officers, employees, and athletes. As with the 2017 Revocation Proclamation, the mining activities that result from the 2026 Revocation Proclamation directly harm Plaintiff SVP's core business activity of facilitating the collection and study of vertebrate fossils and fossil sites, in addition to harming SVP members' paleontological research. Mining operations also impact Archaeology Southwest's core business activity of pursuing preservation archaeology throughout the revoked area. Mining operations also directly interfere with AF's core business activity of protecting rock climbing areas and the surrounding environment.

[26] Chris Clements, *New mining claims crop up on land cut from Bears Ears and Grand Staircase-Escalante*, KUER: NPR Utah (Aug. 18, 2026), *available at* https://perma.cc/6QSP-BGRF.

148. As a result of the 2026 Revocation Proclamation, much of the land reserved as part of Bears Ears National Monument is once again open to oil-and-gas leasing.

149. Before the 2016 Designating Proclamation, areas of the Monument were designated for oil and gas development under the 2016 Moab Master Leasing Plan and the 2008 Monticello Resource Management Plan. Industry has pushed for new drilling sites in many areas of the Monument. For instance, oil-and-gas developers had already submitted expressions of interest for more than 105,187 acres in or near the Monument since 2013, including 88 requested parcels clustered in and around the northeastern part of Bears Ears National Monument near Indian Creek. *See* Center for Biological Diversity, Analysis of Oil and Gas Industry Interests and Mining Potential on Federal Public Lands within Bears Ears National Monument, (Aug. 19, 2017);[27] *see also* Brian Maffly, *Oil and Gas Industry Will Pounce if Bears Ears Shrinks*, Salt Lake Tribune (June 19, 2017).[28] The Indian Creek area of the Monument is widely recognized as a world-class rock-climbing area for its sandstone crack climbing. Plaintiffs' members and affiliates regularly travel to Indian Creek to ascend its cliffs and admire the landscape. Moreover, in 2021 alone, oil and gas companies nominated more than 40,000 acres of land inside the Monument for drilling, including areas containing ancient roads, cliff dwellings, and burial sites. Industry is likely to pursue these nominations now that protected status has once again been removed from these areas.

150. The oil-and-gas development allowed within the Monument by the Revocation Proclamations harms Plaintiffs and their members and affiliates.

151. First, oil-and-gas leasing threatens the pristine landscapes of the Monument. Exploration and development will impair the aesthetic value of the Monument to Plaintiffs and

[27] *Available at* https://perma.cc/D64H-BAA7.
[28] *Available at* https://perma.cc/HAJ4-3V25.

their members and affiliates. Road construction, increased heavy vehicle usage, traffic, drilling, and other energy development activities will corrode the undeveloped areas of the Monument and may impact accessibility throughout the impacted areas. Likewise, exploration and development will disturb the soundscape and viewscape in the Monument.

152. Second, increased private development will diminish the climbing experience for, and recreational value to, Plaintiffs and their members and affiliates. Third, Plaintiffs like Access Fund have invested significant resources in mapping areas threatened by potential resource extraction and continuously monitoring potential resource extraction plans. Fourth, Plaintiffs and their members and affiliates must respond to efforts by BLM and developers to lease land in the Monument through formal protests to BLM and additional advocacy.

153. The 2026 Revocation Proclamation also impedes paleontological preservation and research on the 1.2 million acres excluded from Monument status. Approximately forty percent of the currently known paleontological sites of scientific importance within Bears Ears lost protection under the 2017 Revocation Proclamation. The 2026 Proclamation removed protection for 89% of the scientifically significant paleontological sites recorded so far (211 out of 237). As an organization dedicated to the study and preservation of paleontological resources, Plaintiff SVP and its members have suffered singular and extensive impacts from the Revocation Proclamations' effects on the region's paleontological resources—which directly impairs SVP's core business mission.

154. First, as the excised lands are no longer covered by a proclamation explicitly recognizing the value of paleontology, other uses likely will receive higher priority in agency planning decisions, with the result that paleontological research permits become more difficult to secure.

155. Second, even if fossils are spared from tampering, collection, or destruction, other uses within the Monument can harm the geological context critical to scientific replication and understanding.

156. Third, the 2026 Revocation Proclamation similarly directly harms paleontologists, including SVP members, who maintain ongoing research interest in lands excised from the Monument and who can no longer apply for funding to continue their research, and who may have to cease work under current funding, given uncertainties about land designations and any funding restrictions now in place. The entirety of the Monument is no longer eligible for certain funding. For other national monuments like Grand Staircase-Escalante, the majority of public funding for paleontological activities has originated with BLM's National Landscape Conservation System. And as SVP members found following the 2017 Revocation Proclamation, non-BLM sources, such as private foundation and institutional grantors, are more willing to fund research in lands that have national monument status and those involving students and local Indigenous participants. They are less willing to fund research when there is controversy or uncertainty surrounding a monument's status. Paleontologists, including SVP members, may now have to discontinue their work in the area because of funding gaps. At the time of the 2017 Revocation Proclamation, at least 22 SVP members had ongoing research interests in the excluded areas of the Monument when the revocations reduced the boundaries. As a result of the revocations, SVP members were no longer eligible for research funding from the National Landscape Conservation System for work at those sites and all other excluded areas. SVP member and current President Stuart Sumida stopped applying for additional funding in the Bears Ears area due to the uncertainties surrounding research in the excluded areas of the Monument, and a grant supporting his work in the excised area was put on hold. Another SVP

member conducted doctoral research within Bears Ears and planned to continue her work once a scientific management plan for the Monument was in place; because of the 2017 Revocation Proclamation, no such plan was put in place, and this researcher was forced to focus her research elsewhere. The turmoil caused by the 2017 Revocation Proclamation directly harmed each of these SVP members, who wanted to conduct research within the revoked area but could not as a direct result of the 2017 Revocation Proclamation.

157. The 2026 Revocation Proclamation similarly directly harms paleontologists, including SVP members, who maintain ongoing research interest in lands excised from the Monument and who can no longer apply for certain funding to continue their research, and who may have to cease work under current funding, given uncertainties about land designations and any funding restrictions now in place. As of September 2026, there are at least seventeen SVP members with active projects on the Monument's paleontological resources and another three to four planning projects in the near future, as well as many more who are studying Bears Ears fossils and data in the lab. These injuries are ongoing and will continue to directly injure Plaintiffs and their members and affiliates.

158. Fourth, specialized management structures for paleontological resources will now be limited to the Shash Jáa and Indian Creek units, denying resources and support to paleontological work in the excised areas. Other BLM-managed national monuments with significant paleontological resources have specialist paleontology managers who proactively survey for scientifically important paleontological resources, proactively recruit researchers to study those resources, and coordinate the synthesis and interpretation of the research findings made there. Monument managers often provide crucial information regarding recent activity in the Monument area as well as scientific expertise. None of this management and engagement

occurred under the 2017 Revocation Proclamation and any possible management and engagement will be severely diminished because of the 2026 Revocation Proclamation. SVP research in the excluded areas has and will continue to suffer from the inability to take advantage of these resources.

159. Fifth, "casual collection" of paleontological objects, a practice that destroys and disturbs paleontologically significant sites, is now allowed in the Monument outside of the Shash Jáa and Indian Creek units. Casual collection is generally allowed on lands managed by the USFS and BLM, *see* 36 C.F.R. §§ 291.5, 291.10; 43 C.F.R. § 8365.1-5(b)(2), but was forbidden by the 2021 Restoration Proclamation. *See* 86 Fed. Reg. at 57,333 ("Warning is hereby given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument."); 2025 Management Plan at 31 ("Casual collection of minerals in BENM is prohibited."). Disturbance or removal of paleontological objects directly degrades the scientific, recreational, aesthetic, cultural, and spiritual value of the land, and such collection can destroy the geological context of paleontologically important sites and thereby harm paleontological research and resources. In collaboration with BLM, SVP members participated in educational outreach activities regarding paleontological research at Bears Ears National Monument before and after its original designation. The objects of historic and scientific interest within Bears Ears National Monument are critical to SVP members' past, present, and future research within the Monument. Several known areas rich with scientifically important fossil sites, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods, were stripped of Monument protection under the 2017 Revocation Proclamation and are again unprotected due to the 2026 Revocation Proclamation. SVP and its members experienced firsthand how the casual collection permitted by the 2017 Revocation Proclamation destroys the

geological context of the surrounding area and harms paleontological research and resources. SVP anticipates similar collection and harm because of the 2026 Revocation Proclamation—if it is not happening already. This irreparable damage impairs SVP's core business activity of supporting the conservation and preservation of vertebrate fossils and fossil sites within Bears Ears.

160. Upon information and belief, just as the 2017 Revocation Proclamation did, the 2026 Revocation Proclamation will impede rock climbing and other recreational activities on the 1.2 million acres excluded from national monument status. As those lands will no longer be covered by a proclamation explicitly recognizing the value of rock climbing and other recreational activities, other uses will receive higher priority in agency planning decisions, with the result that access to or other support for recreational activities will become more difficult to secure. Loss of or reduction in these activities directly injures Plaintiffs and their members and affiliates, and in particular AF and Patagonia, whose core business activities involve protecting and enhancing rock climbing areas, including within Bears Ears.

161. The 2026 Revocation Proclamation will also cause Plaintiffs, including AF, to expend additional resources to further their core business activities. For example, after the 2017 Revocation Proclamation, AF committed substantial programmatic resources to preparing geospatial mapping and analysis of the climbing areas that lost protection and collected information on potential resource extraction activities within those same areas. As part of these efforts, AF's then-Policy Director, Erik Murdock, worked directly with the Outdoor Alliance Geographic Information Systems Laboratory to prepare maps of the climbing resources in the withdrawn areas. When the geospatial maps were overlaid with publicly available geospatial information on active and/or proposed oil and gas lease parcels and uranium resource potential, the

resulting maps demonstrated the clear risk of resource extraction to areas utilized by AF members for climbing and recreation, including several world-class climbing areas such as the Cliffs of Insanity, The Wall, and Hart's Draw.

162. Based on the risks to climbing resources that lost protection because of the 2017 Revocation Proclamation, AF engaged in extensive programmatic activities to monitor and protect these areas. AF engaged in frequent monitoring activities to determine whether any oil and gas leases and/or mineral claims were proposed or asserted within the areas withdrawn from Bears Ears. Since the Monument's reduction under the 2026 Revocation Proclamation, AF has continued to conduct mapping and reconnaissance on climbing resources that are located within the excised Monument. The threat of disturbance to these climbing resources has impeded and will continue to impede AF and its members' ability to recreate in formerly protected areas.[29]

163. Similarly, promoting outdoor recreation is the core of Patagonia's business, and it is a leading purveyor of rock-climbing equipment. The loss of federally protected public lands and reduced recreational opportunities within Bears Ears impinges on this business interest. Moreover, Patagonia's customers, employees, and sponsored athletes have made numerous and regular visits to Bears Ears to rock climb and enjoy other outdoor activities. The Revocation Proclamations have diminished and will continue to diminish their opportunities to do so.

164. As a result of the 2026 Revocation Proclamation, areas within the boundary of the Monument are no longer managed in a manner that protects the values specified by the 2021 Restoration Proclamation. Moreover, the benefits of Secretarial Order 3308 and BLM Manual 6220 no longer extend to the 1.2 million acres deprived of Monument status. The loss of these

[29] *See, e.g.*, Murdock Decl. ¶ 9; Tallman Decl. ¶ 9, 16–18; Kennedy Decl. ¶ 11–14.

benefits impairs Plaintiffs' interests, as well as the cultural, aesthetic, recreational, or scientific interests of their members and affiliates.

165. Lands in the revoked areas are no longer subject to BLM policies, including the 2025 Management Plan, to inventory and monitor cultural resources, which in turn would have resulted in the development of cultural resource management plans. *See, e.g.*, 2025 Management Plan at 61 (requiring the creation of a cultural resources management plan/historic property plan within two years). Completing these plans requires additional cultural resource surveys and inventories—which BLM had planned to undertake in collaboration with the Bears Ears Commission and Tribes. *Id.* at 60–61. Conducting detailed cultural resource surveys in the Bears Ears area is especially important because it is estimated that no more than ten percent of the area has been surveyed for cultural resources, notwithstanding the extraordinary significance of historic resources in the area. And after completion of the cultural resource management plans, the cultural resources would have been annually surveyed, more frequently monitored, and subject to stabilization and rest strategies for their maintenance, protection, and restoration. *Id.* at 61–65. Upon information and belief, Monument status for all objects and lands protected or reserved under the 2021 Restoration Proclamation would increase funding available for the management of the lands within Bears Ears, including surveys to identify, evaluate, and protect cultural resources, and will both reestablish the Bears Ears Commission and foster meaningful tribal consultations with government officials. The 2026 Revocation Proclamation reduced the amount of funding available for these activities and impairs Plaintiffs' interests, as well as the cultural, aesthetic, recreational, or scientific interests of their members and affiliates. Moreover, the 2026 Revocation Proclamation has reduced Plaintiffs' opportunities to work collaboratively with the federal government to preserve, protect, and develop the area in ways that balances conserving the land

and Plaintiffs' interests, most importantly by terminating and disbanding the Bears Ears Commission.

166. For example, Plaintiff UDB has lost opportunities to contribute to the management and preservation of the sacred lands within Bears Ears because of the Revocation Proclamations. That directly impairs UDB's core business activity. The 2016 Designating Proclamation specified that the Tribes, which include UDB members, would play an integral role in developing management plans for the area. However, because of the 2017 Revocation Proclamation, contributions from the Tribes and UDB to the management plan and preservation of the Monument were reduced or outright eliminated. When the Tribes lost the ability to participate in the management plan process, so did UDB. In particular, UDB was deprived of the opportunity to provide its important institutional and traditional knowledge to the Tribes and the federal government in the development of these plans. Although the 2021 Restoration Proclamation renewed Tribal, and thus UDB, involvement in the management of the Bears Ears National Monument, that involvement was flat-out eliminated by the 2026 Revocation Proclamation.

167. In addition, the 2026 Revocation Proclamation's removal of protections and the resultant reduction in monitoring for cultural resources directly diminishes the quality and quantity of information that can be relied upon by Archaeology Southwest and its members for archaeological fieldwork and the practice of preservation archaeology. This has cascading negative effects on the utility of that fieldwork for use in later research and studies by ASW and its members. Further, Archaeology Southwest member and employee Sklyar Begay is the Director of Tribal Collaboration and an enrolled member of the Navajo Nation who was actively engaged in developing management plans for the area through the Bears Ears Inter-Tribal

Coalition and the Bears Ears Commission. The 2026 Revocation Proclamation eliminates Mr. Begay's and Archaeology Southwest's ability to contribute to the management of the Monument and to promote Tribal co-management of the Monument.

168. Likewise, the 2026 Revocation Proclamation makes it more difficult for National Trust to adequately protect the vast number of archaeological sites found within Bears Ears due, in large part, to a lack of comprehensive information about those sites. Conservation efforts to identify additional cultural resources and map those resources were not prioritized in the lands excluded under the 2017 Revocation Proclamation, and the National Trust anticipates those efforts will continue to be deprioritized under the 2026 Revocation Proclamation. As a result, the Revocation Proclamations frustrate the National Trust's mission of increasing the availability of data regarding cultural resources in Bears Ears.

169. The 2026 Revocation Proclamation has harmed Plaintiffs in multiple other ways. Like the 2017 Revocation Proclamation did, the 2026 Revocation Proclamation will make it harder for Plaintiffs to accomplish their missions by interfering with their core services and activities and by requiring Plaintiffs to divert their resources to counteract those harms.

**Utah Diné Bikéyah**

170. The protection of the sacred objects and landscapes within Bears Ears is the core business purpose of UDB. Because of the 2017 Revocation Proclamation, UDB had to divert significant resources in order to protect the Monument and its sacred uses, which would not have otherwise been required. UDB members were forced to continuously monitor the spiritual, cultural, and ecological health of the landscape. This included altering their spiritual practices by foregoing certain ceremonies in order to conduct ceremonies to support the health of the landscape that, but for the 2017 Revocation Proclamation, UDB members would not otherwise

have conducted. The 2026 Revocation causes the same injuries. President Trump's de-designation of the landmarks, structures, and objects, and reduction of the Monument's boundaries, allows for uses that will desecrate this sacred place of worship.

171. UDB and its members are committed to ensuring that the ancestral lands within the boundary of the original Bears Ears National Monument remain protected, so that the vital historic record of the Native peoples and opportunities for the land's modern, sustainable, and cultural use are preserved for future generations. In response to the 2017 Revocation Proclamation, UDB dedicated time, money, and effort to the campaign to protect the threatened areas, to support the Tribes in their individual and collective efforts to oversee the management of their ancestral lands, and to educate the public about why these particular lands are significant. Similarly, UDB members dedicated time and resources to ensure that ancestral lands are protected by monitoring the area, including photographing and cataloging the land which was removed from the Monument by the 2017 Revocation Proclamation. UDB members did this by visiting vulnerable sites, observing the ecological health of the area, and documenting changes, such as the removal of cultural items, off-road vehicle damage, visitation increases, and observing the ecological health of the area.

172. UDB was also forced to reallocate its limited resources from essential ethnographic and educational activities to costly, contentious activities to protect the area, including public education, information campaigns, and Native cultural advocacy. In addition, UDB diverted funding and staff time to defending and preserving the objects and landscapes within Bears Ears National Monument against resource development efforts, looting, vandalism, and other adverse impacts on the spiritual and aesthetic value of the area that resulted from the 2017 Revocation Proclamation. As part of reallocating its limited resources to defend and preserve the objects and

landscapes, UDB members traveled through the area to monitor, photograph, and document sensitive areas, such as petroglyphs that are directly under threat of vandalism or destruction by unsupervised visitors. UDB re-mobilized community members to inform decision-makers about the valuable resources within Bears Ears National Monument, drafted comments and engaged in efforts to fully restore the Monument, composed materials detailing the values and importance of the Monument, altered its communication strategies, and re-analyzed its fundraising efforts including determining which grants UDB was eligible for. UDB reasonably expects that the 2026 Revocation Proclamation will require it and its members, including Maryboy, to undertake many of the same advocacy, monitoring, educational, and preservation efforts that followed the 2017 Revocation Proclamation, diverting attention from UDB's core business activities and imposing similar burdens on the organization and its members.

173. As part of its mission, UDB seeks to develop a stable and thriving local economy and preserve traditional knowledge in San Juan County, Utah by investing in Native-owned and -staffed businesses, artists, and community leaders—especially those whose products and arts use resources from the Bears Ears area. In order to support these individuals and activities, UDB received several grants designed for the promotion of Native culture, arts, businesses, and activities—and in doing so, committed these funds to specific development projects related to the cultural resources within Bears Ears. However, because of the 2017 Revocation Proclamation, UDB was unable to foster economic growth and cultural preservation as it intended. This harm resulted because: (1) UDB was forced to shift its financial resources and staff time towards preserving the cultural objects, landscape, and knowledge within Bears Ears, as outlined above, instead of focusing on its grant obligations; and (2) UDB lost the opportunity to collaborate with the federal government in developing local economic opportunities. As a result, UDB could not

fulfill some of its grant obligations, which hindered UDB's ability to fund necessary work on the ground. The 2026 Revocation Proclamation is expected to require renewed advocacy, community engagement, and stewardship efforts by UDB's members and leadership, thereby interfering with UDB's ability to pursue its core business activities.

**Archaeology Southwest**

174. The exposure of the archaeological resources within Bears Ears to disturbance caused by the Revocation Proclamations has directly compromised Archaeology Southwest's ability to fulfill its core business activities. It and its members cannot preserve archaeological objects that have been tampered with, removed, or destroyed.

175. Due to the 2017 Revocation Proclamation, Archaeology Southwest changed its organizational model to increase its public education and advocacy efforts. Archaeology Southwest devoted significant resources to bringing awareness to, and educating the public on, the value of Bears Ears National Monument, including by devoting two double issues of Archaeology Southwest's quarterly magazine to the Bears Ears area and Grand Staircase-Escalante. The issue devoted to the Bears Ears area highlighted the value and importance of preserving the land as a monument. For its part, the Grand Staircase-Escalante issue includes a column from Archaeology Southwest's then-President and CEO calling attention to the reduction of Bears Ears National Monument. Both issues stemmed from Archaeology Southwest's growing concern over the 2017 Revocation Proclamation and its potential impact on funding for archaeological research. Because of the 2017 Revocation Proclamation, Archaeology Southwest devoted a significant portion of its weekly electronic newsletter to the Bears Ears area, including announcements of public events and news stories on the reduction. This required Archaeology

Southwest to devote significant staff time to researching, drafting, and compiling those posts for publication in the newsletter.

176. Archaeology Southwest also suffered direct and immediate injury from the de-designation of the landmarks, structures, and objects of Bears Ears National Monument. The 2017 Revocation Proclamation forced Archaeology Southwest to divert its limited resources from other preservation efforts to support protection and restoration of the Monument. The same is true for the 2026 Revocation Proclamation. For example, in 2019, Archaeology Southwest helped organize two events in Tucson, Arizona to raise awareness of the 2017 Revocation Proclamation and its negative impacts on the Bears Ears area. Each event required Archaeology Southwest to devote significant staff time and resources to cover event logistics—time and resources that would have otherwise been expended on different projects. Archaeology Southwest reasonably anticipates that it will put on similar events as a result of the 2026 Revocation Proclamation, once again diverting its resources.

177. The 2026 Revocation Proclamation presents an immediate threat of degradation of the landscape in the excluded areas of Bears Ears National Monument. For example, the 2017 Revocation Proclamation led to increased traffic to the area. But for the loss of protection, Archaeology Southwest would not have needed to spend money to educate new visitors about conservation. Instead, Archaeology Southwest was obligated to act to forestall the deterioration that would have resulted from heightened traffic to such sites without proper education. Archaeology Southwest believes the same threat of degradation exists with the 2026 Revocation Proclamation and has concrete plans to divert resources to educate new visitors in an attempt to mitigate harms to the Monument and its members.

178. Because of the 2017 Revocation Proclamation, Archaeology Southwest was unable to focus its resources and publications on other areas and projects. Archaeology Southwest had to divert the time and effort of its staff as well as its financial resources toward raising awareness for the Monument—actions that would have been unnecessary if the Monument had not been illegally dismantled by President Trump. Because it is a small non-profit organization, the diversion of resources had a significant effect on Archaeology Southwest's ability to carry out its mission of preservation archaeology for other areas in need of protection. For example, Archaeology Southwest's efforts to promote national monument status for the Great Bend of the Gila and to share information about the cultural landscape of the Greater Gila watershed, which are two high priorities in its strategic plan, suffered significantly due to the need to invest time in educational efforts related to the Bears Ears area. Archaeology Southwest is already planning to reallocate its limited resources in response to the 2026 Revocation Proclamation.

**Conservation Lands Foundation**

179. CLF suffered direct and immediate injury from the 2017 and 2026 Revocation Proclamations due to the loss of designation and protection of the landmarks, structures, and objects of Bears Ears National Monument. By virtue of its mission, CLF acts as a representative for preservation of the natural cultural, historic, and scientific values of Bears Ears National Monument. The 2026 Revocation Proclamation impairs CLF's core business activities, which include providing individual conservation and stewardship groups with technical advice, mentoring, tools, trainings, and other services to ensure successful on-the-ground projects; offering guidance to groups on effective advocacy and community education; and providing local advocates with insights into developments affecting the National Conservation Lands, including Bears Ears National Monument. The 2026 Revocation Proclamation makes all of those activities more

difficult by stripping protection from vast areas of the Monument, reducing available funding, and increasing risk to the natural area.

180. Due to the 2017 Revocation Proclamation, CLF diverted limited resources away from its designation campaigns in the states of Arizona, California, and New Mexico, toward activities designed to communicate about, monitor, and mitigate adverse impacts to the excised area of the Monument. CLF and the organizations it supports also diverted resources from other important stewardship projects and toward programs designed to address protecting the Bears Ears region—such as indigenous advocacy training which, but for the 2017 Revocation Proclamation, CLF would not have initiated. CLF anticipates that it will suffer similar harms, and similarly divert resources from other campaigns, because of the 2026 Revocation Proclamation.

181. Moreover, because of the 2017 Revocation Proclamation, CLF had to make significant organizational changes. It reorganized its internal governance structure, reworked its fundraising strategy, and recrafted its budget to devote more time and resources to protecting areas that were previously part of Bears Ears National Monument and to supporting CLF partners who work in the Bears Ears region. These changes meant that CLF was unable to provide other previously planned services. For instance, CLF was unable to grant financial assistance to Friends of Missouri Breaks and had to reduce a grant to Archeology Southwest for its national monuments work. Both of these grant reductions harmed CLF's ability to work with local partners, and reduced CLF's ability to work with local tribes in those regions. CLF reasonably anticipates that it will suffer similar harms because of the 2026 Revocation Proclamation.

182. CLF traditionally provides grants in a three-year commitment to nascent organizations to build and sustain community-led organizations. However, because of the time, resources, and services shifted to address the 2017 Revocation Proclamation, CLF had to reduce or

forgo commitments to dozens of organizations in almost every state in the West, including Arizona, California, Colorado, Idaho, Montana, Nevada, Utah and Wyoming. CLF anticipates that it will need to take similar actions in response to the 2026 Revocation Proclamation.

183. Additionally, in response to the 2017 Revocation Proclamation, CLF's executive staff established a fund for on-the-ground work and services to monitor unprotected areas that were removed from the Monument, to develop strategies for preserving these areas, to support the tribal coalition, and to work on the new management plan. This fund, which would not have been created but for the 2017 Revocation Proclamation, diverted time and resources away from other programs, including programs to connect indigenous youth to the lands through visits, and education programs designed to protect sensitive cultural and natural resources. CLF is already working to establish a similar fund in response to the 2026 Revocation Proclamation.

184. CLF also shifted its communication and media resources to provide services related to the Bears Ears region that, but for the 2017 Revocation Proclamation, it would not have done. CLF reallocated staff time, resources, and training to field media inquiries about the Bears Ears region, prepare remarks for interviews, create documents and materials to educate audiences and the Friends Grassroots Network about the Bears Ears region, and draft fact sheets and information material for educating community members. In short, the 2017 Revocation Proclamation impeded CLF's ability to provide services to its Friends Grassroots Network partners, and CLF diverted and redirected organizational resources to counteract the effects of the 2017 Revocation Proclamation on the treasured landscape and objects of national significance that were removed from the Bears Ears National Monument. CLF reasonably anticipates that it will be similarly impacted by the 2026 Revocation Proclamation.

185. Like the 2017 Revocation Proclamation, the 2026 Revocation Proclamation will impede CLF's activities in and around Bears Ears National Monument. CLF has already been forced to deploy considerable resources to counteract this harm.

**Patagonia Works**

186. Plaintiff Patagonia has allocated significant programmatic resources to support the creation, designation, and protection of Bears Ears National Monument, as mandated by the public benefit purposes in its Articles of Incorporation. After the 2017 Revocation Proclamation, Patagonia provided additional grants specifically dedicated to supporting organizations that advocated for defending, monitoring, and preserving Bears Ears National Monument as originally designated. But for the 2017 Revocation Proclamation, Patagonia would have provided grants to different organizations in support of different environmental and conservation goals. Patagonia reasonably expects that it will shift its grant-making in a similar way in the wake of the 2026 Revocation Proclamation.

187. Patagonia has also dedicated substantial resources to preserving the Monument as well as educating the public on the distinctive natural setting of the Bears Ears area and the threats to its natural and cultural resources. After the 2017 Revocation Proclamation, Patagonia dedicated additional resources to create a film addressing public lands and, specifically, addressing Bears Ears National Monument. Patagonia also advocated for Bears Ears through its marketing channels, including its company website, social media platforms, catalogs, and company blog. Due to the 2017 Revocation Proclamation, Patagonia diverted resources and staff time to provide regular updates and calls to action to its audience of customers, athletes, and employees. In addition, Patagonia used its marketing channels, including its website and marketing staff, to create and administer a Bears Ears and public lands website platform, which allowed stakeholders to

communicate directly with the Trump Administration about the reduction of the Monument and to provide comments about the management plan development process.

188. Patagonia's advocacy efforts supporting the protection of Bears Ears also included organizing phone, social-media, and letter-writing campaigns, and meeting with state and federal government officials—including staff at the U.S. Department of the Interior, BLM, and the White House Council on Environmental Quality, as well as Utah's governor and congressional delegation. Patagonia's former CEO, Rose Marcario, and the Outdoor Industry Alliance brought together industry leaders and companies to present a unified industry position in support of Bears Ears. The company penned opinion pieces in the *Los Angeles Times* and *Salt Lake Tribune* supporting the Bears Ears National Monument designation and the preservation of public lands. Additionally, Patagonia's then-Director of Environmental Activism dedicated time and resources to testify before the House Natural Resources Subcommittee on National Parks, Forests, and Public Lands where he emphasized the importance of protecting public lands and waters and the negative effects of the reduction of the Monument. Because of the 2026 Revocation Proclamation, Patagonia has already diverted, and will continue to divert, resources from ongoing and future strategic priorities. This has and will continue to impair Patagonia's ability to expand upon its mission and its specific public benefit purposes as a benefit corporation. Patagonia's executives and many others redirected their time and attention from other corporate goals and priorities to the effort to preserve Bears Ears National Monument.

189. Patagonia suffers direct and immediate injury from the 2026 revocation of the designation of the landmarks, structures, and objects of Bears Ears National Monument. By virtue of Patagonia's statutory purposes and obligations as a California benefit corporation—which require it to use its business to create a material positive impact on the environment, including by

conserving public lands like Bears Ears—and its substantial investment of financial support and employee time into the establishment and defense of Bears Ears National Monument, the 2026 Revocation Proclamation causes Patagonia to suffer an immediate and irreparable injury. As a result of President Trump's actions, Patagonia is forced to divert resources from other business and conservation priorities, and towards protection and restoration of the landscape and objects comprising Bears Ears National Monument.

**The Access Fund**

190. In addition to the monitoring activities described above, AF conducted extensive community outreach and education activities to keep its membership and the broader climbing and outdoor-recreation community informed and involved in the management and protection of the public lands that were removed from Bears Ears National Monument by the 2017 Revocation Proclamation. AF committed substantial programmatic resources (community presentations, interactive online maps, news articles, social media, conference panels, and educational videos) to explain the impact of the 2017 Revocation Proclamation, how that decision could impact climbing and other recreational resources, and what the public could do to advocate for the restoration of the Monument designation. AF is going to engage in similar outreach and activities in response to the 2026 Revocation Proclamation.

191. As a result of the 2017 Revocation Proclamation, AF diverted programmatic resources to increase work with impacted stakeholders, investing numerous hours in partnering with the Bears Ears Inter-Tribal Coalition, Outdoor Alliance, Outdoor Industry Association, local climbing organizations like Friends of Indian Creek and Salt Lake Climbers Alliance, and professional athletes who depend on Monument protections. AF also worked with funding

organizations like the Conservation Alliance, Pew Charitable Trusts, and others. AF expects that similar activities will be necessary in the wake of the 2026 Revocation Proclamation.

192. Because of the 2017 Revocation Proclamation, AF's ability to devote time and resources to its other programmatic priorities was severely limited, and AF is already experiencing similar harms due to the 2026 Revocation Proclamation.

**National Trust for Historic Preservation**

193. The National Trust also participated in advocacy and education efforts it would not have otherwise undertaken if not for the 2017 Revocation Proclamation, and will do so again in response to the 2026 Revocation Proclamation. These efforts included attending BLM meetings on management priorities for the smaller Monument area, submitting written comments objecting to the planning process for the smaller Monument area, filing an administrative protest to BLM's proposed Monument Management Plan, and coordinating and leading advocacy against the proposed Monument Management Plan directed at the federal Advisory Council on Historic Preservation ("ACHP"). The National Trust also expended substantial time and resources educating the public about the importance of the legal, policy, and resource issues implicated by the 2017 Revocation Proclamation. This included coordinating public comments expressing concerns about the proposed Monument Management Plan. The National Trust was also forced to divert resources to address congressional efforts to respond to the 2017 Revocation Proclamation.

194. All of these advocacy and education efforts required extra staff time and resources that would have been expended on the preservation of other historical sites. The National Trust anticipates it will experience similar harms due to the 2026 Revocation Proclamation.

**The Society of Vertebrate Paleontology**

195. After the 2017 Revocation Proclamation, SVP devoted significant resources to organizing public events and resources related to the effects of the reduction on paleontological science. SVP also devoted additional time and resources to engaging in public education and advocacy. For example, on March 13, 2019, SVP Immediate Past President P. David Polly testified before the U.S. House Committee on Natural Resources to highlight the paleontological effects of improper alteration of national monuments, including Bears Ears. SVP also prepared presentations in Bloomington, Indiana; Belfast, Maine; Riverside, California; and Brisbane, Australia regarding the effects of funding cuts to paleontological science. SVP anticipates that it will again need to divert its resources to educating the public regarding the impacts of the 2026 Revocation Proclamation on the degradation of the paleontological resources within Bears Ears.

**A'Nuche**

196. The 2026 Revocation Proclamation directly undermines A'Nuche's core business activity of promoting traditional knowledge, cultural preservation, and land stewardship tied to the Ute people's ancestral homeland within Bears Ears. A'Nuche must now devote time, attention, and organizational resources to protecting the Bears Ears landscape and addressing the consequences of the Monument's reduction rather than focusing exclusively on strengthening existing programs, preserving traditional knowledge, and developing new cultural initiatives.

197. A'Nuche has already been forced to divert significant resources in response to the 2026 Revocation Proclamation. Before the 2026 Revocation Proclamation, A'Nuche planned to launch a community quilting project to create a collective representation of the community's connection to the Monument. Now, resources and staff time intended for that project have instead been redirected toward educating the community and the public about the impacts of the

Monument reduction and supporting efforts to protect Bears Ears. Upcoming community meetings that would have focused on cultural programming must now also address issues stemming from the Monument reduction. This diversion of resources has also impacted A'Nuche's ability to support other community cultural initiatives, such as the annual Bear Dance held in White Mesa. Nevertheless, A'Nuche must engage in these efforts to protect Bears Ears from increased threats of resource extraction, looting, vandalism, and other activities that could irreparably damage the cultural and natural resources central to A'Nuche's core business activities and the cultural practices of the community it serves.

198. A'Nuche also relies on access to and engagement with the Bears Ears landscape itself for its core business activities of providing educational programs, cultural preservation initiatives, and youth engagement activities tied to the Monument. The 2026 Revocation Proclamation creates obstacles to A'Nuche's ability to accomplish its core business activity of educating Ute youth and strengthening cultural identity by removing protection from these areas and creating uncertainty about their management.

199. The 2026 Revocation Proclamation further harms A'Nuche's core business activity by eliminating the Bears Ears Commission and removing specific recognition of cultural knowledge as a resource deserving protection. These actions undermine trust and may reduce the willingness of Ute Tribal members to participate in A'Nuche's efforts to preserve, document, and share traditional knowledge connected to the Monument.

200. The 2026 Revocation Proclamation therefore directly impairs A'Nuche's central business activity of preserving, documenting, and sharing ecological, cultural, and spiritual knowledge related to Bears Ears for the benefit of future generations.

**COUNT I – *ULTRA VIRES* EXECUTIVE ACTION AND VIOLATION OF THE ANTIQUITIES ACT 54 U.S.C. § 320301(a) The 2017 Revocation Proclamation is *ultra vires* [All Plaintiffs against All Defendants]**

201. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 200.

202. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against ultra vires actions by Defendants. *See, e.g.*, *American Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) ("[A] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision.") (citing *Chamber of Com.*, 74 F.3d at 1326-28); *Armstrong*, 575 U.S. at 326–27; *Dames & Moore v. Regan*, 453 U.S. 654, 668–88 (1981).

203. Section 320301(a) of Title 54 of the United States Code provides that the "President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."

204. The 2017 Revocation Proclamation revokes the Monument status of numerous historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest designated by the 2016 Designating Proclamation.

205. Neither § 320301(a) nor any other section of the Antiquities Act authorizes the President to revoke the Monument status of, or the protections for, objects designated under the 2016 Designating Proclamation, as determined under the discretion of the establishing President. Congress has not delegated to the President the power to revoke the designation of "historic landmarks, historic and prehistoric structures, and other objects of scientific or historic interest"

once they have been lawfully proclaimed national monuments. Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

206. The Antiquities Act does not authorize the 2017 Revocation Proclamation's action to revoke the designation of landmarks, structures, and objects comprising Bears Ears National Monument.

207. Even if Presidents enjoy some narrow authority under the Antiquities Act to remove protections for national monuments, the 2017 Revocation Proclamation exceeds that authority. The text of the Proclamation and the context surrounding it leave no doubt that the 2017 Revocation Proclamation was implemented to advance unrelated policy goals wholly untethered to any valid statutory criteria under the Antiquities Act. The extraordinary breadth of the executive action shrinking Bears Ears National Monument marks an unusual and irregular exercise of presidential power. The 2017 Revocation Proclamation therefore is not a lawful exercise of statutory authority under the Antiquities Act, even assuming the Act can be read to vest in the President some modicum authority to modify protections.

208. Defendants' attempt to revoke the designation of landmarks, structures, and objects comprising Bears Ears National Monument is an *ultra vires* action: The 2017 Revocation Proclamation exceeds the limited authority to declare national monuments Congress provided to the Executive under the Antiquities Act.

**COUNT II – *ULTRA VIRES* EXECUTIVE ACTION AND VIOLATION OF THE ANTIQUITIES ACT**
**54 U.S.C. § 320301(b)**
**The 2017 Revocation Proclamation is *ultra vires***
**[All Plaintiffs against All Defendants]**

209. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 208.

210. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against unlawful actions by Defendants. *See, e.g.*, *American Forest Res. Council*, 77 F.4th at 796; *Armstrong*, 575 U.S. at 326-27; *Dames & Moore*, 453 U.S. at 668-88.

211. Section 320301(b) of Title 54 of the United States Code provides that the "President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."

212. The 2017 Revocation Proclamation purports to "modify" the reservation of parcels of land that were made a part of Bears Ears National Monument. This action excludes from the Monument's reservation a land area of approximately 1.1 million acres.

213. By excluding vast land areas from the reservation made pursuant to the 2016 Designating Proclamation, the 2017 Revocation Proclamation excludes from the Monument reservation the landmarks, structures, and objects on those land areas that had been lawfully designated in 2016.

214. As a result, the 2017 Revocation Proclamation purports to remove these objects from the protection against entry, location, patent, selection, sale, or other disposition, among other protections established by the 2016 Designating Proclamation. The 2017 Revocation Proclamation directs Defendants other than President Trump not to provide such protection to approximately 1.1 million acres of land. Upon information and belief, Defendants are complying with the directives of the 2017 Revocation Proclamation and are not implementing, and have not implemented, those of the 2016 Designating Proclamation.

215. The two "units" comprising the reservation under the 2017 Revocation Proclamation are not sufficient for, and thus not compatible with, the proper care and

management of the objects designated as part of the Monument by the 2016 Designating Proclamation.

216. The 2017 Revocation Proclamation also purports to eliminate beneficial conditions and directives of the reservation established by the 2016 Designating Proclamation even for the two new "units." The 2017 Revocation Proclamation changes the scope of consultation with and composition of the Bears Ears Commission, allows motorized and non-mechanized vehicle use on roads and trails designated for such use prior to the 2016 Designating Proclamation, allows maintenance of roads and trails for such use, and allows active vegetation management activities.

217. The elimination of the reservation conditions and directives established by Proclamation 9558 is not compatible with the proper care and management of the objects designated as part of the Monument by the 2016 Designating Proclamation.

218. Neither section 320301(b) nor any other section of the Antiquities Act authorizes the President to "modify" the reservation of land or reduce the parcels of land reserved as part of Bears Ears National Monument in a manner that precludes the proper care and management of the objects protected by the 2016 Designating Proclamation. Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

219. The Antiquities Act does not authorize the 2017 Revocation Proclamation's actions to exclude vast areas of land from the Monument's reservation or to eliminate beneficial conditions of that reservation.

220. Even if Presidents enjoy some narrow authority under the Antiquities Act to remove protections for national monuments, the 2017 Revocation Proclamation exceeds that authority. The text of the Proclamation and the context surrounding it leave no doubt that the

2017 Revocation Proclamation was implemented to advance unrelated policy goals wholly untethered to any valid statutory criteria under the Antiquities Act. The extraordinary breadth of the executive action shrinking Bears Ears National Monument marks an unusual and irregular exercise of presidential power. The 2017 Revocation Proclamation therefore is not a lawful exercise of statutory authority under the Antiquities Act, even assuming the Act can be read to vest in the President some modicum of authority to modify protections.

221. Defendants' first attempt to alter the reservation of Bears Ears National Monument is unlawful.

**COUNT III – VIOLATION OF THE SEPARATION OF POWERS**
**U.S. Const. art. IV, § 3, cl. 2**
**The 2017 Revocation Proclamation is Unconstitutional**
**[All Plaintiffs against All Defendants]**

222. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 221.

223. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against unconstitutional actions by Defendants. *See, e.g.*, *Armstrong*, 575 U.S. at 327; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

224. The Constitution vests the power to dispose of and regulate the property of the United States solely in Congress. Specifically, the Property Clause provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2.

225. The Antiquities Act only empowers the President to declare national monuments and does not delegate authority to the President to revoke, abolish, diminish, or replace them. 54 U.S.C. § 320301.

226. Defendants, through the 2017 Revocation Proclamation, purport to dispose of and regulate federal property, namely, the landmarks, structures, and objects of historic or scientific interest that comprise Bears Ears National Monument and the land reserved for that Monument, without a delegation of such power from Congress.

227. Defendants, through the 2017 Revocation Proclamation, have unlawfully arrogated to themselves Congress' exclusive power to dispose of and regulate the property of the United States.

**COUNT IV – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 551 *et seq.***
**Defendants' Implementation of the 2017 Revocation Proclamation is Arbitrary and Capricious and Contrary to Law**
**[All Plaintiffs against Agency Defendants]**

228. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 227.

229. Plaintiffs have a cause of action under the APA to challenge final agency action or a failure to act. 5 U.S.C. § 704. The APA waives the federal government's sovereign immunity. *Id.* § 702.

230. The APA directs courts to "hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

231. Because President Trump had no legal authority to revoke or reduce Bears Ears National Monument, the Agency Defendants' actions implementing the 2017 Dismantling Proclamation are arbitrary and capricious and not in accordance with law.

232. Final agency action exists here because Agency Defendants made a final decision to adhere to the 2017 Revocation Proclamation for mining claims located after the

2017 Revocation Proclamation and before the 2021 Restoration Proclamation, specifically during the period spanning February 2, 2018 to October 8, 2021.

**COUNT V – *ULTRA VIRES* EXECUTIVE ACTION AND VIOLATION OF THE ANTIQUITIES ACT**
**54 U.S.C. § 320301(a)**
**The 2026 Revocation Proclamation is *ultra vires***
**[All Plaintiffs against All Defendants]**

233. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 232.

234. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against ultra vires actions by Defendants. *See, e.g.*, *American Forest Res. Council*, 77 F.4th at 796; *Armstrong*, 575 U.S. at 326–27; *Dames & Moore*, 453 U.S. at 668–88.

235. Section 320301(a) of Title 54 of the United States Code provides that the "President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."

236. The 2026 Revocation Proclamation revokes the Monument status of numerous historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest designated by the 2016 Designation and 2021 Restoration Proclamations.

237. Upon information and belief, Defendants are complying with the directives of the 2026 Revocation Proclamation and not implementing, and have not implemented, those of the 2016 Designation and 2021 Restoration Proclamations.

238. Neither § 320301(a) nor any other section of the Antiquities Act authorizes the President to revoke the Monument status of, or the protections for, objects designated under the 2016 Designation and 2021 Restoration Proclamations, as determined under the discretion of the

establishing President. Congress has not delegated to the President the power to revoke the designation of "historic landmarks, historic and prehistoric structures, and other objects of scientific or historic interest" once they have been lawfully proclaimed national monuments. Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

239. The Antiquities Act does not authorize the 2026 Revocation Proclamation's action to revoke the designation of landmarks, structures, and objects comprising Bears Ears National Monument.

240. Even if Presidents enjoy some narrow authority under the Antiquities Act to remove protections for national monuments, the 2026 Revocation Proclamation exceeds that authority. The text of the Proclamation and the context surrounding it leave no doubt that the 2026 Revocation Proclamation was implemented to advance unrelated policy goals wholly untethered to any valid statutory criteria under the Antiquities Act. *See, e.g.*, 91 Fed. Reg. at 45,171–73 (promoting mining of "critical minerals" and other resource-extractive interests). The extraordinary breadth of the executive action shrinking Bears Ears National Monument marks an unusual and irregular exercise of presidential power. The 2026 Revocation Proclamation therefore is not a lawful exercise of statutory authority under the Antiquities Act, even assuming the Act can be read to vest in the President some modicum of authority to remove protections.

241. Defendants' attempt to revoke the designation of landmarks, structures, and objects comprising Bears Ears National Monument is an *ultra vires* action: The 2026 Revocation Proclamation exceeds the limited authority to declare national monuments Congress provided to the Executive under the Antiquities Act.

**COUNT VI – *ULTRA VIRES* EXECUTIVE ACTION AND VIOLATION OF THE ANTIQUITIES ACT 54 U.S.C. § 320301(b) The 2026 Revocation Proclamation is *ultra vires* [All Plaintiffs against All Defendants]**

242. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 241.

243. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against unlawful actions by Defendants. *See, e.g.*, *American Forest Res. Council*, 77 F.4th at 796; *Armstrong*, 575 U.S. at 326–27; *Dames & Moore*, 453 U.S. at 668–88.

244. Section 320301(b) of Title 54 of the United States Code provides that the "President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."

245. The 2026 Revocation Proclamation purports to "modify" the reservation of parcels of land that were made a part of Bears Ears National Monument. This action excludes from the Monument's reservation a land area of approximately 1.2 million acres, which is approximately 90 percent of the Monument area.

246. By excluding vast land areas from the reservation made pursuant to the 2016 Designating Proclamation, the 2026 Revocation Proclamation excludes from the Monument reservation the landmarks, structures, and objects on those land areas that had been lawfully designated under the 2016 Designation and 2021 Restoration Proclamations.

247. As a result, the 2026 Revocation Proclamation purports to remove these objects from the protection against entry, location, patent, selection, sale, or other disposition, among other protections established by the 2016 Designation and 2021 Restoration Proclamations. The

2026 Revocation Proclamation directs Defendants other than President Trump not to provide such protection to approximately 1.2 million acres of land. Upon information and belief, Defendants are implementing the directives of the 2026 Revocation Proclamation and are not implementing, and have not implemented, those of the 2016 Designation and 2021 Restoration Proclamations.

248. The two "units" comprising the reservation under the 2026 Revocation Proclamation are not sufficient for, and thus not compatible with, the proper care and management of the objects designated as part of the Monument by the 2016 Designation and 2021 Restoration Proclamations.

249. The Revocation Proclamation also purports to eliminate beneficial conditions and directives of the reservation established by the 2016 Designation and 2021 Restoration Proclamations even for the two new "units." The 2026 Revocation Proclamation terminates and disbands the Bears Ears Commission, allows motorized and non-mechanized vehicle use on roads and trails designated for such use prior to the 2016 Designation and 2021 Restoration Proclamations, allows maintenance of roads and trails for such use, and allows active vegetation management activities.

250. The elimination of the reservation conditions and directives established by the 2016 Designation and 2021 Restoration Proclamations is not compatible with the proper care and management of the objects designated as part of the Monument by those proclamations.

251. Neither section 320301(b) nor any other section of the Antiquities Act authorizes the President to "modify" the reservation of land or reduce the parcels of land reserved as part of Bears Ears National Monument in a manner that precludes the proper care and management of

the objects protected by the 2016 Designation and 2021 Restoration Proclamations. Such power remains reserved for Congress under Article IV, Section 3, Clause 2 of the U.S. Constitution.

252. Even if Presidents enjoy some narrow authority under the Antiquities Act to remove protections for national monuments, the 2026 Revocation Proclamation exceeds that authority. The text of the Proclamation and the context surrounding it leave no doubt that the 2026 Revocation Proclamation was implemented to advance unrelated policy goals wholly untethered to any valid statutory criteria under the Antiquities Act. *See, e.g.*, 91 Fed. Reg. at 45,171–73 (promoting mining of "critical minerals" and other resource-extractive interests). The extraordinary breadth of the executive action shrinking Bears Ears National Monument marks an unusual and irregular exercise of presidential power. The 2026 Revocation Proclamation therefore is not a lawful exercise of statutory authority under the Antiquities Act, even assuming the Act can be read to vest in the President some modicum of authority to remove protections.

253. The Antiquities Act does not authorize the 2026 Revocation Proclamation's actions to exclude vast areas of land from the Monument's reservation or to eliminate beneficial conditions of that reservation.

254. Defendants' second attempt to revoke and alter the reservation of Bears Ears National Monument is unlawful.

## COUNT VII – VIOLATION OF THE SEPARATION OF POWERS
## U.S. Const. art. IV, § 3, cl. 2
## The 2026 Revocation Proclamation is Unconstitutional
## [All Plaintiffs against All Defendants]

255. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 254.

256. Plaintiffs have a non-statutory right of action to injunctive and declaratory relief against unconstitutional actions by Defendants. *See, e.g.*, *Armstrong*, 575 U.S. at 327; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Franklin*, 505 U.S. at 801.

257. The Constitution vests the power to dispose of and regulate the property of the United States solely in Congress. Specifically, the Property Clause provides that "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2.

258. The Antiquities Act only empowers the President to declare national monuments and does not delegate authority to the President to revoke, abolish, diminish, or replace them. 54 U.S.C. § 320301.

259. Defendants, through the 2026 Revocation Proclamation, purport to dispose of and regulate federal property, namely, the landmarks, structures, and objects of historic or scientific interest that comprise Bears Ears National Monument and the land reserved for that Monument, without a delegation of such power from Congress.

260. Defendants, through the 2026 Revocation Proclamation, have arrogated to themselves Congress' exclusive power to dispose of and regulate the property of the United States.

**COUNT VIII – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 551 *et seq.***
**Defendants' Implementation of the 2026 Revocation Proclamation is Arbitrary and Capricious and Contrary to Law**
**[All Plaintiffs against Agency Defendants]**

261. Plaintiffs reallege and incorporate by reference the allegations in Paragraphs 1 through 260.

262. Plaintiffs have a cause of action under the APA to challenge final agency action or a failure to act. 5 U.S.C. § 704. The APA waives the federal government's sovereign immunity. *Id.* § 702.

263. The APA directs courts to "hold unlawful and set aside agency action" that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

264. Because President Trump had no legal authority to revoke or reduce Bears Ears National Monument, the Agency Defendants' actions implementing the 2026 Revocation Proclamation are arbitrary and capricious and not in accordance with law.

265. Final agency action exists here because Agency Defendants have made a final decision to implement the 2026 Revocation Proclamation and thereby violate the 2021 Restoration Proclamation. Upon information and belief, Agency Defendants are violating and will violate the terms of the 2021 Restoration Proclamation by managing the lands removed from Bears Ears National Monument as available for mineral exploration and development; by removing public markers delineating the boundaries set by the 2021 Revocation Proclamation, thereby inviting development and mining claims on lands excluded from the Monument in the 2026 Revocation Proclamation; by recording new mining claims located in the excluded lands (which are prohibited by the 2021 Revocation Proclamation); by allowing development on existing mining claims to move forward without restrictions required for claims on national monument lands; and by developing and implementing a monument management plan incorporating the 2026 Revocation Proclamation's diminution of the Monument's boundaries.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that this Court:

(a) DECLARE

i. that the Revocation Proclamations are unlawful and *ultra vires* actions;

ii. that, pursuant to the Antiquities Act, the President may not unilaterally revoke the designation of landmarks, structures, or objects, and may not substantially alter the reservation of land, which together comprise a lawfully created national monument;

iii. that the President's power under the Antiquities Act is limited to:

a. declaring historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the federal government to be national monuments, and

b. reserving, as part of a national monument, the smallest parcels of land compatible with the proper care and management of the objects to be protected;

iv. that the 2021 Restoration Proclamation is controlling with respect to the objects comprising, the parcels of land reserved as, and the management of Bears Ears National Monument;

v. that all Defendants other than President Donald J. Trump:

(1) have duties to manage Bears Ears National Monument to the fullest extent described in, in the manner provided for by, and in a manner that protects the values of the 2021 Restoration Proclamation;

(2) must withdraw lands within Bears Ears National Monument, as described in the 2021 Restoration Proclamation, from all forms of entry,

location, selection, sale, or other disposition under the public land laws or laws applicable to the USFS, from location, entry, and patent under the mining laws, and from disposition under all laws relating to mineral and geothermal leasing; and

(3) must not exchange any lands within Bears Ears National Monument, as described in the 2021 Restoration Proclamation, other than by exchange that furthers the protective purposes of the Monument;

(b) ENJOIN Agency Defendants from implementing the 2017 and 2026 Revocation Proclamations (including any management plans or subsidiary plans premised on the Revocation Proclamations) and directing them to carry out the duties imposed on them in the 2021 Restoration Proclamation;

(c) DECLARE that any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2017 and 2026 Revocation Proclamations are void ab initio;

(d) ORDER Defendants other than President Donald J. Trump to expeditiously comply with all mandates of the 2021 Restoration Proclamation;

(e) ENJOIN Defendants other than President Donald J. Trump from further actions or inaction inconsistent with the 2021 Restoration Proclamation;

(f) AWARD qualifying Plaintiffs fees and costs as appropriate under 28 U.S.C. § 2412 or other applicable authority; and

(g) GRANT Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: September 2, 2026

Respectfully submitted,

*/s/ James T. Banks*
Adam M. Kushner (D.C. Bar No. 426344)
James T. Banks (D.C. Bar No. 261156)
Michael J. West (D.C. Bar No. 1616572)
Marlan Golden (D.C. Bar. No. 1673073)
Brian Malat (D.C. Bar No. 1736216)
Katherine T. McKay (D.C. Bar No. 90012334)
Keenan H. Roarty (D.C. Bar No. 90009018)
Rebecca Wilton (D.C. Bar No. 90025084)
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: 202-637-5600
Fax: 202-637-5910
adam.kushner@hlc.com
james.banks@hlc.com

*Attorneys for Utah Diné Bikéyah, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, The National Trust for Historic Preservation, The Society of Vertebrate Paleontology, and A'Nuche, Inc.*